# IN THE
## UNITED STATES COURT of APPEALS
## EIGHTH CIRCUIT

No. 10-3462

WESLEY IRA PURKEY,
Appellant,

v.

UNITED STATES OF AMERICA,
Appellee.

---

## MOVANT'S APPLICATION FOR CERTIFICATE OF APPEALABILITY

---

Teresa L. Norris, Esq.
P.O. Box 11744
Columbia, SC 29211
(803) 765-1044  (Phone)
(803) 765-1143  (Fax)
teresa@blumelaw.com
Co-counsel to Appellant

Gary E. Brotherton, Esq.
601 W. Nifong Blvd., Ste. 1C
Columbia, Missouri  65203
(573) 875-1571  Phone
(573) 875-1572  Fax
GEBrotherton@LegalWritesLLC.com
Co-counsel to Appellant

# TABLE OF CONTENTS

APPLICATION FOR CERTIFICATE OF APPEALABILITY.............................1

I.     Factual and Procedural Background.............................................2

II.    Legal Standard for Issuance of a COA.......................................5

III.   Claims on Which a COA Should Issue

       A.     Jurists of Reason Could Debate Whether Counsel rendered
              Ineffective Assistance in Their Investigation and
              Presentation of Mitigating Evidence ...........................................8-103

              1.     Counsel failed to obtain the services of a mitigation
                     specialist or to otherwise adequately investigate,
                     prepare, and present mitigation evidence ...............................8

                     (a)     Failure to retain a mitigation specialist.........................13

                     (b)     Failure to adequately investigate................................25

                     (c)     Failure to Adequately Prepare and Present the
                             Testimony of Stephen Peterson, M.D..........................68

                     (d)     Failure to adequately prepare and present the
                             expert testimony of Mark Cunningham, Ph.D...............71

                     (e)     Failure to adequately prepare and present the
                             expert testimony of Bruce Leeson, Ph.D. ....................74

                     (f)     Failure to adequately investigate and prepare
                             witnesses, which resulted in counsel calling
                             alleged "mitigation" witnesses that were
                             prejudicial. ...............................................................76

                     (g)     The District Court's ruling.........................................77

2. An evidentiary hearing should have been conducted regarding Purkey's claims of ineffective assistance of counsel..................................................................................79

3. This District Court's findings are insufficient to allow meaningful appellate review ...............................................102

B. Jurists of Reason Could Debate Whether the Duchardt's 117-page Affidavit Should have been Stricken since ...............104-126

1. No COA is necessary on this procedural issue .....................104

2. Duchardt's Affidavit Exceeded the Scope of the Attorney-Client Waiver Resulting from Purkey's Claims of Ineffectiveness....................................................105

3. Duchardt's Affidavit Did Not Simply Make Factual Statements but Rather Included Legal Argument and Opinion in Violation of Rule 56(e) ......................................115

4. Duchardt's Affidavit Asserted Facts that He Only Investigated After the Filing of Purkey's 2255 Motion ........122

C. Jurists of Reason Could Debate Whether Counsel Rendered Ineffective Assistance in Not Calling Dr. Peterson to Rebut the Government's Charge that Purkey had Recently Fabricated his Recantation of the Kidnaping "[r]ight before this trial" rather than having done so more than a year before trial ........................................................................ 127

CONCLUSION ...........................................................................134

CERTIFICATE OF SERVICE..................................................134

ADDENDUM

*Nelson v. United States*, 297 Fed. Appx. 563 (8th Cir. Oct. 27, 2008) (unpublished opinion)

# APPLICATION FOR CERTIFICATE OF APPEALABILITY

COMES NOW movant, Wesley I. Purkey, by counsel, and moves this Court, pursuant to 28 U.S.C. § 2253 and Fed. R. App. P. 22(b)(1) & (2), to grant a Certificate of Appealability ("COA") with respect to Claims A through C described below to permit Purkey to appeal the district court's Memorandum and Order in which it denied those specific claims contained in Purkey's Motion to Vacate, Set Aside or Correct Convictions and Sentences Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure, without conducting an evidentiary hearing. The district court denied a COA application on October 28, 2010. The application filed in the district court presumed the district judge's familiarity with the record, pleadings and case proceedings, and was accordingly written with brevity given that familiarity and for purposes of judicial economy. The present application is in no way intended to burden this Court, but rather to provide the Court with a consolidated pleading which incorporates the relevant facts and excerpts from the record that are pertinent to each claim on which Purkey seeks a COA and to direct the Court's attention to key issues and facts with which the district court was already familiar and therefore were not pled in the application below. In support of this application, Purkey states as follows:

1

## I. Factual and Procedural Background

Purkey was indicted in the United States District Court, Western District of Missouri, for kidnaping, rape, and murder, under 18 U.S.C. §§ 1201(a), (g), and 3559(d). *See United States v. Purkey*, No. 4:01-cr-00308. The Government alleged that he had kidnaped Jennifer Long, a sixteen year-old girl, in Kansas City, Missouri, and transported her across state lines to Lansing, Kansas, where she was forcibly raped and killed. After making a *quid pro quo* agreement with the FBI, Purkey made an incriminating statement. Purkey pled not guilty to the crimes.

Purkey testified in a pretrial hearing in support of his motion to suppress his statements and related motions. (Doc.[1] 140 – October 25, 2002 Hearing) at 4-90). He also testified at trial denying that he had kidnaped Long, but admitting that he had raped and killed her. (Tr. at 907-1043). His trial and sentencing were conducted by jury. The jury found him guilty on November 5, 2003, and, after hearing evidence regarding punishment, it voted to sentence Purkey to death two weeks later. (Doc. 487). Purkey addressed the Court[2] before he was formally sentenced to death on January 23, 2004. (Doc. 535 – January 23, 2004 Hearing).

Purkey timely appealed his convictions and his sentences, asserting twenty-nine errors, including the District Court's failure to require the jury to make

---

[1] "Doc." refers to documents filed in the underlying criminal case – *United States v. Purkey*, MOW No. No. 4:01-cr-00308.
[2] The Honorable Fernando J. Gaitan, Jr., Chief Judge of the Western District of Missouri.

findings regarding the mitigating factors. This Court affirmed Purkey's convictions and sentences on November 7, 2005. *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005). Rehearing and rehearing *en banc* were denied on January 13, 2006, after which Purkey timely filed his petition for writ of *certiorari* in the United States Supreme Court posing, *inter alia*, the following question:

> Whether the Eighth Circuit erred in sustaining the jury instructions regarding the jury's penalty phase consideration of mitigating and aggravating factors, instructions in which the interpretation of the law is in conflict with holdings of this Court as well as instructions used in the vast majority of Federal capital cases to date?

Certiorari was denied on October 16, 2006. *Purkey v. United States*, 549 U.S. 975 (2006).

With undersigned counsel, Purkey timely filed his motion to vacate, set aside or correct his convictions and sentences in the District Court on October 16, 2007. (2255 Doc.[3] 47). That motion alleged various claims regarding trial counsel's deficient performance

- in investigating and presenting mitigation evidence,
- in failing to object to prosecutorial misconduct,
- in failing to rebut the Government's case,
- in failing to prepare witnesses to testify,
- in failing to fulfill his promise to the jurors that they would hear evidence that there was no kidnaping,

---

[3] "2255 Doc." refers to documents filed in this 2255 action – i.e., *Purkey v. United States*, No. 06-8001-CV-W-FJG.

*Id.* Before filing its suggestions in opposition, the Government sought and obtained an Order compelling Frederick A. Duchardt, Jr., Purkey's trial and appeal attorney, to provide an affidavit in response to the claims of ineffectiveness. *Id.*, (2255 Doc. 60). Duchardt complied by providing a 117-page statement that not only addressed factual allegations but also briefed and argued the legal viability of Purkey's 2255 claims. (2255 Doc. 73, Attachment A). Purkey moved to strike Duchardt's 117-page statement as exceeding the scope of waiver and as improperly arguing the law. 2255 DOC. 83. The District Court denied that request (2255 Doc. 89) and relied heavily on Duchardt's statement, while ignoring the thirty-one affidavits that Purkey filed, in denying Purkey's 2255 motion without an evidentiary hearing. (*Cf.* 2255 Docs. 73 and 89).

## II.    <u>Legal Standard for Issuance of a COA</u>

The Anti-terrorism and Effective Death Penalty Act ("AEDPA") requires, as a precondition to appellate review of the denial of a motion brought pursuant to 28 U.S.C. § 2255, that a certificate of appealability issue upon a showing that the applicant has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  The Supreme Court of the United States has determined definitively what standards must be met by a litigant who seeks a COA. *See, Miller-El v. Cockrell*, 537 U.S. 322 (2003); *Slack v. McDaniel*, 529 U.S. 473 (2000).  In essence, the Court has adopted to AEDPA the standards that applied to the issuance of the former certificate of probable cause required in pre-AEDPA *habeas* litigation, as that standard was enunciated in *Barefoot v. Estelle*, 463 U.S. 880 (1983).[4]  In *Miller-El*, the Court summarized its view as follows:

> Consistent with our prior precedent and the text of the habeas corpus statute, we reiterate that a prisoner seeking a COA need only demonstrate "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c).  A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further.

*Miller-El*, 537 U.S. at 327.  The Court explained further:

---

[4] Prior to AEDPA, there was no requirement that a certificate of probable cause issue as a precondition to appellate review of a challenge to a *federal* conviction. The former requirement of a certificate of probable cause applied only to state prisoners acting pursuant to 28 U.S.C. § 2254.

The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits. We look to the District court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable among jurists of reason. This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statue forbids it.

*Miller-El*, 537 U.S. at 336. In *Slack*, the Court stated:

Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The Petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack*, 529 U.S. at 484. As developed further in *Miller El*, the insurance of a COA,

does not require a showing that the appeal will succeed. Accordingly, a court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in *Slack* would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner "has already failed in that endeavor." *Barefoot, supra*, [463 U.S.] at 893, n.4.

*Miller El*, 537 U.S. at 337. Indeed, *Miller-El* made clear that a petitioner need not prove,

*before the issuance of a COA*, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.

*Id.* at 337-38 (emphasis added). Also in accord with this approach are *Tennard v. Dretke*, 542 U.S. 274 (2004) and *Banks v. Dretke*, 540 U.S. 668 (2004); *see also, Carson v. Director*, 150 F.3d 973, 975 (8th Cir. 1998) ("[Petitioner] had made a 'substantial showing that reasonable courts might differ' as to whether the jury instructions violated his due process rights," and, therefore, a COA properly issued).

That this 2255 arises in the context of a capital case is an additional reason that favors granting the COA. In *Barefoot v. Estelle*, the Court noted that "in a capital case, the nature of the penalty is a proper consideration" in determining whether to issue a COA. *Barefoot*, 463 U.S. at 893. *See also, e.g., Graves v. Cockrell*, 351 F.3d 143, 150 (5th Cir. 2003) ("Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination"; *Valerio v. Crawford*, 306 F.3d 742, 767 (9th Cir. 2002) ("Because this is a capital case, we resolve in Valerio's favor any doubt about whether he has met the standard for a COA"); *Jermyn v. Horn*, 266 F.3d 257, 279 n. 7 (3rd Cir. 2001) ("'In a capital case, the nature of the penalty is a proper consideration in determining whether to issue a [COA]'"); *Clark v. Johnson*, 202 F.3d 760, 763 (5th Cir. 2000) ("[I]n capital cases, doubts as to whether a COA should issue must be resolved in favor of the petitioner").

**III.** <u>Claims on Which a COA Should Issue</u>.

    **A.** **Jurists of Reason Could Debate Whether Counsel rendered Ineffective Assistance in Their Investigation and Presentation of Mitigating Evidence.**

        **1.** **Counsel failed to obtain the services of a mitigation specialist or to otherwise adequately investigate, prepare, and present mitigation evidence.**

This ground was asserted as Grounds V through X in the 2255 Motion. Doc. 47 at 10-33. The facts and legal bases for relief were argued in detail in the Suggestions and Memorandum of Law In Support of the 2255 Motion and the Reply. (Doc. 52 at 11-36; Doc. 82 at 2-53). This ground asserts that, while trial counsel did present some mitigating evidence, counsel failed to adequately investigate and present significant mitigation evidence to the jury and to the defense experts for incorporation into their testimony. Purkey submitted numerous affidavits in support of his arguments, a number of which contradicted the asserted "factual" statements by trial counsel concerning his investigation.

In essence, counsel was ineffective in failing to adequately investigate, prepare, and present substantial mitigating evidence. *See, Porter v. McCollum,* 130 S. Ct. 447 (2009); *Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Williams v. Taylor,* 529 U.S. 362 (2000). Counsel failed to retain the services of a mitigation specialist, conducted only minimal background

social history interviews himself, and, therefore, could not provide the complete and accurate information to the testifying experts for the defense or the jury.

Moreover, all of counsel's alleged "strategy" reasons offered even for the failure to interview witnesses, let alone present their testimony, lead to the same problem as in *Wiggins* and *Rompilla* where the issue was "not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*." *Wiggins*, 539 U.S. at 523 (emphasis in original). Just as in *Wiggins* and *Rompilla*, there could be no valid reason for failing to adequately investigate. Likewise, in the absence of information that would have been obtained in an adequate investigation, counsel could not make a valid tactical decision not to present evidence that counsel was not even aware of.

Purkey's trial counsel, however, urged the District Court to find his performance effective when he did not interview a number of the relevant mitigation witnesses (including Rex Newton, Ph.D., a neutral mental health expert employed by the State of Oregon, and Dion Leiker and Floyd Bose, former law enforcement officers in the State of Kansas), and inadequately interviewed Purkey's family members by attempting to elicit sensitive information in the presence of other people. Counsel also advanced numerous strategic reasons for not calling powerful mitigation witnesses when he had not even interviewed those

witnesses and could, therefore, have no idea what they would say.

As *Wiggins*, *Rompilla*, the ABA Guidelines For the Appointment and Performance of Counsel in Death Penalty Cases ("Guidelines"), and the other authorities cited in the 2255 Motion (Doc. 47), the Memorandum in Support (Doc. 52), and the Reply (Doc. 82), make clear, the Sixth Amendment demands more of trial defense counsel in a capital case. Counsel in this case was simply ineffective, and Purkey was prejudiced by counsel's failures because he was deprived of powerful mitigation evidence, including:

- corroboration and substantive information from Purkey's brother, Gary, and Purkey's friend, Peggy Martenay Noe, regarding Purkey's father's violence and his mother sexual abuse of Purkey and his brother;
- rebuttal evidence, countering the government's argument of recent fabrication, establishing Purkey's prior report of the sexual abuse to Dr. Newton in the Oregon Department of Corrections;
- rebuttal evidence from Dr. Newton countering the government's arguments that Purkey was racist and active in prison gangs; and
- significant positive character evidence, including very favorable testimony from two former law enforcement officers, Mr. Bose and Ms. Leiker.

Counsel also failed to adequately prepare defense witnesses for their testimony. This failure resulted in expert witnesses Bruce Leeson, Ph.D., Stephen Peterson, M.D., and Mark Cunningham, Ph.D., failing to provide any meaning or details to describe the generic label of "sexual abuse" endured by Purkey and in the experts losing credibility during cross-examination due to their unfamiliarity with portions of Purkey's background records and history. Important lay witnesses,

10

Gary Hamilton and Angie Genail, provided only superficial, generic testimony due to the failure to adequately prepare them for their testimony. Finally, due to the failure to adequately interview and prepare "mitigation" witnesses, William Grant, M.D. and Mark Russell, counsel presented testimony that was more aggravating than mitigating.

In assessing whether counsels' conduct was reasonable, the Supreme Court held in *Strickland*:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-91; *see also Williams*, 529 U.S. at 396 (counsel's failure to discover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on the defendant's voluntary confessions because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background").

In *Wiggins*, the Court further examined the scope of the duty to investigate. The Court described the issue as "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*," 539 U.S. at 523 (emphasis in original), "under prevailing professional

norms," *id.* (quoting *Strickland*, 466 U.S. at 688). The ABA Guidelines serve as "guides" to what "reasonable" means, *Bobby v. Van Hook*, 130 S. Ct. 13,17 (2009), and are "well-defined norms" for the conduct of counsel appointed in capital cases, *Wiggins*, 539 U.S. at 510.

As the Court observed in *Wiggins*, "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 510 (quoting 1989 Guideline 11.4.I(C) (emphasis added)).

Counsel's conduct in *Wiggins* fell short of the professional standards because no "social history report" was prepared even though counsel had funds available to retain a "forensic social worker." 539 U.S. at 524. Counsel also "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* "The scope of their investigation was also unreasonable in light of what counsel actually discovered" in the records available to them. *Id.* at 525 (citation omitted).

> In assessing the reasonableness of an attorney's investigation, . . . , a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the

investigation said to support the strategy.

*Id.* at 527. In *Wiggins,* "counsel were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable." *Id.* at 536. Counsel's conduct was deficient in this case in precisely the same fashion as in *Wiggins.*

### (a)    Failure to retain a mitigation specialist.

As early as January 2002, almost two years prior to trial, Purkey's lead counsel submitted a proposed budget to the District Court, which included an estimate of costs for a "mitigation specialist." As counsel observed in that filing, "Use of mitigation specialists is a common practice in death penalty cases, and mitigation specialist services have been approved in all of the death penalty cases which have been tried to date in the Western District of Missouri." (Doc. 47, Exhibit 6 – Proposed Budget). Counsel's observation of the "routine" nature of appointment of mitigation specialists in capital cases was consistent with the revision of the ABA Guidelines in February 2003, which include specifically that a properly constituted capital defense team should consist of "no fewer than two attorneys," "an investigator," and "a mitigation specialist." 2003 Guideline 4.1(A)(1). *See also* 2003 Guideline 10.4(C)(2).

Nonetheless, despite lead counsel's recognition that a mitigation specialist is routinely recognized as an integral part of a capital defense team, lead counsel did

not actually seek the funding for or retain a mitigation specialist. Counsel's course did not change when co-counsel urged him to do so early in the case, when the ABA Guidelines were revised to specifically include these provisions in February 2003, or even in June 2003 when *Wiggins* was decided and co-counsel encouraged him again to obtain the services of a mitigation specialist for the trial then scheduled and conducted beginning with jury selection on October 28, 2003. (Doc. 47, Exhibit 1 – Declaration of Laura O'Sullivan).

Instead, on April 11, 2002, counsel submitted a funding request for Mark Cunningham, Ph.D. as "a mitigation/sentencing specialist," which counsel defined in the request as "a person who . . . is able to explain, in detail, what means are available within the Bureau of Prisons to effect the safe and secure exaction of the punishment of life imprisonment" and a person able to determine whether the defendant "is likely to pose a danger while incarcerated, and what steps can be taken through the correctional systems available to address any such risk of danger." (Doc. 47, Exhibit 7 – Ex Parte Request #3, Cunningham).

Contrary to the definition of a "mitigation/sentencing specialist" that lead counsel provided to the court in seeking funding for Dr. Cunningham, "mitigation specialists," as that term is generally accepted, are not experts dealing solely in the area of future dangerousness and adaptability to confinement. It was generally accepted in the capital defense community, in general, and in the federal capital

defense bar, in particular, even before 1998 that mitigation specialists typically have "graduate degrees, such as a Ph.D. or masters degree in social work." Judicial Conference of the U.S., Subcomm. On Federal Death Penalty Cases, Comm. On Defender Services, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* at 24 (1998).

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. . . .

> The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

2003 Guideline 4.1 Commentary. Utilizing a mitigation specialist and utilizing a team approach "combines the different skills, experience, and perspectives of several disciplines" and allows counsel "to delegate many time-consuming tasks to skilled assistants and focus on the legal issues in the case." 2003 Guideline 10.4 Commentary. Use of a mitigation specialist independent of testifying experts also

allows that person to serve "as part of the defense team covered by the attorney-client privilege and work product doctrine." *Id.*

Despite the specialized training and skills of mitigation specialists and the wide recognition of the need for these services in a capital defense team, lead counsel chose not to retain a mitigation specialist. As counsel later informed the court in supplemental requests for funding for Michael Armstrong, an investigator, and for mental health experts, counsel chose to "dispense[] with" the requested mitigation specialist in order to obtain "budgetary savings." (Doc. 47, Exhibit 12 – Supplemental Expert Request for Investigator). *See also* (Doc. 47, Exhibit 13 – Supplemental Expert Request for Psychiatrist; Doc. 47, Exhibit 14 – Supplemental Expert Request for Dr. Cunningham).[5]

---

[5]"Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 131 S.Ct. 770 (2011). Nonetheless, it is doubtful that foregoing retainer of a mitigation specialist and increasing the workload of counsel and the mental health experts was *actually* cost-effective because the hourly rates for mitigation specialists are generally much cheaper than attorney rates and mental health expert rates.

> Because the hourly rates approved for mitigation specialists are substantially lower than those authorized for attorneys, the appointment of a mitigation specialist or penalty phase investigator generally produces a substantial reduction in the overall costs of representation.

Judicial Conference of the U.S., Subcomm. On Federal Death Penalty Cases, Comm. On Defender Services, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* at 10 (1998).

Before the District Court, trial counsel flatly proclaimed that, due to his own training and experience, a mitigation specialist or mitigation investigator was unnecessary in this case (and, apparently, in other cases tried by counsel).[6] Specifically, he proclaimed:

- "[T]he experienced capital case litigator, by training and experience, can and should be expected to develop case themes himself/herself." (Doc. 73, Attachment 1 at 44).[7] Counsel states he did so in this case, relying on his prior experience in "mental illness defenses" and his "undergraduate and graduate school backgrounds [] in medical biology and psychology," (Doc. 73, Attachment 1 at 45), and using the "thorough reports" of Dr. Peterson and Dr. Cunningham as "roadmaps." (Doc. 73, Attachment 1 at 46).[8]
- He pursued "avenues of documentary and witness investigation" by "shoulder[ing] those duties" himself. (Doc. 73, Attachment 1 at 46). He used Mr. Armstrong's "skill set" to locate and interview witnesses, but then interviewed mitigation witnesses and developed "the rapport" with Mr. Purkey's "family and [] other witnesses [] presented" himself. (Doc. 73, Attachment 1 at 47).[9]

---

[6]*See Sinisterra v. United States*, 600 F.3d 900, 903-904 (8th Cir. 2010) (Noting that Purkey's trial counsel, Fred Duchardt, who also served as Sinisterra's counsel "hired . . . a private investigator, to serve as both the fact investigator and the mitigation specialist" while his co-counsel, Jennifer Herndon, "disagreed with the decision to forego hiring a mitigation specialist"). *See also* Declarations of Jennifer Herndon, filed in *Sinisterra v. United States*, Case No. 04-cv-8003-GAF (W.D. Mo.). (Doc. 82, Exhibits 1 & 2).

[7] Mr. Purkey separately challenges the district court's failure to strike Document 73, Attachment 1 – Statement of Duchardt).

