**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

| | |
|---|---|
| **WESLEY IRA PURKEY,** | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) No. 10-3462 |
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| Appellee. | ) |

**GOVERNMENT'S RESPONSE TO APPELLANT'S APPLICATION**
**FOR A CERTIFICATE OF APPEALABILITY**

On April 7, 2011, appellant Wesley Purkey filed an application for a certificate of

appealability of the district court's denial of his § 2255 motion. The Government opposes

the issuance of a certificate of appealability on all three issues sought by Purkey, and offers

the following in support of its position.

## I. Background

### A.    *Procedural Background*

A jury convicted Wesley Purkey of the kidnapping, rape, and murder of Jennifer

Long, in violation of 18 U.S.C. §§ 1201(a), 1201(g) and 3559(d), and sentenced him to death.

On January 23, 2004, following a denial of Purkey's motion for a new trial, the Chief District

Judge for the Western District of Missouri, the Honorable Judge Fernando J. Gaitan, Jr.,

sentenced Purkey to death. The Eighth Circuit affirmed Purkey's convictions and sentence.

*United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005). Purkey's motion for rehearing and

rehearing en banc was denied on January 13, 2006. The United States Supreme Court denied

Purkey's petition for a writ of certiorari on October 16, 2006. *Purkey v. United States*, 549 U.S. 975 (2006).

Purkey then moved for a writ of habeas corpus under 28 U.S.C. § 2255. He asserted 22 grounds for relief in his § 2255 motion, arguing primarily that he was denied his Sixth Amendment right to effective assistance of counsel at trial and sentencing. The district court denied relief without a hearing. (D.E. 89.)[1] Purkey sought a certificate of appealability from the district court on four issues:

1)   Whether Purkey's counsel failed to adequately investigate and present mitigation evidence, regarding six claims:

a)   Mr. Duchardt failed to obtain the services of a mitigation specialist or otherwise adequately investigate, prepare, and present mitigation evidence;

b)   Mr. Duchardt failed to adequately prepare and present the expert testimony of Dr. Bruce Leeson;

c)   Mr. Duchardt failed to adequately prepare and present the expert testimony of Dr. Stephen Peterson;

d)   Mr. Duchardt failed to adequately prepare and present the expert testimony of Dr. Mark Cunningham;

e)   Mr. Duchardt failed to adequately prepare and present the testimony of Purkey's brother and daughter; and

---

[1] "D.E." refers to the docket entry number in Case No. 06-08001-CV-W-FJG-P.

f)      Mr. Duchardt failed to adequately investigate and prepare witnesses Dr. William Grant and Mark Russell, so they were prejudicial to Purkey;

2)      Whether the district court should have conducted a hearing on Purkey's claims of ineffective assistance of counsel;

3)      Whether the district court should have stricken Mr. Duchardt's affidavit; and

4)      Whether Purkey's counsel was ineffective in not calling Dr. Peterson in the guilt phase of the trial to rebut a claim of recent fabrication.  (D.E. 107.)

Judge Gaitan denied the certificate of appealability on all four grounds.  (D.E. 115.)

Purkey's application for certificate of appealability filed with this Court follows, and is configured in three parts:

1)      Whether counsel rendered ineffective assistance in the investigation and presentation of mitigating evidence, with nine sub-parts;

2)      Whether counsel's affidavit should have been stricken, with four sub-parts; and

3)      Whether counsel rendered ineffective assistance in not calling Dr. Peterson to rebut a claim of recent fabrication.  (Purkey App. COA, i-ii.)

**B.      *Guilt Phase Evidence***

Purkey was tried and convicted of kidnapping, raping, and murdering 16-year-old Jennifer Long.  On December 15, 1998, while in the Wyandotte County jail awaiting trial for the robbery and first-degree murder of 80-year-old Mary Ruth Bales, Purkey contacted law enforcement and offered to speak about a murder and kidnapping that had occurred earlier

that year. Purkey said he wanted to spend his time in a federal prison, rather than a state prison. After giving an account of the kidnapping, rape, and murder of the victim, later identified as Jennifer Long, Purkey refused to cooperate further unless he was assured he would be federally prosecuted.

At trial, the Government established that on January 22, 1998, Purkey applied for a position as a plumber with the Roto-Rooter plumbing company, located in Kansas City, Missouri. Following the interview, Purkey stopped his truck in a parking lot and smoked a rock of crack cocaine and then proceeded east on Truman Road. (Tr. 925.)[2] Purkey planned to go buy something to drink before heading back to his home in Lansing, Kansas. (Tr. 485.) At that point, Purkey observed a young white female whom he believed to be approximately 17 to 19 years of age. During a conversation with the girl he learned that her name was Jennifer. Purkey asked the girl if she wanted to get something to drink with him. Jennifer entered the pickup without any threats or force, according to Purkey. (Tr. 485.) The two then drove to a liquor store a few miles away and purchased gin and orange juice. Purkey soon learned that Jennifer was in high school and that she had left school during the morning after arguing with some female classmates. (Tr. 485.)

Purkey then informed Jennifer that he wanted to go to his home, which was in Kansas, for a few minutes. Jennifer told Purkey that she did not want to go to Kansas and that she wanted to be dropped off. At that point, Purkey reached over into the glove box, pulled out

---

[2]"Tr." refers to the trial transcript by page number.

what he described as a boning knife and placed it under his right thigh in the presence of Jennifer. Purkey claimed that it was at that point that he decided not to let Jennifer out of his truck. (Tr. 487.)

Purkey then drove west on Interstate 70 from Missouri into Kansas, to his home in Lansing. (Tr. 487, 493-94.) Upon arrival, Purkey took Jennifer into his basement; she asked him to please take her back home. (Tr. 510.) Holding a knife in his hand, Purkey ordered Jennifer to take her clothes off and lie down on the floor, where he then raped her. (Tr. 997.)

Following the rape, Purkey told her that he had just finished a long sentence in the penitentiary and did not want to return. Jennifer told Purkey that she had been a virgin. Purkey became fearful. (Tr. 942.) Jennifer begged Purkey to let her leave. (Tr. 1017.) A brief struggle ensued and Purkey became enraged and began stabbing Jennifer in the chest, neck, and face, eventually breaking off the blade of the knife inside of her body. (Tr. 942-43, 1017-18, 1024.) Following the murder, Purkey put Jennifer into a large tool box designed to fit into the back of a pickup truck. (Tr. 1024-25.) Purkey changed his clothes and got rid of Jennifer's backpack. Purkey then drove to Snoopy's Bar in Lansing and had several drinks. (Tr. 1025-26.) Purkey next drove to the Sears store in Lansing and purchased an electric chainsaw for $59.00.[3]

---

[3]Investigators later recovered a copy of the receipt from Sears confirming Purkey purchased the electric chainsaw on January 22, 1998. (Tr. 501, 1022.)

Over the next several days, while his wife was at work and his stepchildren were at school, Purkey dismembered Jennifer Long with the chainsaw while she was lying inside the tool box. (Tr. 1028-29.)[4] Purkey put her body parts in plastic bags and mixed in leaves and debris from his back yard. (Tr. 1029-30.) Purkey burned her body parts in his fireplace; he purchased two cords of wood and used diesel gasoline to accelerate the burning process. (Tr. 492, 646-47, 1030.)

Purkey next cleaned up the chainsaw using gasoline to remove the blood and human debris. (Tr. 1032.)[5] Purkey made his three stepsons help him wash down the basement although they had no idea that a murder had taken place there. (Tr. 648-49, 1030-31.) Purkey also swept the ashes out of the fireplace after burning Jennifer's body parts. Purkey used a hammer to crush the bones that did not burn up. (Tr. 1033.) The bags with the bones and ashes were taken by Purkey south to Clearwater, Kansas, after his family moved from Lansing in March 1998. (Tr. 517, 1034.)

Purkey threw the bags with Jennifer's ashes and bones into a septic pond located on the property in Clearwater. Crushed human bones of an individual under the age of 25 were recovered from the pond in the area where Purkey indicated he had thrown Jennifer's

---

[4]The tool box was later recovered by investigators at the home of Purkey's friend, Patrick Howe. Purkey gave the tool box to Mr. Howe following the murder. (Tr. 730-32.) The box has several chainsaw cut marks in the bottom and on the sides. (Tr. 730, 810-18, 1029.)

[5]The chainsaw was recovered by investigators from the home of Purkey's stepfather, Edward Wiley. (Tr. 639-40.)

remains. (Tr. 789.) Human bones were also found in the sweepings from the ash pit of the fireplace at Purkey's former home. (Tr. 781-83.) All of the bones recovered by the FBI appeared to have been burned. (Tr. 781-94.) Purkey admitted the bones recovered from the septic pond were those of the Jennifer Long. (Tr. 1034.)

Purkey's defense at trial was that he did not kidnap the 16-year-old victim and that she had gone with him to Kansas voluntarily. (Tr. 934, 1014.) Purkey's testimony at trial was inconsistent with all four of his previous statements to investigators in which he steadfastly insisted that he had kidnapped Jennifer Long. Significantly, Purkey's defense was also inconsistent with his own previous sworn testimony in the same case, in a suppression hearing held October 25, 2002, before the magistrate judge. (Tr. 1002-08, 1041-43.) By its verdict, the jury rejected Purkey's defense during the guilt phase of the trial, returning verdicts of guilty on November 5, 2003.

## C.     *Penalty Phase Evidence*

The Government called nine witnesses in its case-in-chief during the penalty phase in support of its submission of six statutory and four non-statutory aggravating factors. (Tr. 1210-1403.) Purkey called 18 witnesses, including four doctors to testify concerning his alleged mental disorders, in support of his submission of 27 mitigating factors. (Tr. 1406-1955.) In rebuttal, the Government called four expert witnesses, including three doctors, in response to Purkey's diminished mental capacity and brain damage claims. (Tr. 1962-2225.)

