IN THE
UNITED STATES COURT of APPEALS
EIGHTH CIRCUIT

No. 10-3462

WESLEY IRA PURKEY,
Appellant,

v.

UNITED STATES OF AMERICA,
Appellee.

---

**MOVANT'S REPLY TO GOVERNMENT'S RESPONSE TO APPLICATION FOR
CERTIFICATE OF APPEALABILITY**

---

COMES NOW movant, Wesley I. Purkey, by counsel, and replies to the Government's

Response to his Application for a Certificate of Appealability filed May 9, 2011 ("Response").[1]

**III.  Claims on Which a COA Should Issue.**[2]

    **A.  Failure to Adequately Investigate and Present Mitigation
        Evidence.**

The essence of Mr. Purkey's claim is that counsel was ineffective in failing adequately to

investigate, prepare, and present substantial mitigating evidence. *See, Porter v. McCollum*, 130

S. Ct. 447 (2009); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510

(2003); *Williams v. Taylor*, 529 U.S. 362 (2000). As in *Wiggins*, the question is "whether the

investigation supporting counsel's decision[s] . . . *was itself reasonable.*" *Wiggins*, 539 U.S. at

523 (emphasis in original). As the Court observed in *Wiggins*, "investigations into mitigating

---

[1] Mr. Purkey does not reply to all of the government's arguments, but intends only to rely
on the Application on those grounds not addressed here and does not withdraw or waive any
argument.

[2] For the ease of the Court, Mr. Purkey uses the same headers as the government used in
the "Response."

1

evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 510 (quoting 1989 Guideline 11.4.1(C) (emphasis added)).

### 1. Failure to Hire Social Worker "Mitigation Specialist"

The Government asserts that Mr. Purkey elevates "form over substance" in asserting that trial counsel was ineffective in failing to retain a mitigation specialist. Response at 24. In essence, the Government argues that Mark Cunningham, Ph.D., served as a "mitigation specialist" for Mr. Purkey. *Id.* at 25. The Government also asserts that Mr. Purkey's position is "that failure to hire a social worker mitigation specialist, as opposed to a psychologist mitigation specialist, is *per se* ineffective assistance of counsel." *Id.* at 26. In making these arguments, the Government blurs the facts and Mr. Purkey's arguments.

While the Government attempts to blur the issue by proclaiming that Dr. Cunningham was a "mitigation specialist," Mr. Duchardt flatly proclaimed that he served that role himself. Specifically, in his far-reaching and improper affidavit, Mr. Duchardt proclaimed that he pursued "avenues of documentary and witness investigation" by "shoulder[ing] those duties" himself. (Doc. 73, Attachment 1 at 46).

Regardless of what trial counsel or the Government calls him, Dr. Cunningham did not serve as a "mitigation specialist," as that term is generally accepted. Rather, he served as an expert witness, who reviewed records and examined Mr. Purkey but did not conduct any independent investigation or interview any other possible mitigation witnesses. "[A] mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client *based on an exhaustive investigation.* . . ." ABA Guidelines For the Appointment and Performance of Counsel in Death Penalty Cases ("Guidelines"), 2003 Guideline 4.1

Commentary (emphasis added).

> They must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information. . . .

Supplementary Guidelines For the Mitigation Function of Defense Teams in Death Penalty Cases [hereinafter Supplementary Guideline] 5.1(C).[3]

> Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. . . .

Supplementary Guideline 10.11(C) at 689.

Regardless of Dr. Cunningham's credentials, he made no attempt to interview any witnesses and certainly made no attempt to investigate Mr. Purkey's life history. Mr. Duchardt conducted the only background investigation alone and, as addressed in the Application filed April 7, 2011, and below, he did so in a deficient manner.

### 2. Failure to adequately investigate.

**Gary Hamilton**

The Government mockingly asserts that Mr. Purkey complains "that only a social worker would have the sensitivity to properly conduct interviews" concerning background, social history, mitigation evidence. Response at 26. Social worker or not, and mockery aside, it is a "no-brainer" to realize that a single interview in the presence of counsel's teenage son and the witness' wife was not going to be the circumstances in which Mr. Purkey's brother would be open to revealing deeply personal information and details of sexual and physical abuse he

---

[3]The Supplementary Guidelines are published in the Hofstra Law Review. *See* Russell Stetler, Supplementary Guidelines For the Mitigation Function of Defense Teams in Death Penalty Cases, Introduction, 36 Hofstra L. Rev. 677 (2008).

suffered growing up.[4] "Counsel thus essentially foreclosed any helpful disclosures from those most likely to know, first-hand, the pertinent facts." *Cargle v. Mullin*, 317 F.3d 1196, 1210 (10th Cir. 2003).