[8]Dr. Peterson's reports were attached as Exhibits 22-23 to Doc. 47. Dr. Cunningham's letter summarizing his testimony is attached to as Exhibit 3 to Doc. 82.

[9]While counsel cited Mr. Armstrong as assisting generally "with duties often assigned to a person commonly referred to as a 'mitigation specialist," his prior training and experience was as a Public Defender investigator and he only "found and interviewed" witnesses counsel "asked [him] to find." (2255 Doc. 73, Attachment 1 at 8-9). Because counsel shouldered the mitigation duty himself,

17

- The failure to obtain a mitigation specialist had nothing to do with costs, but was simply counsel's view that all of the duties that would have been performed by such an expert were handled in "a better fashion" by shouldering the duty himself. (Doc. 73, Attachment 1 at 48-51).

In general, it should again be noted that counsel's view of mitigation specialists is directly contrary to the ABA Guidelines,[10] which are the "well-defined norms" for the conduct of counsel appointed in capital cases, *Wiggins*, 539 U.S. at 524. The Guidelines "can be seen as simply the very specific implementation of the ethical rules" or as an "example of how some of the more general but, notwithstanding their generality, no less important rules of professional conduct should be evaluated in particular contexts." Lawrence J. Fox, Capital Guidelines and Ethical Duties: Mutually Reinforcing Responsibilities, 36 Hofstra L. Rev. 775, 776 (2008).

Missouri Code of Professional Responsibility Rule 4-1.1 requires that a lawyer "provide competent representation" alone or by associating with "a lawyer of established competence in the field in question." Rule 4-1.1 Commentary. The Guidelines specifically require a "mitigation specialist" as part of the capital defense team, regardless of the experience of counsel. Guideline 10.4. This rule is

---

however, specifically as related to the issues asserted in the 2255 Motion, whatever "skill set" Mr. Armstrong had for mitigation investigations is irrelevant as will be addressed below.

[10]Guideline 4.1(A)(1). *See also* Guideline 10.4(C)(2).

"simply extrapolating" from the ethics rule commentary, which allows consultation because this is "the standard of care for lawyers" in matters that require consultation "with experts" in other areas, such as in medical malpractice cases or product failure cases where consulting with non-lawyer experts is the "standard of care." Fox at 778. Like those types of cases, capital litigation is a unique and complex field where "multidisciplinary defense teams that include mitigation specialists have become part of the existing 'standard of care' in capital cases." *Id.* at 803.

Moreover, as is addressed more completely in the Declaration of Sean D. O'Brien,[11] (Doc. 82, Exhibit 4, para. 18), "[t]he use of a mitigation specialist has been standard practice in the defense of capital cases for decades." This is precisely because they serve a function that is distinguishable from counsel, the investigator, and other mental health experts, who are "additional" required team members rather than possible "substitutes" for the mitigation specialist. Guideline 4.1(A)(1). *See also* Guideline 10.4(C)(2).

In short, a mitigation specialist cannot be replaced by having counsel and a guilt-or-innocence investigator investigating and interviewing background

---

[11]Mr. O'Brien is the former Chief Public Defender in Kansas City (1985-1989), the former Executive Director of the Missouri Capital Punishment Resource Center, currently called the Public Interest Litigation Clinic (1989-present), and an associate professor at the University of Missouri-Kansas City School of Law. (Doc. 82, Exhibit 4, paras. 1-9). He has testified as an expert in capital defense previously, (Doc. 82, Exhibit 4, para. 3-4), and was offered as an expert here.

witnesses alone followed by counsel and testifying mental health experts reviewing the records obtained. "Mitigation specialists are experts,"[12] and they are "indispensable" in the preparation of a capital sentencing case for the defense. Guideline 4.1 Commentary. *See also United States v. Kreutzer*, 61 M.J. 293, 302 (C.A.A.F. 2005). Specifically:

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse). . . .

Guideline 4.1 Commentary.

> They must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information. . . .

Supplementary Guidelines For the Mitigation Function of Defense Teams in Death Penalty Cases [hereinafter Supplementary Guideline] 5.1(C).[13]

> Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be

---

[12]Natman Schaye, *Mitigation in the Death Belt - Twelve Steps to Saving Clients' Lives*, The Champion, National Association of Criminal Defense Lawyers, 29-Jul-Champ 18, 19 (July 2005).

[13]The Supplementary Guidelines are published in the Hofstra Law Review. *See* Russell Stetler, Supplementary Guidelines For the Mitigation Function of Defense Teams in Death Penalty Cases, Introduction, 36 Hofstra L. Rev. 677 (2008).

necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. . . .

Supplementary Guideline 10.11(C) at 689. These multiple interviews must be conducted "over time" with the knowledge that clients and witnesses "often disclose traumatic material in small increments." Kathleen Wayland, The Importance of Recognizing Trauma Throughout Capital Mitigation Investigations and Presentations, 36 Hofstra L. Rev. 923, 960 (2008). They must be conducted by a skilled interviewer, who also has the ability to gather information while minimizing the retraumatization of the witness and the "knowledge of how to respond to witnesses who are flooded and overwhelmed during interviews." *Id.* at 960. "[S]pecial issues may arise with respect to interviewing men about psychological trauma." *Id.*

Adequate time is especially necessary to establish rapport with the client's family where the witnesses have suffered traumatic experiences themselves. As Mr. O'Brien explained it, the investigation "involves a time-consuming, painstaking process to overcome substantial barriers to disclosure of some of the most compelling types of mitigating evidence." (Doc. 82, Exhibit 4, para.14). Gathering information about some events from a family member can be difficult due "to the nature of traumatic memory" and "the longstanding effects of the trauma itself." Wayland, at 796. In other words, particular care and skill is necessary in interviewing client's family members about "subjects that are highly

21

sensitive, may be cognitively or emotionally difficult to recall, and the telling or retelling of which may be accompanied by overwhelming effect." *Id.* at 959. The problem is "intensified greatly when the task at hand is to interview witnesses about their own and others' painful or deeply buried histories of exposure to traumatic events," such as having been the victim of "similar traumatic events" the client suffered. *Id.* Thus, experienced capital counsel and mitigation specialists recognize, as a matter of routine, that "[v]ictims, witnesses and perpetrators of physical violence or sexual abuse often initially deny or minimize such behavior." (Doc. 82, Exhibit 4, para. 14).

Attorneys and criminal investigators, who lack training in social sciences, are "unlikely to have these skills" and the ability to assess "'why' it happened, which is the primary piece of the mitigation defense." The Honorable Helen G. Berrigan, The Indispensable Role of the Mitigation Specialist in a Capital Case: A View From the Federal Bench, 36 Hofstra L. Rev. 819, 828 (2008).

> [A] criminal defense lawyer is unlikely to have the necessary skills to amass the mitigation evidence. Lawyers are adept at legal analysis, fitting facts to legal principles, dissecting prior jurisprudence–all essential to an effective defense but often involving abstract concepts far afield from social sciences. Lawyers are not trained in the communication (particularly listening) skills needed, nor perhaps do they have the time or patience, to delve deeply into the life history of their client. They are not knowledgeable about uncovering family abuse or assessing for mental illness, nor recognizing nuanced factors that could be invaluable mitigation evidence. Lawyers are advocates, not investigators and certainly not social workers. On the contrary, lawyers are often perceived by clients and family members as

intimidating, and if court-appointed, may not even be trusted.

*Id.*

"Even those rare defense counsel with the ability to perform a competent mitigation investigation would not have the time." Dwight H. Sullivan, et. al, Raising the Bar: Mitigation Specialists in Military Capital Litigation, 12 Geo. Mason U. Civ. Rts. L.J. 199, 206-07 (2002). In addition:

> [T]here is a very practical reason that investigators and forensic mental health experts cannot do double duty as the mitigation specialist. Even the most skilled capital defense attorneys need the assistance of a mitigation specialist; capital defense is simply too large a task:

> > An uncommonly gifted individual with expertise ranging from DNA to the DSM cannot diligently pursue the two investigative tracks that are part of every capital case: the reinvestigation of the factual allegations which constitute the capital charges, and the biographical inquiry aimed at discovering mitigating evidence that may inspire mercy or compassion in the hearts of jurors. Putting aside whether there are any such renaissance investigators, we can see at the outset that two very different skill sets are involved in the different tracks.[14]

> The truth of this observation is borne out by a recent judgment, which found that where funding restrictions required the defense team to rely on the same individual as investigator and mitigation specialist, the individual was "pressed into service in two roles, resulting in her inability to do either of them sufficiently."[15]

---

[14]Russell Stetler, *Mitigation Investigation: A Duty That Demands Expert Help but Can't Be Delegated,* The Champion, National Association of Criminal Defense Lawyers, at 62 (Mar. 2007).

[15]*Harlow v. Murphy,* No. 05-CV-039-B, slip op. at 30-31 (D. Wyo. Feb. 15, 2008).

Sean O'Brien, *When Life Depends on it: Supplementary Guidelines for the Mitigation Function of Capital Defense Teams*, 36 Hofstra L. Rev. 693, 709 (2008). Thus, even counsel with the necessary skills and time to conduct a mitigation investigation should retain the services of "an experienced mitigation specialist whose sole role is to research, obtain, evaluate, and coordinate" the mitigation investigation and preparation. Sullivan, at 206-07.

In short, utilizing a mitigation specialist and a team approach "combines the different skills, experience, and perspectives of several disciplines" and lets counsel "delegate many time-consuming tasks to skilled assistants and focus on the legal issues in the case." Guideline 10.4 Commentary. It also lets that person serve "as part of the defense team covered by the attorney-client privilege and work product doctrine."[16] *Id.*

Here, there was no "team approach" in the mitigation investigation or, for the most part, development of mitigation themes because counsel shouldered all the duties to gather background records, identify potential witnesses, and to interview those witnesses himself. That much is clearer from counsel's statement.

---

[16]While counsel asserted that he did not want "a mere social worker" to testify concerning Mr. Purkey's background and relied on Dr. Cunningham for these purposes, "supplemented" by Dr. Peterson and the other mental health experts, (2255 Doc. 73, Attachment 1 at 47-48), the failure alleged is not that a social worker did not testify but that the underlying investigation of mitigation evidence was inadequate. "Mitigation specialists...support rather than supplant psychologists and psychiatrists assigned to the defense team." Sullivan, at 215.

Counsel also asserted that he took "on the lion's share of the duties" between himself and his co-counsel, (Doc. 73, Attachment 1 at 3), and that she did "not independently identify and accomplish necessary case tasks" and simply completed assignments counsel gave her, (Doc. 73, Attachment 1 at 5, 7). Thus, it is clear that counsel shouldered virtually the entire lawyer's role, as well as the mitigation specialist's role in the case, which made it virtually impossible for him to conduct in-person interviews, repeatedly when necessary, to develop rapport and elicit sensitive information.

**(b)    Failure to adequately investigate.**

"While counsel did not have a specific obligation to employ a mitigation specialist, they did have an obligation to fully investigate the possible mitigating evidence available." *Jells v. Mitchell*, 538 F.3d 478, 495 (6th Cir. 2008). "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. *See also Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (there is no requirement that defense counsel "scour the globe on the off-chance something will turn up"); *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997) (counsel need not have "a scorch-the-earth strategy"). Nonetheless, a decision not to investigate "must be directly assessed for reasonableness in all the circumstances," *Wiggins*, 539 U.S. at 533 (quoting

*Strickland*, 466 U.S. at 691), and "an attorney must look into readily available sources of evidence," *Hall*, 106 F.3d at 749-50.

"Because the scope of mitigation evidence which may be considered by the jury in sentencing is much broader than the range of relevant information which may be considered in determining guilt or innocence, counsel is under a greater obligation to discover and evaluate potential evidence of mitigation." *United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225, 243 (N.D. Ill. 1995), *aff'd*, 91 F.3d 898 (7th Cir. 1996).

> The responsibility of the lawyer is to walk a mile in the shoes of the client, to see who he is, to get to know his family and the people who care about him, and then to present that information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community.

*Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) (quoting Stephen B. Bright, *Advocate in Residence: The Death Penalty As the Answer to Crime: Costly, Counterproductive and Corrupting*, 36 Santa Clara L. Rev. 1069, 1085-86 (1996)).

The mitigation investigation should include the gathering of records and conducting interviews on numerous topics, such as the defendant's history of mental illness, his family and social history, including physical, sexual, or emotional abuse, and his prior correctional history. 1989 Guideline

11.4.1(D)(2)(C);[17] 2003 Guideline 10.7 Commentary. The investigation should include "[a] multi-generational investigation" because it "frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment." 2003 ABA Guideline 10.7 Commentary. Interviews should be conducted with the client, his family, and "virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others." *Id.*[18]

---

[17]"Collect information relevant to the sentencing phase of trial including, but not limited to: medical history, (mental and physical illness or injury of alcohol and drug use, birth trauma and developmental delays); educational history (achievement, performance and behavior) special educational needs including cognitive limitations and learning disabilities); military history (type and length of service, conduct, special training); employment and training history (including skills and performance, and barriers to employability); family and social history (including physical, sexual or emotional abuse); prior adult and Juvenile record; prior correctional experience (including conduct or supervision and in the institution/education or training/clinical services); and religious and cultural influences." 1989 ABA Guideline 11.4.1(D)(2)(C).

[18]Even before the 2003 revision to the Guidelines, authors experienced in capital litigation also warned of these common-sense principles.

> Interviews are sensitive because of cultural, psychological, and other barriers that must be overcome to ensure that family secrets are disclosed. . . . Regardless of the culture, life-history investigation is invasive of privacy–seeking the darkest, most shameful and intimate secrets of the client's family.
>
> . . . .
>
> Witnesses should always be interviewed in person. The information needed in mitigation is simply not disclosed to strangers over the telephone. Full

Here, the investigation actually conducted by counsel was inadequate despite counsel's assertion that "the same quality of work" was done for Purkey, even without a mitigation specialist. (Doc. 47, Exhibit 12 – Supplemental Expert Request for Investigator; *see also* Doc. 47, Exhibit 13 – Supplemental Expert Request for Psychiatrist; Doc. 47, Exhibit 14 – Supplemental Expert Request for Dr. Cunningham). No one in the defense team performed even near the "well-defined norms" required for capital cases. *Wiggins,* 539 U.S. at 510. Counsel and Armstrong focused their limited mitigation social history investigation almost exclusively on Purkey's wife (Jeanette Purkey), daughter (Angie Genail), and ex-wife (Claire Gaida). Purkey's stepsons and other witnesses were interviewed relative only to Purkey's activities during the 18 months prior to his arrest including his drug usage and the potential poisoning of him. The only other witnesses interviewed that could possibly provide background social history evidence were Purkey's brother, Gary Hamilton, addressed specifically below. In addition, Purkey's cousin, Debbie Prothero, and his paternal aunt, Marguerite Hotchkiss, were interviewed only by phone. *See, e.g., Harries v. Bell,* 417 F.3d

---

disclosure comes only in person with great patience, no matter how skilled the interviewer. Russell Stetler, Capital Cases, The Champion, National Association of Criminal Defense Lawyers, at 38-39 (Feb. 1999). *See also* Dwight H. Sullivan, Jerry L. Britain, Michael N. Knowlan, and Cheryl Pettry, Raising the Bar: Mitigation Specialists in Military Capital Litigation, 12 Geo. Mason U. Civ. Rts. L.J. 199, 214 (2002) ("To be successful in obtaining accurate and complete information, these interviews must be done in person, not by phone").

631 (6th Cir. 2005) (counsel ineffective in capital sentencing for limiting the background investigation to a few phone calls with family members and making limited records requests); *United States v. Murphy*, 50 M.J. 4 (C.A.A.F. 1998) (counsel's "attempt[] to develop an extenuation and mitigation case by correspondence and telephone" was inadequate). No other interviews of potential background witnesses who knew Purkey prior to his 1997 parole were conducted other than witnesses that related to a prior conviction and an alleged sexual assault in the Oregon Department of Corrections in 1987.

**Gary Hamilton**

Purkey's brother, Gary Hamilton, was not interviewed until March 2003 other than a brief phone call with counsel. Counsel knew at the time of that interview and included in his listing of mitigating circumstances to be developed: (1) "abandonment by parents in childhood"; and (2) "sexual abuse by mother." (Doc. 47, Exhibit 9 – To Do List). Dr. Cunningham, based on his initial review of records and evaluation of Purkey, had also listed as "emerging mitigation hypotheses" the following:

- Multigenerational family distress
- Genetic predisposition to substance dependence
- Genetic predisposition to mental illness
- Fetal alcohol exposure
- Parental alcoholism
- Parental neglect and abandonment
- Observed family violence

- Physical and emotional abuse
- Inadequate structure and violence
- Corruptive influence of brother
- Traumatic sexual exposure

Dr. Cunningham also specifically listed Hamilton as a person that needed to be interviewed concerning specific listed areas, including "observation of parental sexual activities," "observation of mother's promiscuity," possible sexual abuse by Gary's friend "Hup," and "sexual interactions" between Purkey and his mother. Dr. Cunningham also listed the need to investigate whether Purkey had told others, specifically listing his wife and ex-wife, about being sexually abused by his mother and the timing of those reports. In addition, Dr. Cunningham noted the need to interview "corrections officers and mental health providers," who had known Purkey. (Doc. 47, Exhibit 10 – Letter from Dr. Cunningham to Duchardt dated December 19, 2002).

Nonetheless, counsel conducted only a single interview of Hamilton in his home in Nebraska in March 2003. And, rather than being sensitive to the difficulty of the topics for the witness, counsel even took his teenage son to that interview. "Counsel thus essentially foreclosed any helpful disclosures from those most likely to know, first-hand, the pertinent facts." *Cargle v. Mullin*, 317 F.3d 1196, 1210 (10th Cir. 2003). According to Hamilton, counsel did not even ask questions about the aberrant sexual interactions among family members, which, as stated by Dr. Cunningham, would be "a standard aspect of a comprehensive psychosocial history

and are a particularly important component of interviews of family members when information has been provided by a defendant that sexual abuse had occurred." (Doc. 47, Exhibit 11 – Mark Cunningham, Ph.D., Declaration). *See Ex Parte Gonzales*, 204 S.W.3d 391, 397 (Tex. Crim. App. 2006) ("[A]n objective standard of reasonable performance for defense counsel in a capital case would have required counsel to inquire whether the defendant had been abused as a child").

Before the District Court, counsel acknowledged that Mr. Hamilton was the only living family member who had lived in the house with Mr. Purkey during his childhood.[19] Nonetheless, counsel conceded that he had only a single in-person interview with Mr. Hamilton prior to trial and that meeting was conducted with counsel's son present for significant portions of the interview and Mr. Hamilton's wife present for the entire interview. (Doc. 73, Attachment 1 at 54-55). While counsel stated that he had "several opportunities to address to Gary, out of the hearing" of the others issues related to "intrafamial sex," it appears from the rest of the statement in context that Mr. Hamilton's wife was present in the room for the entire interview and these allegedly "semi-private[]" "opportunities" to talk to Mr. Hamilton only occurred when counsel's son was also present interacting with Mrs. Hamilton in the same room. (Doc. 73, Attachment 1 at 55).

---

[19]Mr. Hamilton was not, however, the only person available to provide information about Purkey's childhood. As discussed below, Peggy Marteney Noe could have provided essential information. Counsel did not try to interview her or any other available witnesses to address Mr. Purkey's childhood and home life.

While acknowledging that this meeting was not really productive, except in that it "broke the ice" between counsel and Mr. Hamilton, (Doc. 73, Attachment 1 at 55), all of counsel's remaining contacts with Mr. Hamilton to "keep up subtle pressure," (Doc. 73, Attachment 1 at 55), and to try to elicit information and cooperation prior to the beginning of the trial were by phone call only and a significant portion of those were made to Mr. Hamilton's wife and daughter rather than to him. (Doc. 73, Attachment 1 at 54-56).

Counsel's efforts were unquestionably deficient. As Mr. O'Brien observed:

> [T]rial counsel brought his son to the only pre-trial in-person interview of Mr. Purkey's brother, Gary Hamilton. Trial counsel explains that he believes this actually helped him by establishing a father-to-father rapport with Mr. Hamilton. Even if that is true, it was necessary to interview Mr. Hamilton one-on-one, face-to-face, because of the well-known fact that witnesses are reluctant to talk about personal or humiliating aspects of their background in the presence of others. A competent mitigation investigation will invade dark, shameful family secrets; it "exposes raw nerves, re-traumatizes, scratches at the scars nearest the client's heart." Russell Stetler, *Mitigation Evidence in Death Penalty Cases*, Champion, Jan.-Feb. 1999, at 36. Therefore, one-on-one interviews are essential. The mitigation specialist must "attempt to speak with [clients and witnesses] privately to determine if there is anything that they.... were reluctant to say in front of someone else." Benjamin James Sadock & Virginia Alcott Sadock, Kaplan & Sadock's Synopsis of Psychiatry, 7 (9th ed. 2003). Mental health experts recognize that "most patients do not speak freely unless they have privacy and are sure that their conversations cannot be overheard." *Id.* at 8.

(Doc. 82, Exhibit 4, para. 22).

Despite the acceptance by experienced capital counsel, mitigation

specialists, and mental health experts (as summarized by Mr. O'Brien) that private, multiple conversations are necessary to gather sensitive information, counsel placed the responsibility on Mr. Hamilton for not providing the information of his own abuse by his mother in sufficient time and detail before trial.[20] Specifically, counsel stated:

> Unfortunately, Gary did not share with me all of those details as we feverishly prepared him, at the last minute, for his testimony based upon his new revelations. Had Gary shared that information with me at that time, I would have presented much of that information at trial. I in no way fault Gary for not providing me that information at that time. Frankly, at that time, he may not have even remembered that detail.

(Doc. 73, Attachment 1 at 56-57).

While apparently recognizing that these topics were difficult for Mr. Hamilton to talk about <u>and</u> conceding a single in person interview (with one or two additional people in the room the entire time) with only limited phone call follow-up, counsel continued to ignore the importance of a spending adequate time and recognizing the sensitivity of the issues, as a mitigation specialist would, in developing the mitigation investigation. Instead, counsel rationalized that any other approach with Mr. Hamilton would have made the problem worse rather than better. This is the same type of after-the-fact "explanation" as that described in *Wiggins*, 539 U.S. at 527-28, where ineffective counsel's explanation "resemble[d]

---

[20]Mr. Hamilton's declaration was attached as Exhibit 16 to 2255 Doc. 47.

more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations" at the time of the questioned action.

If counsel had not ignored the ABA Guidelines and the "standard of care" in capital cases and had retained a mitigation specialist with the requisite interviewing and mental health background, the odds certainly would have been greatly improved that the information would have been elicited from Mr. Hamilton much earlier and in greater detail. "The results of any mitigation investigation are only as good as the person seeking the evidence." Robin M. Maher, The ABA and the Supplementary Guidelines For the Mitigation Function of Defense Teams in Death Penalty Cases, 36 Hofstra L. Rev. 763, 772 (2008).