*1.* *<u>Aggravation Evidence</u>*

The Government submitted six statutory aggravating factors to the jury, and the jury found all six, that: (1) the death of Jennifer Long occurred during the commission and attempted commission of her kidnapping; (2) Purkey killed Jennifer Long in an especially heinous, cruel, and depraved manner in that the killing involved torture and serious physical abuse; (3) the victim was particularly vulnerable due to her youthful age of 16 years; (4) Purkey had previously been convicted of an offense punishable by a term of imprisonment of more than one year, involving the use, attempted use, and threatened use of a firearm against another person; (5) Purkey had previously been convicted of an offense resulting in the death of a person for which a sentence of life imprisonment was authorized by statute; and (6) Purkey had previously been convicted of two or more offenses punishable by a term of imprisonment of more than one year, committed on different occasions and involving the infliction and attempted infliction of serious bodily injury and death upon another person.

The Government submitted four non-statutory aggravating factors to the jury, of which the jury found three, that: (1) the Government established loss and harm because of the victim's personal characteristics as an individual human being and the impact of the death upon the victim's family; (2) Purkey had previously killed Mary Ruth Bales in a vicious manner in that he repeatedly struck her in the head with a hammer until she died; and (3) Purkey had a substantial criminal history. The Government also submitted a non-statutory aggravating factor which the jury did not find - the future dangerousness of Purkey.

Before Purkey murdered Jennifer Long and Mary Ruth Bales, he spent most of his adult life incarcerated in various prisons in the states of Kansas, Arizona, and Oregon. Purkey had 13 prior felony convictions before receiving the sentence of death in this case, including: a 1971 conviction for first-degree burglary; 1976 convictions for robbery and theft; a 1978 conviction for aggravated escape from custody; a series of convictions for aggravated robbery, kidnapping, aggravated battery, and firearms violations stemming from a 1980 crime spree; and the May 2000 convictions for the first-degree murder and aggravated robbery of Ms. Bales. (Tr. 975-86, 1211-14.) Purkey received a life sentence as part of his 1980 crime spree but was paroled in March 1997 after serving approximately 16½ years on the life sentence. (Tr. 985.)

Testimony in the Government's aggravation evidence established that on October 27, 1998, approximately nine months after kidnapping, raping, and murdering Jennifer Long, Purkey went to the Kansas City, Kansas, home of Mary Ruth Bales, an 80-year-old widow, who walked using a cane. Ms. Bales had called Reddi-Root'r about a leaking pipe. Purkey, who had been working at Reddi-Root'r for about ten weeks, agreed to make the necessary repairs for Ms. Bales. The next day, October 28, 1998, Purkey smoked crack cocaine with a prostitute and then drove to the home of Ms. Bales with the prostitute in his work van. While the prostitute waited outside, Purkey went into Ms. Bales' bedroom, and when Ms. Bales asked him what he was doing there, he viciously bludgeoned the 80-year-old grandmother to death with a claw hammer. Using the claw side of the hammer, Purkey caved

in Ms. Bales' cranium and face. She had defensive wounds on both of her hands, apparently having tried to ward off the hammer blows from Purkey. (Tr. 1236.) While Ms. Bales lay dead in her bedroom, Purkey stole $200 from her purse, and then he and the prostitute smoked some more crack cocaine and ate food from Ms. Bales' kitchen. Purkey planned to burn down Ms. Bales' house to eliminate evidence, but before he could, he was arrested for these crimes and confessed. He was charged with first-degree murder and aggravated robbery in Wyandotte County, Kansas, District Court and pled guilty as charged on April 28, 2000. Purkey was sentenced to a term of life imprisonment with eligibility for parole after 15 years. (Tr. 1215-43.)

In additional aggravation evidence, Gregg Carlberg testified that he was the victim of a kidnapping, aggravated battery, and aggravated assault by Purkey in 1980. Carlberg was kidnapped from a convenience store in the summer of 1980 in Wichita, Kansas. (Tr. 1245.) He then was put into the trunk of a car and driven to a wooded area by Purkey and an accomplice, robbed of $40, and later shot in the head and shoulder while being forced to lie down in an abandoned bathtub in the woods, even though he did not resist the robbery at all. (Tr. 1250-54.) Purkey later admitted to shooting Carlberg in the back of the head. (Tr. 1256.) Carlberg suffered serious injuries including paralyzation for several months, a stroke, and permanent neurological damage. Part of the bullet Purkey fired into Carlberg's head remained lodged in the back of his skull. (Tr. 1253-54.)

Ken Lucas, a gang expert with the Arizona Department of Corrections, testified that Purkey was an active member of the Arizona Aryan Brotherhood, a violent white supremacist prison gang, while confined in a Florence, Arizona, prison in the early 1980s. (Tr. 1340-48, 1352-54, 1360.) Mr. Lucas also explained the meaning of many of the tattoos that appeared on Purkey's body and their association with the Aryan Brotherhood. Purkey had a large "Aryan Brotherhood" tattoo on his back, a Nazi swastika surrounded by "Aryan Pride" on his arm, another swastika tattoo on his right forearm, and a tattoo of a Ku Klux Klansman with a shotgun and a noose. (Tr. 1361-1366.)

Gary Lee Hatfield, a former inmate of slight stature who briefly served time with Purkey in the Oregon Department of Corrections in 1987, testified that Purkey forcibly sodomized him at knife-point and then beat him in the kitchen of the prison camp where they were serving prison sentences. (Tr. 1270, 1273-77.)

William Porter, District Attorney for Tillamook County, Oregon, was the prosecuting attorney assigned to prosecute the Hatfield sodomy case. (Tr. 1315-17.) He testified he eventually dismissed the forcible sodomy charge against Purkey because Purkey cooperated in an internal prison investigation that resulted in criminal charges against prison employees. Mr. Porter testified that Hatfield never recanted his allegations that Purkey had beaten and forcibly sodomized him in the kitchen of the prison camp. In addition, Porter described the incriminating evidence contained in his files, including photographs of injuries to Hatfield as a result of the assault. (Tr. 1318-29.)

The parents of Jennifer Long as well as one of her close personal friends testified, explaining what her loss meant to their lives and how it affected their families. (Tr. 1396-1406.)

2. *Mitigation Evidence*

Purkey called 18 witnesses to support the 27 mitigating factors he submitted to the jury. His mitigation case lasted approximately three days and took more than 500 pages of trial transcript. (Tr. 1406-1955.) The 27 mitigating factors Purkey submitted to the jury were: (1) Purkey's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired; (2) Purkey committed the offense under severe mental or emotional disturbance; (3) with proper medications, such as the medications which Purkey is currently taking, Purkey's mental illness and behaviors can be managed; (4) Purkey suffered brain injuries as a result of car accidents, drug abuse or both; (5) Purkey suffered significant psychological and emotional damage as a result of the serious physical and emotional abuse of him by his parents; (6) Purkey suffered significant psychological and emotional damage as a result of sexual abuse of him by his mother; (7) Purkey suffered significant psychological and emotional damage as a result of his growing up in a dysfunctional home environment in which alcohol abuse, sexual promiscuity and incestuous sex were modeled as proper behavior by his parents; (8) Purkey has never received treatment for the psychological and emotional damage which he suffered as a result of his parents' abuse of him; (9) Purkey's past criminal behavior is attributable, at least in

part, to the brain injuries and psychological and emotional damage which he suffered earlier in his life; (10) Purkey became dependent upon alcohol and illegal drugs at an early age because of a genetic predisposition inherited from his parents and because such dependence was modeled for him by his parents and his older brother Gary; (11) Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence; (12) As a child, Purkey suffered from slow speech development, and for his entire life, Wes Purkey has suffered from the disability of stuttering; (13) while incarcerated, Purkey was the victim of serious physical abuse, that is stabbings; (14) while incarcerated, when given the opportunity to do so, Purkey completed a significant number of hours of college course work; (15) while incarcerated, when given the opportunity to do so, Purkey received training and became qualified as a plumber; (16) Purkey has offered to donate a portion of his liver to his sister-in-law who is dying of liver failure; (17) Purkey should be sentenced to life imprisonment without release because Purkey was led to believe that he would receive that sentence if he provided information regarding the killing of Jennifer Long, and Purkey provided all of the information which was required; (18) the disappearance of Jennifer Long was solved only because Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing; (19) by coming forward and admitting that he had killed Jennifer Long, and directing authorities to evidence about the killing, Mr. Purkey has shown remorse for what he did; (20) Purkey has repeatedly expressed his remorse for what he has done; (21) Purkey is the father of Angie Purkey Genail, and the two have carried on

a loving, father-daughter relationship, with Purkey providing Angie Purkey Genail advice, nurturance, and emotional support, even while he has been incarcerated; (22) Angie Purkey Genail loves her father Mr. Purkey very much; (23) if Purkey is sentenced to life imprisonment without possibility of release, he and Angie Purkey Genail would continue to carry on a loving, nurturing father-daughter relationship; (24) Purkey is the grandfather of Angie Purkey Genail's children Mikey, age 4, and Haley, age 1, and has carried on a loving, grandfatherly relationship, particularly with Mikey, speaking with Mikey on the telephone on numerous occasions; (25) if Purkey is sentenced to life imprisonment without possibility of release, he and his grandchildren, Mikey and Haley, would continue to carry on a loving, nurturing grandfather/grandchild relationship; (26) Purkey has loving and caring relationships with friends and family, and those relationships would continue if he was sentenced to life imprisonment without possibility of release; and (27) in the last three years, Mr. Purkey has volunteered to offer good advice to many young men in trouble about how to avoid a life of crime, and would continue to do so if sentenced to life imprisonment without possibility of release.

Despite the presentation of an exhaustive mitigation case consisting of 18 witnesses over three days, taking more than 500 pages of transcript in support of 27 mitigating factors, no juror found a single mitigating factor. Purkey's witnesses included: a prison psychiatrist; a criminal defense attorney who had previously represented Purkey; several former inmates who had been incarcerated with Purkey; a friend and pastor; a friend who was a tattoo artist;

an administrator from the Hutchinson Correctional Center who had supervised Purkey while he was a custodian; a former parole officer from the State of Kansas; Purkey's aunt; a friend who was incarcerated with Purkey at the Hutchinson Correctional Center; Purkey's daughter; Purkey's brother; a prison minister; a clinical psychologist with the Missouri Department of Corrections; a correctional counselor from the United States Penitentiary at Leavenworth; a radiologist from Kansas University Medical Center; a forensic psychiatrist; and a clinical and forensic psychologist who testified as a mitigation specialist.