**Rex Newton, Ph.D.**

The Government asserts that counsel was not ineffective in failing to interview and present testimony by Dr. Newton, a prison psychologist who treated Mr. Purkey in the Oregon State Penitentiary in the 1980's. The Government's bases are that trial counsel had Dr. Newton's records and provided them to the defense experts. Response at 28.

Notably, the Government ignores the fact that counsel never even interviewed Dr. Newton. Indeed, counsel spent a full nine pages of his affidavit, before the District Court (Doc. 73, Attachment 1 – pp. 61-70), providing his "reasons" and thinking for the "failure to secure the testimony of Dr. Rex Newton, Ph.D," (Doc. 73, Attachment 1 at 61). The *post-hoc* rationalization is patent though because counsel never interviewed Dr. Newton and relied only on his notes in the Oregon Department of Corrections records. The deficiency in that is obvious: "counsel could not have evaluated or weighed the risks and benefits of calling [a witness] as a defense witness without so much as asking [him] what he would say if called." *Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005).

The Government continues to assert, as it did in the District Court, that the Government "concede[d] Purkey had a bad childhood, arguing instead that an abusive childhood did *not* mitigate" Mr. Purkey's crimes committed at the age of 46. Response at 28. The Government did not concede sexual abuse. Any argument to the contrary simply flies in the face of the trial

---

[4] Similarly, Mr. Duchardt's initial attempt to interview Angie Genail, Mr. Purkey's daughter, was equally astounding. Incredibly, counsel's first in-person contact with Ms. Genail was to show up at her wedding to attempt to interview her and her mother. (Doc. 52, Exhibit 5).

record and common sense interpretations. While the testimony is set forth in full in the Application, just a few samples make clear that the Government's assertion (based on Mr. Duchardt's assertions) that it conceded that Mr. Purkey was sexually abused, is absolutely ridiculous. Specifically, the cross-examination of Dr. Stephen Peterson, a defense psychiatrist, reveals:

> Q *Now, you talked a long time during your direct examination about the defendant's childhood and the fact that his mom sexually abused. Do you remember that testimony?*
> A *Yes.*
> Q *Now, did you find any records where that was detailed in his past?*
> A *No. . . .*

Tr. 1808 (emphasis added).

> Q Doctor, going back to the defendant's childhood and *the sexual abuse that he claims he suffered, again we have to rely on his word essentially, because there's not any – there is very little, if anything, in the record to support that, correct?*
> A Well, that's correct. . . .

Tr. 1816 (emphasis added).

> Q To your knowledge, based upon your review of the records, *the only time the defendant ever told a doctor who has examined him about this sexual mistreatment or maltreatment that he's now claiming is to you, that was the first time?*
> A To my understanding, I'm the only one he has ever told in detail to because I'm the only one who ever really asked.

Tr. 1824 (emphasis added).

Clearly, regardless of the Government's or counsel's belated denials, the overall theme of the Government was that (1) Mr. Purkey made up the allegations of sexual abuse, and (2) he did so after he was facing capital murder charges. The Government's expert, Dr. Dietz, made this extremely clear in response to cross-examination:

> Q *For a person in prison to say you have been sexually abused by your mother is certainly not a statement in your interest, is it?*

> A     *It is when you're facing capital murder charges and have people looking for bad things in your childhood to help use in mitigation.*

Tr. 2195 (emphasis added).

> Q     Actually *we have kind of* – did our homework and ***got together a lot of records that verify what he's saying***; is that correct, sir?
>
> A     ***That's right. For everything but the sexual abuse*** I think there's plenty of verification.

Tr. 2215 (emphasis added).

Despite this clear evidence, the Government attempts to obfuscate the issue by claiming that it "concede[d] Purkey had a bad childhood." Response at 28. It is true that the Government conceded Mr. Purkey had a "bad childhood." Tr. 2268.[5] The Government *did not* concede, however, that Mr. Purkey had been sexually abused; indeed, it emphatically denied that.