Even assuming that counsel possessed all of the skills of a trained mitigation expert himself, he never had a single private in-person interview with Mr. Hamilton, let alone the repetitive interviews recognized in the field as a necessity for adequately developing information. Whether this was due to counsel's inattentiveness, lack of expertise or lack of time, since counsel had shouldered the "lion's share" of this case on his own, is irrelevant, because this investigation was not competently conducted.

If counsel had performed adequately in interviewing Mr. Hamilton, counsel would have learned the excruciating details of the brutality of Purkey's father that included even slamming his wife's arm in a door repeatedly until her arm broke

while his children watched.  (Doc. 47, Exhibit 16 – Gary Hamilton Declaration).

More importantly, counsel failed to learn that Mr. Hamilton had also been abused

not just by his mother but also by his grandmother.  (Doc. 47, Exhibit 16).  As

summarized by Dr. Cunningham, who obtained the details from Mr. Hamilton in

preparation for these 2255 proceedings:

> Mr. Hamilton reported to me that he had been sexually abused in separate contexts by both his mother and his maternal grandmother over a period of many years beginning in his elementary school years. The recurrent instances with each involved displays of full body nudity, breast and mutual genital fondling, and simulated or attempted intercourse; and occurred in the respective homes of these maternal figures.  Additionally, as he entered early adolescence, his mother took him to bars with her, represented him as her boyfriend, gave him alcohol, and engaged him in necking and mutual fondling.  Mr. Hamilton also provided information regarding his mother's promiscuity, as well as the longstanding incestuous sexual relationship between his mother and his maternal grandmother's husband (step-grandfather to Gary and Wesley).  Mr. Hamilton's descriptions represented critically important, both in providing inferential corroboration of Mr. Purkey's self-report and in providing anecdotal detail regarding the disturbed interactions that constituted the primary relationships of Mr. Purkey's childhood.

Doc. 47, Exhibit 11).

**Rex Newton, Ph.D.**

Like counsel in *Wiggins*, Purkey's counsel's conduct was deficient because

the evidence revealed that the "failure to investigate thoroughly resulted from

inattention, not reasoned strategic judgment."  539 U.S. at 526.  "Counsel

abandoned their investigation of petitioner's background after having acquired

only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 524. "The scope of their investigation was also unreasonable in light of what counsel actually discovered" and "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Id.* at 525 (citation omitted).

Given the information available prior to trial, counsel should have easily anticipated that the government would allege that Purkey had recently fabricated the allegation that he had been sexually abused by his mother in order to avoid the death penalty. Indeed, the government did make the allegation in cross-examining Dr. Peterson, the defense psychiatrist, that the abuse had never before been reported to anyone. Tr. 1817, 1824. Government counsel then argued that Dr. Peterson's "findings were a fairy tale" and that the evidence of Purkey's horrible childhood was simply "the old abuse excuse." Tr. 2267-68.

If counsel had adequately prepared or had the assistance of a comprehensive history prepared by a mitigation specialist, counsel could have easily countered the allegation that Purkey had never before reported being sexually abused. Indeed, this information was apparent in Purkey's Oregon Department of Corrections records. Specifically, the records reflect that on November 25, 1986, Purkey completed a life history questionnaire in applying for counseling by Rex Newton, Ph.D. On the questionnaire, he reported "anxiety or guilt feelings arising out of

sex or masturbation" from "years ago." In response to "[a]ny relevant details regarding your first or subsequent sexual experiences" he wrote "being abused as a child." He also listed his "most significant memories and experiences" for ages "6-10" as "being sexually abused." (Doc. 47, Exhibit 17 – Portion of Oregon Department of Corrections Records). Thus, it was clear from just this record, which had even been specifically noted by Dr. Peterson is his own report, that Purkey had previously reported the sexual abuse. And, significantly, Purkey had reported it years before trial in a correctional setting where there was no possible motivation for doing so except in attempting to get mental health counseling. In short, Purkey was prejudiced by counsel's failure to establish this on the record in response to the government's cross of Dr. Peterson and argument on this issue.

Counsel could also have presented the testimony of Dr. Rex Newton, the mental health expert employed by the Oregon Department of Corrections who counseled Purkey following his report of the childhood sexual abuse. Dr. Newton could have provided powerful mitigation from a clearly disinterested witness that Purkey was "a throw away kid," who was abused and never got adequate parenting, but he very much wanted to face his demons with therapy and treatment. Dr. Newton also would have provided disinterested and credible testimony that, contrary to the government's arguments and evidence and the tattoos on his body, Purkey was not involved in racist prison gangs and, indeed, was ashamed of his

tattoos. (Doc. 47, Exhibit 18 – Rex Newton, Ph.D., Declaration).

Before the District Court, counsel spent a full nine pages of his affidavit (Doc. 73, Attachment 1 – pp. 61-70) providing his reasons and thinking for the "failure to secure the testimony of Dr. Rex Newton, Ph.D." (Doc. 73, Attachment 1 at 61). The *post-hoc* rationalization is patent though because counsel never interviewed Dr. Newton and relied only on his notes in the Oregon Department of Corrections records. The deficiency in that is obvious: "counsel could not have evaluated or weighed the risks and benefits of calling [a witness] as a defense witness without so much as asking [him] what he would say if called." *Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005). *See also Holsomback v. White*, 133 F.3d 1382, 1388 (11th Cir. 1998) (Counsel "could not have made an informed tactical decision" concerning the benefits versus the risks of presenting the testimony of a witness that counsel had not interviewed); *Ross v. State*, 954 So. 2d 968, 1006 (Miss. 2007) ("[i]t is not reasonable to refuse to investigate when the investigator does not know the relevant facts the investigation will uncover"); *Johns v. State*, 926 So. 2d 188, 196 (Miss. 2006) ("The decision not to interview witnesses, particularly your own, cannot be considered an effective strategic choice").

Aside from the obvious problem that counsel did not interview Dr. Newton, what counsel cited as Dr. Newton's "report," is in actuality only a handful of entries in the Oregon Department of Corrections records when it is clear just from

the prison records that Dr. Newton was involved with Mr. Purkey for a period that spans, at minimum, from November 1986 to August 1988.[21]

As Mr. O'Brien observed, Dr. Newton was "a particularly important mitigation witness." (Doc. 82, Exhibit 4, para. 20).

> He treated Mr. Purkey in prison in Oregon, and it appears that Mr. Purkey opened up to him, revealing significant details of his traumatic life history. Dr. Newton could bring special credibility to the defense case because he is a treating mental health expert whose involvement with Mr. Purkey predated the crime for which the Government was seeking the death penalty. While it is well known that juries are distrustful of retained mental health experts who testify at trial, the same is not true of treating physicians. Dr. Newton's credibility is further enhanced by the fact that he works for the government, and came in contact with Mr. Purkey in his role as an institutional psychologist. Although trial counsel had Dr. Newton's notes from the prison records, and the contents of those notes were favorable to Mr. Purkey, trial counsel never interviewed him. In my opinion, a reasonably competent defense attorney, or a mitigation specialist retained by a reasonably competent attorney, would have interviewed a witness such as Dr. Newton. In the absence of such an interview, a claim of trial strategy is untenable.

*Id.*

Nonetheless, without interviewing Dr. Newton and relying just on his minimal notes, counsel cited a list of reasons that he can conceive of now for not presenting Dr. Newton's testimony. Even assuming that these same reasons were thought of and considered prior to sentencing, counsel's conduct was still deficient.

---

[21]Every reference to Dr. Newton in the prison records was included in Exhibit 17 to 2255 Doc. 47.

In other words, "an actual failure to investigate cannot be excused by a hypothetical decision not to use its unknown results." *Soffar v. Dretke*, 368 F.3d 441, 474, *amended*, 391 F.3d 703 (5th Cir. 2004).

As Mr. O'Brien observed:

> The Supreme Court has specifically rejected "strategy" as a reason not to investigate, observing that "[t]he ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989)). Further, the potential trial counsel's concern mitigating evidence will be "double-edged" does not justify the failure investigate it at all prior to deciding whether to present it. Even if mitigation evidence is "double-edged," competent defense counsel will err on the side of presenting the mitigating evidence to the jury. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 396 (2000). "The practices of skilled capital defense attorneys indicate that these attorneys will rarely, if ever, decide to curtail investigation for mitigating evidence for any reason." Welsh White, Litigating in the Shadow of Death: Defense Attorneys in Capital Cases, 200 (Ann Arbor University of Michigan Press, 2006). Trial counsel's failure to interview Dr. Newton and other witnesses cannot be justified as a strategic decision in the absence of an interview.

(Doc. 82, Exhibit 4, para. 21).

Here, counsel simply could not make a reasoned decision not to present the testimony of Dr. Newton without interviewing him. Specifically, counsel could not have known or considered:

- Dr. Newton's substantial credentials as a neutral mental health provider employed by the prison system.

40

- The extraordinary fact that Dr. Newton remembered Mr. Purkey (and, specifically remembered him as "remarkable") more than 15 years after he lost contact with him, given the hundreds, if not thousands of inmates/patients Dr. Newton would have seen in the interim.

- Dr. Newton's detailed recollections of, among other things, Mr. Purkey's statements and goals, the variations in his "demeanor," his "behaviors and characteristics," and his expressed "feelings."

- Dr. Newton's own powerful observations, including among others, that Mr. Purkey was "deeply ashamed" of his tattoos and prior connection to a racist prison organization and his genuine attempts with "very little assistance to overcome the huge emotional barriers that were created for him in early childhood by his own family." Dr. Newton also observed that Mr. Purkey "fell though the proverbial cracks of all our social services."

- Dr. Newton's willingness to travel from Oregon to Missouri to testify on Mr. Purkey's behalf.

Aside from these things, which could not have been considered by counsel without interviewing Dr. Newton, the *post-hoc* rationalization counsel provided in these proceedings for not interviewing or presenting the testimony of Dr. Newton are particularly unreasonable in light of the totality of the evidence in this case and

sheer logic.

First, counsel cited concerns that Dr. Newton's first involvement with Mr. Purkey was when Mr. Purkey was "housed in a lower security facility in Oregon, and was on good track for an earlier release." (Doc. 73, Attachment 1 at 62). This is simply not true. As reflected in the prison records (Exhibit 17 to Doc. 47, pages 1-3), on November 27, 1986, when Mr. Purkey applied for the treatment program provided by Dr. Newton, he completed the "Life History Questionnaire" reflecting that he was confined at "OSP." *Id.* at 3. "OSP" refers to the Oregon State Penitentiary, which is "the state's only maximum security prison," where even death-sentenced inmates are housed.[22] He was also serving a sentence of 15 years to life and, by his own note at the time, Mr. Purkey's only knowledge or thought about the possibility of parole was "1988 parole board tentative." *Id.* at 1.

Counsel also stated, as part of his reason for not presenting testimony from Dr. Newton: "All the while Mr. Purkey was working with Dr. Newton, he was also engaging in activities which were at best against the rules and at worst, arguably criminal." (Doc. 73, Attachment 1 at 63). Yet, as the government already presented in Mr. Purkey's sentencing, the only disciplinary infraction during the time Mr. Purkey was seen by Dr. Newton was the alleged sexual assault

---

[22]*See* www.oregon.gov/DOC/OPS/PRISON/osp.shtml#General_Information. Counsel certainly could have learned this basic information from an interview of Dr. Newton, who had been a consultant for the Oregon Department of Corrections for more than 20 years by the time of Mr. Purkey's trial.

on Gary Hatfield, Tr. at 1927, which the government and defense counsel presented substantial evidence about. Thus, counsel's concern now that Dr. Newton's testimony could be used as a "springboard" by the government for additional aggravation is simply *post-hoc* rationalization not based in fact. During Mr. Purkey's capital sentencing, the government did present the available evidence of Mr. Purkey's disciplinary incidents prior to, during, and after Dr. Newton's contacts with Mr. Purkey.

Counsel also asserted that, in order to avoid the "springboard" that might be caused by Dr. Newton's testimony, he presented "the functional equivalent of Dr. Newton, and in most cases a more updated version of that information." (Doc. 73, Attachment 1 at 63). Counsel then listed the witnesses believed to be a functional equivalent starting with Dr. Peterson and Dr. Cunningham. While these doctors were very helpful to the defense, they were retained defense experts that never saw Mr. Purkey until he was already incarcerated on the present capital offenses. The other listed witnesses were lay witnesses with far more limited contact with Mr. Purkey than Dr. Newton and mostly referred to the time frame, again, that was after Mr. Purkey was facing a potential death penalty. Thus, the testimony of any of these witnesses would certainly be viewed through a more cynical lens by jurors than the testimony that Dr. Newton could have given considering his extended history with Mr. Purkey, his status as a mental health expert, and his status as a

neutral employee of a correctional system. *See* (Doc. 82, Exhibit 4 – O'Brien Affidavit) ("While it is well known that juries are distrustful of retained mental health experts who testify at trial, the same is not true of treating physicians"). *See also* Scott E. Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va. L. Rev. 1109 (Sep. 1997) (discussing Capital Jury Project study findings that "lay experts"–such as former teachers, former employees or supervisors, and correctional staff with personal knowledge of the defendant–are viewed by jurors as far more credible and believable than both retained professional experts and family and friends).

Trial counsel attempted to minimize the impact of Dr. Newton's ability to testify (as the Oregon prison records reflected) that Mr. Purkey reported to him that he had been sexually abused by his mother as a child.

> Counsel for Mr. Purkey find greatest fault over my failure to produce Dr. Newton to specifically say that Wes had told him, in the late 80's, about his mother sexually abusing him ([2255] Doc. 47, p.21). This evidence, it is argued, would have countered what Purkey's current Counsel claim were government accusations ". . .that Purkey had recently fabricated the allegation that he had been sexually abused by his mother in order to avoid the death penalty. . ." ([2255] Doc. 47, p.21). The fatal flaw in this logic is that the government never made such claims.

(Doc. 73, Attachment 1 at 64).

The record reflects to the contrary, however. Specifically, during cross-examination of Dr. Peterson, the following exchanges occurred:

Q    Now, Doctor, you testified that you did not believe – you believe there is a mental disease and I think I heard you testify, tell me if I'm wrong, I heard you testify that you did not believe the problem here is that the defendant's primary – that he was suffering from antisocial personality disorder, that's not your diagnosis, correct?

A    I believe what I said was that this is a combination of difficulties. I would say it's too simplistic to merely put him in the characterization of antisocial personality. He certainly was identified by age 14 with having had severe psychocentral problems, problems with immaturity, problems with language delay, all sorts of things that one would expect for a child who has been sexually and physically abused and emotionally abandoned. Ultimately he has features of antisocial. He has features of borderline. He has features of dependent personality and obsessive-compulsive disorder. The latter two to a much lesser extent.

Q    Doctor, would you agree with me – you examined that large stack of records, correct?

A    Yes.

Q    And would you agree with me that about twelve or thirteen psychologists and psychiatrists before you have concluded the defendant's problem is that he suffers from an antisocial personality disorder?

A    I don't know if it's twelve or thirteen, but in the present matters it's about three or four, yes.

Q    You mean the two cases we're talking about here?

A    Yes. You mean through his entire correctional record. The correctional records also suggest that he has other substantial psychosexual problems.

Q    And psychosexual problems, that could mean – you tell me if I'm wrong – that he doesn't know whether he likes men or women?

A    No, it doesn't mean that at all.

Q    What does it mean?

A    As a consequence of having been repeatedly sexually traumatized as a child, he has developed an abnormal attachment to sexual activity as a way of comfort, one of the only ways he finds comfort.

Q    *Now, you talked a long time during your direct examination*

*about the defendant's childhood and the fact that his mom sexually abused Do you remember that testimony?*

A    *Yes.*

Q    *Now, did you find any records where that was detailed in his past?*

A    *No,* there really haven't been any detailed questioning of him. There were some references, and I brought up a couple of them, but there hasn't been any detailed questioning of him about his sexual development or his sexual abuse and trauma by anyone.

Q    Except you?

A    Yes.

Q    And Dr. Dietz, our expert, after you were finished interviewing him, correct?

A    Yes.

Tr. 1806-1808 (emphasis added).

Q    *Doctor, going back to the defendant's childhood and the sexual abuse that he claims he suffered, again we have to rely on his word essentially, because there's not any – there is very little, if anything, in the record to support that, correct?*

A    *Well, that's correct.* There are some elements to support it, such as the reports of his brother and his aunt and the people who talked with Mr. Purkey long before he was involved in any of these cases, about his development. So certainly it would have been nice to have a video camera on Mr. Purkey's shoulder to see what he experienced, but we don't have that. At the same time you can't really discount not knowing, or not having a camera there recording every event, because, for example, most children don't remember how they learned to walk, but most kids do walk. And so the fact that they don't remember or there's not a source of information that proves when they took their first step doesn't mean they didn't learn how to walk.

Q    We're not talking about walking. We're talking about a man who claims his mother had sex with him when he's a kid, right?

A    Yes.

Q    *You're aware from the reports that – the only report that exists of sexual contact between the defendant and his mother is her claim that in 1972 when he was 19 years old he raped*

> *her. Have you seen that report?*
>
> A  *I have seen the report.* I've also seen the medical report that the doctor gave the opinion that she had not been sexually assaulted, and that once she had sobered up she dropped the charges.
>
> Q  That wasn't in a medical report, was it, sir? It was in the detective's report. He wrote that down.
>
> A  By the doctor to the detective.
>
> Q  Did you also read, sir, that the mother was agonizing over the fact that her son would have to go back to prison if she pursued it; did you read that?
>
> A  I read that. And the police could certainly have pressed charges without her.

Tr. 1816-1817 (emphasis added).

This section was quoted by counsel in his statement. He then asserts that "[c]urrent counsel for Purkey does not note that Dr. Peterson also more generally deflected the government advances by specifically referencing Mr. Purkey's multiple prior accounts of the sexual abuse." (Doc. 73, Attachment 1 at 65). The problem, however, is that Dr. Peterson was not referring to "prior accounts of the sexual abuse" by Mr. Purkey in stating that "[t]here are some elements to support it, such as the reports of his brother and his aunt and the people who talked with Mr. Purkey long before he was involved in any of these cases, about his development." Mr. Purkey's brother did not testify that Mr. Purkey had been sexually abused or reported it to him. He testified only that he had himself been sexually abused by his mother. Tr. 1552-53. Likewise, the records reflected only that Mr. Purkey's deceased aunt had reported that Mr. Purkey's mother was

promiscuous.  Tr. 2154.[23]

The next section quoted by counsel includes the following exchange:

Q       *To your knowledge, based upon your review of the records, the only time the defendant ever told a doctor who has examined him about this sexual mistreatment or maltreatment that he's now claiming is to you, that was the first time?*

A       *To my understanding, I'm the only one he has ever told in detail to because I'm the only one who ever really asked.*

Q       To your knowledge.

A       Yes. I know that Dr. Fernando out at Larned did not ask because I asked Mr. Purkey, and I know the process out at Larned, and Mr. Purkey said Dr. Fernando did not ask him anything about his sexual development before he gave the diagnosis, which is common practice out at Larned.

Q       Yet Mr. Purkey told you that?

A       Mr. Purkey told me that, plus there's no indication in any of the records especially done by the social worker of any detailed

---

[23]Dr. Cunningham made similar points during his direct examination.

Q       *Let me stop you for just a second. Did you have any independent verification of Mr. Purkey's having been sexually abused other than the accounts that he has now given because psychosexual evaluations have been conducted?*

A       *There are – there's collateral information I guess you would say.* For example, when his great aunt describes that the mother was highly promiscuous and wasn't careful about what happened in front of the boys, that's giving you some kind of inferential information about mom's lack of inhibitions or her own sexual difficulties. There is a reference in one of the early psychological evaluations that's done of Wes when he's about 15 or 16 where it talks about him having a serious problem with sexual identification and then doesn't go on and explain that, though. . . .

Tr. 1865-1866 (emphasis added).

> psychosexual history done by Dr. Fernando or even the social worker.
>
> Q  Thank you. That's all I have.

Tr. 1824-1825 (emphasis added).

With respect to this section counsel addressed what he believed was "the thrust of the point being made by Dr. Peterson at this point." (Doc. 73, Attachment 1 at 66). The problem, however, is not in what Dr. Peterson was saying, but in the overall theme of the government, that Mr. Purkey's extensive records did not reflect that he had ever told a doctor or anyone else about being sexually abused until he reported it to Dr. Peterson when he already had pending murder charges. *See* Tr. 1824 ("based upon your review of the records, the only time the defendant ever told a doctor who has examined him about this sexual mistreatment or maltreatment that he's now claiming is to you, that was the first time?").

The government continued this theme during cross examination of Dr. Cunningham in the following exchange.

> Q  Now, I have reviewed the records too. Would it be a fair statement to say that the information that came from the aunt, the record that you're talking about, is information where she described how the mother – the mother was promiscuous, correct?
>
> A  She described the alcoholism, promiscuity, chaotic nature of the home. The records describe both his father and mother having abandoned him. Father's whereabouts being unknown.
>
> Q  But there was nothing in those records, sir, about the defendant seeing his mother's lovers come out of the bedroom without any clothes on.
>
> A  No, sir, that came from Mr. Purkey. The records describe that

she was promiscuous and without regard to what the boys saw. The specific description of what he saw came from the discussions that he had with me. The record describes, though, provides a broader context to that same sort of action.

Q   *And there was nothing in those records, sir, was there, that talked about the defendant saying that he – or confirmation that he was having sex with his mother at age eight? There's nothing in the records from back then that would confirm that, is there?*

A   *Not specifically.* There are descriptions about sexual issues that he has. There are descriptions about being very anxious when the topic of his mother comes up. Certainly the history that he displays is consistent with somebody who has been sexually traumatized.   But otherwise *the records don't specifically recount that he made an outcry of sexual abuse to anyone else.*

Q   *Of course, the parents aren't here. They're both dead, correct?*

A   *That's correct.*

Q   *And they can't defend themselves, right?*

A   *That's correct.*

Q   And there is some indication that the defendant had a serious problem with sexual identification.

A   That was described in his adolescence, yes, sir.

Q   Could that mean that he wasn't sure whether he liked men or women?

A   Potentially. It's uncertain what that refers to or what that's a euphemism for in terms of what kind of sexual conflicts he's having.

Tr. 1933-35 (emphasis added).

While counsel asserted before the District Court that the government was not asserting ". . .that Purkey had recently fabricated the allegation that he had been sexually abused by his mother in order to avoid the death penalty," (Doc. 73, Attachment 1 at 64, *quoting* Doc. 47, p.21), the record clearly reflects that counsel

had a different view at the time of trial. This is particularly clear in counsel's cross

examination of Dr. Park Dietz, the psychiatrist retained by the government.

Q And particularly, there was no indication of a psychosexual analysis to the extent that you and Dr. Peterson delved into it with Mr. Purkey before now; is that correct?