Dr. William Grant, a Bureau of Prisons psychiatrist, testified that he had prescribed three medications to Purkey, which were designed to address Purkey's depression, anxiety, anger, and aggression. (Tr. 1406-16.)

Dennis Messoline, an Oregon attorney who represented Purkey in the Gary Hatfield sodomy case, testified that he had planned to assert a consent defense, and had filed a motion with the court seeking permission to elicit Mr. Hatfield's prior sexual history at trial before the case was eventually dismissed. (Tr. 1664-1736.)

Nealy Vinson, a former inmate who was incarcerated with Purkey and Hatfield in Oregon, was called to discredit Hatfield's account of the sexual assault by Purkey. Vinson testified that Purkey got along well with other inmates and that he was not a racist. Vinson also testified that Purkey was not violent during his incarceration in Oregon. (Tr. 1449-64.)

Randy Masterson, another inmate who was incarcerated with Purkey in Oregon, testified Purkey was not a racist, got along well with the other inmates, and was not involved

with the Aryan Brotherhood prison gang in Oregon. Purkey also offered Masterson's testimony to discredit Hatfield. Masterson testified that he had sexual relations with Hatfield in a broom closet at the prison. Masterson also testified that he was the homosexual lover of Purkey for two and a half years. (Tr. 1468-76.)

Linda Skeen, a pastor at the Faith and Evangelistic Center in Leavenworth, Kansas, testified that she became a friend of Purkey while he was on parole in 1997 and 1998. Skeen testified that Purkey was always nice when in her home and that she and her husband referred to Purkey as "Uncle Wes." (Tr. 1478-84.)

Patrick Howe, a friend of Purkey and a tattoo artist, testified that Purkey asked him to cover up his Nazi swastikas and Aryan Brotherhood tattoos. Howe testified that he tried to cover up the tattoos with skin toned ink, but the process was unsuccessful. Howe also testified that Purkey was friendly to people of other races in prison. (Tr. 1485-91.)

Dominic Genuik, a Public Service Administrator at the Hutchinson Correctional Facility in Kansas, testified that Purkey was an auditorium custodian while incarcerated at his institution. Genuik testified that Purkey participated in a program called JAIL (Juvenile Assistance Information Liaison), a program similar to the Scared Straight program. The purpose of the program was to counsel juvenile offenders not to violate the law and to share prison experiences. Inmates participating in the program would share with the juveniles the consequences of negative behavior in an effort to discourage participation in criminal activity. Genuik testified that Purkey was not a racist, counseled both African-American and

Hispanic juveniles, and he did not consider Purkey to be a security threat at the institution. (Tr. 1491-1501.)

Michael Gibbons, a correctional counselor from the Lansing Correctional Facility, testified that he was Purkey's former parole officer in Kansas. Gibbons testified that Purkey participated in a drug and alcohol counseling program, a family counseling program, and that he was employed while on parole. Gibbons testified that Purkey had no employment problems while under his supervision. Gibbons further testified that while Purkey was on parole he admitted to Gibbons that he was having a drug problem and sought to gain admission into a drug counseling program at the Kansas University Medical Center. (Tr. 1502-17.)

Marguerite Hotchkiss, Purkey's 78-year-old aunt, testified she was the sister of Purkey's father. She testified in detail about Purkey's neglectful and disadvantaged childhood. She further testified that when Purkey was five-years-old, he could not speak words and would only grunt. She said that Purkey was a stutterer as he got older and that stuttering was a common trait in Purkey's family. Hotchkiss testified that Purkey's father, Jack, had suffered a head injury requiring a metal plate to be inserted in his head, that he had terrible headaches, and that he was an alcoholic who was always drunk. She also testified that Jack Purkey lost a good job at Boeing Aircraft in Wichita, Kansas, because of his alcohol problem. She further testified that Jack Purkey committed suicide in 1984. She testified that Purkey was involved in a terrible automobile accident and was hospitalized. Hotchkiss also

- 17 -

testified about her love for Purkey and that she would continue her relationship with him if he was granted a sentence of life without parole. (Tr. 1520-29.)

Robert Lopez, a fellow inmate who was incarcerated with Purkey at the Hutchinson Correctional Facility in Kansas, worked as a custodian with Purkey. Lopez testified that Purkey was not associated with the Aryan Brotherhood prison gang at the Hutchinson facility. He testified that Purkey read the Bible frequently and he considered Purkey to be a friend who had counseled him about staying out of gangs while in prison. Lopez also testified Purkey was not a racist and would help African-American inmates with legal work. He testified Purkey represented other inmates, never fought with other inmates, counseled juvenile offenders, and did not use drugs in prison. Finally, Lopez also testified that in his opinion, Purkey loved his daughter very much. (Tr. 1530-40.)

Angie Genail, Purkey's daughter, testified about her relationship with her father. She displayed a large number of photographs of Purkey's family and described for the jury the individuals in each photo. She testified Purkey's parents were alcoholics. She testified that Purkey had shared with her that his mother had thrown alcoholic drinks in his face when he was a child. She testified that she had a good and loving relationship with Purkey and he had always kept in contact with her even though most of his adult life was spent in prison. She testified that Purkey was a good grandfather to her son, was supportive to her, that she loved him, and that she would maintain a relationship with Purkey if he was given a life sentence. (Tr. 1541-48.)

Gary Hamilton, Purkey's brother, testified that Jack Purkey was his stepfather and Purkey's father. Hamilton testified that Jack Purkey was an alcoholic who had lost his job at Boeing Aircraft, after which he lived on skid row in Wichita. He testified that Jack Purkey beat Purkey, himself (Gary), and their mother frequently. He testified that Purkey's mother, Velma Purkey, was also an alcoholic and would bring men home to have sex in front of both him and Purkey when they were children and in their teen years. He testified those men beat both him and Purkey. Hamilton further testified his mother sexually abused him, but Hamilton did not know if she had also sexually abused Purkey. He also testified that both he and Purkey had been diagnosed as bipolar. He testified that he had prior felony convictions for property theft crimes, but he had decided to change his life in the 1970s and had not been in trouble with the law since that time. He further testified that Purkey had volunteered to donate part of his liver to help Hamilton's sick wife who had liver disease. On cross-examination, Hamilton admitted that Purkey had been an aggressive, self-centered, and manipulating con man. (Tr. 1548-64.)

Reverend John Otto, a prison minister at the Hutchinson Correctional Facility, testified that he counseled Purkey in prison. He further testified that in his belief, Purkey was a Christian and he was remorseful for his criminal conduct. (Tr. 1564-69.)

Dr. Bruce Leeson, a clinical psychologist with the Missouri Department of Corrections, testified that he was retained as an expert witness for Purkey and had administered neuropsychological tests to Purkey. Dr. Leeson testified that in his opinion

Purkey was depressed and anxious and had a significant amount of frontal and temporal lobe brain impairment which detrimentally affected his ability to plan ahead and focus. He further testified that the brain damage could explain Purkey's impulsive behavior. On cross-examination, Dr. Leeson said that Purkey had scored well on intelligence tests, and that Purkey's test results correlated with classification profiles for drug abuse, assault, rape, and antisocial personality disorder. (Tr. 1577-1650.)

Mark Russell, a correctional counselor at the United States Penitentiary in Leavenworth, Kansas, testified that while Purkey was incarcerated in the special housing unit at Leavenworth he had no disciplinary violations. He further testified that Purkey had submitted a request to have his tattoos removed. (Tr. 1651-63.)

Dr. David Preston, a physician, testified that according to tests he performed on Purkey, Purkey had frontal and temporal lobe brain damage. He said it could have been caused by car accidents Purkey had been in, or by Purkey's drug and alcohol abuse. (Tr. 1664-1736.)

Dr. Stephen Peterson, a forensic psychiatrist, was another expert witness who testified on Purkey's behalf. Dr. Peterson testified that Purkey had a longstanding chronic mental illness that had been untreated at the time of the murders of Jennifer Long and Mary Ruth Bales. He testified that Purkey suffered severe sexual, physical, and emotional abuse during childhood. He testified that Purkey was extremely impulsive and angry, and concluded that Purkey had substantial problems with substance abuse beginning in his teens. He testified

that Purkey suffered from depression and was dysthymic, and had a severe personality disorder with anti-social features, obsessive-compulsive, and dependency features.

Dr. Peterson further described in detail three closed-head injuries that Purkey allegedly suffered in 1968, 1972, and 1974. He testified in great detail about Purkey's abusive, chaotic, and neglectful home life as a child and teenager. He described Purkey's parents as alcoholics and told the jury that Purkey's father had committed suicide. In conclusion, Dr. Peterson testified that Purkey did not have the capacity to form the intent to kill Jennifer Long because of severe psychiatric illness. On cross-examination, Dr. Peterson admitted that 12 or 13 psychologists/psychiatrists had concluded that Purkey was a psychopath and/or had antisocial personality disorder. (Tr. 1738-1832.)

Dr. Mark Cunningham, a clinical and forensic psychologist, testified as a mitigation specialist on behalf of Purkey. Dr. Cunningham testified that he had reviewed a total of ten binders of information from Purkey's incarcerations in both state and federal prisons, that he reviewed medical and psychiatric records of Purkey's parents, Jack and Velma Purkey, and that he reviewed all Purkey's medical records, psychiatric records, and school records. Dr. Cunningham also reviewed the reports of all the medical experts for both the defense and prosecution, as well as interview summaries of Purkey's friends and family. Finally, Dr. Cunningham interviewed Purkey himself a number of times. He testified that Purkey was a profoundly damaged person in both his neurological and neuro-developmental history. He described in great detail Purkey's abusive, neglectful, and alcoholic parents. He informed

the jury of their poor parenting skills and how these had impacted Purkey's development. He also testified that Purkey had been in car accidents resulting in probable brain damage, consistent with frontal and temporal lobe brain damage.

Dr. Cunningham testified that Purkey's mother had been sexually promiscuous with several boyfriends in front of Purkey and his brother. He also testified that Purkey's mother sexually abused him as a child and as a teenager, and described the abuse. He said Purkey was made to penetrate his mother with a hairbrush and have intercourse with his mother. Dr. Cunningham described reports from Purkey's aunt and brother as corroboration of the sexual abuse. He also described Purkey's significant alcohol and drug addictions, including addiction to methamphetamine, cocaine, and Ritalin.