Finally, the Government asserts that Dr. Newton's testimony would have made no difference because the source of the information that Mr. Purkey was sexually abused by his mother was still Mr. Purkey, thus, still "garbage in, garbage out" if Dr. Newton had testified. Response at 28. This argument is inflated. Mr. Purkey made the disclosures to Dr. Newton in seeking mental health treatment more than 15 years before having pending capital charges. Thus, it was not, as characterized by Dr. Dietz, a self-serving statement made only when Mr. Purkey was "facing capital murder charges" and the defense was "looking for bad things in [his] childhood to help use in mitigation." Tr. 2195. It was made by a man seeking help.

---

[5] Specifically, in closing, government counsel argued:

> Now, the next group of mitigating factors have [sic] to do with the defendant's bad childhood. Now, that's the old abuse excuse. He had a bad childhood. No doubt he did not have a good childhood. I'm not disputing that.

Tr. 2268.

**Floyd Bose and Dion Leiker**

Notably, the Government does not even attempt to rely on Mr. Duchardt's claims. Specifically, before the District Court, despite having no notes and no time records supporting his current account of events,[6] counsel declared that he had "various opportunities to talk to Dion [Lieker]" and Mr. Bose.[7] (Doc. 73, Attachment 1 at 70). Nonetheless, counsel never spoke to them. (Doc. 82, Exhibits 12 & 13). Clearly, counsel's conduct was deficient.

**Peggy and Evette Noe**

The Government also avoids defending Mr. Duchardt's deficient performance in failing to interview Peggy Marteney Noe and her daughter, Evette Marteney Noe. Thus, the Government again seems to disavow Mr. Duchardts' claims – which, again, have no support in notes or time records – that he "did speak, prior to trial, certainly with Peggy, and possibly with Evette." (Doc. 73, Attachment 1 at 73). Both of these women adamantly denied that Mr. Duchardt ever talked to them. (Doc. 82, Exhibits 14 & 15).

**Other Family Members and Associates**

The Government seems to focus here on asserting that because Mr. Duchardt had at least brief interviews with witnesses he could not have been ineffective. The Government ignores, however, counsel's complete misunderstanding in some of these interviews that resulted in

---

[6] It should be noted that Mr. Duchardt turned over no notes whatsoever to the undersigned counsel, which is a common theme through his cases – e.g., *Sinisterra*, Mr. Duchardt also turned over no trial notes to 2255 counsel. *See generally Sinisterra v. United States*, 600 F.3d 900 (8th Cir. 2010) (remanding for evidentiary hearing on the question of ineffective assistance of counsel in failing to adequately prepare and present mitigation evidence).

[7] Mr. Duchardt also asserted that he "obtained what records [he] could about the matter," 2255 Doc. 73, Attachment 1 at 70, but there are none in his file and no indication of any attempt to obtain such records in notes or time records.

counsel not calling potentially helpful background witnesses. For example, Mr. Duchardt cited as reasons not to call Debbie Prothero, Mr. Purkey's cousin, as a witness "that she was personally very much in favor of the death penalty," (Doc. 73, Attachment 1 at 59), "and was in no way opposed to Wes receiving the death penalty in this case," (Doc. 73, Attachment 1 at 60 n.6). Ms. Prothero, on the other hand, cited as "absolutely wrong," counsel's recollection that she was not opposed to Purkey receiving the death penalty. (Doc. 82, Exhibit 6). She also cited her willingness to testify on his behalf and provided the substance of the testimony that she could have and would have given. (Doc. 82, Exhibit 7).

The Government categorically errs in characterizing potential witness Sam Hoffmeier as a "fellow inmate[]." Hoffmeier is not an inmate. He is a volunteer prison minister who conducted Bible study groups for inmates. 2255 Doc. 47, Exh. 25. He would have provided good character evidence, *id.*, at least as significant as some of the evidence discussed in *Williams v. Taylor*, such as a "certified public accountant" who could have testified based on his visits with the defendant "as part of a prison ministry program." 529 U.S. at 396.

**Prejudice**

In discussing prejudice, item by item, the Government ignores the proper review required. In determining prejudice due to counsel's failure to present mitigating evidence in sentencing, this Court must "evaluate the totality of the evidence–'both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding[s].'" *Wiggins*, 539 U.S. at 536 (quoting *Williams*, 529 U.S. at 397-98).