A If there was, I didn't see it.

Q Right. But both you and Dr. Peterson went into those issues; is that correct, sir?

A Yes.

Q Okay. And very thoroughly. You would like to think that you both did.

A Actually, I don't know, I think Mr. Purkey cut me off on some of the questions in that area.

Q Okay. Well, in any event, you had indicated that in terms of what Mr. Purkey was telling you, that certainly if you were to accept his account as true, he would have suffered sexual abuse at a very young age; is that a fair statement?

A If what he told me was true, he underwent considerable long-term sexual abuse by his mother.

Q *Now, in particular there are secondary indications in the record of possible sexual trauma to Mr. Purkey, is that correct, childhood sexual trauma?*

A *That's too vague a phrase for me to respond to, but I can tell you exactly what was in the record.*

Q *All right, sir.*

A *There is one record from the time he was an adolescent indicating that there had been promiscuous behavior by his mother who was – had brought at least three men home and was openly engaging in sex in the home with the boys. There was another record that said that someone else had found some psychosexual problem that was never identified, and the report that supposedly said that was never received. And I think up until he's facing capital murder charges, that's all that was in the record.*

Q All right, sir. Now, are you also familiar with the fact that Wes's brother Gary has also testified about his own abuse by his mother?

A So I have been told, yes.

Q   Now, what you testified to the jury is, though, that this is an account that really comes from only these sources; is that correct?

A   That's right, those are the only sources I'm aware of.

Q   Okay. Is that necessarily unusual in the case of a man having been sexually abused by his mother, not coming forward about the issue until directly asked about it?

A   It's such a rare event that I don't think anyone could say what's usual or not. But looking by analogy, it's true that it's not common for males to volunteer stories of their sexual abuse unless there's something good that will come of it for them.

Q   Okay. Now, in your testimony, were you indicating that you were relying upon Mr. Purkey's account of this sexual abuse or not relying on it?

A   All I can do is report it and indicate that that's where it came from. It's not for me to judge his credibility and it's not for me to find the facts. That's for the fact-finder.

Q   Sure, and I understand that, but certainly you take the facts and use them to reach the conclusions which you do. Did you use Mr. Purkey's representations that he had been sexually abused by his mother in order to reach any of the conclusions which you did, or did you not?

A   Sure, I used them to – first, I used it to reach the conclusion that he might have been sexually abused by his mother, just as he says. Second -

Q   Can I stop you there for just a second, if you don't mind. I take it by saying might as opposed to many of the things that you said more as a fact, that you are saying that in your opinion there's a possibility that that's also not true, as opposed to some of the other things that you more indicated as a fact. Am I --

A   For the reason I gave earlier. If I have corroborative evidence, I'll accept it as a fact and I don't think it's a matter in dispute. *This I think is a matter in dispute that's not for me to be the fact-finder about.* The jury has to do that.

Q   Okay. Now, though, isn't it the case that Mr. Purkey was also the only source for your finding that he had committed acts of delinquency prior to the age of 15?

A   No. Some of that comes from records as well, but there were some delinquent acts for which he was my only source. And I rely on that in a different way because that's an admission

52

against interest. That is, when somebody makes a statement that hurts their interests, it has a different degree of reliability than someone who makes a self-serving statement that promotes their interest.

Q     *For a person in prison to say you have been sexually abused by your mother is certainly not a statement in your interest, is it?*

A     *It is when you're facing capital murder charges and have people looking for bad things in your childhood to help use in mitigation.*

Tr. 2191-94 (emphasis added).

Clearly, this testimony indicated that the issue of whether Mr. Purkey had been sexually abused was "a matter in dispute." In addition, the clear implication from Dr. Dietz's last statement in this exchange was that Mr. Purkey's report of sexual abuse was made only when he was "facing capital murder charges and ha[d] people looking for bad things in [his] childhood to help use in mitigation."

Another exchange between counsel and Dr. Dietz is also relevant.

Q     Let me start it fresh then. In terms of the sexual, physical, emotional abuse, that is something that a psychiatrist or a psychologist, assuming it's true, would think was important in terms of the psychological or psychiatric development of the person; would you concede me that much?

A     Yes.

Q     Would you also concede me that to the extent these factors did occur, that's at least part of the explanation for why Wes Purkey is who he is today?

A     That the abuse that occurred of him is part of why he is who he is and makes the decisions he makes, has the personality he has, all of that I would agree.

Q     All right, sir. Now, this is not some usual level of abuse that you would see in people. This is a fairly significant level of abuse, if you assume that it's all true.

A     The sexual part is beyond the ordinary. The rest of it is a pretty average story for the kinds of people I see.

Q     Not for the normal kid. I mean, I don't recall that, and I assume you didn't have it.

A     I'm talking about for the kinds of people I see. I hear the rest of that very often. But not the sexual abuse by the mother. That's a very unusual story. I have never heard it before, actually.

Q     And basically it is an explanation for why people get damaged and end up in the places many times – it's not an excuse, but it's certainly an explanation for why they end up where they do?

A     What is?

Q     Abuse.

A     Abuse does help explain some of why people end up getting in trouble.

Q     And particularly what you're talking about is many of the people who you deal with in these evaluations that you do tell a similar story of abuse and neglect?

A     Correct.

Q     A story just like Wes Purkey's that can be independently verified?

A     No. Usually it can't.

Q     *Actually we have kind of – did our homework and got together a lot of records that verify what he's saying; is that correct, sir?*

A     *That's right. For everything but the sexual abuse I think there's plenty of verification.*

Tr. 2214-15 (emphasis added).

Like the previous quoted testimony, this exchange clearly indicated that the government and its experts were not conceding that Mr. Purkey had been sexually abused. Nonetheless, counsel asserted before the District Court that "government Counsel took their questioning of the sexual abuse no further" than Dr. Peterson's cross examination. (Doc. 73, Attachment 1 at 67). Counsel even cited that the

government was "instead essentially conceding that Purkey had been abused," (Doc. 73, Attachment 1 at 67), and cites a portion of argument where, according to counsel, "government Counsel actually conceded the abuse took place," (Doc. 73, Attachment 1 at 68):

> Now, the next group of mitigating factors have to do with the defendant's bad childhood. Now, that's the old abuse excuse. He had a bad childhood. No doubt he did not have a good childhood. I'm not disputing that. But many people in this country grow up with alcoholic parents or are abused and they turn out fine. His own brother corrected his behavior way back in 1977, decided he wasn't going to do any more crimes, and he changed. And this is about personal choices. He chose not to make any changes in his life. He just kept doing the same things, being violent, committing crimes. He made those choices.

Tr. 2268.

The problem, however, is that government counsel conceded only that Mr. Purkey had "a bad childhood." In addition, counsel left off of this quotation the next paragraph that makes it clear that the government was not conceding that Mr. Purkey had been sexually abused.

> What about personal responsibility? Aren't you tired of people having an excuse for everything? This guy goes out and he beats – he stabs this girl to death, beats an 80-year-old grandmother, and it's somebody else's fault. It's his mom's fault, who is not here to defend herself. Did you notice the picture they brought of mom, did you notice that? You know, the one they bring of her, she's sitting on a couch in her nightgown with a cigarette. Now, come on.

Tr. 2268-69. The reference to Mr. Purkey's mother not being "here to defend herself" had, of course, been used in cross-examination of Dr. Cunningham in

challenging the evidence of sexual abuse. Counsel clearly understood it that way

at trial when he argued in his own closing:

> Where was there a glimmer of hope in anything that Wes Purkey dealt
> with for the first 14 years of his life? The glimmer of hope was maybe
> he and his brother could hold off his dad from beating their mother, or
> maybe they could hold him off from beating them, but only then have
> dad take in a prostitute or have mother sexually molest you.
>
> The government wants to talk about they're not here to defend
> themselves, and what a crock. You know what, folks. They were not
> there to defend themselves back in the '60s and 70's either when these
> allegations were first coming up. You know why. They abandoned
> them.

Tr. 2275.

Counsel's additional trial argument also made clear that he was not thinking

that the government or its experts had conceded the sexual abuse.

> And you know what else they never did? They never did the
> psychosexual history of Mr. Purkey to find out about this depraved
> childhood that he was dealing with. So it isn't a fairy tale that Dr.
> Peterson talked to you about. It's the reality. It's the reality I tried to
> get Dr. Dietz to come along with me on and assume for at least the
> sake of argument that there was brain injury, what's that mean. He
> didn't want to go there. He said, well, you have to forget everything
> else that went before.
>
> Of course you don't have to forget everything. And particularly
> you don't have to forget what's clear. The injuries of this man's
> background and what those things did to him, the horrific childhood
> that he had to deal with. And when you put all of those things
> together, you come up with a conclusion by Dr. Peterson that this man
> could not, could not intend to kill Jennifer or cause her serious
> physical injury at the time that killing happened, that he does suffer
> from a mental disease or illness, that he does have a severe mental or
> emotional disturbance.
>
> It's all there, folks. It is all there despite the hatchet job that was
> tried to be done on it. And even Dr. Dietz, much as he was reluctant to

do so, has to admit the information is all there about the terrible childhood, and there's no reason to think otherwise about the sexual abuse. Remember what Gary told you about his same experience with the mother.

Tr. 2280-81. Counsel was, of course, referring back to Dr. Dietz's concession that the defense did the "homework and got together a lot of records" verifying Mr. Purkey's "story of abuse and neglect" but pointing out that the concession of verification did not include sexual abuse. Specifically, he said, "For everything but the sexual abuse I think there's plenty of verification." Tr. 2215.

The government's rebuttal argument made the final point that the government was not conceding that Mr. Purkey was sexually abused.

An expert is only as good as the information they have to evaluate. They fed them the information. They gave them the three and a half feet, or, you know, it got taller and shorter, boxes of information to evaluate. They fed it to those experts. Garbage in, garbage out.

They want you to believe him, a man that can take a tattoo off his arm because he wears shirts to here and his boss is Jewish, they want you to believe that man when he said his mother sexually molested him. You're going to have to make that decision, whether you believe that. He was 46 years old when he made these decisions.

Tr. 2291-92. Clearly, in context, the implication was that Mr. Purkey's statements concerning sexual molestation were simply more "[g]arbage in, garbage out," rather than having "given up challenging the abuse," as counsel asserted when leaving out the first four quoted lines from his own quotation of this final argument. (Doc. 73, Attachment 1 at 69).

Counsel may be correct that, even with Dr. Newton's records and testimony,

the government would have been "asking the jury to doubt Purkey's accounts of the abuse, whenever those accounts occurred." (Doc. 73, Attachment 1 at 69). This argument would have been greatly deflated, however, when put in the context of a documented initial report made in seeking mental health treatment from a prison mental health counselor more than 15 years prior to having pending capital charges. This was the information that Dr. Newton could have provided to dispel the picture painted of a self-serving statement made only when Mr. Purkey was "facing capital murder charges" and the defense was "looking for bad things in [his] childhood to help use in mitigation." Tr. 2191-94.

At bottom, counsel did not have a "strategy" pretrial not to interview Dr. Newton and did not have a strategy during sentencing not to present his testimony. Counsel's conduct was deficient because counsel never interviewed Dr. Newton. *See Link v. Luebbers*, 469 F.3d 1197, 1204 (8th Cir. 2006) ("Ordinarily, we consider strategic decisions to be virtually unchallengeable unless they are based on deficient investigation"). *Link*, 469 F.3d at 1204.

**Floyd Bose and Dion Leiker**

Counsel also failed to interview Floyd Bose and his daughter, Dion Leiker, who were made known to trial counsel well prior to trial but were never even contacted despite the significant mitigation evidence they could have provided. Doc. 47, Exhibit 19 – Purkey Letter to Duchardt dated August 7, 2003).

Specifically, Bose, a law enforcement officer for 24 years and former Sheriff in Smith Center, Kansas, would have testified that he met Purkey while Purkey was in prison in the early 1980's. Bose's son had been murdered and Purkey contacted the family to provide them with information he had learned that gave the family closure in helping them to understand what had happened. Bose also found Purkey to be very remorseful for his own crimes. (Doc. 47, Exhibit 20 – Floyd Bose Declaration). He remains in irregular contact with Purkey as does his daughter, Dion Leiker, who also served twelve years in law enforcement. Leiker stayed in contact with Purkey after that time and describes him as a very compassionate person, who even helped her understand her grandson's problems after her grandson was sexually molested. She also credits Purkey with saving her life in 1983 when he convinced her to escape an extremely violent marriage in which she was being abused weekly. (Doc. 47, Exhibit 21 – Dion Leiker Declaration).

Before the District Court, despite having no notes and no time records supporting his current account of events,[24] counsel declared that he had "various opportunities to talk to Dion" about Mr. Purkey's assistance to Ms. Leiker and Mr. Bose "in their attempt to sort out the death in prison of Floyd's son, Dion's

---

[24]It should be noted that Purkey's counsel turned over no notes whatsoever to the undersigned counsel, which is again consistent with his practices in *Sinisterra*, where he also turned over no trial notes to 2255 counsel. *See generally Sinisterra v. United States*, 600 F.3d 900 (8th Cir. 2010) (remanding for evidentiary hearing on the question of ineffective assistance of counsel in failing to adequately prepare and present mitigation evidence).

brother."[25] (Doc. 73, Attachment 1 at 70). Counsel again purported a strategy for not presenting their testimony, which included counsel's desire to prohibit revelation that Mr. Purkey "had asked for" financial assistance in exchange for his information, which was "possibly false." (Doc. 73, Attachment 1 at 72).

Counsel again professed investigation and "strategy" contradicted by the other available evidence. First and foremost, Ms. Leiker, a former law enforcement officer, is adamant that counsel never talked to her. (Doc. 82, Exhibit 12). Second, as is clear from Ms. Leiker's initial declaration, which was attached as Exhibit 21 to Doc. 47, and her second declaration in response to counsel's allegations, her brother was not killed in prison. He was killed outside of prison, and Mr. Purkey only heard about it later. In addition, as Ms. Leiker stated, "His murder had nothing to do with a 'conspiracy which involved inmates, prison officials or government officials." Finally, as is clear from both Ms. Leiker's declaration and Mr. Bose's second declaration in response to counsel's allegations, (Doc. 82, Exhibits 12 & 13),[26] Mr. Purkey never asked for any financial assistance from them in exchange for the information provided or otherwise. Thus, all of counsel's purported reasons again fold in the face of other evidence and

---

[25]Counsel also asserted that he "obtained what records [he] could about the matter," 2255 Doc. 73, Attachment 1 at 70, but there are none in counsel's file and no indication of any attempt to obtain such records in notes or time records.

[26]Mr. Bose's initial declaration was attached as Exhibit 20 to 2255 Doc. 47.

information and stand starkly as after-the-fact declarations rationalizing counsel's failures in the pretrial investigation. He could not form a valid strategy "based on deficient investigation."

**Peggy and Evette Noe**

Counsel also failed to interview Peggy Marteney Noe and her daughter, Evette Marteney Noe, who will be referred to here by their first names for simplicity's sake. Peggy was named in some of Purkey's Wichita Police Records that were obtained by trial counsel. Specifically, on April 4, 1974, when Purkey had been taken into "protective custody" for public drunkenness and taken to the hospital, Peggy was listed as his common law wife. Purkey has remained in contact with her over the years and could easily have provided contact information for her.

Peggy has known Purkey since the second grade and went to school with him. She knew he went to special classes everyday after school for his stuttering problem. She also knew even at the time that he was physically abused by his parents and that they were alcoholics. When Purkey was only 16 or 17 years old, he also confided in Peggy the information that his mother was sexually abusing him and had been doing so for a long time. While it was difficult for him to talk about it and stuttered badly when he did, he told Peggy that his mother forced him to have sex with her and made him do other things to her sexually to stimulate her.

Peggy was also aware that after Purkey's grandmother died, his mother lived with her step-father "like husband and wife" and clearly had a sexual relationship with him. Peggy even observed Purkey's step-grandfather threaten him with a shotgun when Purkey confronted them asserting that their actions were wrong. (Doc. 52, Exhibit 3).

In addition to this information, Peggy has many very positive things to say about Purkey and has remained in contact with him over the years. Her daughter, Evette Noe, who was born in 1973, also has very good things to say about Purkey, including that he has been like a father to her. She has known him since she was a child when he helped to raise her. After he went to prison, she started writing to him when she was nine, and she still writes to him. Purkey gave her Duchardt's phone number, and she tried to contact him a number of times prior to Purkey's capital trial. He never returned her calls. (Doc. 52, Exhibit 4). This is simply unforgivable, deficient conduct. *See, e.g., Williams v. Taylor,* 529 U.S. at 396 ("Counsel failed even to return the phone call of a certified public accountant who had offered to testify" in mitigation).

Again with no notes or time records reflecting any contact with these witnesses, counsel asserted before the District Court that he "did speak, prior to trial, certainly with Peggy, and possibly with Evette." (Doc. 73, Attachment 1 at 73). Both of these women adamantly denied that counsel ever talked to them.

Indeed, Peggy Noe even characterized counsel's statement that he talked to her as "an out and out lie."  Likewise, Evette Noe declared that she attempted to call counsel but her calls were never returned.  (Doc. 82, Exhibits 14 & 15).

Counsel went further in his assertion that Dr. Peterson considered the information from Peggy, even though there is absolutely no reference to it in Dr. Peterson's reports, his testimony, or anywhere else that counsel can point to.

Finally, counsel asserted again, as with Dr. Newton, that the government never asserted "that Purkey had recently made up the story about the sexual abuse in order to avoid the death penalty."  (Doc. 73, Attachment 1 at 74).  This "reason" has already been addressed and the argument will not be repeated here.

**Other Family Members and Associates**

With respect to Angie Genail, Mr. Purkey's daughter, counsel recalls that he met with her in person three times to prepare her testimony, which in the end was "powerful" from his perspective.  (Doc. 73, Attachment 1 at 58-59).  In her declaration, however, Ms. Genail clearly disputed counsel's recollection about his contacts with her.  Doc. 52, Exhibit 5).[27]  It is also notable here that nowhere in counsel's lengthy statement does he dispute the allegation included in the 2255 Motion, Document 47 at 11 n.3, that counsel's first in-person contact with Ms.

---

[27]Notably, counsel's vouchers submitted to the District Court for payment reflect only one in-person meeting with Ms. Genail long before the trial and one brief consultation with her when the sentencing proceeding was already on-going. This is far more consistent with Ms. Genail's recollection than counsel's.

Genail was to show up at her wedding to attempt to interview her and her mother. She confirmed this undisputed allegation in her affidavit. (Doc. 52, Exhibit 5).

As Mr. O'Brien observed:

A competent interviewer will also be sensitive to other distractions that may erect barriers to disclosure of sensitive information. Showing up at a wedding, for example, and expecting to conduct meaningful interviews of family, friends and members of the wedding party is not likely to produce meaningful information.

(Doc. 82, Exhibit 4, para. 22).

Counsel's lack of attentiveness to the interviewing and preparation of Mr. Purkey's family members is also reflected in the declarations of Purkey's cousin, Debbie Prothero, and his aunt, Marguerite Hotchkiss. (Doc. 82, Exhibits 6, 7, 9, 10). Counsel cited as reasons not to call Ms. Prothero as a witness "that she had little or no recollection of or prior relationship with Wes and that she was personally very much in favor of the death penalty," (Doc. 73, Attachment 1 at 59), "and was in no way opposed to Wes receiving the death penalty in this case," (Doc. 73, Attachment 1 at 60 n.6). Ms. Prothero, on the other hand, cited as "absolutely wrong," counsel's recollection that she was not opposed to Purkey receiving the death penalty. (Doc. 82, Exhibit 6). She also cited her willingness to testify on his behalf and provided the substance of the testimony that she could

have given. (Doc. 82, Exhibit 7).[28]

While Purkey's aunt, Marguerite Hotchkiss did testify by teleconference,[29] she stated that she only spoke to counsel by telephone and was never prepared to testify. The substance of her testimony was also hampered by the circumstances of her testimony, where she was alone in a room looking at a screen where she could only see counsel from the neck down. By her own description, the circumstances were "uncomfortable and frustrating" and she was "appalled." (Doc. 82, Exhibit 10). Ms. Hotchkiss also provided the additional substantive information that she could have included in her testimony. *Id.*

Counsel's view that his investigation was adequate in its truncated form is also not consistent with the evidence relating to counsel's failure to call Sam Hoffmeier as a mitigation witness. Counsel stated that he did not call Sam Hoffmeier to testify as a good character witness because "Hoffmeier did not deal with Purkey in the segregation pod." (Doc. 73, Attachment 1 at 39). If counsel had delved further into the issue with Mr. Hoffmeier, he would have been aware that this simply was not true because Mr. Hoffmeier's "only dealings" with Mr.

---

[28]Her husband, Russ Prothero, also provided the substance of the testimony that he could have given. (2255 Doc. 82, Exhibit 8).

[29]Counsel stated that Ms. Hotchkiss was "adamant" that she not testify in person because of "emotional problems over the case itself and her perceived difficulties related to travel," 2255 Doc. 73, Attachment 1 at 60, which counsel clearly did not believe. Ms. Hotchkiss, however, disputed these statements and explained that she was unable to testify in person because "her health had deteriorated by the time of Wes' trial." Doc. 82, Exhibit 9.

Purkey "was in the segregation unit" or "segregation pod." (Doc. 82, Exhibit 11). Mr. Hoffmeier would have testified consistent with his initial declaration, which is attached as Exhibit 25 to Doc. 47. Thus, he would have provided good character evidence at least as significant as some of the evidence discussed in *Williams v. Taylor, supra,* such as a "certified public accountant" who could have testified based on his visits with the defendant "as part of a prison ministry program." *See also* Berrigan, at 831 (noting that the court in *Williams* "considered even something as minor as 'returning a guard's missing wallet' as noteworthy mitigation").

**Prejudice**

Although counsel did present mitigation evidence through retained mental health experts, Purkey was prejudiced by not having disinterested, lay witnesses, such as Dr. Newton, Mr. Bose, and Ms. Leiker, in particular, testify on his behalf. "The jury was called upon to determine whether a man whom they did not know would live or die." *Collier v. Turpin,* 177 F.3d 1184, 1204 (11th Cir. 1999). Counsel's duty was to "humanize the defendant for the jury, show his character in the best light available, and bring his good qualities to the fore." *State v. Williams,* 794 N.E.2d 27, 50 (Ohio 2003), *modified on reconsideration,* 814 N.E.2d 818 (Ohio 2004). The jury should have "heard first-hand accounts" and "personal testimony" from these witnesses in support of the expert testimony. *Powell v.*

*Collins*, 332 F.3d 376, 400 (6th Cir. 2003). These witnesses could have given the jurors *"objective and specific* examples of why [Purkey's] life should be spared" and could have provided the information that "illuminates the man whose life [was] in their hands." *Marquez-Burrola v. State*, 157 P.3d 749, 766-67 (Okla Crim. App. 2007). In short, these witnesses could have provided the testimony that "would have humanized" Purkey for the jury. *Williams v. Anderson*, 460 F.3d 789, 805 (6th Cir. 2006).