Dr. Cunningham testified that there was an extremely high level of security at the Federal Bureau of Prisons facility at ADX Florence, Colorado. He described it as a super-max facility in which the likelihood of violence had been substantially reduced because of the high level of security. Dr. Cunningham also testified that because Purkey was taking appropriate medications to control his behavior, because of his age (51 years old), and because of the high security precautions within the Bureau of Prisons he believed Purkey would not be a significant threat to others in the future. (Tr. 1840-1954.) Not one juror found even one mitigating factor out of the 27 submitted.

## II. **Standard of Review**

To appeal the denial of any of his substantive claims of constitutional error, Purkey must first be issued a certificate of appealability by the district court or the Eighth Circuit. *See* 28 U.S.C. § 2253(c)(1)(B). Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue only if a movant has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003); *Garrett v. United States*, 211 F.3d 1075, 1076-77 (8th Cir. 2000). To make such a showing, the issues must be debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings. *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997). Courts reject constitutional claims either on the merits or on procedural grounds. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy [28 U.S.C.] § 2253(c) is straightforward: the [movant] must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El*, 537 U.S. at 338 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

As with a substantive claim, a certificate of appealability also may be issued regarding whether a district court erred in failing to hold an evidentiary hearing. *Anjulo-Lopez v. United States*, 541 F.3d 814, 817 (8th Cir. 2008).

- 23 -

### III. <u>Argument and Authorities</u>

**A.     *Claim of Failure to Adequately Investigate and Present Mitigation Evidence***

Even with the benefit of hindsight, Purkey does not advance one new mitigation theme or area of mitigation evidence that Mr. Duchardt failed to investigate or present. Instead, Purkey makes amorphous claims that the investigation should have been more "sensitive," that because Mr. Duchardt failed to properly "prepare" the witnesses, they provided "generic" testimony; he also claims Mr. Duchardt was ineffective for failing to call additional witnesses who would testify to the exact same matters to which the 18 mitigation witnesses presented by Mr. Duchardt testified.   (Purkey App. COA, 9-11.)   Purkey's allegations of ineffective assistance of counsel, which encompass several sub-claims, fall far short of making a "substantial showing of the denial of a constitutional right" as is required by the Antiterrorism and Effective Death Penalty Act (AEDPA) to obtain a certificate of appealability.  28 U.S.C. § 2253 (c)(2).

### 1.     *Failure to Hire Social Worker "Mitigation Specialist"*

Purkey's first claimed area of ineffective assistance provides a good example of his elevation of form over substance – he argues Mr. Duchardt was ineffective for failing to hire a forensic social worker with the job title of "mitigation specialist."  He acknowledges in his application for certificate of appealability that "trial counsel did present some mitigating evidence" (Purkey App. COA, 8.) (18 witnesses in support of 27 mitigating factors), but

speculates that because he did not hire a "mitigation specialist," Mr. Duchardt failed to "develop rapport and elicit sensitive information." (Purkey App. COA, 25.)

As Mr. Duchardt stated in his affidavit, the role of mitigation specialist was filled by himself as experienced capital counsel in developing mitigation themes, and by Dr. Mark Cunningham, in making a comprehensive trial presentation. (Duchardt Aff. 43-79.) As Mr. Duchardt said, Dr. Cunningham was a far more qualified and impressive witness than "a mere social worker" would have been. Purkey mistakenly argues that Dr. Cunningham was hired as a mitigation expert "solely in the area of future dangerousness and adaptability to confinement." (Purkey App. COA, 14.) As noted above in the summary of mitigation evidence, Dr. Cunningham testified that he had reviewed ten binders of information from Purkey's incarcerations in Kansas, Arizona, Oregon, and federal prison, that he reviewed medical and psychiatric records of Purkey's parents, Jack and Velma Purkey, and that he reviewed all Purkey's medical records, psychiatric records, and school records. Dr. Cunningham also reviewed the reports of all the medical experts for both the defense and prosecution, as well as interview summaries of Purkey's friends and family. Finally, Dr. Cunningham interviewed Purkey himself a number of times.

He testified in extensive detail about Purkey's abusive, neglectful, and alcoholic parents, as well as about Purkey's probable brain damage. Further, Dr. Cunningham worked before trial with Mr. Duchardt to develop mitigation themes - in preparation for mitigation

he sent to Mr. Duchardt mitigating circumstances to be developed through investigation and 11 mitigation hypotheses.  (D.E. 47; Exh. 9, 10.)

In support of his position that failure to hire a social worker mitigation specialist, as opposed to a psychologist mitigation specialist, is *per se* ineffective assistance of counsel, Purkey cites several law review articles and argues that only a social worker would have the sensitivity to properly conduct interviews.  However, this Court has recently found that if trial counsel conducted a proper mitigation investigation, the need for a mitigation specialist is obviated.  *United States v. Sinisterra*, 600 F.3d 900, 909 (8th Cir. 2010).  Even Purkey acknowledges that counsel does not have a specific obligation to employ a mitigation specialist.  (Purkey App. COA, 25.)  Because Purkey does not even allege any concrete prejudice suffered by trial counsel's decision to hire a psychologist mitigation specialist rather than a social worker mitigation specialist, his claim that trial counsel was ineffective for hiring the wrong kind of mitigation specialist must fail.

   2.   *Failure to Adequately Investigate*

"*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins v. Smith*, 539 U.S. 510, 533 (2003). *See also Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (there is no requirement that defense counsel "scour the globe on the off-chance something will turn up"); *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997) (counsel need not have "a scorch-the-earth strategy").

### a. Gary Hamilton

Purkey alleges ineffective assistance for failure to investigate. His first claimed subcategory is the failure to interview Gary Hamilton in a sensitive manner. (Purkey App. COA, 33.) He speculates that a better investigation/interview would have uncovered an additional act of abuse by Purkey's father Jack Purkey, against Purkey's mother - breaking her arm by slamming it in a door. The other additional information trial counsel allegedly failed to uncover was that Gary Hamilton had been sexually abused by his grandmother as well as his mother. (Purkey App. COA, 34-35.)

As detailed above, Hamilton testified that he, his mother, and Purkey were physically abused by Jack Purkey, that Velma Purkey had sex with other men in front of Hamilton and Purkey, that their mother's boyfriends beat both Hamilton and Purkey, that Velma Purkey sexually abused Hamilton, and that both he and Purkey were diagnosed as bipolar. Just because different counsel, several years later, uncovered additional details from a witness does not establish that trial counsel was ineffective. *Nave v. Delo*, 62 F.3d 1024, 1037 (8th Cir. 1995). Not only is the evidence redundant and cumulative, additional evidence of abuse of Purkey's mother and/or brother would have added nothing to mitigate Purkey's crimes.

### b. Rex Newton

Purkey next claims trial counsel was ineffective for failing to fully investigate Rex Newton, a prison psychologist from Oregon. First, trial counsel did secure all Purkey's prison records from Purkey's incarceration in Oregon; indeed, those very records are used

by Purkey now to make the claim that trial counsel should have investigated Purkey's Oregon incarceration more thoroughly. He argues that Dr. Rex Newton would have testified that while Purkey was incarcerated in Oregon, Purkey disclosed sexual abuse in a questionnaire, and that Purkey was not racist or involved in prison gangs in Oregon.

First, the questionnaire was obtained, available, and used by the defense in mitigation. The Oregon records were used and cited by Dr. Peterson and Dr. Cunningham in their reports. Second, while Purkey spends 15 pages of his application arguing that Dr. Newton would have significantly bolstered Purkey's claim to have been sexually abused as a child, the *source* of Dr. Newton's record of Purkey's sexual abuse remained the same - Purkey himself. (Purkey App. COA, 43-58.) Thus, the Government would have still been able to argue that those claims lacked verification, and that they were "garbage in, garbage out." (Purkey App. COA, 57.) In an attempt to allege prejudice, Purkey argues that the Government did not concede that Purkey had been sexually abused, citing the Government's closing argument, "Aren't you tired of people having an excuse for everything?" (Purkey App. COA, 55.) But the Government did concede Purkey had a bad childhood, arguing instead that an abusive childhood did *not* mitigate Purkey's brutal, vicious murders of two innocent and defenseless women - murders Purkey committed at the age of 46.

Finally, even with the benefit of hindsight, Purkey cannot point to *any* new area of mitigation evidence that Dr. Newton would have testified to. He argues that Dr. Newton would have provided testimony about Purkey before he was facing the death penalty, would

have testified that Purkey was ashamed of his racist tattoos, that Purkey wanted treatment, and that he was abused as a child. (Purkey App. COA, 41, 44, 53.) So Dr. Newton would have been at least the twelfth mitigation witness who knew Purkey before he was facing the death penalty,[6] the fourth mitigation witness who knew Purkey from his incarceration in Oregon,[7] the seventh mitigation witness to testify that Purkey was neither racist nor involved in prison gangs,[8] the third mitigation witness to testify that Purkey sought treatment in and/or out of prison,[9] and the sixth mitigation witness to testify that Purkey was abused as a child.[10] Purkey's proffered testimony would therefore have been redundant and cumulative of evidence already presented. *United States v. Paul*, 534 F.3d 832, 838 (8th Cir. 2008) (holding trial counsel not ineffective for failing to present redundant and cumulative evidence.). To the extent Purkey argues that Dr. Newton would have provided additional corroboration of evidence that was presented in the mitigation case, the Supreme Court has recently held that largely duplicative and substantiating "new" mitigation evidence will not

---

[6]Angie Genail, Gary Hamilton, Nealy Vinson, Randy Masterson, Linda Skeen, Dominic Genuik, Michael Gibbons, Marguerite Hotchkiss, Robert Lopez, the Reverend John Otto, and Dennis Messoline all knew Purkey before he faced the death penalty.

[7]Dennis Messoline, Nealy Vinson, and Randy Masterson all knew Purkey from his Oregon incarceration.