The test is not whether the sentencer could have heard all available mitigating evidence and still decided on a death sentence. In other words, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot

8

be shown by a preponderance of the evidence to have determined the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Thus, "a defendant need *not* show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693 (emphasis added).

The Court must determine whether the undiscovered "mitigating evidence, taken as a whole, might well have influenced the jury's appraisal" of the defendant's culpability. *Rompilla*, 545 U.S. at 376 (quoting *Wiggins*, 539 U.S. at 538. "Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams*, 529 U.S. at 398. Prejudice is established if "there is a reasonable probability that *at least one juror* would have struck a different balance" but for counsel's errors. *Wiggins*, 539 U.S. at 537 (emphasis added).

Here, the Government did not consider the "totality" of the evidence and, instead, simply engaged in rote cataloguing witness by witness. For example, the importance of Floyd Bose and Dion Lieker, both former law enforcement officers, is dismissed in one paragraph simply because seven other witnesses testified about Mr. Purkey's "positive character traits" and two correctional officers testified. Response at 30.[8] When one looks beneath this rote cataloguing, however, the seven witnesses cited by the Government are Mr. Purkey's family members, people who met him in prison, and a prison minister. Testimony by these witnesses does nothing to alleviate the prejudice of not having disinterested, lay witnesses, such as Dr. Newton, Mr. Bose, and Ms. Leiker, in particular, testify on his behalf.

These witnesses not only could have provided substantial, credible, and humanizing mitigating information in their own right, but their testimony would also have provided

---

[8] Peggy and Evette Noe were similarly dismissed by the government.

substantial support for Dr. Cunningham's testimony rebutting the Government's assertion of future dangerousness. In addition, the testimony of Margaret Noe and Dr. Newton was also relevant corroborating information that would have supported Dr. Peterson's testimony and established that Purkey did not just "make up" the report of sexual abuse in order to escape the death penalty.

The overall prejudice is clear because the available, but unpresented mitigation evidence was not simply "'new' evidence [that] largely duplicated the mitigation at trial." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1409 (2011). If all of the available mitigating evidence had been presented, "there is a reasonable probability that at least one juror would have struck a difference balance." *Wiggins*, 539 U.S. at 537.

### 7. The District Court's ruling.

The Government, as did the District Court, simply ignores the significance of the fact that Purkey's jury found that he *did not* pose a future danger (Doc. 487, p. 7).[9] This is a significant fact. Likewise, the Government continues with the assumption the District Court made -- that

---

[9] As the Court stated in *United States v. Johnson*, 2010 U.S. Dist. LEXIS 133727, 9-10 (N.D. Ill. Dec. 13, 2010):

> A number of studies suggest that *future dangerousness is one of the most [significant] issues, if not the most significant, for juries deciding whether or not to sentence a defendant to death. See, e.g.,* John H. Blume, et al., Future Dangerousness in Capital Cases: Always "At Issue", 86 Cornell L. Rev. 397, 404 (2001); Stephen P. Garvey, Aggravation and Mitigation in Capital Cases: What do Jurors Think?, 98 Colum. L. Rev. 1538, 1559-60 (1998); Sally Costanzo & Mark Costanzo, Life or Death Decisions: An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework, 18 Law & Hum. Behav. 151, 160 (1994) ("[n]early all jurors [surveyed]...offered the observation that the penalty decision hinged on the issue of whether the defendant would pose a continuing threat to society").

2010 U.S. Dist. LEXIS 133727, 9-10 (emphasis added).

"no jurors voted for a single mitigating factor." Response at 19, 22, 37, 42; 2255 Doc. 89 at 11. This is only an *assumption* because the *fact* is that the Verdict form is simply blank as to any mitigating factor. At trial, the District Court was initially willing to ask the jurors to complete the form, but the Government retorted, "Absolutely no[t]." (Tr. 2313). As a result, no inquiry was made. Given the void in the record – due to the Government's prior objection, it is just as likely that the form – as to mitigation – was not filled out due to oversight as it is that no juror voted for a single mitigating factor. This presents a one of a kind circumstance, making Purkey's case the only federal capital case in which a death verdict was imposed after the jury simply left the verdict form *blank* as to all mitigating factors. Indeed, after exhaustive research and comprehensive review of federal capital trial verdict forms, counsel have been unable to identify even one other federal death penalty case in which the jury simply recorded no vote at all on any mitigating factor.[10]

Here, Purkey's jury failed to indicate any acknowledgment, let alone *consideration*, of even obvious undisputed evidence in mitigation. For example:

> 18.    The disappearance of Jennifer Long was solved only because Mr. Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing.