These witnesses not only could have provided substantial, credible, and humanizing mitigating information in their own right, but their testimony would also have provided substantial support for Dr. Cunningham's testimony rebutting the government's assertion of future dangerousness. In addition, the testimony of Margaret Noe and Dr. Newton was also relevant corroborating information that would have supported Dr. Peterson's testimony and established that Purkey did not just "make up" the report of sexual abuse in order to escape the death penalty. In short, their testimony would have "corroborated [Dr. Peterson's] testimony and bolstered the credibility of his response to the prosecution," who attacked him and Purkey by essentially asserting that Purkey had recently fabricated an allegation that his mother had sexually abused him. *Hovey v. Ayers*, 458 F.3d 892, 926 (9th Cir. 2006). With respect to Dr. Newton, in particular, his testimony "coming as it did from [a] doctor[] who had no connection to the defense or incentive to invent a

diagnosis and thus who [was] invulnerable to charges of fabrication, could very well have made the difference in a life as opposed to death verdict." *Id.* at 927.

The overall prejudice is clear because the available, but unpresented mitigation evidence was not simply "'new' evidence [that] largely duplicated the mitigation at trial." *Cullen v. Pinholster*, ___ S.Ct. ___, 2011 WL 1225705, at *19 (Apr. 4, 2011). Even without this evidence, the jury spent approximately twelve hours in sentencing deliberations before reaching a verdict. *See, e.g., Williams*, 794 N.E.2d at 54. If all of the available mitigating evidence had been presented, "there is a reasonable probability that at least one juror would have struck a difference balance." *Wiggins*, 539 U.S. at 537.

### (c) Failure to Adequately Prepare and Present the Testimony of Stephen Peterson, M.D.

Dr. Stephen Peterson, a forensic psychiatrist retained by counsel, testified in sentencing. He detailed Purkey's report of sexual abuse by his mother in his report prepared in April 2000 in connection with Purkey's prior murder conviction in Kansas. (Doc. 47, Exhibit 22). He also noted in his August 2003 report prepared in connection with this case that Purkey's prior report of the sexual abuse to Dr. Newton was documented in the Oregon Department of Corrections records. (Doc. 47, Exhibit 23).

During sentencing, Dr. Peterson testified only generally that Purkey was "severely sexually and physically and emotionally abused in childhood" and he

"developed abnormal psychosexual ideas." Tr. 1748. The only detail he included in his testimony was that Purkey had reported pervasive sexual abuse by his mother from age six to 14 and he witnessed her sexual involvement with her boyfriends after his father left. Tr. 1750. He also mentioned Purkey's father paying for prostitutes for him at a young age and how each of these things resulted in Purkey having substantial difficulties with "emotional detachment" to women. Tr. 1750. He also mentioned Purkey's prior diagnosis of "psychosexual problems of identification." Tr. 1752.

During cross-examination, however, Dr. Peterson "admitted" that the only prior report of sexual contact with his mother was her 1972 report that Purkey allegedly raped her.[30] Tr. 1817. He also testified on cross that he was the only one Purkey told about sexual abuse in detail because he was the only one to ask. Tr. 1824. At the time, he was not aware, of course, that Purkey had provided some of this information to Margaret "Peggy" Noe 20 years before or that Purkey had also provided detailed information on this topic to Dr. Cunningham.

Dr. Peterson was aware, however, but had simply forgotten that the Oregon Department of Corrections Records reflected Purkey's prior report of being

_____

[30]Purkey was never charged with this alleged offense because law enforcement officers reported that Mrs. Purkey was intoxicated and appeared to have mental problems, the examining doctor found no evidence of sexual assault, and Mrs. Purkey's aunt, who lived in the home, reported that Purkey was not even present in the home at the time of the alleged rape.

sexually abused as a child. Nonetheless, counsel failed to even point out those records in redirect or to even direct him to his own report, which referenced in detail the prior Oregon reports. (Doc. 47, Exhibit 23).

Counsel's conduct failed to prepare Dr. Peterson to testify about the details of the sexual abuse he was aware of, to provide him with the information concerning the details of the sexual abuse Dr. Cunningham was aware of, to develop the additional information that Dr. Newton and Peggy Noe could have provided, or even to correct the false perception created during cross-examination.

As addressed, the prior records and information from Dr. Newton and Noe "would have strengthened" and "confirmed" Dr. Peterson's opinion that Purkey had, in fact, been sexually abused by his mother and that he was not simply fabricating an allegation in order to avoid the death penalty. *See, e.g., Hovey,* 458 F.3d at 926.

Dr. Peterson also should have been prepared and questioned on the stand by counsel concerning the details of the horrid abuse Purkey endured from his mother rather than just the "conclusional testimony" that Purkey was sexually abused. *Lewis v. Drake,* 355 F.3d 364, 368 (5th Cir. 2003). This was "wholly inadequate to present to the jury a true picture of the tortured childhood" Purkey experienced. *Id.* at 369. The mere label of "sexual abuse" tells the jury nothing about "a defendant's troubled childhood, [which] will present him in a more sympathetic

light to a jury." *Turpin v. Lipham*, 510 S.E.2d 32, 41 (Ga. 1998).

The prejudice is especially clear "[w]here, as here, the very matter as to which defense counsel has been ineffective becomes one of the linchpins of the prosecutor's closing." *Commonwealth v. Alvarez*, 740 N.E.2d 610, 618 (Mass. 2000). Here, because counsel did not adequately prepare Dr. Peterson beforehand or redirect him after the very damaging cross, government counsel was free to argue (without objection or contradiction by defense counsel) that Dr. Peterson's "findings were a fairy tale" and that the evidence of Purkey's horrible childhood was simply "the old abuse excuse." Tr. 2267-68. If counsel had performed adequately, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

### (d) Failure to adequately prepare and present the expert testimony of Mark Cunningham, Ph.D.

Dr. Cunningham, a forensic psychologist, was retained by counsel as a defense expert or as a "mitigation/sentencing specialist" to rebut the government's allegations of future dangerousness and to address other matters. In his interviews of Purkey, Dr. Cunningham was provided with details about the sexual abuse of Purkey by his mother. Specifically, Dr. Cunningham had learned and was prepared to testify, based on information provided to him by Purkey, that Purkey had been exposed to such things as his parents having sexual intercourse with the

door open, seeing his father walk around naked with a partial erection, and seeing his mother frequently in only a negligee. After his parents separated, he had also observed his mother having sexual intercourse with another man.

Dr. Cunningham was also prepared to testify about the details of the sexual abuse by Purkey's mother because he believed it was very important in providing mitigating information to a jury to provide the actual details of events rather than simply putting a label on it such as "sexual abuse." He could have testified that, when Purkey was only eight, his mother was inappropriately touching his genitalia. After she separated from her husband, she would have him sleep with her and manually stimulate her sexually or to penetrate her with the handle of a hairbrush. She would also have him rub lotion on her breasts and genitalia. As he grew older, she had him to perform cunnilingus on her, and she would manually stimulate him to orgasm. Ultimately, she sporadically engaged him in sexual intercourse. (Doc. 47, Exhibit 11).

Dr. Cunningham had even prepared slides, which were discussed with counsel in preparation for his testimony, including these relevant slides. (Doc. 47, Exhibit 11). Dr. Cunningham understood, when he took the witness stand, that he would be testifying about the details of "the sexual abuse of Mr. Purkey and his exposure to other sexual traumas as a child." (Doc. 47, Exhibit 11). But counsel did not question him about these details, and Dr. Cunningham believed "this was a

significant omission because this was important mitigating information in its own right but was also important in understanding Mr. Purkey's mental makeup." (Doc. 47, Exhibit 11).

Like Dr. Peterson, Dr. Cunningham testified only generically about Purkey's mother's promiscuous behavior. Tr. 1858. He also testified generically that she sexually abused him for years and that he had also been abused by an older male several times. Tr. 1865.

Counsel's conduct was deficient in failing to adequately prepare Dr. Cunningham to testify concerning the details of the sexual abuse he was aware of, failing to develop the additional information that Dr. Newton and Peggy Marteney could have provided, and failing to even ask the questions of Dr. Cunningham to elicit the information he was prepared to testify to in accordance with the slides he had prepared. (Doc. 47, Exhibit 11).

Counsel's conduct was not based on any reasonable strategic or tactical decision. Dr. Cunningham's intent to testify to these details is clear from his slides. (Doc. 47, Exhibit 11). Thus, counsel apparently just failed to ask the appropriate questions, perhaps because of his failure to prepare or refer to notes while he examines witnesses in court. (Doc. 47, Exhibit 1). Just as with Dr. Peterson, counsel's failure to adequately present the available evidence was prejudicial.

### (e) Failure to adequately prepare and present the expert testimony of Bruce Leeson, Ph.D.

During sentencing, one of the expert witnesses presented by counsel was Bruce Leeson, Ph.D., who testified on the basis of neuropsychological testing that Purkey suffers from frontal and temporal lobe dysfunction. During cross-examination, however, it became apparent that he had not been provided with sufficient information and/or had not been adequately prepared by defense counsel for the government's cross examination. Specifically, Dr. Leeson was not aware that Purkey had completed some college courses or that he was "a jailhouse lawyer." Tr. 1616. He also was not aware of neurological examinations of Purkey following head injuries in car accidents, even though Dr. Leeson had referred to these head injuries as a possible source of neurological dysfunction. He was also unaware of other prior expert reports that formed the basis for government cross-examination. Tr. 1626-31.

Counsel's conduct was deficient in failing to provide Dr. Leeson with sufficient records and failing to adequately prepare him for cross-examination. "[W]hen experts are placed on the stand with virtually no preparation or foundation, a capital defendant has not received effective penalty phase assistance of counsel." *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998).

> A defense attorney in the sentencing phase of a capital trial has "a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client[ ] facts that the

experts do not request." Regardless of whether a defense expert requests specific information relevant to a defendant's background, it is defense counsel's "duty to seek out such evidence and bring it to the attention of the experts."

*Hovey*, 458 F.3d at 925.

Counsel's conduct was prejudicial because Dr. Leeson's credibility was severely challenged before the jury simply because he had not been adequately prepared to address the prior reports and other information.

> The clear implication of the prosecution's argument was that [Dr. Leeson] was uninformed about the subject of his diagnosis and that his conclusions stemmed from a general misunderstanding of the facts. Even if the background information did not change [his] diagnosis, he at least would have been able to testify more knowledgeably about the case and better weather the prosecution's attempts to discredit him. He would have been able to anticipate the prosecution's questions during cross-examination and explain [his opinions] . . . . Instead, [he] was caught by surprise, in an embarrassed and vulnerable situation. He was entirely discredited by his lack of critical information, information that lay in the hands of [Purkey's] counsel.

*Hovey*, 458 F.3d at 929. If Dr. Leeson had been adequately prepared and able to explain that his findings of neurological dysfunction, which were an integral part of the defense theme in mitigation, were not rebutted by the information the government used in cross-examination, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different. Brain damage, especially when combined with the influence of drugs, has significant impact on functioning. *Detrich v. Ryan*, 619

F.3d 1038, 1064 (9th Cir. 2010) (In essence, the available but unpresented mitigation was that petitioner had cognitive deficits that were compounded by his abusive childhood and drugs and alcohol that "caused him to act impulsively and impaired his ability to control his action"); *Caro v. Woodford*, 280 F.3d 1247, 1258 (9th Cir. 2002) (Counsel ineffective in capital sentencing for failing to prepare and present evidence of the defendant's brain damage due to a long history of exposure to toxic pesticides and chemicals, history of severe head injuries, and significant abuse as a child, aa this evidence explained "that his behavior was physically compelled, not premeditated, or even due to a lack of emotional control, his moral culpability would have been reduced").

**(f)     Failure to adequately investigate and prepare witnesses, which resulted in counsel calling alleged "mitigation" witnesses that were prejudicial.**

Counsel's inattention and lack of preparation for sentencing also manifested itself in counsel's presentation of "mitigation" witnesses that provided information that was more harmful than helpful to Purkey. Specifically, the very first defense witness was Dr. William Grant, a Bureau of Prisons employee, who testified about the medications he had prescribed for Purkey, but also made it clear that he prescribed these medications based on the recommendation of Dr. Peterson and because Purkey was "on trial for his life" and the medications were not otherwise inappropriate. Tr. 1410, 1415, 1417. He then testified on cross-examination that

while Dr. Peterson reported that Purkey suffered "anxiety" others, presumably himself included, would call it "attitude, belligerent, irritable." He also testified that it "seems to be more acceptable to be anxious than to be irritable, angry and aggressive" and that Purkey has "real anger control problems." Tr. 1416.

Counsel also called Mark Russell, a counselor at USP-Leavenworth, presumably to testify that it was no "club Fed." On cross-examination, however, Russell acknowledged that Purkey was housed in a unit for inmates that had behavioral problems and were administratively segregated. He also testified that Purkey was the only pretrial detainee there and he was sent because he "was a management problem" and was "demanding." Tr. 1656. He also testified that he had heard that Purkey has a long history of assaultive behavior in prison. Tr. 1658.

Counsel's conduct was deficient in failing to adequately interview these witnesses before putting them on the witness stand. "[C]ounsel could not have evaluated or weighed the risks and benefits of calling [these witnesses] . . . without so much as asking [them] what [they] would say if called." *Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005). If counsel had done so, it would have been clear that their testimony was not "mitigating" and, in fact, was more harmful than helpful to Purkey. Their testimony was, in fact, prejudicial to Purkey.

**(g) The District Court's ruling.**

In ruling on these issues, the district court simply made conclusory findings

that Purkey "failed to overcome the presumption that Mr. Duchardt's actions were not sound trial strategy." The court also made conclusory findings that counsel's "actions did not fall below an objective standard of reasonableness," and Purkey could not establish prejudice from counsel's actions or inactions. (Doc. 89 at 4). Specifically, the court relied on the assertion that "no jurors voted for a single mitigating factor," (2255 Doc 89 at 11), based on the evidence counsel presented, to support the logically faulty extension of that assertion – i.e., jurors would, therefore, have necessarily rejected any and all evidence that counsel could have *but did not* prepare and present. This prejudice analysis is faulty in the same fashion as that employed by the state court in *Sears v. Upton*, 130 S. Ct. 3259, 3264 (2010) (the state postconviction court failed to apply the proper prejudice inquiry in determining that counsel's facially inadequate mitigation investigation did not prejudice the petitioner simply because "*some* mitigation evidence" had been presented).

In addressing whether Purkey is entitled to a certificate of appealability, this Court need only make a threshold inquiry rather than full merits consideration of whether Purkey has established entitlement to relief. *Miller-El v. Cockrell*, 537 U.S. at 337. This Court's assessment requires only "an overview of the claims" and "a general assessment of their merits." *Id.* At minimum, Purkey has established that reasonable jurists could debate whether he is entitled to relief, even

78

if he might not prevail after "the case has received full consideration." *Id.* at 338. While Purkey submits that he can and will prevail on the merits, the question here is only "the debatability of the underlying constitutional claim, not the resolution of the debate." *Id.* at 342. Because the debatability has been established, Purkey is entitled to a certificate of appealability on this claim.

**2. An evidentiary hearing should have been conducted regarding Purkey's claims of ineffective assistance of counsel.**

On October 16, 2007, Purkey filed his motion to vacate his conviction and death sentence, supporting it with a number of affidavits:

| | |
|---|---|
| Ex. 1 | Declaration of Laura O'Sullivan |
| Ex. 11 | Declaration of Mark Cunningham, Ph.D. |
| Ex. 15 | Declaration of Stephen Peterson, M.D. |
| Ex. 16 | Declaration of Gary Hamilton |
| Ex. 18 | Declaration of Rex Newton, M.D. |
| Ex. 20 | Declaration of Floyd Bose |
| Ex. 21 | Declaration of Dion Leiker |
| Ex. 25 | Declaration of Sam Hoffmeier |

(2255 Doc. 47). Mr. Purkey, then, requested an evidentiary hearing. *Id.* at 52-53). Six weeks later, Purkey filed his Memorandum of Law in Support of his 2255 motion, attaching additional affidavits:

| | |
|---|---|
| Ex. 26 | Declaration of Cornelius Peoples |
| Ex. 27 | Declaration of Melvin Lister |
| Ex. 28 | Declaration of Margaret Noe |
| Ex. 29 | Declaration of Evette Noe |

(2255 Doc. 52). After obtaining lengthy extensions to give Duchardt additional time to craft his statement in opposition to his former client's motion, the Government filed its suggestions in opposition on May 20, 2008. (2255 Doc. #73). Much of the Government's suggestions simply incorporated arguments from the "Statement of Frederick A. Duchardt, Jr."[31] *See, e.g.,* (2255 Doc. 73, p. 44, *citing* Affidavit 43-79 ("Mr. Duchardt's explanation is very thorough and no further argument is necessary,"); p. 45, *citing* Affidavit 79-82 ("Mr. Duchardt provides a well-reasoned response to Purkey's allegations that he inadequately prepared defense expert Dr. Leeson to testify at trial…No further argument is necessary"); p. 46, *citing* 89-92 ("As Mr. Duchardt correctly states in his affidavit, post-conviction counsel for Purkey have not fully and accurately described the trial testimony of Dr. Cunningham").

On September 15, 2008, Purkey filed his (sealed)[32] motion to strike Duchardt's affidavit, attaching several affidavits:

| | |
|---|---|
| Ex. 1 | Emails between 2255 counsel and Duchardt |
| Ex. 2 | Email from Duchardt to AUSA |
| Ex. 3 | Email from 2255 counsel to Duchardt |
| Ex. 4 | Letter from Duchardt to Purkey |
| Ex. 5 | Report of Lawrence Fox |
| Ex. 6 | Declaration of Dion Leiker |
| Ex. 7 | Declaration of Floyd Bose |
| Ex. 8 | Declaration of Debbie Prothero |

---

[31] *See* III(B), *infra.*

[32] This motion was filed under seal since Duchardt's affidavit exceeded the scope of waiver and contained privileged information.

|          |                                                              |
|----------|--------------------------------------------------------------|
| Ex. 9    | Declaration of Margaret Ann Noe                              |
| Ex. 10   | Declaration of Evette C. Noe                                 |

(2255 Doc. 83).

Also, on September 15, 2008, Purkey filed his (sealed)[33] reply suggestions in support of his 2255 motion, again, attaching a number of affidavits:

|          |                                                              |
|----------|--------------------------------------------------------------|
| Ex. 1    | Declaration of Jennifer Herndon (12/2/04) (filed in *Sinisterra v. United States*, Case No. 04-cv-8003-GAF (W.D. Mo.) |
| Ex. 2    | Declaration of Jennifer Herndon (10/31/07) (filed in *Sinisterra v. United States*, Case No. 04-cv-8003-GAF (W.D. Mo.) |
| Ex. 4    | Declaration of Sean D. O'Brien, Esq.                        |
| Ex. 5    | Declaration of Angie Genail                                 |
| Ex. 6    | Declaration of Debbie Prothero (7/23/08)                    |
| Ex. 7    | Declaration of Debbie Prothero (3/2/08)                     |
| Ex. 8    | Declaration of Russ Prothero                                |
| Ex. 9    | Declaration of Marguerite Hotchkiss (7/23/08)               |
| Ex. 10   | Declaration of Marguerite Hotchkiss (1/25/08)               |
| Ex. 11   | Declaration of Sam Hoffmeier                                |
| Ex. 12   | Declaration of Dion Leiker                                  |
| Ex. 13   | Declaration of Floyd Bose                                   |
| Ex. 14   | Declaration of Margaret "Peggy" Noe                         |
| Ex. 15   | Declaration of Evette Noe                                   |

(2255 Doc. 82). Purkey renewed his request for an evidentiary hearing, noting that he would be filing a separate request for a hearing by October 15, 2008 (2255 Doc. 82, p. 56). Purkey filed that request on October 7, 2008 (2255 Doc. 84).

---

[33] This reply was filed under seal for the same reason.

To dismiss Purkey's motion without an evidentiary hearing, the District Court had to accept the factual allegations in Purkey's 2255 motion as true. After all, § 2255 requires a hearing as follows:

> Unless the motion and *the files and records of the case* conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States Attorney, grant a prompt hearing thereon....

28 U.S.C. § 2255 (emphasis added). The District Court's judgment, however, ignored Purkey's factual allegations and the thirty-one supporting affidavits he had filed, opting instead to rely exclusively on the contrary facts asserted in Duchardt's 117-page statement (2255 Doc. 89, p. 3 ("In response to these allegations, Mr. Duchardt filed a 117 page affidavit, in which he goes into extensive detail to refute movant's claims"); p. 4 ("The Court has reviewed Mr. Duchardt's affidavit, as well as the briefs and arguments presented by counsel and finds that movant has failed to overcome the presumption that Mr. Duchardt's actions were not sound trial strategy")).

Although Purkey bore the burden to establish his right to a hearing, that burden is "relatively light...and is *significantly lower* than his burden to show he is entitled to § 2255 relief." *Valentine v. United States*, 488 F.3d 325, 333-34 (6th Cir. 2007) (emphasis added); *accord Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999).

The Rules Governing § 2255 Proceedings illustrate that this language is intended to incorporate the standards governing evidentiary hearings in *habeas corpus* cases that was articulated by the United States Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 312 (1963). *See* Advisory Committee Notes to Rule 8, Rules Governing § 2255 Proceedings (incorporating Advisory Committee Notes to Rule 8, Rules Governing § 2254 Cases).[34] There, the Supreme Court articulated the appropriate standard for determining when an evidentiary hearing must be held:

> *Where the facts are in dispute*, the federal court in *habeas corpus* must hold an evidentiary hearing if the *habeas* applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding.

372 U.S. at 312 (emphasis added). As the *Townsend* court further explained, the litigant must also demonstrate that the facts alleged, if true, would entitle him to relief. 372 U.S. at 312. The *Townsend* court then identified six circumstances under which a federal court *must* grant an evidentiary hearing:

> If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the factfinding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state court

---

[34] "The standards for § 2255 hearings are essentially the same as for evidentiary hearings under a *habeas* petition, except that the previous federal factfinding proceeding is in issue [in determining whether a hearing is necessary] rather than the state's." Advisory Committee Notes to Rule 8 of the Rules Governing § 2255 Proceedings.

hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

372 U.S. at 313.

In 2255 cases like this, of course, there is no prior *habeas* proceeding in which an evidentiary hearing could have been conducted on the movant's claims. Thus, the 2255 proceeding is the only vehicle through which a factual record may be made. Thus, an evidentiary hearing must be held when (1) there are disputed issues of fact that cannot be conclusively resolved on the basis of the extant record alone and (2) those facts, if true, would entitle the movant to relief.