[8]Mark Russell, Nealy Vinson, Randy Masterson, Patrick Howe, Dominic Genuik, and Robert Lopez all testified that Purkey was not racist or involved in prison gangs.

[9]Michael Gibbons and Dr. Peterson both testified that Purkey sought treatment.

[10]Angie Genail, Gary Hamilton, Marguerite Hotchkiss, Dr. Stephen Peterson, and Dr. Mark Cunningham all testified to abuse Purkey suffered as a child.

support a finding that trial counsel was ineffective. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1409-10 (2011).

### c. *Floyd Bose and Dion Leiker*

Purkey argues that his trial counsel was ineffective for failing to interview Floyd Bose and his daughter Dion Leiker, both former law enforcement officers, to present favorable character evidence about Purkey. (Purkey App. COA, 58-61.) No fewer than seven mitigation witnesses testified that Purkey had positive character traits.[11] And two other law enforcement witnesses testified on Purkey's behalf.[12]

### d. *Peggy and Evette Noe*

Purkey claims that Mr. Duchardt should have called Peggy Noe as a witness to testify that Purkey was abused as a child and had good character traits. Again, no fewer than five mitigation witnesses testified that Purkey was abused as a child,[13] and no fewer than seven mitigation witnesses testified that Purkey had positive character traits.[14] As with Purkey's

---

[11] Angie Genail, Gary Hamilton, Marguerite Hotchkiss, Linda Skeen, Patrick Howe, Robert Lopez, and the Reverend John Otto all testified that Purkey had good character traits.

[12] Dominic Genuik and Michael Gibbons were law enforcement witnesses.

[13] Angie Genail, Gary Hamilton, Marguerite Hotchkiss, Dr. Stephen Peterson, and Dr. Mark Cunningham all testified to abuse Purkey suffered as a child.

[14] Angie Genail, Gary Hamilton, Marguerite Hotchkiss, Linda Skeen, Patrick Howe, Robert Lopez, and the Reverend John Otto all testified that Purkey had good character traits.

other proffered testimony, the Noes would have been redundant and cumulative of evidence already presented.  *Paul*, 534 F.3d at 838.

      *e.*      *Other Family Members and Associates*

Purkey claims that trial counsel's investigation and interviews of Angie Genail and Marguerite Hotchkiss were inadequate, but does not bother to delineate what was lacking from their testimony.  Purkey merely cites the same law professor who provides extensive armchair quarterbacking by attacking the timing and sensitivity of trial counsel's witness interviews.  (Purkey App. COA, 63-65.)

Purkey also complains that his trial counsel should have called as character witnesses Purkey's cousin, Debbie Prothero, and yet another of Purkey's fellow inmates, Sam Hoffmeier.  It is unclear why these two witnesses are lumped into Purkey's allegations of an inadequate investigation, since it is undisputed that Mr. Duchardt did interview these two witnesses.  He can only be challenging Mr. Duchardt's decision not to call these two additional character witnesses to supplement the other seven character witnesses who testified on Purkey's behalf.  To the extent Purkey attacks Mr. Duchardt's trial strategy, his claim must fail.  "Under *Strickland,* strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Rodela-Aguilar v. United States*, 596 F.3d 457, 464 (8th Cir. 2010).  Purkey's failure to properly classify his argument is also fatal to his claim, as it has long been a requirement that movants in § 2255 proceedings identify the specific facts that support his claims.  *See*, *e.g.*, *Blackledge v.*

*Allison*, 431 U.S. 63, 75-76 (1977); *Saunders v. United States*, 236 F.3d 950, 953 (8th Cir. 2001)*; see also* Rule 2(b)(2) of the Rules Governing Section 2255 Proceedings.

Purkey claims prejudice, but cites not one mitigation theme or area of mitigation evidence that Mr. Duchardt failed to investigate or present. Purkey asks this Court to find his trial counsel ineffective because he did not "scour the globe on the off-chance something will turn up" *Rompilla*, 545 U.S. at 383. Yet even with the benefit of hindsight and additional investigation, Purkey proposes no new area of inquiry that Mr. Duchardt should have pursued.

### 3. *Alleged Failure to Prepare Dr. Stephen Peterson's Testimony*

Purkey alleges Mr. Duchardt was ineffective in preparing Dr. Peterson to testify. He claims that Dr. Peterson was not familiar with his own report, and that somehow, Purkey does not explain how or why, this was Mr. Duchardt's fault. Dr. Peterson acknowledged at trial that he testified as an expert witness approximately 10 to 20 times per year, for the past 11 years, and had previously testified in capital cases; he should not have needed Mr. Duchardt's help in reading his own report before he testified. (Tr. 1788.) Purkey's other claim is that Dr. Peterson testified only "generally" about Purkey's abuse as a child. (Purkey App. COA, 68-70.) Purkey has not correctly characterized Dr. Peterson's testimony. Dr. Peterson did testify that Purkey had reported his sexual abuse to multiple persons on multiple previous occasions. (Tr. 1752-53, 1816.) Further, contrary to Purkey's allegations, Dr. Peterson testified in some detail about Purkey's sexual abuse. Dr. Peterson testified that

Purkey described that his mother was "teaching him how to sexually stimulate her anally and orally and also washing him in way that were sexualized, at least in his recollection, all the way back to about age six to ten." (Tr. 1750.) To the extent he did not provide even greater detail, Mr. Duchardt exercised reasonable trial strategy – as he noted in his affidavit, "I wanted Dr. Peterson to strike a balance so that enough was said about the varieties of sex used by the mother upon Wes and the young age at which she exposed Wes to those kinds of sex, in order to give Dr. Peterson the opportunity to convey the psychological and emotional damage wrought by overwhelming one too young with such sex games." (Duchardt Aff. 84.) Contrary to Purkey's allegations that the Government used his supposed recent fabrication of sexual abuse as a linchpin in its closing argument, Government counsel essentially conceded that Purkey had been abused as a child. (Purkey App. COA, 71.) What Government counsel instead argued was that Purkey's abuse as a child did not mitigate horrific crimes he committed when he was 46 years old:

> Now, the next group of mitigating factors have to do with the defendant's bad childhood. Now, that's the old abuse excuse. He had a bad childhood. No doubt he did not have a good childhood. I'm not disputing that. But many people in this country grow up with alcoholic parents or are abused and they turn out fine. His own brother corrected his behavior way back in 1977, decided he wasn't going to do any more crimes, and he changed. And this is about personal choices. He chose not to make any changes in his life. He just kept doing the same things, being violent,  committing crimes. He made those choices.

> What about personal responsibility? Aren't you tired of people having an excuse for everything? This guy goes out and he beats - - he stabs this girl to death, beats an 80-year-old grandmother, and it's somebody else's fault.

(Tr. 2268.)

### 4. *Alleged Failure to Prepare Dr. Mark Cunningham's Testimony*

Purkey alleges Mr. Duchardt was ineffective in failing to prepare Dr. Cunningham to testify, claiming that Dr. Cunningham should have given more detail about Purkey's sexual abuse as a child, and Dr. Cunningham should have used slides in his trial presentation. Mr. Duchardt sets forth in his affidavit his trial strategy in having Dr. Cunningham describe some, but not all of the details concerning Purkey's abuse. (Duchardt Aff. 89-92.) Likewise, Mr. Duchardt describes his reasonable trial strategy for not having Dr. Cunningham use a PowerPoint demonstration during his testimony, since that would have opened the door for Dr. Park Dietz to use a PowerPoint presentation during his testimony, which Mr. Duchardt hoped to prevent. Once again, Purkey has offered complaints about form, rather than substance, and his claims do not come close to establishing a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253 (c)(2).

### 5. *Alleged Failure to Prepare Dr. Bruce Leeson's Testimony*

Purkey also alleges Mr. Duchardt was ineffective in failing to properly prepare Dr. Bruce Leeson to testify. As Mr. Duchardt explains in his affidavit, Dr. Leeson had all the records needed to make his diagnoses, was prepared far in advance of trial, and testified as to his diagnoses and the impact of the diagnosed conditions on Purkey. (Duchardt Aff. 79-82.) A review of Dr. Leeson's testimony confirms this. A case from the Eighth Circuit is more on point than those cited by Purkey: *Nave*, 62 F.3d at 1037, which held that trial counsel "cannot be held ineffective merely because different counsel, three years later, was

able to formulate a question which elicited the desired response." Even years later and with the benefit of hindsight, Purkey does not establish how better preparation would have made Dr. Leeson a more effective witness. Purkey's failure to put forward the more compelling evidence he claims his trial counsel should have elicited is fatal to his claim. Indeed, it has long been a requirement that movants in § 2255 proceedings identify the specific facts that support his claims. *See, e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 75-76 (1977); *Saunders v. United States*, 236 F.3d 950, 953 (8th Cir. 2001)*; see also* Rule 2(b)(2) of the Rules Governing Section 2255 Proceedings. Purkey's nonspecific claim of purported testimony that is merely of hypothetical or remote benefit to the defense is insufficient to prove prejudice. *Caban v. United States*, 281 F.3d 778, 786 (8th Cir. 2002).

### *6. Alleged Failure to Prepare the Testimony of Dr. Grant and Mark Russell*

Purkey next claims that the testimony of Dr. Grant and Mark Russell was actually prejudicial to Purkey's mitigation case. However, both men testified in support of mitigation themes for which, earlier in the same application, Purkey argues that Mr. Duchardt did not present *enough* evidence. (Purkey App. COA, 13-68.) Leaving aside the contradictory positions taken by Purkey in attempts to argue Mr. Duchardt was ineffective, he fails to show prejudice. He complains that Dr. Grant testified that Purkey had "real anger control problems" and that Mark Russell testified that Purkey had a long history of assaultive behavior in prison. (Purkey App. COA, 77.) However, had these witnesses failed to acknowledge what was already in evidence through several different witnesses, and indeed,

through Purkey's own outbursts during the trial, which was thus patently obvious to anyone in the courtroom (that Purkey was angry and assaultive), the witnesses would have had no credibility. (Tr. 1798-1800, 1931, 1957-62, 2298-2301.) Purkey's claim also illustrates the downside of calling an endless stream of mitigation witnesses to testify - that presentation of mitigating evidence is a double-edged sword. The Supreme Court recently held that trial counsel was not ineffective for failing to call a defendant's siblings to testify to the defendant's abuse by his father, nor by failing to call a psychiatrist. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1409-10 (2011). The Court found that if trial counsel had called the psychiatrist to testify, that would have opened the door to testimony by a state expert, and had trial counsel presented additional evidence of the defendant's family problems, the jury could have concluded he was beyond rehabilitation. *Id.* at 1410; *see also Wong v. Belmontes*, 558 U.S. —, 130 S.Ct. 383, 389-90 (2009) (per curiam) (taking into account that certain mitigating evidence would have exposed the petitioner to further aggravating evidence).