(Doc. 484, pp. 33-36; Doc. 487, pp. 9-16). While Mr. Purkey's training as a plumber may arguably not be mitigating as the Government points out, Response at 49, it is undisputed fact that this crime would not have been solved if Mr. Purkey had not come forward. It is also beyond dispute that this is a mitigating factor. The fact that the jury made no markings

---

[10] Counsel have, however, identified four federal death-sentenced inmate whose jurors recorded a zero vote on all mitigating factors: Brandon Bernard, Len Davis, Jurijus Kadamovas, and Iouri Mikhel.

whatsoever on this finding or any other mitigating factor, thus, clearly indicates that the jury simply failed to consider and record their votes on these factors.

Plainly put, the lack of any acknowledgment of Purkey's mitigating factors makes it impossible to ascertain whether "no juror voted for a single mitigating factor." Thus, there can be no assurance that the jury actually considered the mitigation, let alone that the jury considered it and rejected it. A blank form simply does not permit such a conclusion. *See United States v. Hammer*, 404 F.Supp.2d 676, 801 (M.D. Pa. 2005) ("the jury's defective answers with respect to mitigating factors renders the penalty phase of the trial defective").

In this context, it cannot be said that had the jury heard the full body of mitigating evidence available to trial counsel that there is no reasonable probability that even one juror would have held out for a life verdict. It can, and must, be said that Purkey has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2), and that

> jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further.

*Miller-El*, 537 U.S. at 327. Thus, this Court should issue a certificate of appealability so that full consideration of Purkey's constitutional claims and the denial of an evidentiary hearing can be had.

### B. The Court Should Have Stricken Mr. Duchardt's Affidavit

The Government asserts that Purkey "nowhere cites any case, statute, or rule that compels this Court to strike a validly executed affidavit which Mr. Duchardt was ordered to produce." Response at 51. The Government further asserts that Purkey cites only "the Restatement of the Law Governing Lawyers" and "the Missouri State Public Defender Guidelines. *Id.* This is clearly not true as Mr. Purkey also relies on F.R.C.P. Rule 56(c)(4) and

numerous cases applying the rule.[11]

The Government is also incorrect in characterizing Mr. Duchardt's statement as an "affidavit." An "affidavit" is "a *written statement of fact*, signed and sworn to before a person having authority to administer an oath." The Law Dictionary, Anderson Publishing Co. (2002) (emphasis added). Mr. Duchardt wrote a 117-page "statement" that includes a plethora of hearsay, legal argument, and opinion. Rather than simply stating the facts as they existed when Mr. Duchardt made his decisions, it zealously advocates for the Government and against Purkey. Mr. Duchardt assumed the role, not of a factual witness, but of an advocate against his former client.

Specifically, Duchardt painstakingly reviewed the cases cited in Purkey's memorandum in support of his § 2255 motion and provided his own legal argument attempting to distinguish those cases on their facts, or to otherwise argue that those cases are inapposite to Purkey's case (*See, e.g.*, 2255 Doc. #73, Ex. A, pp. 18-19; 25-29; 39-43; 74-79; 81-82; 88-89; 106; 107; 108; 109; 114). In all, Duchardt devoted approximately 25 pages (roughly 21%) of his statement to legal argument about the applicability of the cases cited in Purkey's memorandum of law. Such a comprehensive "brief" opposing his former client's 2255 motion far exceeds the bounds of an "affidavit."

The Government asserts, however, that "a lawyer forced to defend himself against 22 allegations that he was ineffective, will respond with legal arguments to explain his trial strategy." Response at 52. The problem, however, is that Duchardt's legal analysis is not an

---

[11] Rule 56(c)(4) provides, in relevant part: "An affidavit or declaration . . . must be made on personal knowledge, [and] set out facts that would be admissible in evidence. . . ." *See also* Local Rules, United States District Court for the Western District of Missouri, Rule 56.1(a)("All facts on which a motion or opposition is based shall be presented in accordance with Rule 56 of the Federal Rules of Civil Procedure").

explanation of his decisions <u>during the trial and sentencing proceedings</u>. It is simply *post hoc* legal argument or expression of legal opinion and not a recitation of a "fact" to which an affiant is competent to testify. *Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985). Indeed, Mr. Duchardt's <u>current legal arguments</u> could have played <u>no</u> role in his decision-making during his representation of Purkey. Indeed, he makes no assertion that they did.