Here, Purkey made copious allegations of ineffectiveness which are not conclusively refuted by the record and which, if true, entitle him to relief from his conviction and death sentence (*See* 2255 Docs. 47, 52 and 82). Indeed, this Court has recognized that "when the petitioner's claim is that his trial counsel was constitutionally ineffective, the files and records [generally] do not conclusively show that [petitioner] is entitled to no relief." *Shaw v. United States,* 24 F.3d 1040 (8th Cir. 1994); *accord, Nelson v. United States,* 297 Fed. Appx. 563, No. 07-3071 (8th Cir. Oct. 27, 2008) (remanded because evidentiary hearing was required on several claims of ineffective assistance) (Attached per FRAP 32.1)[35] *Koskela v. United States,* 235 F.3d 1148, 1149 (8th Cir. 2001) (remanded because evidentiary hearing was required on claim of ineffective assistance in failing to call certain

---

[35] Attached per FRAP 32.1.

witnesses).[36] Many of Mr. Purkey's allegations involve activity outside the courtroom, and, thus, the record can shed absolutely no light on them. The Supreme Court has concluded that, where movant's allegations relate to events "outside the courtroom and upon which the record could, therefore, cast no real light," a hearing is required. *Machibroda v. United States*, 368 U.S. 487, 494-95 (1962).

> *Machibroda* is cited in Rule 5 of the Rules Governing § 2255 Proceedings:

> Numerous cases have held that the government's answer and affidavits are not conclusive against the movant, and *if they raise disputed issues of fact a hearing must be held. Machibroda v. United States*, 368 U.S. 487, 494, 495 (1962); *United States v. Salerno*, 290 F.2d 105, 106 (2nd Cir.1961); *Romero v. United States*, 327 F.2d 711, 712 (5th Cir.1964); *Scott v. United States*, 349 F.2d 641, 642, 643 (6th Cir.1965); *Schiebelhut v. United States*, 357 F.2d 743, 745 (6th Cir.1966); and *Del Piano v. United States*, 362 F.2d 931, 932, 933 (3rd Cir.1966).

---

[36] *See also Smith v. United States*, 182 F.3d 1023 (8th Cir. 1999) (remanded because evidentiary hearing was required regarding prisoner's ineffective assistance of counsel claim); *Latorre v. United States*, 193 F.3d 1035 (8th Cir. 1999) (remanded because evidentiary hearing was required because the record was inconclusive on movant's claim); *Shaw v. United States*, 24 F.3d 1040 (8th Cir. 1994) (remanded because evidentiary hearing was required because the claim of ineffective assistance was not "inadequate on its face"); *Neary v. United States*, 998 F.2d 563 (8th Cir. 1993) (remanded because evidentiary hearing was required on claim of ineffective assistance); *United States v. Unger*, 665 F.2d 251 (8th Cir. 1981) (remanded because evidentiary hearing was required on claim of ineffective assistance not refuted by the record); *Rose v. United States*, 513 F.2d 1251 (8th Cir. 1975) (remanded because evidentiary hearing was required on movant's claim that he was incompetent at the time of his guilty plea).

Advisory Committee Notes to Rule 5, Rules Governing Section 2255 Cases (emphasis added). Indeed,

> "[a]n opposing affidavit by the Government is not part of 'the files and records of the case' which can be taken to 'conclusively show that the prisoner is entitled to no relief,' within 28 U.S.C. § 2255. The principle was established by the Supreme Court as long ago as *Walker v. Johnston*, 312 U.S. 275 (1941)...'It is true that they (appellant's allegations) are denied in the (government) affidavits filed with the return to the rule, but the denials only serve to make the issues which must be resolved by evidence taken in the usual way. They can have no other office. The witnesses who made them must be subjected to examination Ore tenus or by deposition as are all other witnesses."

*Lindhorst v. United States*, 585 F.2d 361, 365 (8th Cir. 1981), *quoting Walker*, 312 U.S. at 286-87. Here, the record and files from the underlying criminal case do not conclusively refute Purkey's 2255 claims. While it is true that the Government and Duchardt have denied Mr. Purkey's allegations (DOC. #73), those denials serve only as a demand for a hearing where the claims may be resolved by evidence taken in the usual manner.

The numerous factual disputes in the assertions made in the copious affidavits Purkey has filed and the one filed by Duchardt cannot be resolved without taking testimony. *See, e.g., Watson v. United States*, 493 F.3d 960 (8th Cir. 2007) (remanded because evidentiary hearing was required before court could decide credibility questions). The District Court's judgment, however, purports without factual or legal basis, to do just that, holding,

The Court finds that no hearing is necessary in this case, because even if movant's allegations are true, and Mr. Duchardt was ineffective for failing to call certain witnesses or to present a more complete mitigation case, movant would not be entitled to relief. As noted above, of the twenty-seven mitigating factors which were presented to the jury, no jurors voted for a single mitigating factor. So, even if movant's counsel had called different or additional witnesses or introduced more or additional mental health or evidence relating to his abuse as a child and young adult, it is unlikely that the jury would have considered this mitigating evidence or that they would have sentenced movant to life in prison.

(DOC. #89 at 10). The competing affidavits filed in this case clearly establish a "question of fact." *West v. United States*, 994 F.2d 510 (8th Cir. 1993) (remanded for evidentiary hearing because movant's allegations were sufficient to make a "question of fact").

In *Machibroda, supra,* the movant submitted an affidavit claiming that, on three separate occasions, the Assistant U.S. Attorney (AUSA) had promised him that, if he pleaded guilty, he would receive a sentence of not more than twenty years; the AUSA cautioned him not to tell his defense lawyer about the offer; and if movant did not obey, the AUSA would raise two other previously uncharged robberies; and the movant had sent letters to both the AUSA and the sentencing court regarding the misrepresentations of the AUSA, to which the movant had received no reply. *Machibroda, supra* at 489-490. The AUSA responded with a competing affidavit denying any promises or coercion with respect to the movant's plea, but admitting having spoken with the movant in the county jail the day before

the co-defendant's trial, and having told the movant that this was his last opportunity to tell the truth, and that the sentencing court might well take into consideration the movant's refusal to talk. *Id.* at 491-492.

The district judge decided, *without a hearing*, that the movant's allegations were false, observing that the court had received no letters from the movant mentioning any alleged agreement with the AUSA and that the movant had not complained in a timely manner when no request was forthcoming by the AUSA for a reduction of sentence. *Id.* at 492-493. The Supreme Court *reversed*, holding:

> This was not a case where the issues raised by the motion were conclusively determined either by the motion itself or by the "files and records" in the trial court. The factual allegations contained in the Appellant's motion and affidavit, and put in issue by the affidavit filed with the Government's response, related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light. Nor were the circumstances alleged of a kind that the District Judge could completely resolve by drawing upon his own personal knowledge or recollection.

368 U.S. at 494-495. The Court rejected the government's argument that a hearing in the case would be futile because of the apparent lack of any other witnesses to the alleged occurrences, other than the movant himself and the AUSA.

> The petitioner's motion and affidavit contain charges which are detailed and specific. It is not unreasonable to suppose that many of the material allegations can either be corroborated or disproved by the visitors' records of the county jail where the petitioner was confined, the mail records of the penitentiary to which he was sent, and other such sources. *Not by the pleadings and the affidavits, but by the whole of the testimony, must it be determined whether the petitioner has carried his burden of proof and shown his right to a discharge.*

The Government's contention that his allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence. On this record it is his right to be heard.

368 U.S. at 495 (emphasis added) (citation and quotation marks omitted). The *Machibroda* court further held that the specific and detailed factual assertions by the movant in that case, "while improbable, cannot at this juncture be said to incredible. If the allegations are true, the [movant] is clearly entitled to relief. Accordingly, we think the function of [§ 2255] can be served in this case only by affording the hearing which its provisions require." 368 U.S. at 496.

Here, Mr. Purkey raised copious claims which the trial record did not and could not refute, and which, if true, demand relief. Through declarations, Purkey's witnesses uniformly contradict Duchardt's denials of those allegations. These contradictions demand a hearing. Where evidence outside the trial record contradicts the constitutionality of the judgment and sentence, "the function of 28 U. S. C. § 2255 can be served...only by affording the hearing which its provisions require." *Machibroda*, 368 U.S. at 496. The District Court could not determine whether to believe Purkey's witnesses or Duchardt's denials without hearing from the witnesses themselves.

In *Watson v. United States*, 493 F.3d 960, 962 (8th Cir. 2007), the movant alleged that he was denied effective assistance of counsel when his counsel failed

to file a notice of appeal as Watson had directed. The district court denied his claim *without an evidentiary hearing,* but this Court reversed, noting

> There is no evidence in the record to contradict Watson's assertion that he requested an appeal. Although the district court was not required to credit Watson's assertion, (citation omitted), *it was required to hold a hearing before making factual determinations about Watson's credibility.*

*Id.* at 964; (emphasis added); *accord Koskela v. United States,* 235 F.3d 1148, 1149 (8th Cir. 2001). Likewise, there is no evidence in the record to contradict Purkey's post-conviction claims that trial and appeal counsel rendered ineffective assistance (*See* Docs. 47, 52 and 82). There are allegations and there are denials, but the District Court could not determine which to credit without hearing the witnesses testify, observing their demeanor, and making the necessary credibility determinations. There is no other means of judging their credibility.

In *Koskela,* 235 F.3d at 1149, the district court denied the 2255 motion *without an evidentiary hearing,* finding that "the [movant's supporting] affidavits lacked credibility in the face of the government's pleadings and affidavits, and in any event did not undermine the Court's confidence in the trial outcome." This Court reversed, holding, "Because the record before the District Court contained sharply conflicting evidence, the Court abused its discretion in finding a hearing unnecessary." *Id.* The District Court, here, was likewise confronted with "sharply

conflicting" assertions and denials, and an evidentiary hearing was the only means of resolving those conflicts.

It is "uncontroversial...that the privilege of *habeas corpus* entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Boumediene v. Bush*, 553 U.S. 723, 779 (2008), *quoting I.N.S. v. St. Cyr*, 533 U.S. 289, 302 (2001). "Congress has recognized that federal *habeas corpus* has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty." *McFarland v. Scott*, 512 U.S. 849, 859 (1994). In order for the Writ to serve this vital function, a petitioner such as Purkey "is entitled to careful consideration and plenary processing of [his claim, including full opportunity for presentation of the relevant facts." *Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977). Indeed, Purkey's claims are not "so 'palpably incredible,' so 'patently frivolous or false,' as to warrant summary dismissal." *Blackledge v. Allison, supra*, at 76, *quoting Pennsylvania ex rel. Herman v. Claudy*, 350 U.S. 116, 119 (1965).

In refusing even to hear evidence, the District Court applied three critical principles in a way that is debatable among reasonable jurists. First, the "reasonable probability of a different result," has a unique importance in the capital context. The sentencing phase is "the most critical phase of a death penalty case."

*Smith v. Mullin*, 379 F.3d 919, 939 (10th Cir. 2004), *quoting Romano v. Gibson*, 278 F.3d 1156, 1180 (10th Cir. 2002). It is then that "the jury is called upon to make a 'highly subjective, unique, *individualized* judgment regarding the punishment that a particular person deserves,'" *Turner v. Murray*, 476 U.S. 28, 33 (1986) (emphasis added), *quoting Caldwell v. Mississippi*, 472 U.S. 320, 340 n.7 (1985). In the federal death penalty scheme, a non-unanimous jury in sentencing spares the defendant's life. *See* 18 U.S.C.S. § 3591 et seq. In *Wiggins v. Smith*, 539 U.S. 510, 536 (2003), the Court noted that in this type of death penalty scheme, confidence in the outcome is undermined where there is "a reasonable probability that *at least one juror* would have struck a different balance." (emphasis added).

A § 2255 movant "faces a relatively low burden" since "it only takes one juror to nix a death sentence." *United States v. Johnson*, 2010 U.S. Dist. LEXIS 133727, 9-10 (N.D. IL December 13, 2010) (*Johnson II*), *quoting United States v. Johnson*, 223 F.3d 665, 670 (7th Cir. 2000) (*Johnson I*). In *Johnson II*, the movant argued that trial counsel had been ineffective in not presenting evidence that the

> Federal Bureau of Prisons is empowered to classify a prisoner serving a life sentence without possibility of release to the highest security level federal prison, under conditions of confinement that eliminate any reasonable probability that the prisoner will be a continuing and serious threat to society.

2010 U.S. Dist. LEXIS 133727, 10-11. In vacating Johnson's death sentence, the district court observed that

> [a] number of studies suggest that *future dangerousness is one of the most [significant] issues, if not the most significant, for juries deciding whether or not to sentence a defendant to death. See, e.g.,* John H. Blume, et al., Future Dangerousness in Capital Cases: Always "At Issue", 86 Cornell L. Rev. 397, 404 (2001); Stephen P. Garvey, Aggravation and Mitigation in Capital Cases: What do Jurors Think?, 98 Colum. L. Rev. 1538, 1559-60 (1998); Sally Costanzo & Mark Costanzo, Life or Death Decisions: An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework, 18 Law & Hum. Behav. 151, 160 (1994) ("[n]early all jurors [surveyed]...offered the observation that the penalty decision hinged on the issue of whether the defendant would pose a continuing threat to society").

2010 U.S. Dist. LEXIS 133727, 9-10 (emphasis added).

Here, it cannot be overstated that Purkey's jury found that he *did not* pose a future danger (Doc. 487, p. 7). Given the almost over-riding significance a capital jury gives to its finding with regard to the defendant's future dangerousness, it cannot be that there is no reasonable probability that the mitigating evidence that Purkey's jury did not hear could not have caused even one juror to opt for life, rather than death. Accordingly, reasonable jurists can disagree with the District Court's refusal even to hear the mitigation evidence that trial counsel failed to investigate and present.

Second, to prove that his attorneys' deficient performance at trial prejudiced him, Purkey does not even have to prove that but for that deficient performance

one such juror *would have* voted to spare his life; only that there is a "reasonable probability" of such a result. In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Court made clear:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Id.* at 434; *see also Strickland v. Washington*, 466 U.S. 668, 693 (1984) ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"); *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice"). "[T]he adjective ["reasonable"] is important." *Kyles*, 514 U.S. at 434. Indeed, as explained in *Strickland* itself:

> [R]easonable probability of a different result" is thus *less than a preponderance of the evidence.* It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome."

*Strickland*, 466 U.S. at 693 (emphasis added).

Finally, in a capital case, a "reasonable probability" of a different sentence can only be determined by weighing the full "body of mitigation evidence" that was presented along with the evidence that could have been presented that "might well have influenced the jury's appraisal of [the defendant's] moral culpability."

*Williams v. Taylor*, 529 U.S. 362, 398 (2000); *accord Sears v. Upton*, 130 S. Ct. 3259, 3267 (2010) ("A proper analysis of prejudice under *Strickland* would have taken into account the newly uncovered evidence of Sears' "significant" mental and psychological impairments, along with the mitigation evidence introduced during Sears' penalty phase trial, to assess whether there is a reasonable probability that Sears would have received a different sentence after a constitutionally sufficient mitigation investigation"). Without hearing the mitigation evidence that *could have been* presented, the District Court had nothing with which to judge whether, when added to the mitigation actually presented, the full body of mitigation produced a "reasonable probability" that at least one juror would have voted to spare Purkey's life.

Instead of looking at the full body of mitigation that the jury should have heard, the District Court's judgment contorts the law and concludes that since the jury was not swayed by the mitigation that was presented it also would have rejected the full body of mitigation that *could have been* presented. This unsupported reasoning would make it impossible for any capital defendant to prove prejudice. Specifically, under the District Court's reasoning, even if trial counsel had presented no mitigation evidence prior to the jury's rejection of mitigating factors, the Movant could not establish prejudice in §2255 proceedings. That is not the state of the law.

Equally problematic is the District Court's inconsistent opinion as to what the jury did or did not do with respect to finding mitigating factors. On the one hand, in rejecting Purkey's claim that his jury did not even acknowledge the mitigating factors before voting on them, the District Court's judgment finds that the jury "simply chose not to give any weight to that evidence, which under the law they are entitled to do." (2255 Doc. 89 at 9). But, then, to find that Purkey could not establish any prejudice from his claims of ineffective assistance of counsel, the District Court's judgment opines that "no jurors voted for a single mitigating factor." (2255 Doc. 89 at 11). Neither statement can be made with any certainty. The fact is that the Verdict form is simply blank as to any mitigating factor. At trial, the District Court was initially willing to ask the jurors to complete the form, but the Government retorted, "Absolutely no[t]." (Tr. 2313). As a result, no inquiry was made. This presents a one of a kind circumstance, making Purkey's case the only case out of the Western District of Missouri in which the jury simply left the form *blank* as to all mitigating factors.[37] Indeed, after

---

[37] *Compare United States v. Moore*, No. 94-00194 (W.D. MO) (votes indicated – deadlocked); *United States v. Ortiz*, No. 98-00149 (W.D. MO) (votes indicated – death verdict); *United States v. Sinisterra*, No. 98-00311 (W.D. MO) (votes indicated – death verdict); *United States v. Tello*, No. 98-00311 (W.D. MO) (votes indicated – non-unanimous verdict); *United States v. Nelson*, No. 99-00303 (W.D. MO) (votes indicated – death verdict); *United States v. Haskell*, No. 00-00395 (W.D. MO) (votes indicated – life verdict); *United States v. Smith*, No. 02-05025 (W.D. MO) (votes indicated – non-unanimous verdict); *United States v. Montgomery*, No. 05-06002 (W.D. MO) (votes indicated – death verdict).

exhaustive research and comprehensive review of federal capital trial verdict forms, counsel have been unable to identify even one other federal death penalty case in which the jury simply recorded no vote on any mitigating factor.

A similar situation arose in *(Randy) Anderson v. State*, 108 S.W.3d 592, 609 (Ark. 2003) (*Anderson I*), where the jury did not check any box to indicate it had found a mitigating factor to exist. The parties, however, had stipulated to the existence of the mitigating factor of no previous criminal history. *Id.* The Arkansas Supreme Court held,

> There is no written proof that the jury considered any mitigating circumstances. Section 5-4-603 requires "written findings" that "aggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances found to exist." Without a signed and filed Form 2, this court is unable to say that the jury considered any possible mitigating circumstances, much less that it concluded beyond a reasonable doubt that the only aggravating circumstance outweighed any mitigating circumstances found to exist. Accordingly, we reverse and remand for resentencing.

*Id.* at 609.

A slightly different scenario arose in *(Justin) Anderson v. State*, 163 S.W.3d 333, 358 (Ark. 2004) (*Anderson II*). There, the jury heard "unrebutted evidence ...that [Justin Anderson] grew up in an abusive family, that his mother was mentally retarded, and that he was separated from his family and sent to a foster home at an early age." *Id.* at 358. Nonetheless, the jury's verdict indicated that no such evidence had been presented. *Id.* With no objection and no polling, the

Arkansas Supreme Court could "only conclude that the jury eliminated from its consideration all evidence presented of mitigating circumstances and sentenced [Justin] Anderson to death solely based on the aggravating circumstance." *Id.* at 360. The *Anderson II* court reversed for a new sentencing trial. *Id.*

Here, while the Government did not stipulate that any mitigating factor existed (as in *Anders I*), many such factors were nonetheless undisputed (as in *Anderson II*). Like the jury in *Anderson II*, Purkey's jury failed to indicate any acknowledgment, let alone *consideration*, of the obvious undisputed evidence in mitigation:

\* \* \*

11. Mr. Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence.

12. As a child, Mr. Purkey suffered from slow speech development, and for his entire life, Wesley Purkey has suffered from the disability of stuttering.

13. While incarcerated, Mr. Purkey was the victim of serious physical abuse, that is stabbings.

14. While incarcerated, when given the opportunity to do so, Mr. Purkey completed a significant number of hours of college coursework.

15. While incarcerated, when given the opportunity to do so, Mr. Purkey received training and became qualified as a plumber.

16. Mr. Purkey has offered to donate a portion of his liver to his sister-in-law who is dying of liver failure.

* * *

18. The disappearance of Jennifer Long was solved only because Mr. Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing.

* * *

21. Mr. Purkey is the father of Angie Purkey Genail, and the two have carried on a loving, father-daughter relationship, with Mr. Purkey providing Angie Purkey Genail advice, nurturance and emotional support, even while he has been incarcerated.

22. Angie Purkey Genail loves her father Mr. Purkey very much.

* * *

24. Mr. Purkey is the grandfather of Angie Purkey Genail's children Mikey, age 4, and Haley, age 1, and has carried on a loving, grandfatherly relationship, particularly with Mikey, speaking with Mikey on the telephone on numerous occasions.

* * *

27. In the past three years, Mr. Purkey has volunteered to offer good advice to many young men in trouble about how to avoid a life of crime, and would continue to do so if sentenced to life imprisonment without possibility of release.

(Doc. 484, pp. 33-36; Doc. 487, pp. 9-16). The evidence made these mitigating factors obvious, but the jury failed to acknowledge them. "[T]he failure appropriately to consider mitigating circumstances can have an adverse affect on the weighing process and result in an inappropriate sentencing outcome." *United States v. Hammer*, 404 F. Supp. 2d 676, 801 (M.D. Pa. 2005). Errors regarding

either aggravating factors or mitigating factors can distort the weighing process, and thereby raise doubts about the propriety of a death sentence. Lisa R. Duffet, Habeas Corpus and Actual Innocence of the Death Sentence After *Sawyer v. Whitley*: Another Nail into the Coffin of State Capital Defendants, 44 Case W. Res. L. Rev. 121, 148 (1993). Hammer argued that his jury failed to find, consider and weigh undisputed or conceded mitigating factors. *Hammer, supra* at 690. The district court agreed, holding, "The jury's defective answers with respect to mitigating factors renders the penalty phase of the trial defective." *Id.* at 801.

In Purkey's direct appeal, this Court noted that a "jury's identification of proven mitigating factors facilitates appellate review, especially when we have to evaluate the effect of any error on the sentence that the jury recommended." *United States v. Purkey*, 428 F.3d 738, 763 (8th Cir. 2005); *see also United States v. Rodriguez*, 2009 U.S. App. LEXIS 20921, *51-52, No. 07-1316 (8th Cir. September 22, 2009) (noting that the recorded votes on the mitigating factors facilitated appellate review). This Court, did not, however, suggest that the jury's failure to document any voting on the mitigating factors was equivalent to a finding that none existed. The lack of documentation makes the District Court's finding here particularly problematic. As was true in *Anderson I* and *Anderson II*, the lack of any acknowledgment of Purkey's mitigating factors makes it impossible to ascertain what mitigation evidence the jury considered, or how it weighed that

evidence against the aggravating factors – let alone how the full body of mitigating evidence that could have been presented would have been viewed by each *individual* juror.