As noted by Mr. Duchardt in his affidavit, both men were called in order to provide favorable testimony for Purkey as part of a reasonable trial strategy. (Duchardt Aff. 93-98.) The men did provide favorable testimony – Mr. Duchardt was able to convince the jury that Purkey did not warrant a finding of future dangerousness, the one aggravating factor *not found* by the jury, so the testimony of these two men describing Purkey's current and future prison conditions must have been persuasive, or at the very least, non-harmful.

7.      *The District Court's Ruling*

Purkey claims that the district court's order is insufficient to provide for appellate review.  Purkey claims the district court made conclusory findings, and relied on a faulty assertion - that "no jurors voted for a single mitigating factor (D.E. 89 at 11), based on the evidence counsel presented, to support the logically faulty extension of that assertion - i.e., jurors would, therefore, have necessarily rejected any and all evidence that counsel could have but did not prepare and present."  (Purkey App. COA, 78.)  Purkey cites the district court's original ruling on his § 2255 motion, but fails to cite the district court's order denying the certificate of appealability.  (D.E. 89, 115.)  In the order denying Purkey's certificate of appealability, the district court actually addressed Purkey's arguments that its prior ruling was conclusory and relied on a faulty assumption.  (D.E. 115 at 8-14.)  Regarding Purkey's many claims that Mr. Duchardt neither interviewed nor properly prepared witnesses, the district court found,

> this additional information would only have added to the *quantity* of mitigation evidence and would not have changed the type or the nature of evidence which was offered.  As previously discussed, in the penalty phase of the case Mr. Duchardt submitted 27 mitigating factors and called 18 witnesses to testify.  Purkey argues that the Court's analysis was flawed because by concluding that the jury was not swayed by the evidence that was presented, they would have also rejected the evidence which *could* have been presented.  However, the Court finds that there is not a "reasonable probability" that this additional evidence would have swayed at least one juror, because despite carefully filling out all the other areas of the Special Verdict Form, and signing their names below the Certification, not one jury indicated that they found the existence of a single mitigating factor.

(D.E. 115 at 10-12.)  (Emphasis in original.)

- 37 -

A recent Eighth Circuit case provides guidance in assessing claims of ineffective assistance for failure to investigate and present evidence in a capital case. As in this case, the district court in *United States v. Paul*, 534 F.3d 832, 838 (8th Cir. 2008) denied the § 2255 motion without a hearing; however in *Paul*, the Eighth Circuit granted a certificate of appealability on two issues. A certificate of appealability was issued on trial counsel's failure to investigate and present mitigation evidence, and trial counsel's failure to investigate and assert the defendant's competence to stand trial. *Paul*, 534 F.3d at 832-34. Paul had been convicted by a jury of murder, while aiding and abetting another, for the killing of 82-year-old Sherman Williams and sentenced to death. *Id.* His trial counsel presented no witnesses during the guilt phase, and in the sentencing phase presented the testimony of Paul's mother and played a tape recording from a co-conspirator which tended to show that Paul had not fired the fatal shot. *Id.* at 836.

In his § 2255 motion, Paul made the same claims Purkey does here – that his trial counsel failed to investigate and present evidence in mitigation. *Id.* The record in *Paul* was not as extensive as the record in this case, because the attorney in *Paul* did not provide a rationale for his actions, thus there was no evidence that any particular decision was strategic. *Id.* at 837. Nevertheless, this Court found that the record conclusively showed Paul did not suffer prejudice, as the proffered evidence "would have been largely cumulative of evidence already presented, and likely less powerful than testimony already elicited." *Id.* at 838. Further, this Court found that the Government had presented a strong case on aggravating

factors that supported a death sentence, as the jury found three statutory aggravators and six non-statutory aggravators. *Id.* at 839-40. The court found that Paul's proffered evidence would not undermine any of the evidence in aggravation. *Id.* at 840.

The jury in *Paul* had unanimously agreed on four mitigating factors. However, Paul contended that his attorney was ineffective in not investigating and presenting additional witnesses to testify that Paul was abused as a child and had a compassionate personality. *Id.* at 841-42. This Court held that much of the new evidence cited was largely cumulative, as Paul's mother had testified about his childhood abuse and Paul's love for animals and his great-grandmother. *Id.* at 842. This Court's discussion of the issue of prejudice in the sentencing phase of a capital case is instructive:

> [w]e recognize that the jury's findings do not preclude the possibility that more detail about Paul's difficult and abusive childhood or his compassionate character may have caused the jury to give more weight to mitigating factors that some or all of the jurors already found, but we must consider the incremental benefit of the proffered evidence in the context of the entire record. Nothing that Paul offers detracts from the government's strong case in aggravation, and the weight of this evidence is a proper and significant factor in considering whether Paul has established prejudice. The mitigation case at trial covered much of the same ground as the newly proffered evidence. The record at trial gave the jury an opportunity to consider the same mitigating factors to which the new evidence pertains for similar or identical reasons. We acknowledge that the evidence of physical abuse by Paul's father presented at trial was not as extensive as that proffered in this habeas proceeding, but the jury certainly was not given reason to develop a "benign conception" of Paul's childhood, as in *Rompilla v. Beard*, 545 U.S. 374, 391 (2005). Unlike the record in *Williams v. Taylor*, 529 U.S. 362 and *Wiggins v. Smith*, 539 U.S. 510, 534-38 (2003), the mitigation case here did include a good deal of mitigating information about Paul's childhood, sufficient to convince all jurors that Paul's experienced "parental neglect, abandonment, and corruptive influence," "parental abdication as to holding the defendant accountable for his behavior,"

and "chaotic family instability," and to persuade eight jurors that Paul experienced modeled parental irresponsibility.

*Id.* at 843.  (Some internal citations omitted.)

This Court held, "[t]aking the record as a whole, therefore, we conclude that Paul's proffered evidence concerning his medical, mental, or physical history is insufficient to undermine confidence in the jury's verdict in the penalty phase.  Accordingly, even assuming that Paul could show that the performance of trial counsel was constitutionally deficient, he has not established resulting prejudice." *Id.*

Likewise, the recently decided Supreme Court case in *Cullen v. Pinholster* supports the district court's ruling.  In *Pinholster*, trial counsel representing a capital defendant called only one witness, the defendant's mother, in the penalty phase, although the defendant's brother had also testified in the guilt phase, and trial counsel had consulted a psychiatrist but decided not to call him as a witness. *Pinholster*, 131 S.Ct. at 1396.  The California Supreme Court affirmed the denial of Pinholster's claim that his trial counsel was ineffective in investigating and presenting penalty phase evidence, but then a federal district judge reversed, finding that trial counsel was ineffective for failing to investigate and present mitigation evidence, including a new category of evidence, claimed mental illness; the Ninth Circuit affirmed the district judge. *Id.* at 1396-97.

The Supreme Court, however, reversed the Ninth Circuit, finding that trial counsel had provided effective assistance of counsel. *Id.* at 1407-08.  Pinholster had argued that his trial counsel "should have pursued and presented additional evidence about:  his family

members and their criminal, mental, and substance abuse problems; his schooling; and his medical and mental health history, including his epileptic disorder." *Id.* at 1404. The Supreme Court noted that Pinholster's counsel confronted a challenging penalty phase with an unsympathetic client, and held that the Ninth Circuit wrongly overlooked "the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions." *Id.* at 1406 (quoting *Strickland*, 466 U.S. at 689).

The Supreme Court also found that Pinholster had not showed prejudice, after weighing the aggravation evidence against the totality of available mitigating evidence. *Id.* at 1408-10. The State's aggravating evidence consisted first of Pinholster's underlying crime - a home burglary in which Pinholster and two accomplices beat and stabbed to death two men who happened to interrupt the burglary. *Id.* at 1394. The State also presented evidence that Pinholster had threatened to kill the State's lead witness, assaulted a man with a straight razor, kidnapped another person with a knife, and had a history of violent outbursts and involvement in gangs. *Id.* at 1408. In mitigation, Pinholster's mother testified that he had a troubled childhood and adolescence, that he had suffered two head injuries at the ages of 2 or 3, and 4 or 5, that he struggled in school, that he spent time in a state mental institution for emotionally handicapped children, that he was beaten badly in jail, and that his siblings had been in trouble also. Pinholster's brother testified in the guilt phase that Pinholster had been in institutions all his life, suffered from epilepsy, and was "more or less" drunk on the night of the murders. *Id.* at 1408-09.

After weighing the evidence in aggravation and mitigation, the Supreme Court held that the additional evidence Pinholster would have presented would have "largely duplicated the mitigation evidence at trial." *Id*. at 1409. The Court found that additional details of substance abuse, mental illness, and criminal problems in Pinholster's family was by no means clearly mitigating, as the jury "might simply have concluded that Pinholster was simply beyond rehabilitation." *Id*. at 1410. Further, the Supreme Court held that additional details that Pinholster was abused and neglected as a child, that he may not have had enough to eat as a child, that he may have suffered "some degree" of brain damage, and that Pinholster had a drug problem was not so significant that, even assuming Pinholster's trial counsel performed deficiently, it was unreasonable for the California Supreme Court to conclude that Pinholster had failed to show a "substantial" likelihood of a different sentence. *Id*. (citing *Harrington v. Richter*, 562 U.S. —, 131 S.Ct. at 792 (2011); *Strickland*, 466 U.S. at 693).