Jurists of reason could certainly disagree with the District Court's resolution of this issue or conclude, at a minimum, that the issues presented deserve encouragement to proceed further. *Miller-El*, 537 U.S. at 327. Thus, this Court should issue a certificate of appealability so that full consideration of Mr. Purkey's constitutional claims can be had.

**C. Duchardt was ineffective for not calling Dr. Peterson to rebut the allegation that Mr. Purkey recanted his fabricated admission of kidnaping "right before trial" rather than a year before trial.**

The Government notes that Mr. Purkey initially informed law enforcement that he had kidnaped Ms. Long. Almost from the beginning, however, he informed his appointed counsel, that he did not kidnap her.[12] He repeatedly asked Mr. Duchardt to arrange for him to take a polygraph on the issue of the kidnaping. Indeed, Mr. Duchardt took that request to the Government and even reiterated it on the eve of trial.[13] During trial, Mr. Duchardt, nevertheless, let the Government maintain unimpeded its false assertions of recantation "right before trial."

The Government even seems to concede that Mr. Purkey's recantation occurred at least "a year before trial." Response at 54. This clearly is not "right before trial." And, while Mr.

---

[12] Clearly, by November 2001, Purkey had recanted that statement to others as well. Specifically, on November 2, 2001, Michael Speakman, a government witness, advised FBI agents that Purkey had said: (i) "[the] girl was with him partying"; (ii) "[he] did not snatch [her]"; and (iii) "[it was] not forcible with girl". (2255 Doc. 47, Ex. 24 – Brunell Rough Notes dated 11/02/01).

[13] Purkey remains ready to submit to a polygraph on this critical issue.

Purkey did testify during the suppression hearing that he had kidnaped Ms. Long, he did so on the advice of counsel. Likewise, he simply responded, "That's true," on cross-examination during trial when asked, "here recently you have come up with this new story that you didn't kidnap her." Again, he did so because he believed, based on the advice of counsel, that his *entire* testimony would be struck if he documented his recantations. Not only did defense counsel not correct this on re-direct, they did not rebut it by calling Dr. Peterson to testify.

For the reasons set forth in full in the Application for Certificate of Appealability, counsel's failure to present Dr. Peterson's rebuttal testimony did irreparable harm to Purkey. Contrary to his current claims, Duchardt did not have a strategy to avoid calling Dr. Peterson during the trial. He fully intended to do so, which is precisely why the Government moved *in limine* to preclude Dr. Peterson's testimony on this point. (Doc. 337).

Jurists of reason could disagree with the District Court's resolution of this constitutional claim. At a minimum, such jurists could conclude that the issue presented deserves encouragement to proceed further. *See Miller-El*, 537 U.S. at 327. Therefore, this Court should issue a certificate of appealability.

## CONCLUSION

For the reasons set forth in the Application for Certificate of Appealability and above, this Court should grant a certificate of appealability on each of the asserted claims and grant any additional relief the Court may deem just or proper.

Respectfully submitted,

Teresa L. Norris, Esq.
P.O. Box 11744
Columbia, SC 29211
(803) 765-1044 (Phone)
(803) 765-1143 (Fax)
teresa@blumelaw.com
Co-counsel to Movant

Gary E. Brotherton, Esq.
601 W. Nifong Blvd., Ste. 1C
Columbia, Missouri 65203
(573) 875-1571 Phone
(573) 875-1572 Fax
GEBrotherton@LegalWritesLLC.com
Co-counsel to Movant

/s/ Teresa L. Norris
Teresa L. Norris
Co-counsel to Movant

/s/ Gary E. Brotherton
Gary E. Brotherton
Co-counsel to Movant

## CERTIFICATE OF SERVICE

This will certify that, on today's date, this reply was served upon the United States by filing via CM/ECF.

/s/ Gary E. Brotherton
Gary E. Brotherton

Dated: Columbia, MO
May 26, 2011