In *Rodriguez*, the Government had argued that "the issue of punishment for the Defendant is not an issue of how it affects his family." *Id.* at 50. The majority agreed that this argument crossed the line. *Id.* at 50-51. Pointing to the jury's penalty-phase verdict form, however, the majority noted that the jury had "unanimously found that six members of Rodriguez's family 'will suffer emotional pain if [Rodriguez] is executed.'" *Id.* at 52. Thus, the recorded votes established that the *Rodriguez* jury had not "ignore[d] the family-impact" but simply imposed death in spite of that factor. *Id.* The same review cannot be had here because Purkey's jury did not record *anything.* Thus, there can be no assurance that the jury actually considered the mitigation, let alone that the jury considered it and rejected it. A blank form simply does not support either contradictory inference that the District Court reached in denying relief.

The District Court's judgment hinges on an assessment that it is "unlikely" that the jury "would have sentenced movant to life in prison" even if it heard his full body of mitigating evidence because it was not moved by what it actually heard. Aside from the unsupported reasoning, this ignores the trouble the jury quite obviously had in returning its death verdict. The jury struggled for nearly

eleven hours over the course of two days: It began deliberating at 11:30 a.m. on November 18, 2003, and recessed for the night at 4:15 p.m. (Tr. 10, 2297, 2309). The jury resumed deliberations at 8:37 a.m. on November 19, 2003 (Doc. 482), and it returned its verdict just over six hours later at 2:45 p.m. *Id.* This totals 10 hours, 53 minutes. This was not a "slam dunk" for the Government even with the incomplete mitigation case presented by trial counsel. It cannot be said that had the jury heard the full body of mitigating evidence available to trial counsel that there is no reasonable probability that even one juror would have held out for a life verdict. It can, and must, be said that Purkey has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2), and that

> jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further.

*Miller-El,* 537 U.S. at 327. Thus, this Court should issue a certificate of appealability so that full consideration of Purkey's constitutional claims can be had.

### 3. The District Court's findings are insufficient to allow meaningful appellate review.

Finally, the District Court's conclusory judgment rejecting Purkey's allegations of ineffective assistance are not in accord with § 2255, which required the District Court to determine the issues and make findings of fact and conclusions of law with respect thereto. Purkey presented seventeen allegations of

ineffective assistance of counsel and supported those with twenty-six affidavits.[38] The Government countered with its own 117-page affidavit from Duchardt. The District Court's judgment largely ignored these allegations and never discussed any of the specific claims or evidence that counsel should have found and offered at trial. The entire discussion of Purkey's ineffective assistance claims filled less than two pages of the District Court's judgment. While the findings mandated by § 2255 do not require the District Court to enumerate every fact, the court "must formulate findings on the ultimate facts necessary to reach a decision." *Collins v. Henderson*, 180 F.3d 988, 990 (8th Cir. 1999). Ultimately, the findings of fact must "afford a reviewing court a clear understanding of the basis of the [C]ourt's decision." *Id.* The only reference even to any type of claim Purkey presented came in the concluding paragraph of the two page discussion and then only generically recited that Purkey had alleged that his attorneys were "ineffective for failing to call certain witnesses or to present a more complete mitigation case." (Doc. 89 at 11). There simply was no discussion or finding of facts necessary to reach the conclusion that, even if Purkey could show that counsel's performance was deficient, he could not prove that he was thereby prejudiced.

---

[38] This excludes the five affidavits submitted with Purkey's motion to strike Duchardt's affidavit.

**B.    Jurists of Reason Could Debate Whether Duchardt's
117-page Affidavit Should have been Stricken**

**1.    No COA is necessary on this procedural issue**

Before addressing whether this issue warrants a certificate of appealability, this Court must consider the proper role of a COA on procedural issues. The Supreme Court has recognized that,

> The issue becomes somewhat *more complicated where, as here, the district court dismisses the petition based on procedural grounds.* We hold as follows: When the district court *denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim,* a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (emphasis added). Here, however, the District Court did reach the merits, but it did so after erroneously deciding this critical procedural issue.

> This Court has held that a COA is not necessary in situations similar to this:

> We do not think § 2253(c) is intended to preclude all review of preliminary procedural issues, such as the limitations question now before us. We read § 2253(c) as addressing only the sort of showing required for a petitioner to obtain appellate review of the merits of his or her claims for habeas corpus or § 2255 relief. *Otherwise, a final order entered by a district court based upon a question antecedent to the merits, if adverse to the petitioner, could never be reviewed on appeal.* While we assume Congress has the power to establish such a regime, we do not think it intended to do so when it enacted the AEDPA.

*Nichols v. Bowersox*, 172 F.3d 1068, 1070 (8th Cir. 1999) (emphasis added), *cited with approval in Roney v. United States*, 205 F.3d 1061, 1062 (8th Cir. 2000), *but overruled on other grounds in Riddle v. Kemna*, 523 F.3d 850 (8th Cir. 2008) (en banc) (overruling Nichols holding with regard to when the statute of limitations began). Whether Duchardt's 117-page affidavit should have been struck is a question antecedent to the merits of Purkey's 2255 motion. *Nichols* and *Roney* remain sound on this procedural question, thus, this Court should hear this procedural matter.

Alternatively, should this Court determine that a COA is required under *Slack*, it must apply the lower burden. The *Slack* court rejected the requirement that an appellant make a "substantial showing" before obtaining a COA. 529 U.S. at 484. Instead, the Court explained that

> a COA should issue [on procedural matters] when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Id.* Applying this standard, this Court should grant a COA.

### 2. Duchardt's Affidavit Exceeded the Scope of the Attorney-Client Waiver Resulting from Purkey's Claims of Ineffectiveness

In denying Purkey's motion to strike Duchardt's 117-page affidavit, which is more in the form of a formal adversary's brief, the District Court relied solely on

the black letter law that justified its initial Order to execute *an* affidavit. (2255 Doc. 89, pp 4-5, *citing Tasby v. United States,* 504 F.2d 332, 336 (8th Cir. 1974), *cert. denied,* 419 U.S. 1125 (1975) and *Stobaugh v. United States,* No. 06-3317-CV-S-RED, 2007 WL 628420, *1, n.1 (W.D.Mo. Feb. 27, 2007)). In doing so, the District Court completely missed the point. Purkey never contended that his attorney could not execute *an* affidavit; indeed, he did not oppose the Government's motion for an Order compelling Duchardt to do so. Purkey's objection to *this* affidavit is that Duchardt (1) exceeded the scope of the waiver and disclosed privileged information and (2) made purely legal arguments and not simply factual statements (*See* 2255 Doc. 83, pp. 8-29).

Throughout his affidavit, Duchardt referred to confidential information that he learned in the course of representing Purkey, information that is not in the record below and information that was otherwise not generally known prior to Duchardt's disclosure. For example, with respect to the claim that trial counsel should have presented the testimony of Floyd Bose and Dion Leiker as mitigation witnesses, Mr. Duchardt disclosed: "It was my understanding that, in the years since Wes' (sic) revelations to Dion and Floyd, Wes has asked for and had received from them financial assistance.[39] *While I was not sure the government*

---

[39] Ms. Leiker occasionally sends Purkey a little money *now*, but she did not begin doing that until *after* Purkey arrived on Death Row (2255 Doc. 83, Ex. 6). Likewise, while Mr. Bose did post "a few bucks" on Purkey's account in the

*was aware of this*, I knew that it would not be difficult for the government to obtain institutional financial records." (2255 Doc. 73, Ex. A, p. 72) (emphasis added). Even assuming that Duchardt's spurious claim was true, he owed Purkey a duty to keep it confidential. *See* Missouri Rule 4-1.6(b) (requiring counsel to keep information confidential *unless* reasonably necessary to establish a "claim or defense"); *accord* Restatement § 33 (2)(a) & (d) (requiring that an attorney "take no unfair advantage of a former client by abusing knowledge or trust acquired by means of the representation."). Divulging this false image was not *reasonably necessary*; it simply sought an *unfair advantage* over Duchardt's former client.

Likewise, to rebut a claim that he should have developed Debbie Prothero and her husband as mitigation witnesses, Duchardt stated:

> In her conversations with me, Debbie made clear that neither she nor her husband knew much of anything about Wes or his side of the family. Moreover, in every conversation I had with Debbie, she made sure it was abundantly clear that she was very much in favor of the death penalty, and was in no way opposed to Wes receiving the death penalty in this case.

(2255 Doc. 73, Ex. A, p. 59 n.6).[40] Again, even if this was true, Duchardt owed Purkey a duty to keep it confidential. *See* Missouri Rule 4-1.6(b) (requiring

---

1980s, Mr. Purkey did not ask him to do so and it had nothing to do with Purkey having given Mr. Bose information about his son's death (2255 Doc. 83, Ex. 7).

[40] Again, this was just plain wrong. Ms. Prothero was active in helping Duchardt compile a history of Purkey's dysfunctional childhood, and she never suggested that she favored him being executed; she loves him and maintains contact with him (2255 Doc. 83, Ex. 8).

counsel to keep information confidential *unless* reasonably necessary to establish a "claim or defense"); *accord* Restatement § 33 (2)(a) & (d) (requiring that an attorney "take no unfair advantage of a former client by abusing knowledge or trust acquired by means of the representation."). Divulging this false image was not *reasonably necessary*; it simply sought an *unfair advantage* over Mr. Duchardt's former client.

In yet another instance, with respect to a claim that trial counsel should have developed Peggy and Evette Noe as mitigation witnesses, Duchardt stated that his decision not to pursue these witnesses was based on "either...problems in the relationship between Wes and Peggy, or problems in Peggy's and Evette's backgrounds, or both." (2255 Doc. 73, Ex. A, p. 73). Again, Mr. Duchardt resorted to taking pot shots that the facts simply do not support. He did not even talk to Peggy Noe or Evette Noe (2255 Doc. 83, Exs. 9 and 10). But, again, even assuming Duchardt's claim was true, he owed Purkey a duty to keep it confidential. *See* Missouri Rule 4-1.6(b) (requiring counsel to keep information confidential *unless* reasonably necessary to establish a "claim or defense"); *accord* Restatement § 33 (2)(a) & (d) (requiring that an attorney "take no unfair advantage of a former client by abusing knowledge or trust acquired by means of the representation."). Creating the false image that these two women have "problems" was not *reasonably necessary*; it simply sought an *unfair advantage* over Mr.

Duchardt's former client.

In each of these instances, Duchardt made factual assertions that, even if true, disclosed information that was otherwise generally unknown and that he could only have received through his representation of Purkey. Of course, Duchardt's assertions can only be based on hypothetical discussions because he did not talk to Ms. Leiker Mr. Bose, Peggy Noe or Evette Noe before trial (2255 Doc. 83, Exs. 6, 7, 9, 10); and Ms. Prothero never told him what he asserted in his pleading (2255 Doc. 83, Ex. 8). No reasonable attorney could conclude that such disclosures were reasonably necessary in order to answer the limited allegations of ineffectiveness. *See* Missouri Rule 4-1.6(b).

Rather than take steps to safeguard any information which might be damaging to his client and provide a "proportionate and restrained response" to the allegations of ineffective assistance, *see* Restatement (Third) of The Law Governing Lawyers, § 64 Comment (e) (2008), Duchardt responded in a manner that sought to erect unwarranted obstacles to Purkey's ability to use these witnesses as part of his *habeas* proceedings. Such conduct violates Missouri Rules 4-1.6 and 4-1.9, which prohibit the disclosure of confidential information. *See also* Comment to Missouri Rule 4-1.6 at ¶ 3 ("The confidentiality rule ... not only applies to matters communicated in confidence by the client, but also to all information relating to the representation, whatever its source.") and at ¶ 4 ("This

prohibition also applies to disclosures by a lawyer that do not in themselves reveal protected information but could reasonably lead to the discovery of such information by a third person.").

Duchardt's conduct also violates Restatement § 33, which requires that counsel take no unfair advantage of a client after termination of representation by abusing knowledge acquired by means of representation; Restatement § 60, which requires that counsel not disclose confidential information "if there is a reasonable prospect that doing so will adversely affect a material interest of the client"; Restatement §§ 63 and 86, which provide that trial counsel should work with successor counsel to invoke a privilege against the disclosure of confidential information; and Restatement § 64, which provides that any such disclosure must constitute a "proportionate and restrained response." This latter provision of the Restatement is echoed in the ABA Guidelines and the Missouri PD Guidelines. *See* ABA Guideline 10.13, requiring that trial counsel cooperate with the strategies of successor counsel and to safeguard the interests of the client; Missouri PD Guideline 11.3.5, requiring that trial counsel not volunteer information that may be detrimental to the client's post-conviction case.

Still, in answering a claim that trial counsel failed to adequately prepare Purkey to testify at trial, Duchardt offered to provide the District Court with a copy of a videotape that he claimed to have used in his preparation sessions with Mr.

Purkey (2255 Doc. 73, Ex. A, p. 111). Incredibly, Duchardt had failed to include this alleged video when transferring Purkey's file to current post-conviction counsel. Any such videotape would constitute confidential work product that is otherwise privileged from disclosure. *See* Restatement § 92, Reporter's Note on Comment c. But Duchardt volunteered to transfer his work product to the District Court rather than post-conviction counsel. Such blatant advocacy against his client cannot be countenanced. *See, e.g.,* Missouri PD Guideline 11.3.6, requiring that trial counsel not act, or appear to act, as an advocate against a former client.

Duchardt's 117-page[41] statement volunteered copious amounts of unwarranted and privileged information. His conduct violated the ABA Guideline 10.13 requirement that trial counsel safeguard the interests of his former client as well as the Missouri PD Guideline 11.3.5 requirement that trial counsel not volunteer information against his former client, as well as. Ignoring these commands, Duchardt acted in his self-interest, while baldly seeking to undermine Purkey's *habeas* claims.

On a claim regarding trial counsel's failure to call CCA inmate Cornelius Peoples as a witness, Duchardt responded by referring to extra-record conversations he allegedly had with Mr. Peoples's lawyer, Bill Odle (2255 Doc.

---

[41] The sheer volume of Duchardt's affidavit is stunning. The 24-page affidavit he filed in *Sinisterra v. United States*, MOW No. 98-311-02-CR-W-GAF (Doc. 50) pales by comparison.

73, Ex. A, p. 31-32). Additionally, Duchardt referred to purported "bad acts" evidence against Mr. Peoples that he claimed to have learned in the course of representing one of Mr. Peoples's co-defendants (Carl Haskell) in a different case (2255 Doc. 73, Ex. A, p. 32-33). Finally, Duchardt volunteered information about Mr. Peoples's decision to become a cooperating witness against other defendants as a justification for why he did not call him as a witness for Purkey (2255 Doc. #73, Ex. A, p. 33-34). Here, Duchardt telegraphed his motive to not simply state the facts as they existed when he prepared for Purkey's trial and, used hindsight to rationalize and to impede Purkey's post-conviction rights. In the process, Duchardt overlooked that Mr. Peoples's cooperation in the referenced cases did not occur or even come to light until *after* Purkey's trial.[42]

Duchardt continued, saying, "Peoples then went on to inform in another case, *United States v. Hargrove*, District of Kansas case number 03-20192-CM, and received an additional reduction of sentence for that cooperation." (2255 Doc. 73, Ex. A, p. 33, *citing* Docs. 812, 813, 814). Again, the chronology betrays the

---

[42] Duchardt stated that Mr. Peoples *"was in negotiations* to become an informer against his codefendant, Xavier Lightfoot, and received a substantial reduction in sentence as a result." (2255 Doc. 73, Ex. A, p. 33, *citing United States v. Peoples*, WDMO Case # 00-395, Doc. 658, 660, 800)) (emphasis added). This is a curious assertion because Purkey went to trial in October 2003, and Mr. Peoples was not even interviewed by law enforcement concerning Xavier Lightfoot until <u>December 18, 2003</u>. *See United States v. Peoples*, WDMO #00-395, Doc. 781, p. 1. Thus, Mr. Peoples's status as an informer against Mr. Lightfoot simply could not have played any part in Mr. Duchardt's preparation for Mr. Purkey's <u>October 2003</u> trial.

falsity of Duchardt's reasoning; Mr. Peoples did not testify in *Hargrove* until October 2005. *See Peoples*, WDMO #00-395, DOC. #812, p. 1. Duchardt cannot explain how Mr. Peoples's actions in October 2005 impacted Duchardt's "decision" not to use him in October 2003.

The District Court's judgment began from the correct premise, i.e., "that movant had waived his attorney-client privilege *as to his ineffective assistance of counsel claims...*" (2255 Doc. 89 at 5) (emphasis added). The District Court's conclusion "that Mr. Duchardt did not act improperly in filing the Affidavit nor did he violate his duty of loyalty or his duty of confidentiality, *as the attorney-client privilege had been waived*," (2255 Doc. 89 at 5) (emphasis added), however, does not follow. The attorney-client privilege was not waived to the extent of Duchardt's disclosures. The waiver authorized by *Tasby* and the rules of professional conduct is much narrower than the District Court's conclusion implies. Under ABA Model Rule 1.6(b)(5) a "lawyer may reveal information relating to the representation of a client to the extent the lawyer *reasonably* believes *necessary*...to respond to allegations in any proceeding concerning the lawyer's representation of the client..." (emphasis added); *accord* Missouri Supreme Court Rule 4-1.6(b)(3) and Comment to Rule 4-1.6, ¶ 17.[43]

---

[43] The Missouri Supreme Court Rules of Professional Conduct govern counsel admitted to practice in this Court. Western District of Missouri, Local Rule 83.5(c)(2).

> [T]he rule allows disclosure of only that information which is *reasonably necessary to respond to the specific allegations* of malpractice, ineffective assistance of counsel or ethical misconduct. In certain instances, attorneys have exceeded this restriction, apparently in an effort to exact a toll upon the client alleging misconduct or malpractice against their attorney. The rule prohibits such, and an attorney's engaging in this type of conduct subjects him to disciplinary action, and possible civil liability.

J. McLain, "OPINIONS OF THE GENERAL COUNSEL: CONFIDENTIALITY – CAN YOU KEEP A SECRET?" 62 Ala. Law. 296, 297-298 (Sept. 2001) (emphasis added).

The District Court's judgment eliminated this limitation and transformed the limited waiver of privilege into a blanket waiver that gives counsel an unfettered license to disclose any and all privileged communications whether relevant to a claim of ineffectiveness or not. Such an exception swallows the rule. "An ethical code is not a garment that lawyers may don and doff at pleasure." *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1264 (5th Cir. Tex. 1983). The Professional Rules and *Tasby* required this Court to analyze each of Purkey's specific allegations of ineffectiveness and determine whether each response in Duchardt's 117-page affidavit was reasonably necessary to answer Purkey's specific allegations.

These privileged, false and *post hoc* justifications far exceed the "narrow waiver" the Government was entitled to pierce. Jurists of reason could disagree with the District Court's resolution of this issue or conclude, at a minimum, that

the issues presented deserve encouragement to proceed further. *Miller-El*, 537 U.S. at 327. Thus, this Court should issue a certificate of appealability so that full consideration of Purkey's constitutional claims can be had.

### 3. Duchardt's Affidavit Did Not Simply Make Factual Statements but Rather Included Legal Arugment and Opinion in Violation of Rule 56(e)

The Government moved the District Court to compel Duchardt to provide an affidavit responding to Purkey's 2255 claims of ineffective assistance, noting that Purkey had made a limited waiver of privilege (2255 Doc. 60). An "affidavit" is "a *written statement of fact*, signed and sworn to before a person having authority to administer an oath." The Law Dictionary, Anderson Publishing Co. (2002) (emphasis added). With no objection from Purkey, the District Court Ordered Duchardt to provide such an affidavit (2255 Doc. 62).

Duchardt wrote a 117-page "statement" that includes a plethora of hearsay, legal argument and opinion. Duchardt painstakingly reviewed the cases cited in Purkey's memorandum in support of his § 2255 motion and provided his own legal argument attempting to distinguish those cases on their facts, or to otherwise argue that those cases are inapposite to Purkey's case (*See, e.g.*, 2255 Doc. #73, Ex. A, pp. 18-19; 25-29; 39-43; 74-79; 81-82; 88-89; 106; 107; 108; 109; 114). In all, Duchardt devoted approximately 25 pages (roughly 21%) of his statement to legal argument about the applicability of the cases cited in Purkey's memorandum of

law. More often than not, Duchardt annotated his discussion of caselaw with legal argument such as:

> What Counsel for Purkey have done is *tease certain language* from these cases, *ignoring the extreme facts* in those cases which justified the language in those cases, and ignoring that the very different circumstances in this case would not allow application of that language to this case. The upshot of all of this is, *despite the invective tone of the arguments advanced by Counsel for Purkey*, there is no factual or legal support for the arguments themselves.

(2255 Doc. 73, Ex. A, pp 28-29) (emphasis added). Such a comprehensive brief opposing his former client's 2255 motion far exceeds the bounds of an "affidavit."

Duchardt's "statement" does not simply state the facts as they existed when Duchardt made his decisions; it zealously advocates for the Government and against Purkey. Duchardt assumed the role, not of a factual witness, but of an advocate against his former client. "Mr. Duchardt, in effect, has undertaken the role as co-counsel for the United States of America in this proceeding" (2255 Doc. 83, Exhibit 5, p. 4).[44]

> Time and again, Mr. Duchardt's affidavit not only discloses privileged and confidential information, but also spends, page after page, paragraph after paragraph, distinguishing for the court the case law that Mr. Purkey's lawyers rely upon in seeking relief from the court. One cannot imagine a more significant demonstration that a lawyer has switched sides and gone way beyond defending himself to

---

[44] Lawrence J. Fox is the I. Grant Irey, Jr. Adjunct Professor of Law at the University of Pennsylvania Law School and a lecturer on law at Harvard Law School teaching legal ethics and professional responsibility (Exhibit 5, p. 2). Professor Fox has written extensively regarding lawyers' responsibilities to their clients.

attacking his former client than the exercise in which Mr. Duchardt engages by disdainfully characterizing and disparaging the legal arguments of Mr. Purkey's present counsel.

*Id.*

The Government relied exclusively on Duchardt's briefing of the issues in filing its suggestions in opposition to Purkey's 2255 motion (2255 Doc. 73). While not labeling it as such, the Government's suggestions in opposition constituted a motion for summary judgment. *See Siguenza v. United States*, 2010 U.S. Dist. LEXIS 75660 (W.D.N.C. July 27, 2010) (holding that the Government's response to Siguenza's 2255 motion was a "*de facto* motion for summary judgment"). As in *Siguenza*, the Government, here, moved for a summary disposition of Purkey's motion merely on the pleadings (2255 Doc. 73, p. 59). In making such a prayer, the Government could supply affidavits and declarations disputing Purkey's factual allegations; however, it could not rely on legal briefs posing as such. F.R.C.P. 56(e).[45]

"The Federal Rules of Civil Procedure govern habeas proceedings unless superseded by the rules governing section 2254 or 2255 cases. Fed. R. Civ. P. Rule

---

[45] Rule 56 has been amended during these proceedings: On December 1, 2007 and December 1, 2008, Rule 56(e)(1) provided, *inter alia*, "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence...." The December 1, 2009, amendment to Rule 56, however, maintains "the concept expressed in former subsection (e)(2)" *Lemay v. United States*, 2010 U.S. Dist. LEXIS 133369, 1, n.1 (W.D.N.C. Dec. 15, 2010), *citing* Rule 56 (c)(1)(B) and (e)(2) (2010).