Purkey's claims of ineffective assistance are far weaker than Paul's or Pinholster's were. Mr. Duchardt presented 18 witnesses in support of 27 mitigating factors, so that Purkey alleges, at best, cumulative benefit, which does not demonstrate that reasonable jurists would find the district court's assessment of his constitutional claims debatable or wrong. As the district court noted in its order denying Purkey's § 2255 motion, not a single juror found a single mitigating factor on the verdict forms. As jurors are presumed to follow the court's instructions, Purkey's complaints that they did not fill out the mitigation forms

are without merit.  *United States v. Griffith*, 301 F.3d 880, 884 n.3 (8th Cir. 2002).  In any

case, the jury by their verdict gave more weight to the aggravating evidence than the

mitigating evidence, as they were entitled to do.

In its order denying Purkey's certificate of appealability, the district court considered

and weighed Purkey's proffered mitigation evidence, and despite Purkey's mistaken claim[15]

that the district court failed to consider what was *not* presented in mitigation, Judge Gaitan

found that the proffered evidence would not have changed the jury's verdict:

> . . . the Government also presented a very strong aggravation case.  The jury
> heard testimony describing how Purkey first raped Jennifer Long, then stabbed
> her several times.  Following the murder, he described how he put her body
> into a tool box and then used a chainsaw to dismember her body, put her body
> parts in plastic bags and then burned them in a fireplace.  Purkey also
> described how he swept the ashes out of the fireplace and put any remaining
> bones into the bags and then threw the bags into a septic pond in Clearwater,
> Kansas.  The jury also heard that Purkey confessed to murdering an eighty year
> old woman with a claw hammer.  Additionally, the jury also heard that Purkey
> had kidnapped and robbed a man in 1980 and then shot him in the back of the
> head.  The jury certainly weighed this strong aggravating evidence against all
> the mitigation evidence that Mr. Duchardt presented.  The Court is capable
> without a hearing, of weighing the mitigation case which was presented
> against the mitigation case which could have been presented.  The Court has
> determined that the additional evidence which Purkey argues should have been
> presented would have been as in the *Paul* case, largely cumulative to the
> evidence that was presented.  The Court finds that it is not reasonably possible
> that the testimony of these additional witnesses would have swayed at least one
> juror to have voted for a life sentence.

(D.E. 115 at 13-14.)

---

[15] (Purkey App. COA 78.)

8.      *Claim That the Court Should Have Conducted an Evidentiary Hearing*

Purkey seeks a certificate of appealability on the district court's denial of his § 2255 motion without an evidentiary hearing. "A district court does not err in dismissing a movant's § 2255 Motion without a hearing if (1) the movant's allegations, accepted as true, would not entitle the movant to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Buster v. United States*, 447 F.3d 1130, 1132 (8th Cir. 2006) (citing *Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003)).

Purkey relies on several cases to support his argument that the district court should have granted a hearing. None are factually similar to this case, that is, none of the cited cases could be resolved on the existing record, because any disputed facts were found by the district court to be irrelevant either because the proposed evidence would have been redundant, or because the court found that counsel exercised reasonable trial strategy. Purkey cites *Shaw v. United States*, 24 F.3d 1040, 1042 (8th Cir. 1994), which did not even have an existing record - it was remanded for hearing because the court did not permit a prisoner to find and interview witnesses in support of his § 2255 motion, before denying the motion. He also cites *Nelson v. United States*, 297 Fed.Appx. 563, No. 07-3071 (8th Cir. 2008), to support his claim that this Court should have held an evidentiary hearing. However, *Nelson* is easily distinguished, because the Government in *Nelson* actually *joined* in Nelson's request for an evidentiary hearing, since neither of Nelson's attorneys at trial had

provided affidavits. In *Nelson* the Government acknowledged, "it will be necessary to obtain testimony or affidavits from Mr. Berrigan and Ms. Hunt in order to fully address all of the allegations raised. The United States requests the Court set this matter for an evidentiary hearing at its earliest convenience." (Nelson Civ. D.E. 39 at 48.) In contrast, Mr. Duchardt has provided a thorough, 117-page affidavit for this case, detailing his investigation and trial strategy, and conclusively showing that Purkey is entitled to no relief.

Likewise, all the remaining cases cited by Purkey in support of his claim to an evidentiary hearing present far different factual situations. Purkey cites *Koskela v. United States*, 235 F.3d 1148, 1149 (8th Cir. 2001), but in *Koskela*, the record contained sharply conflicting evidence as to whether the attorney failed to investigate an entire *category* of evidence – alibi evidence. *Id.* The other cases cited by Purkey are also easily distinguishable. *See Smith v. United States*, 182 F.3d 1023, 1026 (8th Cir. 1999) (remanded for hearing for court to decide whether attorney's failure to object to prisoner wearing jail clothes at jury trial was ineffective); *Latorre v. United States*, 193 F.3d 1035, 1041 (8th Cir. 1999) (prisoner claimed actual innocence and the original plea colloquy was inadequate); *Neary v. United States*, 998 F.2d 563, 566 (8th Cir. 1993) (remanded because prisoner was sentenced in excess of maximum sentence authorized by law); *United States v. Unger*, 665 F.2d 251, 256 (8th Cir. 1981) (remanded for hearing where prisoner claimed attorney materially misrepresented sentence she would receive after pleading guilty, and where prisoner had not waived attorney's actual conflict of interest on the record); *Rose v. United*

*States*, 513 F.2d 1251, 1257 (8th Cir. 1975) (remanded for hearing on whether prisoner was incompetent at time of guilty plea, where there was no record he was competent, and where he was found incompetent eight months after plea).

Purkey also cites a string of cases in which the movant's allegations, if true, would constitute relief.  In *Lindhorst v. United States*, 585 F.2d 3612 (8th Cir. 1978), the movant alleged that the prosecution suborned perjury at trial with witnesses the prosecution admitted were essential.  *Id.* at 363-64.  *See also Watson v. United States*, 493 F.3d 960, 964 (8th Cir. 2007) (movant alleged he requested his attorney to file an appeal, and nothing in the record refuted his assertions); *West v. United States*, 994 F.2d 510, 513 (8th Cir. 1993) (movant made undisputed claim that his attorney failed to develop and present rebuttal evidence to the presentence investigation report); *Machibroda v. United States*, 368 U.S. 487, 493 (1962) (movant alleged his plea was induced by the prosecutor's promises).

However, Purkey makes no allegation which, if true, would constitute relief.  He alleges witnesses should have been called to add their testimony to the same matters as those of the many mitigation witnesses who did testify, and that the witnesses who were called should have been interviewed in a more "sensitive" manner or should have been better "prepared."  None of these claims, even if true, would entitle Purkey to relief, as the district court found:  "The Court has determined that the additional evidence which Purkey argues should have been presented would have been as in the *Paul* case, largely cumulative to the evidence that was presented.  The Court finds that it is not reasonably possible that the

testimony of these additional witnesses would have swayed at least one juror to have voted for a life sentence." (D.E. 115 at 13-14.)

Purkey claims that the district court erred in three ways in making this determination. First, Purkey argues that in making the finding that there was no "reasonable probability of a different result," the court ignored the unique context of a capital case, that is, that the defense need to convince only one juror to "nix a death sentence." (Purkey App. COA, 91-92.) The district court made that exact finding, quoted directly above, relying largely on the strength of the Government's aggravation case, combined with the redundant and cumulative nature of Purkey's proffered additional evidence.

Purkey argues the district court made its second error by not considering that "Purkey does not even have to prove that but for that deficient performance one such juror would have voted to spare his life; only that there is a "reasonable probability" of such a result." (Purkey App. COA, 93-94.) Again, the district court made just that finding. No doubt Purkey disagrees with the finding, but the district court used the proper standard and found that there was no reasonable probability that one juror would have voted for a life sentence had the additional or more polished evidence been presented. (D.E. 115 at 13-14.)

Purkey's third claimed error by the district court is that only by weighing the "full body of mitigation evidence that was presented along with the evidence that could have been represented that 'might well have influenced the jury's appraisal of [the defendant's] moral culpability.'" (Purkey App. COA, 94.) However, the district did consider the mitigation case

which could have been presented: "In reviewing the evidence which was presented and considering the evidence which was not presented, the Court does not find that reasonable jurists would disagree that Mr. Duchardt's performance was reasonable considering all of the circumstances." (D.E. 115 at 7.) Purkey argues that no capital defendant would be able to prove prejudice using the district court's reasoning. This is false. Had Purkey brought forth a new category or area of mitigation evidence, or had he made a claim that, if true, would entitle him to relief, he might be entitled to a hearing.

Rather, this case presents this Court with the strongest possible grounds for affirming the district court's denial of a hearing - if Purkey's motion cannot be denied without a hearing, then no case reasonably could. The Government presented very strong aggravation evidence, and the defense presented an extensive and thorough mitigation case. The jury found nine aggravating factors and no mitigating factors. That the jury found no mitigation was not the fault of defense counsel; it was an impartial judgment of Purkey's horrific crimes and unsympathetic personality.

Purkey argues that even though no juror found a single mitigating factor, the jury's "failure to document" any voting on the mitigating factors is particularly problematic. (Purkey App. COA, 100.) The district court addressed this claim:

> However, the Verdict Form clearly states in the instructions: "[f]or each of the following mitigating factor, indicate, in the space provided, the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence." Thus, by leaving all of the spaces blank, the logical conclusion is that none of the jurors found the existence of *any* of the mitigating factors. This conclusion is bolstered by the fact that the jury

completely filled out the remainder of the nineteen page Special Verdict Form, finding the existence of six Statutory Aggravating Factors and three Non-Statutory Aggravating Factors. The jury did not find that the Government had established beyond a reasonable doubt the future dangerousness of the defendant.

(D.E. 115 at 12.)

Purkey cites 11 mitigating factors which he claims were obviously "undisputed" in arguing that the jury failed to consider his mitigation. (Purkey App. COA, 98-99.) To cite just one example, mitigation factor #15, "[w]hile incarcerated, when given the opportunity to do so, Mr. Purkey received training and became qualified as a plumber," illustrates the problem with Purkey's argument. The facts of claim may be true, and yet in no way *mitigating* of Purkey's crimes. It was this very plumbing training that presumably led to Purkey applying for a job at Roto-Rooter, right after which he kidnapped, raped, and murdered Jennifer Long, and that same training which brought him into employment with Reddi-Root'r and into the home of 80-year-old Mary Ruth Bales, so that Purkey could bludgeon her to death and rob her. It is no wonder the jury did not consider Purkey's plumbing training to be mitigating - it would have been astonishing if they had.