81(a)(4)." *Barnett v. Roper*, 541 F.3d 804, 807 (8th Cir. 2008). There is no corresponding rule governing 2255 cases regarding affidavits like Duchardt's, thus, Rule 56(e) applies to the summary disposition of this case. *See Lemay v. United States*, 2010 U.S. Dist. LEXIS 133369, 1, n.1 (W.D.N.C. Dec. 15, 2010); *Baker v. United States*, 2009 U.S. Dist. LEXIS 75143 (D.S.C. July 7, 2009) (applying Rule 56(e) to motions to dispose of 2255 proceedings on their pleadings). Under Rule 56(e)(2) (2007-2008),

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits [] - set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

The *Lemay* court emphasized that affidavits and declarations must be in a form which would be admissible at trial. *Lemay, supra*. Thus, Rule 56(e) forecloses the inclusion of legal conclusions or arguments in an affidavit. *See Toro Co. v. Krouse, Kern & Co.*, 644 F. Supp. 986, 989 (N.D. Ind. 1986). "[T]he standard set forth therein for the adequacy of supporting affidavits is a high one, and the rule places an affirmative duty on the affiant to present statements which would be admissible at trial." *Id.* at 990.

Duchardt provided very few "statements" that would be admissible at a hearing. Indeed, his <u>current legal arguments</u> could have played <u>no</u> role in his decision-making during his representation of Purkey. He repeatedly argued and

opined as to the strength of Purkey's 2255 claims. He repeatedly argued that a given claim of error was either harmless or that no prejudice can be proven. Although Duchardt was careful not to use those precise words, the manner in which he articulated his points made it clear that he was advancing a "harmless error"/"no prejudice"-line of attack on his former client's claims. A sample of some of Duchardt's legal arguments and opinions follows:

| 2255 Grounds for Relief | Duchardt's response[46] |
| --- | --- |
| **Issue II**: Counsel failed to object to the government's repeated improper references to Mr. Purkey's desire to serve a life sentence in a federal penitentiary as a desire to go to "Club Fed" | p. 16: there was no prejudice resulting from the use of "Club Fed" because Mr. Purkey's desire for a federal sentence would have still been a part of the record, so the jury "would have still been potentially led to the very same sorts of dangerous misconceptions about the favorable conditions of confinement in a Federal penitentiary."<br><br>p. 17: there was no prejudice from the failure to object because jurors already have misconceptions about supposedly "soft" conditions of a life sentence. |
| **Issue III**: Counsel made an unfulfilled and prejudicial promise to the jury during opening statements that the victim's friends and family would testify that there was no kidnaping. | P. 22: the testimony of Brooke Doolittle (the victim's friend) that the victim would never get into a car with a stranger was not prejudicial because the judge sustained an objection and instructed the jury to disregard that testimony. |

---

[46] All citations are to Doc. 73, Ex. A,

| | |
|---|---|
| **Issue V**: Counsel failed to adequately develop and present mitigation evidence. | p. 74: proposed testimony from Peggy Noe – a witness that § 2255 counsel allege could have been called as a mitigation witness – regarding Mr. Purkey's childhood sexual abuse would only have been cumulative of evidence presented at trial and would not have been as effective as the trial testimony of Mr. Purkey's brother, Gary Hamilton |
| **Issue VII**: Counsel failed to adequately prepare and present the expert testimony of Dr. Stephen Peterson, M.D., a psychiatrist who evaluated Mr. Purkey for the defense and testified in the penalty phase. | p. 86: the "real problem faced by Dr. Peterson in advancing the conclusions that he did" was not rooted in counsel's failure to adequately prepare him, but rather that Dr. Peterson was "swimming upstream against a torrent of evaluation results from numerous mental health professionals made over the preceding thirty-some-odd years" and that the government expert's diagnosis of anti-social personality disorder "simply mirrored the conclusions reached consistently and persistently by the various mental health professionals who had evaluated Wes over the years." |
| **Issue X**: Counsel rendered ineffective assistance in calling certain mitigation witnesses who provided prejudicial information. | p. 96: prison official Mark Russell's concession that he had heard rumors of Mr. Purkey's assaultive behavior was not prejudicial: "In a different case, under different circumstances, such a revelation would have been problematic. In this case, Mr. Russell's information was but a thimble of water from the ocean." |

The legal arguments and opinions that fill Duchardt's statement are profuse. Legal argument is an expression of legal opinion and not a recitation of a "fact" to which an affiant is competent to testify. *Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985). In *Pfeil*, the Seventh Circuit rejected portions of Pfeil's affidavit that asserted that Rogers' advice was incorrect and Pfeil's conclusion that Rogers conspired to illegally destroy the dogs. *Id.* The Seventh Circuit held that these were mere legal arguments that could not be considered as a recitation of fact to which Pfeil would be competent to testify. *Id.*

This Court has similarly held,

> In evaluating evidence related to possible summary judgment, *a court may not consider* affidavits that do not satisfy the requirements of Fed. R. Civ. P. 56(e). *See, e.g., Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987); *see also Kern v. Tri-State Insurance Co.*, 386 F.2d 754, 756 (8th Cir. 1967).

*El Deeb v. University of Minn.*, 60 F.3d 423, 429 (8th Cir. 1995) (emphasis added). Here, Duchardt's affidavit falls far outside the requirements of Rule 56(e). His affidavit has legal argument and opinion interwoven throughout its entire 117 pages. He left no legal analysis for the Government to do in preparing its suggestions in opposition to Purkey's 2255 motion; indeed, at 117 pages, Duchardt's "affidavit" nearly doubled the length of the Government's own brief (*Cf.* 2255 Doc. 73, Ex. A, pp. 60 and 117). The examples set out in the above table clearly demonstrate that Duchardt did not merely recite the facts explaining his

121

work on Purkey's trial and appeal, but also provided lengthy legal argument and lofty opinion that Purkey's 2255 claims of ineffectiveness were legally baseless. Jurists of reason could disagree with the District Court's resolution of this issue or conclude, at a minimum, that the issues presented deserve encouragement to proceed further. *Miller-El*, 537 U.S. at 327. Thus, this Court should issue a certificate of appealability so that full consideration of Purkey's constitutional claims can be had.

### 4. Duchardt's Affidavit Asserted Facts that He Only Investigated After the Filing of Purkey's 2255 Motion

Even with his legal arguments, Duchardt was not finished trying to disprove his former client's post-conviction claims. Next, he assumed the role of the Government's investigator, conducting his own witness interviews in an effort to debunk Purkey's 2255 claims. Here, Duchardt accused undersigned counsel of obtaining an affidavit from Dr. Peterson by deceiving him and further offered to obtain another affidavit from Dr. Peterson to corroborate his own fallacious premise:

> It should be noted that, even though their claims are incorrect, current Counsel for Purkey persuaded Dr. Peterson to embrace and admit them as if they were true ([2255]DOC. #47, attachment 15, p. 3-4). I have spoken to Dr. Peterson, and have learned that current Counsel for Purkey were able to obtain these inaccurate admissions from him by misleading him, showing him only the limited parts of the record, as cited in their pleadings, and not providing Dr. Peterson with the whole transcript of the case, and in particular not providing Dr.

> Peterson the portions of the transcript wherein he does refer to Mr. Purkey's other revelations about the sexual abuse and wherein the actual government arguments are revealed. I did not ask for Dr. Peterson to complete another affidavit in these regards, but I can if the Court wishes.

(2255 Doc. 73, Ex. A, 83). This investigation by proxy fell way outside the bounds of the limited waiver effected by a former client's allegation of ineffective assistance of counsel (*See* 2255 Doc. 83, Ex. 5, p. 4).

When Duchardt conducted his own post-conviction "interview" of Dr. Peterson about Purkey's post-conviction allegations, Dr. Peterson was away from his office and had not reviewed Mr. Purkey's file for some time (2255 Doc. 83, Ex. 1, p. 2). Duchardt's hasty accusation was thereby baseless (*See* 2255 Doc. 47, n.27). Moreover, at bottom, his actions demonstrated that he forgot or deliberately abandoned his continuing duty of loyalty to Purkey. The Supreme Court has recognized that "the duty of loyalty to a client is 'perhaps the most basic' responsibility of counsel." *Burger v. Kemp*, 483 U.S. 776, 800 (1987). Interviewing witnesses as the Government's proxy violated that duty of loyalty. It certainly was not reasonably necessary in order for Duchardt to provide his factual response to the limited allegations of ineffectiveness. *See* Missouri Rule 4-1.6; *accord* ABA Guideline 10.13 (requiring that trial counsel cooperate with successor counsel); Missouri PD Guideline 11.3.5 (requiring that counsel not volunteer information that may be detrimental to his client's post-conviction case); and

Missouri PD Guideline 11.3.6 (requiring that counsel not advocate, or give the appearance of advocating, against his former client).

Duchardt continued unabated, not to defend himself, but simply to undermine Purkey's 2255 claims. He gratuitously disparaged Purkey's proffered witnesses: He has falsely described Debbie Prothero as someone anxious to see Purkey executed (2255 Doc. 73, Ex. A, pp. 59-60, including n. 6); he falsely described Marguerite Hotchkiss as someone aloof and uninterested in helping Purkey (2255 Doc. 73, Ex. A, pp. 59-61); he falsely described Dion Leiker and Floyd Bose, both former law enforcement officers, as gullible and easily misled (2255 Doc. 73, Ex. A, pp. 70-72); and he falsely described Peggy Noe and Evette Noe as having "problems" in their backgrounds (2255 Doc. 73, Ex. A, pp. 72-74). None of those assertions were even remotely accurate. Duchardt's pot-shots illustrate that he entirely abandoned his duty of loyalty to Purkey. Again, Restatement § 33 instructs counsel not to take any unfair advantage of a client after termination of representation by abusing knowledge acquired by means of representation. *See also* Restatement § 60 (requiring that counsel not disclose confidential information "if there is a reasonable prospect that doing so will adversely affect a material interest of the client"); Restatement §§ 63 and 86 (providing that trial counsel should work with successor counsel to invoke a privilege against the disclosure of confidential information); and Restatement § 64

124

(providing that any such disclosure must constitute a "proportionate and restrained response").

Duchardt also took it upon himself to describe what he considered to be deficiencies or omissions in Purkey's § 2255 motion. For example, on two of the claims, Duchardt needlessly commented on the absence of affidavits (*See* 2255 DOC. 73, Ex. A, p. 30 (noting that *habeas* counsel have not provided affidavits from inmate Xavier Lightfoot and prison personnel Perdue and Williams); p. 59 n.6 ("In a footnote, Wes' current Counsel allege that Debbie and her husband would have willingly testified on Wes' behalf...However, Counsel do not provide affidavits from Debbie or her husband, nor do they mention what Debbie or her husband could have or would have said had they been called to witness."). Elsewhere, on a claim regarding Duchardt's failure adequately to develop and present mitigation evidence, Duchardt argued that the claim was deficient:

> Though current Counsel for Mr. Purkey have indicted my approach in this regard, they do not identify in their pleadings a single mitigation theme which was missed as a result of this approach.
>
> It is also implied in the argument made by current Counsel for Mr. Purkey that our efforts to develop certain avenues of mitigation evidence, for instance the poisoning came at the expense of work on other avenues of mitigation evidence ([2255] Doc. 52, p. 25). However, current Counsel for Mr. Purkey do not support that inference, since they fail to advance even one new mitigation theme which they found and we supposedly missed.

(2255 Doc. 73, Ex. A, p. 51).

In these 2255 proceedings, Duchardt meticulously investigated, researched and argued claims in his 117-page statement in which he recklessly disclosed privileged and confidential information, strenuously advocated against his former client and haphazardly ignored his duty of loyalty. Duchardt went far beyond questions of fact. He essentially wrote a legal brief attacking the merits of Purkey's post-conviction claims. Worse, in publishing his quasi-brief to the Government, Duchardt did much more than what was reasonably necessary to answer Purkey's 2255 claims. He far exceeded the restriction imposed by Missouri Rule 4-1.6 not to jeopardize his former client's rights. "An ethical code is not a garment that lawyers may don and doff at pleasure." *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1264 (5th Cir. Tex. 1983). Duchardt, however, completely disregarded his ethical obligation to Mr. Purkey. Reasonable jurists could disagree with the District Court's resolution of this constitutional claim, or, at least, such jurists could conclude that the issue deserves further review. *See Miller-El*, 537 U.S. at 327. Therefore, this Court should issue a certificate of appealability.

**C. Jurists of Reason Could Debate Whether Counsel Rendered Ineffective Assistance in Not Calling Dr. Peterson to Rebut the Government's Charge that Purkey had Recently Fabricated his Recantation of the Kidnaping "[r]ight before this trial" rather than having done so more than a year before trial**

In December, 1998, Purkey told lead investigator Tarpley and Detective Howard that he had kidnaped Ms. Long in Missouri and forced her to accompany him to his home in Kansas, where he killed her. But in the month after the government obtained the indictment, Purkey recanted that kidnaping to its star witness – Michael Speakman. On November 2, 2001, Speakman spoke with the FBI, advising them that Purkey had said: (i) "[the] girl was with him partying"; (ii) "[he] did not snatch [her]"; and (iii) "[it was] not forcible with girl". (2255 Doc. 47, Ex. 24 – Brunell Rough Notes dated 11/02/01). The government paid no attention to this.

Purkey continued to deny the kidnaping throughout the course of his case. When he first met with anyone on the defense team, he told them that he did not kidnap Ms. Long. Inexplicably, however, when it came time for the suppression hearing, Duchardt advised Purkey that the kidnaping was irrelevant to whether the confession was coerced, and, thus, Purkey should testify that he did, *in fact*, kidnap Ms. Long. This advice is troublesome beyond its ramifications on Purkey's case. It also violated Duchardt's ethical obligations as an officer of the court. In the District Court, Duchardt was bound by the Missouri Rules of Professional

Conduct, not to knowingly offer evidence he knew to be false. Mo.S.Ct. Rule 4-3.3(a)(3); *accord* ABA Model Rules of Professional Conduct, Rule 8.4(c-d). Duchardt's illegitimate advice that Purkey lie about the alleged kidnaping is indefensible. It, more than anything else, set Purkey's case on a misleading course that created the atmosphere for this resulting conviction. It provided the Government with ample ammunition to impeach Purkey's trial testimony with the fact that he had admitted the kidnaping at the suppression hearing – with Duchardt sitting silent throughout.

It bears repeating that Purkey's recantation did not occur in a vacuum. He repeatedly asked Duchardt to arrange for him to take a polygraph on the issue of the kidnaping. Indeed, Duchardt took that request to the Government and even reiterated it on the eve of trial.[47] During trial, Duchardt, nevertheless, let the Government maintain its false, prejudicial assertions of recantation "right before trial" unimpeded. No reasonable trial attorney would have allowed this ultimate issue to be tried as though fiction was truth and truth was fiction.

A few months before trial, Dr. Peterson authored his report, which detailed his work on Purkey's case. He had interviewed Purkey four different times in late-2002: September 19, 2002; October 10, 2002; November 6, 2002; and December 30, 2002. During each of those interviews, Purkey told Dr. Peterson that Ms. Long

---

[47] Purkey remains ready to submit to a polygraph on this critical issue.

went with him voluntarily. (2255 Doc. 47, Ex. 23 at 45-46). Knowing the Government's repeated assertions that Purkey had only recanted the kidnaping on the eve of trial had no basis in fact, Duchardt was obliged to inform the jury of such. The first, best manner of setting the record straight would have been to object early and often. Failing that, a reasonably competent trial attorney would have called Dr. Peterson to rebut the Government's spurious assertions.

Because of Dr. Peterson's August 13th report, on September 25, 2003, the government moved *in limine* to preclude Dr. Peterson from testifying that Purkey had told him during the various interviews that he had not kidnaped Long. (Doc. 337). In that motion, the Government argued, "[D]efendant's recent fabrication is a shallow attempt to put on his defense through his psychiatrist while at the same time denying the Government the opportunity to cross-examine defendant concerning his changed story." *Id.* at 3. Though this assertion was clearly false, trial counsel did nothing to set the record straight. A reasonably competent attorney would have responded to the Government's motion by pointing out that the Government had been aware of Purkey's recantation since it heard of it from Speakman.

Right before trial, the District Court sustained the Government's motion. (Doc. 440). Trial began on October 29, 2003, and, immediately, government counsel elicited from its lead investigator and member of the prosecution team that

"[r]ight before this trial" was the first time he had ever heard that Purkey was claiming not to have kidnaped Ms. Long. (Tr. 566). Then, during cross-examination of Purkey, government counsel asserted, "here recently you have come up with this new story that you didn't kidnap her?" (Tr. 1008). Believing O'Sullivan that his *entire* testimony would be struck if he documented his recantations, Purkey simply replied, "That's true." (Tr. 1008). Not only did defense counsel not correct this on re-direct, they did not rebut it by calling Dr. Peterson to testify. After trial, Duchardt told Purkey that he could have called Dr. Peterson but that he did not even think to do it.

As fully argued *supra*, Duchardt and O'Sullivan were obliged to be effective. U.S. Const., Amends.VI; *Gideon v. Wainwright*, 372 U.S. 335 (1963); *Cuyler v. Sullivan*, 446 U.S. 335 (1980). Purkey need only show that there is a reasonable probability that but for counsel's deficient performance the result would have been different. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). As explained in *Strickland*, "reasonable probability of a different result" is something "less than a preponderance of the evidence." *Id.* at 693.

It is true that counsel's failure to call a witness "is precisely the sort of strategic trial decision that *Strickland* protects from second-guessing." *Sanders v. Trickey*, 875 F.2d 205, 212 (8th Cir. 1989). Here, however, counsel's defense strategy was to refute the kidnaping element of the charge by attacking it head-on.

*See, e.g.,* Tr. 408, 411, 413. Indeed, he called his own investigator to help with that. Tr. 893-900. And an hour before calling Purkey to the stand, counsel told him that he had to testify because the defense had no other means of refuting the kidnaping. Calling Dr. Peterson to testify about Purkey's prior consistent statement in order to rehabilitate Purkey would have supported the very strategy counsel employed to defend Purkey. Dr. Peterson would have served to corroborate Purkey's testimony which was central to his defense. Such corroboration would have been critical. *See State v. Hayes,* 785 S.W.2d 661, 663 (Mo. App., W.D. 1990) ("The defendant's own testimony on a decisive issue in a case is always received with doubt because of his interest in the result of the case. Corroboration is critical, and corroboration by a single witness can never be discounted as 'merely cumulative'").

Prior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because the witness has been discredited. *Tome v. United States,* 513 U.S. 150, 157 (1995). A trial witness's prior consistent out-of-court statement, however, is *not hearsay* if it is "offered to rebut an express or implied charge against the declarant of recent fabrication...." *United States v. Bercier,* 2007 U.S. App. LEXIS 25490 (8th Cir. 2007) *quoting* FRE 801(d)(1)(B). In *Tome,* resolving a conflict in the circuits, the Court held that, to be admissible as non-hearsay under Rule 801(d)(1)(B), a prior consistent

statement must have been made "before the charged recent fabrication." 513 U.S. at 167.

In *United States v. Street*, 66 F.3d 969, 976 (8th Cir. 1995), Ranger Coe described Street[48] as having spoken many obscenities. On cross-examination, Street brought out that Coe had made no mention of such obscenities in his grand jury testimony. *Id.* In redirect-examination of Coe, the government introduced into evidence Coe's report, which was written shortly after the incident. *Id.* at 977. In it, Coe described Street's obscene statements in virtually the same terms that he testified to at trial. *Id.* On appeal, Street sought reversal, arguing that Coe's report constituted inadmissible hearsay. *Id.* This Court disagreed, "The statement was offered to rebut a charge of recent fabrication of testimony and was consistent with Coe's testimony at trial." *Id.*

Here, Dr. Peterson's testimony would have been admissible on this same ground. It would have described Purkey's prior consistent out-of-court statement, offered to rebut the government's unfounded charge that Purkey had fabricated his recantation "[r]ight before this trial." Dr. Peterson could have testified that Purkey had consistently maintained that he invited Ms. Long to party with him, thinking he was talking to a prostitute. (Doc. 47, Ex. 23 at 45). Purkey had consistently

---

[48] Street was convicted of forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with park rangers while they were engaged in or on account of the performance of their official duties. 18 U.S.C.S. § 111(a).

maintained: "[She] wanted to go to Kansas City, Kansas with him" *id.* at 46; and that he told the FBI that he kidnaped her only so that he would get a "federal crime of kidnaping." *Id.*

These prior consistent statements came long before the charged "recent" fabrication, and reasonably competent attorneys would have offered them. Nothing was more important to Purkey's case than his own credibility. *See, e.g.,* Tr. 1104 ("It is ironic that both we and the government are *absolutely dependent on one man's credibility* and believability in this case, and that one man is Wes Purkey") (emphasis added). *Cf., Hayes, supra.* The Government sought the upper hand by misleading the jury to believe that Purkey's recantation of the kidnaping had come not two years before trial but *right before trial.* And the simple fact is that there is no reasonable strategy for not calling Dr. Peterson, who was ready, willing and able to testify. Counsel's failure to do so did irreparable harm to Purkey. Jurists of reason could disagree with the District Court's resolution of this constitutional claim. At a minimum, such jurists could conclude that the issue presented deserves encouragement to proceed further. *See Miller-El,* 537 U.S. at 327. Therefore, this Court should issue a certificate of appealability.

<u>CONCLUSION</u>

For the reasons set forth above, this Court should grant a certificate of appealability on each of the asserted claims and grant any additional relief the Court may deem just or proper.

Respectfully submitted,

Teresa L. Norris, Esq.  
P.O. Box 11744  
Columbia, SC 29211  
(803) 765-1044  (Phone)  
(803) 765-1143  (Fax)  
teresa@blumelaw.com  
Co-counsel to Movant

Gary E. Brotherton, Esq.  
601 W. Nifong Blvd., Ste. 1C  
Columbia, Missouri  65203  
(573) 875-1571  Phone  
(573) 875-1572  Fax  
GEBrotherton@LegalWritesLLC.com  
Co-counsel to Movant

By:   /s/  Teresa L. Norri  
Teresa L. Norris  
Co-counsel to Movant

<u>CERTIFICATE OF SERVICE</u>

This will certify that, on today's date, this motion was served upon the United States by filing via CM/ECF.

/s/ Gary E. Brotherton  
Gary E. Brotherton

<u>Dated</u>:       Columbia, MO  
            April 7, 2011