In an attempt to bolster his claim that this was a close case, Purkey cites the length of jury deliberations in the penalty phase. As Purkey correctly notes in his application for certificate of appealability, the jury deliberated approximately 10 hours and 53 minutes over two days, before returning a unanimous death verdict, having unanimously found nine aggravating factors. (D.E. 107 at 14.) This time period included two lunches, and almost

- 49 -

certainly other breaks as well. (Tr. 2297.) The jury was instructed to deliberate on 37 separate factors (10 aggravating factors and 27 mitigating factors), after listening to 31 witnesses testify over several days. The jury never sent a note or question to the judge indicating that they were having trouble reaching a verdict. (Tr. 2297, 2308-10). The fact that the jury took their job seriously does not mean that they struggled to reach a verdict or that this was a close case. Purkey kidnapped, raped, and brutally killed a 16-year-old girl, after which he coldly and methodically dismembered her, burned her body, and disposed of her remains in a septic pond. A few months later, he cruelly murdered and robbed an 80-year-old woman, using a claw-hammer, in the bedroom of her own home. Purkey committed these two vicious and senseless murders after spending the majority of his adult life in prison for a series of violent crimes such as kidnapping, assault, robbery, and aggravated escape from custody. As the Eighth Circuit held in *Paul*, in affirming the denial of a § 2255 motion without a hearing,"[n]othing that Paul offers detracts from the government's strong case in aggravation, and the weight of this evidence is a proper and significant factor in considering whether Paul has established prejudice." *Paul*, 534 F.3d at 843. The district court properly denied Purkey's request for hearing.

>     9. *The District Court's Findings Are Allegedly Insufficient to Allow Meaningful Appellate Review*

Purkey's claim here repeats his argument in section A.7, above. The Government incorporates its response from that section, found in pages 37 through 43 of this response.

**B.**      ***Claim That the Court Should Have Stricken Mr. Duchardt's Affidavit***

Although Purkey criticizes the district court for relying on "black letter law" allowing an affidavit, he nowhere cites any case, statute, or rule that compels this Court to strike a validly executed affidavit which Mr. Duchardt was ordered to produce. (Purkey App. COA, 105-06.) Purkey cites the Restatement of The Law Governing Lawyers, which are irrelevant, and the Missouri State Public Defender Guidelines, which are likewise irrelevant.

He complains that Mr. Duchardt exceeded the scope of the attorney-client privilege waiver, but in each example cited, Mr. Duchardt directly responded to a claim by Purkey that he was ineffective. For example, Purkey claimed that Mr. Duchardt should have developed Debbie Prothero as a mitigation witness. Mr. Duchardt responded to the claim that he was ineffective by citing a conversation he had with Ms. Prothero, in which she said she did not know much about Purkey's family and that she was in favor of the death penalty. (Duchardt Aff. 59.) Purkey claims that Mr. Duchardt had a duty to keep this conversation confidential. (Purkey App. COA, 107.) Purkey argues that divulging the information "was not reasonably necessary" to counter Purkey's claim of ineffective assistance. (Purkey App. COA, 108.) But when Purkey claimed that Mr. Duchardt was ineffective for failing to develop a mitigation witness, he waived any attorney-client privilege as it related to Mr. Duchardt's decision not to use that witness. *See Tasby v. United States*, 504 F.2d 332, 336 (8th Cir. 1974); *Bittaker v. Woodford*, 331 F.3d 715, 716 (9th Cir. 2003) ("It has long been the rule in the federal courts that, where a habeas petitioner raises a claim of ineffective assistance

of counsel, he waives the attorney-client privilege as to all communications with his allegedly ineffective lawyer.")

The district court did not, as Purkey claims, turn the waiver into "unfettered license to disclose any and all privileged communications whether relevant to a claim of ineffectiveness or not." (Purkey App. COA, 114.) The district court did analyze each of Purkey's many claims along with Mr. Duchardt's responses, and made specific findings in denying Purkey's application for certificate of appealability on this issue, "Purkey may not like the way that Mr. Duchardt drafted his affidavit or how he framed the issues, but the Court finds that the disclosures in Mr. Duchardt's affidavit were necessary in order to rebut the numerous charges of ineffectiveness raised by Mr. Purkey." (D.E. 115 at 15.)

Purkey also claims that Mr. Duchardt's affidavit included legal arguments in addition to facts. (Purkey App. COA, 115.) However, a lawyer, forced to defend himself against 22 allegations that he was ineffective, will respond with legal arguments to explain his trial strategy. Had Mr. Duchardt submitted an affidavit in which he merely claimed that each decision he made was part of his trial strategy, without explaining his strategy at all, Purkey would have complained that the affidavit was conclusory. Now, he complains that Mr. Duchardt said in his affidavit that the claimed errors were either harmless or that no prejudice could be proven: "[a]lthough Duchardt was careful not to use those precise words, the manner in which he articulated his points made it clear that he was advancing a "harmless error"/"no prejudice" - line of attach on his former client's claims." (Purkey App. COA,

119.) Purkey then cites as an example of this supposedly egregious conduct by trial counsel, Mr. Duchardt's response to Purkey's claim that he failed to develop and present mitigation evidence. "[P]roposed testimony from Peggy Noe - a witness that § 2255 counsel allege could have been called as a mitigation witness - regarding Mr. Purkey's childhood sexual abuse would only have been cumulative of evidence presented at trial and would not have been as effective as the trial testimony of Mr. Purkey's brother, Gary Hamilton." (Purkey App. COA, 120.) Mr. Duchardt's response clearly shows his reasonable trial strategy, which is exactly what Judge Gaitan ordered him to do in producing the affidavit. Purkey's claim that a certificate of appealability should issue on whether Mr. Duchardt's affidavit should be stricken is without foundation in law or fact and should be denied.

## C. *Claim That Mr. Duchardt Was Ineffective for Not Calling Dr. Peterson in Guilt Phase*

Purkey's final claim in this application is that Mr. Duchardt was ineffective for failing to call Dr. Peterson in the guilt phase of the trial to testify that Purkey had denied kidnapping Jennifer Long during interviews with him in late 2002, thereby supposedly countering the argument that Purkey's recantation was a recent fabrication. As Mr. Duchardt states in his affidavit, calling Dr. Peterson during the guilt phase of the trial, to testify that Purkey had recanted the kidnapping portion of his confession a few months before the Government knew that he had done so, would have accomplished little if anything. (Duchardt Aff. 114-15.) In December 1998, Purkey repeatedly confessed to law enforcement that he had kidnapped Jennifer Long. (Tr. 495-510.) Then, after he was charged with murder and kidnapping and

when he was represented by counsel, Purkey testified under oath in a suppression hearing that his confessions to law enforcement were true. Shortly afterward or maybe even during the same time period, he apparently recanted his confessions to Dr. Peterson, in late 2002, relatively recently in the context of the case; four years after his confessions and just a year before trial.

Purkey claims that corroborating his testimony at trial was critical to his defense. (Purkey App. COA, 131.) However the defense at trial faced an insurmountable obstacle in attempting to corroborate Purkey's recantation - Purkey's own sworn testimony a year previously and at the same time he was apparently telling a different story to Dr. Peterson. The defense would have to convince the jury to believe that Purkey's first sworn testimony was perjury that Purkey committed in the same case and represented by the same lawyers, while his second sworn testimony, which was self-serving and inconsistent with all his statements to law enforcement, was true. Interestingly, Purkey in his application to this Court, claims that he again committed perjury, during the jury trial, as well as during the suppression hearing. (Purkey App. COA, 130.) Purkey cannot show any prejudice as there is little significance as to whether he recanted his confessions right before trial or a year before trial – it was certainly after he found out he could face the death penalty if convicted, and the idea that he had any "credibility" to preserve is laughable. Further, Mr. Duchardt explains his very reasonable trial strategy of not jeopardizing Dr. Peterson's credibility

during the guilt phase, as it was completely sensible to foresee that the jury would not believe the self-serving recantation of a career criminal, no matter when the recantation occurred.

"We give great deference to counsel's informed strategic decisions, noting we "must resist the temptation to second-guess a lawyer's trial strategy." *Middleton v. Roper*, 455 F.3d 838, 848-49 (8th Cir. 2006) (quoting *Laws v. Armontrout*, 863 F.2d 1377, 1393 (8th Cir. 1988)). "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Middleton, id.* at 849 (quoting *Strickland*, 466 U.S. at 690). Mr. Duchardt made a thorough investigation of the law and facts, and decided not to call Dr. Peterson during the guilt phase of the trial, reasoning as follows: "I would have moved heaven and earth to avoid embroiling Dr. Peterson in the controversy over the kidnapping admission retraction, lest that involvement compromise his effectiveness during the penalty phase." (Duchardt Aff. 114-15.) Mr. Duchardt decided to bring forth evidence, independent of Purkey's statements, to try to prove there was no kidnapping. Mr. Duchardt made reasoned choices and Purkey does nothing more than second-guess his strategy. This claim, like the others, is without merit and should be denied.

## IV.  Conclusion

Purkey has failed to demonstrate that reasonable jurists would find the district court's assessment of his constitutional claims debatable or wrong. Purkey cannot overcome the Government's strong case in aggravation, nor the excellent and thorough investigation and representation provided by Mr. Duchardt, one of the most skilled and experienced capital

defense attorneys in the midwest, to make a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2). Accordingly, Purkey's certificate for appealability should be denied.

Respectfully submitted,

BETH PHILLIPS
United States Attorney

By  */s/ Kathleen D. Mahoney*

KATHLEEN D. MAHONEY
Assistant United States Attorney
Chief, Fraud & Corruption Unit

By  */s/ David M. Ketchmark*

DAVID M. KETCHMARK
First Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East Ninth Street, Fifth Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122

*Attorneys for Appellee*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 9, 2011, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system.

*/s/ Kathleen D. Mahoney*
Kathleen D. Mahoney
Assistant United States Attorney