**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

**NO. 10-3462**

**WESLEY IRA PURKEY,**
                                    **Appellant,**

**v.**

**UNITED STATES,**
                                    **Appellee.**

*On Appeal from the United States District Court*
*for the Western District of Missouri*
*The Honorable Fernando J. Gaitan, Jr., Chief Judge*

_____

**APPELLANT'S BRIEF AND ADDENDUM**

_____

Teresa L. Norris, Esq.                 Gary E. Brotherton, Esq.
P.O. Box 11744                          601 W. Nifong Blvd., Ste. 1C
Columbia, SC 29211                      Columbia, Missouri 65203
(803) 765-1044 (Phone)                 (573) 875-1571 Phone
(803) 765-1143 (Fax)                   (573) 875-1572 Fax
teresa@blumelaw.com                     GEBrotherton@LegalWritesLLC.com
Co-counsel to Appellant                 Co-counsel to Appellant

## SUMMARY OF CASE

A federal jury in the Western District of Missouri found Wesley Ira Purkey (Purkey) guilty of kidnaping, rape and murder, under 18 U.S.C. §§ 1201(a, g), and 3559(d). As found by the jury, The Honorable Fernando J. Gaitan, Jr., Chief Judge, sentenced Purkey to death for the murder.

In proceedings under 28 U.S.C. § 2255 (§ 2255), Purkey raised claims of ineffective assistance of counsel at both the guilt-or-innocence and sentencing phases of the capital trial. Pertinent to the issues set for review here, Purkey alleged that trial counsel were ineffective in failing to investigate, prepare and present copious mitigating evidence. In responding to those claims, Frederick A. Duchardt, Jr. – trial and appeal counsel – provided the Government with a 117-page affidavit that addressed not only the factual allegations but also the legal analysis of Purkey's memorandum in support of his motion. The District Court overruled Purkey's § 2255 motion without an evidentiary hearing, relying extensively on Duchardt's 117-page statement and ignoring the thirty-one contrary affidavits that Purkey filed.

# REQUEST FOR ORAL ARGUMENT

Purkey requests sixty (60) minutes for oral argument so that the parties may adequately address the significant issues of the ineffective assistance of counsel as well as the propriety of the district court's relying exclusively on Duchardt's 117-page affidavit to dismiss Purkey's § 2255 motion without an evidentiary hearing.

# TABLE OF CONTENTS

SUMMARY OF THE CASE.................................................................................i

TABLE OF CONTENTS................................................................................. ii

TABLE OF AUTHORITIES .........................................................................vi

STATEMENT OF JURISDICTION ...............................................................xvi

ISSUES PRESENTED FOR REVIEW ........................................................ xvii

I. Whether counsel rendered ineffective assistance under the Sixth Amendment by failing to investigate anything but a minimal social history, failing to provide mental health experts with complete and accurate information, and failing to present the full panoply of mitigation that was available. ......................................xvii

II. Whether the trial court clearly erred in relying on trial counsel's 117-page affidavit to summarily deny Purkey's motion for post-conviction relief when that affidavit made bald assertions without corroborating documentation, in ignoring the copious affidavits filed by Purkey that contradicted trial counsel's affidavit, and in applying the wrong standard to deny an evidentiary hearing even though Purkey alleged facts, which were not refuted by the record and which, if proved, would warrant relief.............................................xvii

III. Whether the trial court abused its discretion in refusing to strike Duchardt's 117-page affidavit that far exceeded the scope of the limited waiver of privilege effected by Purkey's allegations of ineffectiveness, made purely legal arguments disputing Purkey's legal memorandum in support of the 2255 motion, and suggested there were documents to corroborate his assertions but failed to provide such documents along with his affidavit. ...............................xvii

STATEMENT OF THE CASE ...........................................................................1

STATEMENT OF THE FACTS ........................................................................3

SUMMARY OF THE ARGUMENT ................................................................12

STANDARD OF REVIEW ............................................................................13

ARGUMENT ..................................................................................................16

    I.    Counsel rendered Ineffective Assistance in Their Investigation, Preparation and Presentation of Mitigating Evidence. ........................................................16

        (a)    Failure to adequately investigate ........................................19

                Gary Hamilton ........................................................24

                Rex Newton, Ph.D. ................................................30

                Floyd Bose and Dion Leiker ..................................54

                Peggy and Evette Noe .............................................56

                Other Family Members and Associates ..................58

             Prejudice ..................................................................61

        (b)    Failure to Adequately Prepare and Present the Testimony of Stephen Peterson, M.D. .................................63

        (c)    Failure to adequately prepare and present the expert testimony of Mark Cunningham, Ph.D. ....................66

        (d)    Failure to adequately prepare and present the expert testimony of Bruce Leeson, Ph.D. ...........................68

(e) Failure to adequately investigate and prepare witnesses, which resulted in counsel calling alleged "mitigation" witnesses that were prejudicial ..................................................70

(f) The District Court's ruling..................................................72

II. An evidentiary hearing should have been conducted regarding Purkey's claims of ineffective assistance of counsel..................................................................................77

(a) The District Court applied the wrong standard ...................79

(b) Duchardt Attached no Documentation to his 117-page Affidavit..................................................80

(c) Summary judgment was improper.......................................82

(d) An evidentiary hearing must be held .................................84

III. Duchardt's Affidavit Exceeded the Scope of the Attorney-Client Waiver Resulting from Purkey's Claims of Ineffectiveness............................................................107

(a) Exceeded the scope of the narrow waiver by disclosing privileged information .....................................109

(b) Duchardt made purely legal arguments rather than factual statements.......................................................118

(c) Duchardt asserted facts based on investigation done in preparing his affidavit...........................................128

(d) Duchardt's 117-page affidavit must be struck...................129

CONCLUSION...................................................................................131

CERTIFICATE OF COMPLIANCE.................................................132

CERTIFICATE OF VIRUS SCAN ..................................................133

CERTIFICATE OF FILING..........................................................................134

CERTIFICATE OF SERVICE ....................................................................135

ADDENDUM

    Order & Judgment denying 2255 Motion .........................................ADD1

    Order denying Rule 59(e) Motion ...................................................ADD13

    Nelson v. United States (unpublished)............................................ADD18

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**C**ASES

*Allstate Finance Corp. v. Zimmerman*, 296 F.2d 797 (5th Cir. 1961) ....................82

*Anderson (Justin) v. State*, 163 S.W.3d 333 (Ark. 2004)......................................101

*Anderson(Randy) v. State*, 108 S.W.3d 592 (Ark. 2003) ..............................100, 101

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..............................................94

*Andrews v. United States*, 373 U.S. 334 (1963) ....................................................103

*Anjulo-Lopez v. United States*, 541 F.3d 814 (8th Cir. 2008) .................................15

*Antwine v. Delo,* 54 F.3d 1357 (8th Cir. 1995)...............................................20, 21

*Aron v. United States*, 291 F.3d 708 (11th Cir. 2002)............................................86

*Baker v. United States*, 2009 U.S. Dist. LEXIS 75143 (D.S.C. July 7, 2009) ...........................................................................................................123

*Barnett v. Roper*, 541 F.3d 804 (8th Cir. 2008).....................................................123

*Bean v. Calderon*, 163 F.3d 1073 (9th Cir. 1998) ..................................................69

*Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003)..........................................7, 107

*Blackledge v. Allison*, 431 U.S. 63 (1977)..............................................................95

*Bobby v. Van Hook*, 130 S. Ct. 13 (2009) ..............................................................19

*Boumediene v. Bush*, 553 U.S. 723 (2008) .............................................................94

*Burger v. Kemp*, 483 U.S. 776 (1987) ...................................................................129

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) .........................................................95

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003)..................................................26

*Caro v. Calderon,* 165 F.3d 1223 (9th Cir. 1999) ..................................................17

*Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002) ......................................................70

*Collier v. Turpin*, 177 F.3d 1184 (11th Cir. 1999) ....................................................61

*Commonwealth v. Alvarez*, 740 N.E.2d 610 (Mass. 2000)...........................................65

*Cullen v. Pinholster*, 131 S.Ct. 1388 (2011) ...............................................................62

*Del Piano v. United States*, 362 F.2d 931 (3rd Cir.1966) ..........................................88

*Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851 (1st Cir. 2008) ............................80, 82

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992)...............................................................................................................................93

*Eddings* v. *Oklahoma*, 455 U.S. 104 (1982)................................................................90

*El Deeb v. University of Minnesota*, 60 F.3d 423 (8th Cir. 1995)............................127

*Ex Parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006) ...................................26

*Friedel v. City of Madison*, 832 F.2d 965 (7th Cir. 1987).......................................127

*Frierson v. Woodford*, 463 F.3d 982 (9th Cir. 2006) ................................................17

*Greater Newburyport Clamshell Alliance v. Public Service Co. of New Hampshire*, 838 F.2d 13 (1st Cir. 1988)....................................................................107

*Heisler v. Metropolitan Council*, 339 F.3d 622 (8th Cir. 2003).........................81, 82

*Holloway v. United States*, 960 F.2d 1348 (8th Cir. 1992) .......................................15

*Holsomback v. White*, 133 F.3d 1382 (11th Cir. 1998) .............................................32

*Hovey v. Ayers*, 458 F.3d 892 (9th Cir. 2006) ....................................................passim

*I.N.S. v. St. Cyr*, 533 U.S. 289 (2001).........................................................................94

*In re. Lott*, 424 F.3d 446 (6th Cir. 2005) .....................................................................7

*Kenley v. Armontrout*, 937 F.3d 1298 (8th Cir. 1991)..............................................20

*Kern v. Tri-State Insurance Co.*, 386 F.2d 754 (8th Cir. 1967) ..............................127

*Koskela v. United States*, 235 F.3d 1148 (8th Cir. 2001)...........................87, 93, 94

*Kyles v. Whitley*, 514 U.S. 419 (1995)......................................................13, 97, 98

*Latorre v. United States*, 193 F.3d 1035 (8th Cir. 1999)............................................87

*Lemay v. United States*, 2010 U.S. Dist. LEXIS 133369 (W.D.N.C. Dec. 15, 2010) ......................................................................................................123

*Lewis v. Drake*, 355 F.3d 364 (5th Cir. 2003) ...........................................................65

*Lindhorst v. United States*, 585 F.2d 361 (8th Cir. 1981) ..........................................88

*Link v. Luebbers*, 469 F.3d 1197 (8th Cir. 2006) ......................................................54

*Machibroda v. United States*, 368 U.S. 487 (1962) .........................................passim

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).......................................................................................................94

*McCuin v. Texas Power & Light Co.* 714 F.2d 1255 (5th Cir. Tex. 1983).......................................................118, 130

*McFarland v. Scott*, 512 U.S. 849 (1994) ................................................................94

*Neary v. United States*, 998 F.2d 563 (8th Cir. 1993) ...............................................87

*Nelson v. United States*, 297 Fed. Appx. 563, 2008 U.S. App. LEXIS 22338 (8th Cir. Oct. 27, 2008)...............................................................86

*Nix v. Whiteside*, 475 U.S. 157 (1986) ...............................................................13, 97

*North Dakota State University v. United States*, 255 F.3d 599 (8th Cir. 2001) ..............................................................................................15, 81

*Pennsylvania ex rel. Herman v. Claudy*, 350 U.S. 116 (1965) .............................95

*Pfeil v. Rogers*, 757 F.2d 850 (7th Cir. 1985)................................................126, 127

*Porter v. McCollum*, 130 S. Ct. 447 (2009) ............................................................16

*Powell v. Collins*, 332 F.3d 376 (6th Cir. 2003)......................................................61

*Purkey v. United States*, 549 U.S. 975 (2006)........................................................1, 5

*Richards v. Quarterman,* 566 F.3d 553 (5th Cir. 2009) ...........................................14

*Rivera v. Quarterman,* 505 F.3d 349 (5th Cir. 2007) ................................................14

*Romano v. Gibson*, 239 F.3d 1156 (10th Cir. 2002)................................................95

*Romero v. United States*, 327 F.2d 711 (5th Cir.1964) ..........................................88

*Rompilla v. Beard*, 545 U.S. 374 (2005) ........................................16, 17, 73

*Rose v. United States*, 513 F.2d 1251 (8th Cir. 1975) ............................................87

*Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620 (1944) ................................80

*Schiebelhut v. United States*, 357 F.2d 743 (6th Cir.1966) ...................................88

*Scott v. United States*, 349 F.2d 641 (6th Cir.1965) ..............................................88

*Sears v. Upton*, 130 S. Ct. 3259 (2010) .........................................................73, 98

*Shaw v. United States,* 24 F.3d 1040 (8th Cir. 1994) .......................................86, 87

*Siguenza v. United States*, 2010 U.S. Dist. LEXIS 75660 (W.D.N.C. July 27, 2010) ........................................................................................122

*Sinisterra v. United States*, 600 F.3d 900 (8th Cir. 2010) ..........................15, 22, 55

*Sinisterra v. United States*, Case No. 04-cv-8003-GAF (W.D. Mo.)......9, 22, 55, 79

*Sinisterra v. United States*, MOW No. 98-311-02-CR-W-GAF ..........................115

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004)......................................................95

*Smith v. United States*, 182 F.3d 1023 (8th Cir. 1999)............................................87

*Soffar v. Dretke*, 368 F.3d 441, *amended*, 391 F.3d 703 (5th Cir. 2004)................34

*Sprague v. Vogt*, 150 F.2d 795 (8th Cir. 1945)................................................81, 82

*Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157 (7th Cir. 1963)..........81

*Stobaugh v. United States*, [2007 U.S. Dist. LEXIS 13331], 2007 WL 628420 (W.D.Mo. Feb. 27, 2007) ................................................................108

*Strickland v. Washington*, 466 U.S. 668 (1984) ...............................................passim

*Tasby v. United States,* 504 F.2d 332 (8th Cir. 1974) ....................107, 108, 117, 118

*Toro Co. v. Krouse, Kern & Co, Inc.*, 644 F. Supp. 986 (N.D. Ind. 1986) ...........124

*Towns v. Smith*, 395 F.3d 251 (6th Cir. 2005) .....................................................32, 72

*Townsend v. Sain*, 372 U.S. 293 (1963) ........................................................................85

*Turner v. Murray*, 476 U.S. 28 (1986) ........................................................................95

*Turner v. United States*, 183 F.3d 474 (6th Cir. 1999).............................................84

*United States v. Duke*, 50 F.3d 571 (8th Cir. 1995)..................................................15

*United States v. Hammer*, 404 F.Supp.2d 676 (M.D. Pa. 2005) .............76, 103, 104

*United States v. Hammer*, 564 F.3d 628 (3rd Cir. 2009).......................................103

*United States v. Haskell*, No. 00-00395 (W.D. MO).................................................100

*United States v. Johnson*, 2010 U.S. Dist. LEXIS 133727 (N.D. Ill. Dec. 13, 2010) ...............................................................................................................74, 96

*United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000)...........................................96

*United States v. Montgomery*, No. 05-06002 (W.D. MO) ......................................100

*United States v. Moore*, No. 94-00194 (W.D. MO) ..............................................100

*United States v. Nelson*, No. 99-00303 (W.D. MO)...............................................100

*United States v. Ortiz*, No. 98-00149 (W.D. MO)..................................................100

*United States v. Peoples*, WDMO Case # 00-395 ...................................................116

*United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005)..............................1, 3, 4, 104

*United States v. Purkey*, MOW No. 4:01-cr-00308.................................................123

*United States v. Purkey*, MOW No. 4:01-cr-00308.........................................1, 3, 5

*United States v. Purkey*, No. 04-1337 (10/25/2002 TR 4-90) ...................................3

*United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009) .............................104, 105

*United States v. Salerno*, 290 F.2d 105 (2nd Cir.1961)..............................................88

*United States v. Sinisterra*, No. 98-00311 (W.D. MO) ........................................100

*United States v. Smith*, No. 02-05025 (W.D. MO) ................................................100

*United States v. Tello*, No. 98-00311 (W.D. MO) ................................................100

*United States v. Unger*, 665 F.2d 251 (8th Cir. 1981) ..................................87

*Valentine v. United States*, 488 F.3d 325 (6th Cir. 2007) ..........................84

*Walker v. Johnston*, 312 U.S. 275 (1941) ...........................................................88

*Washington Post Co. v. Keogh*, 365 F.2d 965 (D.C. Cir. 1966) ..........................81

*Watson v. United States*, 493 F.3d 960 (8th Cir. 2007) ...............................15, 89, 93

*West v. United States,* 994 F.2d 510 (8th Cir. 1993) ...................................90

*Wiggins v. Smith*, 539 U.S. 510 (2003).........................................................passim

*Williams v. Anderson*, 460 F.3d 789 (6th Cir. 2006)........................................61

*Williams v. Taylor,* 529 U.S. 362 (2000)........................................................passim

**CONSTITUTION**

U.S. Const., Amend VI ........................................................................................17

U.S. Const., Amend VIII ....................................................................................90

**STATUTES**

18 U.S.C. § 1201 ..............................................................................................1, 3

18 U.S.C. § 3559 ..............................................................................................1, 3

18 U.S.C. § 3591 ..............................................................................................95

18 U.S.C. § 3599 ..............................................................................................5

28 U.S.C. § 1291 ..............................................................................................2

28 U.S.C. § 1651 ..............................................................................................2

28 U.S.C. § 2253 ..............................................................................................2

28 U.S.C. § 2255......................................................................................passim

**RULES**

ABA Model Rule 1.6...................................................................................117

FRAP 32....................................................................................................132

FRCP 56.............................................................................80, 82, 123, 127

FRCP 81....................................................................................................123

Missouri Rule of Professional Conduct 4-1.6 ..................................passim

Missouri Rule of Professional Conduct 4-1.9 ........................................113

MOW Local Rule 56.1.......................................................................84, 112

MOW Local Rule 83.5...............................................................................110

Rules Governing § 2255 Proceedings, Rule 5.....................................87, 88

Rules Governing § 2255 Proceedings, Rule 8..........................................85

**MISCELLANEOUS**

ABA Guidelines For the Appointment and Performance of Counsel in
    Death Penalty Cases, Guideline 4.1 (2003) ...................................21, 25

ABA Guidelines For the Appointment and Performance of Counsel in
    Death Penalty Cases, Guideline 10.13 (2003) ...................114, 115, 129

ABA Guidelines For the Appointment and Performance of Counsel in
    Death Penalty Cases, Guideline 10.4 (2003) .......................................21

ABA Guidelines For the Appointment and Performance of Counsel in
    Death Penalty Cases, Guideline 11.4 (1989) ..................................21, 34

*An Analysis of Capital Jury Decision Making Under the Special Issues
    Sentencing Framework*, 18 ...............................................................74, 96

Benjamin James Sadock & Virginia Alcott Sadock, Kaplan & Sadock's
    Synopsis of Psychiatry, 7 (9th ed. 2003) ............................................28

DOC Operations Division: Prisons, Oregon State Penitentiary, www.oregon.gov/DOC/OPS/PRISON/osp.shtml#General_Information (last visited 11/11/11) ....................................................................................36

J. McLain, *"OPINIONS OF THE GENERAL COUNSEL: CONFIDENTIALITY – CAN YOU KEEP A SECRET?"* 62 ...........................117

John H. Blume, et al., *Future Dangerousness in Capital Cases: Always "At Issue"*, 86 Cornell L. Rev. 397, 404 (2001) ...........................................74, 96

Judicial Conference of the U.S., Subcomm. On Federal Death Penalty Cases, Comm. On Defender Services, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* at 24 (1998) ...............................................................................21

Law Dictionary, Anderson Publishing Co. (2002)...................................................118

Lisa R. Duffet, *Habeas Corpus and Actual Innocence of the Death Sentence After <u>Sawyer v. Whitley</u>: Another Nail into the Coffin of State Capital Defendants*, 44 Case W. Res. L. Rev. 121 (1993)......................104

Missouri Public Defender Guideline 11.3 ............................................114, 115, 129

Restatement (Third) of The Law Governing Lawyers § 33 (2008)

.........................................................................................110, 111, 113, 121

Restatement (Third) of The Law Governing Lawyers, § 60 (2008)..............113, 121

Restatement (Third) of The Law Governing Lawyers, § 64 (2008)......112, 113, 121

Restatement (Third) of The Law Governing Lawyers, § 86 (2008)..............113, 121

Restatement (Third) of The Law Governing Lawyers, § 92 (2008)......................114

Russell Stetler, *Mitigation Evidence in Death Penalty Cases*...........................27, 28

Russell Stetler, *Supplementary Guidelines For the Mitigation Function of Defense Teams in Death Penalty Cases* ...........................................................25

Sally Costanzo & Mark Costanzo, *Life or Death Decisions: An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework*, 18 Law & Hum. Behav. 151 (1994) ......................................74, 96

Scott E. Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va. L. Rev. 1109 (Sep. 1997) ..............................................................................................33

Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*, 98 Colum. L. Rev. 1538, 1559-60 (1998).......................74, 96

Supplementary Guidelines For the Mitigation Function of Defense Teams in Death Penalty Cases ...................................................................25

Welsh White, *Litigating in the Shadow of Death: Defense Attorneys in Capital Cases* (Ann Arbor University of Michigan Press, 2006) ......................34

## <u>STATEMENT OF JURISDICTION</u>

Pursuant to 28 U.S.C. § 2255, Wesley I. Purkey filed his timely motion for post-conviction relief, alleging deficient performance by trial counsel that prejudiced Purkey. On September 29, 2009, the Western District of Missouri denied that motion without an evidentiary hearing. On December 22, 2009, the district court denied Purkey's motion to alter, correct or amend its judgment. That final order is appealable to this Court pursuant to jurisdiction conferred by 28 U.S.C. §§ 1291, 1651, 2253, and 2255(d), and, after extension, Purkey timely filed his notice of appeal and application for certificate of appealability on March 24, 2010. The district court denied a certificate of appealability as to all claims.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291, as this is an appeal from a final judgment of the United States District Court for the Western District of Missouri. This Court issued its certificate of appealability on June 10, 2011.

## ISSUES PRESENTED FOR REVIEW

I.    Whether counsel rendered ineffective assistance under the Sixth Amendment by failing to investigate anything but a minimal social history, failing to provide mental health experts with complete and accurate information, and failing to present the full panoply of mitigation that was available.

> *Strickland v. Washington*, 466 U.S. 668 (1984);
> *Wiggins v. Smith*, 539 U.S. 510 (2003); and
> *Williams v. Taylor,* 529 U.S. 362 (2000).

II.    Whether the district court clearly erred in relying on trial counsel's 117-page affidavit to summarily deny Purkey's motion for post-conviction relief when that affidavit made bald assertions without corroborating documentation; in ignoring the copious affidavits filed by Purkey that contradicted trial counsel's affidavit; and in applying the wrong standard to deny an evidentiary hearing even though Purkey alleged facts, which were not refuted by the record and which, if proved, would warrant relief.

> *North Dakota State University v. United States*, 255 F.3d 599 (8th Cir. 2001);
> *Townsend v. Sain*, 372 U.S. 293 (1963);
> *Machibroda v. United States*, 368 U.S. 487 (1962).

III.    Whether the district court abused its discretion in refusing to strike Duchardt's 117-page affidavit that far exceeded the scope of the limited waiver of privilege effected by Purkey's allegations of ineffectiveness; made purely legal arguments disputing Purkey's legal memorandum in support of the 2255 motion; and suggested there were documents to corroborate his assertions but failed to provide such documents along with his affidavit.

> *Tasby v. United States,* 504 F.2d 332 (8th Cir. 1974);
> *Lemay v. United States*, 2010 U.S. Dist. LEXIS 133369 (W.D.N.C. Dec. 15, 2010);
> *Pfeil v. Rogers*, 757 F.2d 850 (7th Cir. 1985).

**STATEMENT OF THE CASE**

A jury sitting in the United States District Court, Western District of Missouri, found Purkey guilty of kidnaping, rape, and murder. *United States v. Purkey*, MOW No. 4:01-cr-00308; *United States v. Purkey*, 428 F.3d 738, 744 (8ᵗʰ Cir. 2005); *see* 18 U.S.C. §§ 1201(a), (g), and 3559(d). After hearing evidence regarding punishment, the jury voted to sentence Purkey to death, though it did not record anything to indicate having voted on the mitigating circumstances. 428 F.3d at 746; APP 111-112, 481-485. This Court affirmed Purkey's convictions and sentences on November 7, 2005, *United States v. Purkey*, 428 F.3d 738 (8ᵗʰ Cir. 2005), and the Supreme Court denied his petition for a writ of *certiorari* on October 16, 2006, *Purkey v. United States*, 549 U.S. 975 (2006) (No. 05-11528).

Pursuant to 28 U.S.C. § 2255, Purkey then filed his timely motion for post-conviction relief on October 16, 2007. APP 7. Purkey alleged copious failings by trial counsel that prejudiced him and requested an evidentiary hearing to prove those allegations. APP 65-205. The Government's response in opposition was filed under seal because it included a 117-page affidavit from Frederick A. Duchardt, Jr., who had represented Purkey at trial and on appeal. APP 544-720. Contemporaneous with his reply suggestions in support of his 2255 motion, Purkey also moved to strike Duchardt's affidavit as exceeding the

1

scope of Purkey's waiver of privilege as well as the bounds of a proper affidavit. APP 722-726, 834-890.[1] Purkey thereafter renewed his request for an evidentiary hearing. APP 891-907.

On September 29, 2009, the district court denied Purkey's motion to strike Duchardt's 117-page affidavit and relied on it to deny Purkey's 2255 motion without allowing an evidentiary hearing. APP 920-931. That final order is appealable to this Court pursuant to jurisdiction conferred under 28 U.S.C. §§ 1291, 1651, 2253, and 2255(d). The district court denied a certificate of appealability as to all claims. APP 1055-1072.

---

[1] Purkey filed both of these documents under seal.

## STATEMENT OF THE FACTS

<u>CRIMINAL PROCEEDINGS</u>

Purkey was indicted in the United States District Court, Western District of Missouri, for kidnaping, rape, and murder, under 18 U.S.C. §§ 1201(a), (g), and 3559(d). *See United States v. Purkey*, MOW No. 4:01-cr-00308; *United States v. Purkey*, 428 F.3d 738, 744 (8th Cir. 2005). The Government alleged that Purkey had kidnaped Jennifer Long, a sixteen year-old girl, in Kansas City, Missouri, and transported her across state lines to Lansing, Kansas, where she was forcibly raped and killed. 428 F.3d at 745. After making a *quid pro quo* agreement with the FBI that he "would confess to the crime and provide full cooperation in return for a life sentence in a federal institution," Purkey made an incriminating statement. *Id.* at 747. Purkey pled not guilty to the crimes. *Id.* Frederick A. Duchardt, Jr. and Laura O'Sullivan represented him at trial.

Purkey testified in a pretrial hearing in support of his motion to suppress his statements and related motions. *See United States v. Purkey*, No. 04-1337, (10/25/2002 TR 4-90). He also testified at trial denying that he had kidnaped Long, but admitting that he had raped and killed her. *Id*. (TR at 907-1043). His trial and sentencing were conducted by jury.

> During trial, testimony was offered in sentencing concerning the importance of medications to relieve []Purkey's prominent mental health symptoms – symptoms, which interfere with his ability to communicate calmly and rationally with

3

counsel. (footnote omitted).  William Grant, M.D., of the federal Medical Center in Springfield, Missouri, testified at trial that he prescribed Tegretol, which stabilizes "unstable people," Zoloft, which is an anti-depressant that helps with obsessions, and Klonepin, which is an anti-anxiety medication.  [TR] at 1409. These medications had also been advocated by Dr. Peterson, the psychiatrist retained by trial defense counsel, because, without the medications, []Purkey was having uncontrolled rage attacks and was "close to being unable to work with [defense counsel], or anyone else," *id.* at 1780, in part because of his "severe anxiety," which makes []Purkey irritable, *id.* at 1781.

APP 22.[2]

The jury found him guilty on November 5, 2003, and, after hearing evidence regarding punishment, it voted to sentence Purkey to death – though it did not record anything to indicate that it had voted on the mitigating circumstances.  428 F.3d at 746.   Before announcing the verdict, the district court considered sending the jury back to record its votes on the mitigating circumstances; however, the Government strenuously objected, "Absolutely no[t]."  TR 2313.  The district court dropped the matter and made no inquiry. *Id*.

---

[2] Purkey's severe anxiety, depression and mood swings have been major contributing factors that have frequently led him to ask that 2255 counsel be removed and that an execution date be set. *See*, *e.g.*, APP 22, n. 6; *accord* "COUNSEL'S (ORDERED) RESPONSE TO APPELLANT'S *PRO SE* MOTIONS TO REMOVE COUNSEL, PROCEED *PRO SE* AND DISMISS HIS APPEAL" filed herein on September 9, 2011.  During the district court proceedings, Purkey sought an Order compelling the Bureau of Prisons to provide psychiatric medication, but the district court denied that motion.  APP 6, 16-64, 538-540.

This Court affirmed Purkey's convictions and sentences on November 7, 2005, *see Purkey*, *supra*, and the Supreme Court denied his petition for a writ of *certiorari* on October 16, 2006. *Purkey v. United States*, 549 U.S. 975 (2006).

§ 2255 PROCEEDINGS

On December 18, 2006, pursuant to 18 U.S.C. § 3599(a)(2) and 28 U.S.C. § 2255 (§ 2255), the district court appointed undersigned counsel to represent Purkey in his pursuit of relief under § 2255. APP 2. About a week later, "[2255 counsel] and his legal assistant traveled to Duchardt's home and retrieved what was represented to be Duchardt's entire file pertaining to []Purkey." APP 851. Almost 1½ years later, Duchardt revealed to the Government in a 117-page affidavit that he still had a videotape made in preparation for trial that he had not provided to 2255 counsel. APP 714, 850. On October 16, 2007, Purkey filed his § 2255 motion. APP 7, 65-426. In his motion, Purkey raised, *inter alia*, copious grounds[3] of ineffective assistance of counsel for their:

- "failure to obtain the services of a mitigation specialist or otherwise adequately investigate, prepare, and present mitigation evidence…" APP 64-88;

- "failure to adequately prepare and present the expert testimony of Bruce Leeson, Ph.D." APP 89;

---

[3] To avoid unnecessary duplication, the voluminous facts supporting these claims are fully presented in the Argument section of this brief. *See*, *infra* at 17-78.

- "failure to adequately prepare and present the expert testimony of Stephen Peterson, M.D." APP 90-93;

- "failure to adequately prepare and present the expert testimony of Mark Cunningham, Ph.D."' APP 93-95;

- "failure to adequately prepare and present the lay testimony of Gary Hamilton and Angie Genail in mitigation." APP 95-96;

- "failure to adequately investigate and prepare witnesses, which resulted in counsel calling alleged "mitigation" witnesses that were prejudicial." APP 96-97.

Along with his § 2255 motion, Purkey filed eight (8) affidavits:

| | | |
|---|---|---|
| Ex. 1 | Declaration of Laura O'Sullivan – APP 121-128. | |
| Ex. 11 | Declaration of Mark Cunningham, Ph.D. – APP 225-235. | |
| Ex. 15 | Declaration of Stephen Peterson, M.D. – APP 252-255. | |
| Ex. 16 | Declaration of Gary Hamilton – APP 256-258. | |
| Ex. 18 | Declaration of Rex Newton, M.D. – APP 294-295. | |
| Ex. 20 | Declaration of Floyd Bose – APP 298. | |
| Ex. 21 | Declaration of Dion Leiker – APP 299. | |
| Ex. 25 | Declaration of Sam Hoffmeier – APP 426. | |

With leave from the District Court, Purkey filed a further memorandum in support of his § 2255 motion about six weeks later. APP 7, 427-515. He contemporaneously filed four (4) additional affidavits:

| | |
|---|---|
| Ex. 26 | Declaration of Cornelius Peoples – APP 511. |
| Ex. 27 | Declaration of Melvin Lister – APP 512. |
| Ex. 28 | Declaration of Margaret Noe – APP 513-514. |
| Ex. 29 | Declaration of Evette Noe – APP 515. |

Before filing its response, the Government sought an Order compelling Duchardt to provide an affidavit responding to the claims of ineffectiveness.

APP 531-537.  In that request, the Government acknowledged that Purkey had only made a narrow waiver of his attorney-client privilege and the Government did not seek to go beyond that.  APP 535-536 ("A broad waiver rule would no doubt inhibit the kind of frank attorney-client communications and vigorous investigation of all possible defenses that the attorney-client and work product privileges are designed to promote"), *citing Bittaker v. Woodford*, 331 F.3d 715, 722 (9th Cir. 2003); *In re. Lott*, 424 F.3d 446 (6th Cir. 2005)).  Purkey did not object to this narrow request, and the District Court granted it.  APP 8, 540-541.

Duchardt had about six months after the Government sought his affidavit to prepare it – he prepared a 117-page affidavit.  APP 8-9, 604-720, 723-724. Duchardt disputed Purkey's § 2255 claims, interviewed at least one witness concerning Purkey's § 2255 claims and researched the legal arguments Purkey made in support of his § 2255 claims.  *Id*.  He provided his response to the Government before Purkey could review it or 2255 counsel could lodge any objection:

3.      []Duchardt Gave No Effective Notice[4]

a.      At 11:40 a.m. EST on May 7, 2008, []Duchardt emailed undersigned counsel, stating:

I have appended to this memo a copy of the affidavit which I have completed in the Purkey case.  Though you have not raised any objections to this point about my preparing this, I

---

[4] This is excerpted from Purkey's motion to strike Duchardt's affidavit.

am providing it to you, ahead of my providing it to the government, in case you believe that objections to its release should be made. *I intend to provide this to the government this afternoon unless I hear from you before then*.

(Exhibit 1, p. 1) (emphasis added). The affidavit appended to this email was 117-page "draft" of []Duchardt's statement.

  b.      At 1:51 p.m. EST on May 7, 2008, Counsel Norris replied to []Duchardt, objecting that his

  statement crosses the bounds of appropriately making factual statements in rebuttal of claims made to affirmatively making legal arguments against Mr. Purkey to whom you still have ethical obligations. Specifically, to the extent you make legal arguments about cases to which we have cited and arguments made and make legal arguments to rebut Wes' claims, your statement reads like a brief submitted by the government and I believe is inappropriate and crosses ethical boundaries.

(Exhibit 1, p. 1-2).

  c.      Apparently, that same afternoon (i.e., May 7, 2008), []Duchardt emailed his "draft" affidavit to the Government. The "draft" had not been signed, and the Government asked []Duchardt to execute it before a notary public and resubmit it.

  d.      On May 8, 2008, []Duchardt mailed his 117-page "draft" of his statement from his address in Trimble, Missouri, to []Purkey at the United States Penitentiary in Terre Haute, Indiana (Exhibit 4). By this time, of course, the cat was already out of the bag, as []Duchardt had already published his "draft" to counsel for the Government.

  e.      On May 9, 2008, i.e., just one day after he had placed []Purkey's copy in the U.S. mail, []Duchardt executed his 117-page statement (Doc. 73, Ex. A, p. 117), swearing that he

was providing such statement "because no objections have been interposed by []Purkey or his Counsel" (Doc. 73, Ex. A, p. 1).

APP 841-843.

Purkey promptly notified the Government and the district court of his intent to object to the filing of the 117-page affidavit. APP 722-726. The Government subsequently filed its response to Purkey's § 2255 motion and Duchardt's affidavit under seal. APP 543-720.

Purkey filed his reply suggestions in support of his § 2255 motion, attaching fourteen (14) additional affidavits:

| Ex. 1 | Declaration of Jennifer Herndon (12/2/04) (filed in *Sinisterra v. United States*, Case No. 04-cv-8003-GAF (W.D. Mo.) – APP 785-794. |
| Ex. 2 | Declaration of Jennifer Herndon (10/31/07) (filed in *Sinisterra v. United States*, Case No. 04-cv-8003-GAF (W.D. Mo.) – APP 795-801. |
| Ex. 4 | Declaration of Sean D. O'Brien, Esq. – APP 806-818. |
| Ex. 5 | Declaration of Angie Genail – APP 819-822. |
| Ex. 6 | Declaration of Debbie Prothero (7/23/08) – APP 822-823. |
| Ex. 7 | Declaration of Debbie Prothero (3/2/08) – APP 824. |
| Ex. 8 | Declaration of Russ Prothero – APP 825. |
| Ex. 9 | Declaration of Marguerite Hotchkiss (7/23/08) – APP 826-827. |
| Ex. 10 | Declaration of Marguerite Hotchkiss (1/25/08) – APP 828. |
| Ex. 11 | Declaration of Sam Hoffmeier – APP 829. |
| Ex. 12 | Declaration of Dion Leiker – APP 830. |
| Ex. 13 | Declaration of Floyd Bose – APP 831. |
| Ex. 14 | Declaration of Margaret "Peggy" Noe – APP 832. |
| Ex. 15 | Declaration of Evette Noe – APP 833. |

Purkey simultaneously filed his motion to strike Duchardt's 117-page affidavit. APP 834-890. To it, Purkey attached another five (5) affidavits contradicting Duchardt's allegations:

Declaration of Dion Leiker – APP 886.
Declaration of Floyd Bose – APP 887.
Declaration of Debbie Prothero – APP 888.
Declaration of Peggy Noe – APP 889.
Declaration of Evette Noe – APP 890.

Although Purkey had requested an evidentiary hearing in his initial § 2255 motion – APP 116-117, he renewed that request in a separate motion in October 2008. APP 891-902. On September 29, 2009, the District Court overruled Purkey's motion to strike, his motion to set an evidentiary hearing and his § 2255 motion at the same time. APP 12, 920-930. In denying Purkey's § 2255 motion without an evidentiary hearing, the district court relied heavily on Duchardt's 117-page affidavit that the Government filed but made no reference to any of the thirty-one (31) affidavits that Purkey filed. *Id*.

On October 13, 2009, Purkey moved the district court to alter or amend its judgment – APP 12, 932-945, arguing:

TH[E] COURT MISAPPLIED THE LAW AND SHOULD VACATE THE JUDGMENT AND STRIKE THE 117-PAGE AFFIDAVIT PROVIDED BY TRIAL COUNSEL.

APP 933-935; and

10

> TH[E] COURT MISAPPLIED THE LAW AND SHOULD VACATE THE JUDGMENT AND RECEIVE TESTIMONY AS TO THE ALLEGATIONS IN PURKEY'S MOTION TO VACATE.

APP 936-945. After the Government responded – APP 946-953 – and Purkey replied – APP 954-962, the district court denied the motion to alter or amend on December 22, 2009. APP 13, 966-970.

After extension, Purkey timely filed his notice of appeal and application for certificate of appealability on March 24, 2010. APP 14, 972-1000. The district court denied a certificate of appealability as to all claims. APP 1055-1073. This Court granted its certificate of appealability, and this appeal follows.

## SUMMARY OF ARGUMENT

This appeal follows the district court's judgment overruling Purkey's § 2255 motion without holding an evidentiary hearing. Purkey argues, *inter alia*, that trial counsel rendered ineffective assistance in their investigation, preparation and presentation of mitigating evidence. A plethora of compelling mitigating evidence was available to a reasonably competent attorney at the time of Purkey's trial. Purkey's trial counsel, however, performed far below the prevailing norms for capital defense attorneys, which prejudiced Purkey. Further, Purkey argues that his case must be remanded for an evidentiary hearing since his motion alleged copious facts that are not refuted by the record and that, if proved, would warrant relief. Finally, Purkey argues that the district court improperly relied on trial counsel's 117-page affidavit in opposition to Purkey's factual claims and legal analyses since trial counsel went beyond factual matters within his personal knowledge, withheld documents alluded to within his affidavit, violated attorney-client privilege and engaged in legal analysis.

## STANDARD OF REVIEW

INEFFECTIVE ASSISTANCE OF COUNSEL

To establish his claim of ineffective assistance of counsel, Purkey must show that his attorneys' performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance means conduct that does not comport with that of a reasonably competent attorney in capital cases. *Id.* at 687. The standard is an objective one that evaluates counsel's performance in light of the professional norms prevailing at the time of the representation. *Id.* at 686. Prejudice requires a reasonable probability that, but for the error, the result of the proceedings would have been different. *Id.* at 689.

This is *not*, however, an outcome determinative test. *Id.* at 693-694. That standard is too burdensome for the Constitution to permit. *Id.* Instead, the Supreme Court has stressed that "the adjective ['reasonable'] is important." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). In *Kyles*, the Court emphasized:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Id.*; *see also Strickland*, 466 U.S. at 693 ("a defendant *need not show* that counsel's deficient conduct *more likely than not* altered the outcome in the case") (emphasis added); *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("a

defendant *need not establish that the attorney's deficient performance more likely than not* altered the outcome in order to establish prejudice") (emphasis added). As explained in *Strickland*:

> "[R]easonable probability of a different result" is thus *less than a preponderance of the evidence*. It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome."

466 U.S. at 693 (emphasis added). Prejudice is established if "there is a reasonable probability that *at least one juror* would have struck a different balance" but for counsel's errors. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (emphasis added).

Finally, claims of ineffective assistance of counsel claim present a mixed question of law and fact. *Richards v. Quarterman,* 566 F.3d 553, 561 (5th Cir. 2009). With mixed questions of law and fact, the appellate court must review the claim *de novo* and independently apply the law to the facts found by the district court, unless those factual determinations are clearly erroneous. *Id.* A finding is clearly erroneous when it is implausible in the light of the whole record. *Rivera v. Quarterman,* 505 F.3d 349, 361 (5th Cir. 2007).

DENIAL WITHOUT AN EVIDENTIARY HEARING

Section 2255 requires an evidentiary hearing

> [u]nless the motion and *the files and records of the case* conclusively show that the prisoner is entitled to no relief, the

14

court shall cause notice thereof to be served upon the United States Attorney, grant a prompt hearing thereon….

(emphasis added); *accord Watson v. United States*, 493 F.3d 960, 963 (8th Cir. 2007) ("No hearing is required where the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." (internal quotations and citation omitted)). Thus, this Court must consider the validity of Purkey's claims for relief and review *de novo* the district court's rejection of those claims. *Sinisterra v. United States*, 600 F.3d 900, 906 (8th Cir. 2010), *citing Anjulo-Lopez v. United States*, 541 F.3d 814, 817 (8th Cir. 2008).

> [This Court] review[s] *de novo* a district court's conclusions regarding issues of law as well as issues involving mixed questions of law and fact. *Holloway v. United States*, 960 F.2d 1348, 1351 (8th Cir. 1992). To affirm the district court when it denies a § 2255 motion without an evidentiary hearing, we must be persuaded by our *de novo* review that "the motion and the files and records of the case conclusively show that [the movant] is entitled to no relief." *Id.*, *quoting* 28 U.S.C. § 2255.

*United States v. Duke*, 50 F.3d 571, 576 (8th Cir. 1995).

### DUCHARDT'S 117-PAGE AFFIDAVIT

The propriety of Duchardt's 117-page affidavit involves a purely legal issue which this Court reviews *de novo*. *See, e.g.*, *North Dakota State University v. United States*, 255 F.3d 599, 603 (8th Cir. 2001).

## ARGUMENT

### I. Counsel rendered Ineffective Assistance in Their Investigation, Preparation and Presentation of Mitigating Evidence.

While trial counsel did present some mitigating evidence, counsel failed to retain the services of a mitigation specialist, conducted only minimal background social history interviews, and, therefore, could not provide the complete and accurate information to the testifying experts for the defense or the jury. *See Porter v. McCollum*, 130 S. Ct. 447 (2009); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor,* 529 U.S. 362 (2000).

All of counsel's alleged "strategy" reasons for the failure to interview witnesses, or to present their testimony, lead to the same problem as in *Wiggins* and *Rompilla* where the issue was "not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision . . . *was itself reasonable*." *Wiggins*, 539 U.S. at 523 (emphasis in original). Just as in *Wiggins* and *Rompilla*, there could be no valid reason for failing to conduct an adequate investigation. Likewise, in the absence of information that would have been obtained in an adequate investigation, counsel could not make a valid tactical decision not to present evidence that counsel was not even aware of.

Purkey's trial counsel, however, urged the district court to find his performance effective when he did not interview a number of the relevant mitigation witnesses (including Rex Newton, Ph.D., a neutral mental health expert employed by the State of Oregon, and Dion Leiker and Floyd Bose, former law enforcement officers in the State of Kansas), and inadequately interviewed Purkey's family members by attempting to elicit sensitive information in the presence of other people.  Counsel also advanced numerous strategic reasons for not calling powerful mitigation witnesses when he had not even interviewed those witnesses and could, therefore, have no idea what they would say.

As *Wiggins* and *Rompilla* make clear, the Sixth Amendment demands more of trial defense counsel in a capital case.

> The imperative to cast a wide net for all relevant mitigating evidence is heightened at a capital sentencing hearing because "the Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy."

*Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 2006) (quoting *Caro v. Calderon,* 165 F.3d 1223, 1227 (9th Cir. 1999)).  Counsel in this case simply performed deficiently and those deficiencies prejudiced Purkey in that counsel's failures deprived Purkey of powerful mitigation evidence, including:

- corroboration and substantive information from Purkey's brother, Gary, and Purkey's friend, Peggy Martenay Noe, regarding Purkey's

father's violence and his mother's sexual abuse of Purkey and his brother;

- rebuttal evidence, countering the government's argument of recent fabrication, establishing Purkey's prior report of the sexual abuse to Dr. Newton in the Oregon Department of Corrections;

- rebuttal evidence from Dr. Newton countering the government's arguments that Purkey was racist and active in prison gangs; and

- significant positive character evidence, including very favorable testimony from two former law enforcement officers, Mr. Bose and Ms. Leiker.

Counsel also failed to prepare defense witnesses adequately for their testimony. This failure resulted in expert witnesses Bruce Leeson, Ph.D., Stephen Peterson, M.D., and Mark Cunningham, Ph.D., failing to provide any meaning or details to describe the generic label of "sexual abuse" endured by Purkey. Likewise, the experts lost credibility during cross-examination due to their unfamiliarity with portions of Purkey's background records and history. Important lay witnesses, Gary Hamilton and Angie Genail, provided only superficial, generic testimony due to the failure to prepare them adequately for their testimony. Finally, beyond basic initial interviews, counsel did not prepare "mitigation" witnesses, particularly William Grant, M.D. and Mark Russell. Thus, counsel presented testimony that was more aggravating than mitigating.

### (a)  Failure to adequately investigate.

In assessing whether counsels' conduct was reasonable, the Supreme Court held in *Strickland*:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-91; *see also Williams,* 529 U.S. at 396 (counsel ineffective in failing to "fulfill their obligation to conduct a thorough investigation of the defendant's background").

In *Wiggins*, the Court further examined the scope of the duty to investigate. The Court described the issue as "whether the investigation supporting counsel's decision . . . *was itself reasonable*," 539 U.S. at 523 (emphasis in original), "under prevailing professional norms," *id.* (quoting *Strickland*, 466 U.S. at 688). The ABA Guidelines For the Appointment and Performance of Counsel in Death Penalty Cases ("Guidelines")[5] serve as "guides" to what "reasonable" means, *Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009), and are "well-defined norms" for the conduct of counsel appointed in

---

[5] Unless otherwise noted, citations to the Guidelines are to the 2003 Guidelines.

capital cases, *Wiggins*, 539 U.S. at 510.

Counsel's conduct in *Wiggins* fell short of the professional standards because no "social history report" was prepared even though counsel had funds available to retain a "forensic social worker." 539 U.S. at 524. Counsel also "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* "The scope of their investigation was also unreasonable in light of what counsel actually discovered" in the records available to them. *Id.* at 525 (citation omitted).

> In assessing the reasonableness of an attorney's investigation, . . . , a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support the strategy.

*Id.* at 527.

> [I]f limiting the investigation was not reasonable, then neither was the subsequent strategic choice. "Strategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel."

*Antwine v. Delo,* 54 F.3d 1357, 1367 (8th Cir. 1995) (quoting *Kenley v. Armontrout,* 937 F.3d 1298, 1304 (8th Cir. 1991)). In *Wiggins*, "counsel were not in a position to make a reasonable strategic choice . . . because the

investigation supporting their choice was unreasonable." *Id.* at 536. Counsel's

conduct was deficient in this case in precisely the same fashion as in *Wiggins*.

As the Court observed in *Wiggins*, "investigations into mitigating

evidence 'should comprise efforts to discover *all reasonably available*

mitigating evidence and evidence to rebut any aggravating evidence that may be

introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 510 (quoting 1989

Guideline 11.4.I(C) (emphasis added)).

Here, the investigation actually conducted by counsel was inadequate for

a number of reasons. First, counsel did not retain a mitigation specialist[6] and

---

[6]A properly constituted capital defense team should consist of "no fewer than two attorneys," "an investigator," and "a mitigation specialist." Guideline 4.1(A)(1). *See also* Guideline 10.4(C)(2). Mitigation specialists typically have "graduate degrees, such as a Ph.D. or masters degree in social work." Judicial Conference of the U.S., Subcomm. On Federal Death Penalty Cases, Comm. On Defender Services, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* at 24 (1998).

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. . . .

> The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the

essentially bore the sole responsibility for preparation of mitigation himself. He did so even over the objection of his co-counsel. APP 121-128.

Before the district court, trial counsel flatly proclaimed that, due to his own training and experience, a mitigation specialist or mitigation investigator was unnecessary in this case (and, apparently, in other cases tried by counsel).[7] Specifically, he proclaimed:

- "[T]he experienced capital case litigator, by training and experience, can and should be expected to develop case themes himself/herself." APP 648.[8] Counsel states he did so in this case, relying on his prior experience in "mental illness defenses" and his "undergraduate and graduate school backgrounds [] in medical biology and psychology," APP 649, and using the "thorough reports" of Dr. Peterson and Dr.

information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

Guideline 4.1 Commentary.

[7] *See Sinisterra v. United States*, 600 F.3d 900, 903-904 (8th Cir. 2010) (Noting that Purkey's trial counsel, Fred Duchardt, who also served as Sinisterra's counsel "hired . . . a private investigator, to serve as both the fact investigator and the mitigation specialist" while his co-counsel, Jennifer Herndon, "disagreed with the decision to forego hiring a mitigation specialist"). *See also* Declarations of Jennifer Herndon, filed in *Sinisterra v. United States*, Case No. 04-cv-8003-GAF (W.D. Mo.). APP 785-801.

[8] Purkey separately challenges the district court's failure to strike Document 73, Attachment 1 – Statement of Duchardt. *See*, *infra* at 107-130.

Cunningham as "roadmaps." APP 650.[9]

- He pursued "avenues of documentary and witness investigation" by "shoulder[ing] those duties" himself. APP 650. He used Mr. Armstrong's "skill set" to locate and interview witnesses, but then interviewed mitigation witnesses and developed "the rapport" with Mr. Purkey's "family and [] other witnesses [] presented" himself. APP 651.

Second, despite counsel's assertion that "the same quality of work" was done for Purkey, even without a mitigation specialist – APP 236-240 (Supplemental Expert Request for Investigator); *see also* APP 241-245 (Supplemental Expert Request for Psychiatrist), APP 246-251 Supplemental Expert Request for Dr. Cunningham), no one on the defense team performed even near the "well-defined norms" required for capital cases. *Wiggins*, 539 U.S. at 510.

Counsel and Armstrong focused their limited mitigation social history investigation almost exclusively on Purkey's wife (Jeanette Purkey), daughter (Angie Genail), and ex-wife (Claire Gaida). Purkey's stepsons and other witnesses were interviewed relative only to Purkey's activities during the 18 months prior to his arrest including his drug usage and the potential poisoning of him by his wife. The only other witnesses interviewed that could possibly

---

[9] Dr. Peterson's reports were attached as Exhibits 22-23 to Doc. 47 – APP 252-255. Dr. Cunningham's letter summarizing his testimony was attached as Exhibit 3 to Doc. 82 – APP 802-805.

provide background social history evidence were Purkey's brother, Gary Hamilton, addressed specifically below. In addition, Purkey's cousin, Debbie Prothero, and his paternal aunt, Marguerite Hotchkiss, were interviewed only by phone. No other interviews of potential background witnesses who knew Purkey prior to his 1997 parole were conducted. These witnesses related primarily to a prior conviction and an alleged sexual assault in the Oregon Department of Corrections in 1987.

**Gary Hamilton**

Other than a brief phone call with counsel, Purkey's brother, Gary Hamilton, was not interviewed until March 2003. Counsel knew at the time of that interview and included in his listing of mitigating circumstances to be developed: (1) "abandonment by parents in childhood"; and (2) "sexual abuse by mother." APP 206-217. Dr. Cunningham, based on his initial review of records and evaluation of Purkey, had listed as "emerging mitigation hypotheses" the following:

- Multigenerational family distress
- Genetic predisposition to substance dependence
- Genetic predisposition to mental illness
- Fetal alcohol exposure
- Parental alcoholism
- Parental neglect and abandonment
- Observed family violence
- Physical and emotional abuse
- Inadequate structure and violence

- Corruptive influence of brother
- Traumatic sexual exposure

APP 218.  Dr. Cunningham specifically listed Hamilton as a person that needed to be interviewed concerning specific areas, including "observation of parental sexual activities," "observation of mother's promiscuity," possible sexual abuse by Gary's friend "Hup," and "sexual interactions" between Purkey and his mother.  APP 220-221.  Dr. Cunningham noted the need to investigate whether Purkey had told others, specifically listing his wife and ex-wife, about being sexually abused by his mother and the timing of those reports.  APP 221.  In addition, Dr. Cunningham noted the need to interview "corrections officers and mental health providers," who had known Purkey.  APP 222..

Nonetheless, counsel conducted only a single interview of Hamilton in his home in Nebraska in March 2003.  Counsel did not take "the time . . . to elicit sensitive, embarrassing and often humiliating evidence (e.g. family sexual abuse)," Guideline 4.1 Commentary, or "establish rapport" with Hamilton "to overcome barriers . . . against the disclosure of sensitive information." Supplementary Guidelines For the Mitigation Function of Defense Teams in Death Penalty Cases [hereinafter Supplementary Guideline] 5.1(C).[10]  Instead,

---

[10]The Supplementary Guidelines are published in the Hofstra Law Review.  *See* Russell Stetler, *Supplementary Guidelines For the Mitigation Function of Defense Teams in Death Penalty Cases*, Introduction, 36 Hofstra L. Rev. 677 (2008).

counsel took his teenage son to that single interview.  APP 258.  Hamilton rightly felt this was "strange."  APP 258.  "Counsel thus essentially foreclosed any helpful disclosures from [the one witness] most likely to know, first-hand, the pertinent facts."  *Cargle v. Mullin*, 317 F.3d 1196, 1210 (10th Cir. 2003). Counsel did not even ask Hamilton about the aberrant sexual interactions among family members, which refutes counsel's claim to be qualified to fill the role of a mitigation specialist.  Dr. Cunningham will testify that such aberrant sexually behavior would be "a standard aspect of a comprehensive psychosocial history and are a particularly important component of interviews of family members when information has been provided by a defendant that sexual abuse had occurred."  APP 226.  *See Ex Parte Gonzales*, 204 S.W.3d 391, 397 (Tex. Crim. App. 2006) ("[A]n objective standard of reasonable performance for defense counsel in a capital case would have required counsel to inquire whether the defendant had been abused as a child").

Before the district court, counsel conceded that he had only a single in-person interview with Mr. Hamilton prior to trial.  APP 657-658.  While counsel stated that he had "several opportunities to address to [Hamilton], out of the hearing" of the others issues related to "intrafamial sex," it appears from the rest of the statement that Mr. Hamilton's wife was present in the room for the entire interview and these allegedly "semi-private[]" "opportunities" to talk

26

to Mr. Hamilton only occurred when counsel's son was also present interacting with Mrs. Hamilton in the same room. APP 658.

While acknowledging that this meeting was not really productive, except that it "broke the ice" between counsel and Mr. Hamilton, APP 658, all of counsel's remaining contacts with Mr. Hamilton to "keep up subtle pressure," APP 658, and to try to elicit information and cooperation prior to the beginning of the trial were by phone call only and a significant portion of those were made to Mr. Hamilton's wife and daughter rather than to him. APP 657-659.

Counsel's efforts were grossly deficient. As expert counsel, Sean D. O'Brien,[11] observed:

> [T]rial counsel brought his son to the only pre-trial in-person interview of Mr. Purkey's brother, Gary Hamilton. Trial counsel explains that he believes this actually helped him by establishing a father-to-father rapport with Mr. Hamilton. Even if that is true, it was necessary to interview Mr. Hamilton one-on-one, face-to-face, because of the well-known fact that witnesses are reluctant to talk about personal or humiliating aspects of their background in the presence of others. A competent mitigation investigation will invade dark, shameful family secrets; it "exposes raw nerves, re-traumatizes, scratches at the scars nearest the client's heart." Russell Stetler, *Mitigation Evidence in Death Penalty Cases*, Champion, Jan.-Feb. 1999, at 36. Therefore, one-on-one interviews are essential. The mitigation specialist must "attempt to

---

[11] Mr. O'Brien is the former Chief Public Defender in Kansas City (1985-1989), the former Executive Director of the Missouri Capital Punishment Resource Center, currently called the Public Interest Litigation Clinic (1989-present), and an associate professor at the University of Missouri-Kansas City School of Law. APP 805-809. He has testified as an expert in capital defense previously, APP 806-807, and was offered as an expert here.

> speak with [clients and witnesses] privately to determine if there is anything that they.... were reluctant to say in front of someone else." Benjamin James Sadock & Virginia Alcott Sadock, Kaplan & Sadock's Synopsis of Psychiatry, 7 (9th ed. 2003). Mental health experts recognize that "most patients do not speak freely unless they have privacy and are sure that their conversations cannot be overheard." *Id.* at 8.

APP 817-818.

Despite the acceptance by experienced capital counsel, mitigation specialists, and mental health experts (as summarized by Mr. O'Brien) that private, multiple conversations are necessary to gather sensitive information, counsel placed the responsibility on Mr. Hamilton for not providing the information of his own abuse by his mother in sufficient time and detail before trial. Specifically, counsel stated:

> Unfortunately, Gary did not share with me all of those details[12] as we feverishly prepared him, at the last minute, for his testimony based upon his new revelations. Had Gary shared that information with me at that time, I would have presented much of that information at trial.

APP 659-660.

While apparently recognizing that these topics were difficult for Mr. Hamilton to talk about, counsel rationalized that any other approach with Mr. Hamilton would not have garnered even the information and cooperation counsel did obtain. This is the same type of after-the-fact "explanation" as that

---

[12] Mr. Hamilton's declaration was attached as Exhibit 16 to 2255 Doc. 47 – APP 256-258.

described in *Wiggins*, 539 U.S. at 527-28, where ineffective counsel's explanation "resemble[d] more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations" at the time of the questioned action.

If counsel had performed adequately in interviewing Mr. Hamilton, counsel would have learned the excruciating details of the brutality of Purkey's father that included even slamming his wife's arm in a door repeatedly until her arm broke while his children watched. APP 256. More importantly, counsel failed to learn that Mr. Hamilton had also been abused not just by his mother but also by his grandmother. APP 656-657. As summarized by Dr. Cunningham, who obtained the details from Mr. Hamilton in preparation for these 2255 proceedings:

> Mr. Hamilton reported to me that he had been sexually abused in separate contexts by both his mother and his maternal grandmother over a period of many years beginning in his elementary school years. The recurrent instances with each involved displays of full body nudity, breast and mutual genital fondling, and simulated or attempted intercourse; and occurred in the respective homes of these maternal figures. Additionally, as he entered early adolescence, his mother took him to bars with her, represented him as her boyfriend, gave him alcohol, and engaged him in necking and mutual fondling. Mr. Hamilton also provided information regarding his mother's promiscuity, as well as the longstanding incestuous sexual relationship between his mother and his maternal grandmother's husband (step-grandfather to Gary and Wesley). Mr. Hamilton's descriptions represented critically important, both in providing inferential corroboration of Mr. Purkey's self-report and in providing anecdotal detail regarding the disturbed

interactions that constituted the primary relationships of Mr. Purkey's childhood.

APP 226.

**Rex Newton, Ph.D.**

Given the information available prior to trial, counsel should have easily anticipated that the government would allege that Purkey had recently fabricated the allegation that he had been sexually abused by his mother in order to avoid the death penalty. Indeed, the government did make the allegation in cross-examining Dr. Peterson, the defense psychiatrist, that the abuse had never before been reported to anyone. TR 1817, 1824. Government counsel then argued that Dr. Peterson's "findings were a fairy tale" and that the evidence of Purkey's horrible childhood was simply "the old abuse excuse." TR 2267-68.

If counsel had adequately investigated and prepared, counsel could easily have countered the allegation that Purkey had never before reported being sexually abused. Indeed, this information was apparent in Purkey's Oregon Department of Corrections records that were obtained by counsel. Specifically, the records reflect that on November 25, 1986, Purkey completed a life history questionnaire in applying for counseling by Rex Newton, Ph.D., a mental health expert employed by the Oregon Department of Corrections. On the questionnaire, he reported "anxiety or guilt feelings arising out of sex or

masturbation" from "years ago." In response to "[a]ny relevant details regarding your first or subsequent sexual experiences" he wrote "being abused as a child." He also listed his "most significant memories and experiences" for ages "6-10" as "being sexually abused." APP 259-293 (Portion of Oregon Department of Corrections Records). Thus, it was clear from these records, which had even been specifically noted by Dr. Peterson is his own report, that Purkey had previously reported the sexual abuse. And, significantly, Purkey had reported it years before trial in a correctional setting where there was no possible motivation for doing so except in attempting to get mental health counseling. In short, Purkey was prejudiced by counsel's failure to establish this on the record in response to the government's cross of Dr. Peterson and argument on this issue.

Counsel could also have presented the testimony of Dr. Newton, who counseled Purkey for a period that spans, at minimum, from November 1986 to August 1988. APP 294. Dr. Newton could have provided powerful mitigation from a clearly disinterested witness that Purkey was "a throw away kid," who was abused and never got adequate parenting, but he very much wanted to face his demons with therapy and treatment. APP 294. Dr. Newton also would have provided disinterested and credible testimony that, contrary to the government's arguments and evidence and the tattoos on his body, Purkey was not involved in

31

racist prison gangs and, indeed, was ashamed of his tattoos. APP 294.

Before the district court, counsel spent a full nine pages of his affidavit, APP 664-673, providing his alleged reasons and thinking for the "failure to secure the testimony of Dr. Rex Newton, Ph.D." APP 664. The *post-hoc* rationalization is patent though because counsel never interviewed Dr. Newton and relied only on his notes in the Oregon Department of Corrections records. The deficiency in that is obvious: "[C]ounsel could not have evaluated or weighed the risks and benefits of calling [a witness] . . . without so much as asking [him] what he would say if called." *Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005). *See also Holsomback v. White*, 133 F.3d 1382, 1388 (11th Cir. 1998) (counsel "could not have made an informed tactical decision" concerning the benefits versus the risks of presenting the testimony of a witness that counsel had not interviewed).

Aside from the obvious problem that counsel did not interview Dr. Newton, what counsel cited as Dr. Newton's "report," is in actuality only a handful of entries in the Oregon Department of Corrections records. [13]

As Mr. O'Brien observed, Dr. Newton was "a particularly important mitigation witness." APP 815-816.

He treated Mr. Purkey in prison in Oregon, and it appears that Mr.

[13]Every reference to Dr. Newton in the prison records was included in Exhibit 17 to 2255 Doc. 47 – APP 259-293.

Purkey opened up to him, revealing significant details of his traumatic life history. Dr. Newton could bring special credibility to the defense case because he is a treating mental health expert whose involvement with Mr. Purkey predated the crime for which the Government was seeking the death penalty. While it is well known that juries are distrustful of retained mental health experts who testify at trial, the same is not true of treating physicians.[14] Dr. Newton's credibility is further enhanced by the fact that he works for the government, and came in contact with Mr. Purkey in his role as an institutional psychologist. Although trial counsel had Dr. Newton's notes from the prison records, and the contents of those notes were favorable to Mr. Purkey, trial counsel never interviewed him. In my opinion, a reasonably competent defense attorney, or a mitigation specialist retained by a reasonably competent attorney, would have interviewed a witness such as Dr. Newton. In the absence of such an interview, a claim of trial strategy is untenable.

*Id.*

Nonetheless, counsel cited a list of reasons that he can conceive of now for not presenting Dr. Newton's testimony. Even assuming that these same reasons were thought of and considered prior to sentencing, which is a far stretch of the imagination, counsel's conduct was still deficient. In other words, "an actual failure to investigate cannot be excused by a hypothetical decision

---

[14] *See also* Scott E. Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va. L. Rev. 1109 (Sep. 1997) (discussing Capital Jury Project study findings that "lay experts"– such as former teachers, former employees or supervisors, and correctional staff with personal knowledge of the defendant–are viewed by jurors as far more credible and believable than both retained professional experts and family and friends).

not to use its unknown results." *Soffar v. Dretke*, 368 F.3d 441, 474, *amended*, 391 F.3d 703 (5th Cir. 2004).

As Mr. O'Brien observed:

The Supreme Court has specifically rejected "strategy" as a reason not to investigate, observing that "[t]he ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins v. Smith,* 539 U.S. 510, 524 (2003) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989)). Further, the potential trial counsel's concern mitigating evidence will be "double-edged" does not justify the failure to investigate it at all prior to deciding whether to present it. Even if mitigation evidence is "double-edged," competent defense counsel will err on the side of presenting the mitigating evidence to the jury. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 396 (2000). "The practices of skilled capital defense attorneys indicate that these attorneys will rarely, if ever, decide to curtail investigation for mitigating evidence for any reason." Welsh White, *Litigating in the Shadow of Death: Defense Attorneys in Capital Cases*, 200 (Ann Arbor University of Michigan Press, 2006). Trial counsel's failure to interview Dr. Newton and other witnesses cannot be justified as a strategic decision in the absence of an interview.

APP 816-817.

Without interviewing Dr. Newton, counsel could not have known or considered:

- Dr. Newton's substantial credentials as a neutral mental health provider employed by the prison system.

- The extraordinary fact that Dr. Newton, who had seen hundreds, if not thousands of inmates/patients in the interim, remembered Purkey (and, specifically remembered him as "remarkable") more

than 15 years after he lost contact with him.

- Dr. Newton's detailed recollections of, among other things, Purkey's statements and goals, the variations in his "demeanor," his "behaviors and characteristics," and his expressed "feelings."

- Dr. Newton's own powerful observations, including among others, that Purkey was "deeply ashamed" of his tattoos and prior connection to a racist prison organization and his genuine attempts with "very little assistance to overcome the huge emotional barriers that were created for him in early childhood by his own family." Dr. Newton also observed that Purkey "fell though the proverbial cracks of all our social services."

- Dr. Newton's willingness to travel from Oregon to Missouri to testify on Purkey's behalf.

Further, without interviewing Dr. Newton, the *post-hoc* rationalization counsel provided in these proceedings for not interviewing or presenting the testimony of Dr. Newton is particularly unreasonable in light of the totality of the evidence in this case and sheer logic.

First, counsel cited concerns that Dr. Newton's first involvement with Purkey was when Purkey was "housed in a lower security facility in Oregon, and was on good track for an earlier release." APP 665. This is simply not true. As reflected in the prison records (APP 259-261), on November 27, 1986, when Purkey applied for the treatment program provided by Dr. Newton, he completed the "Life History Questionnaire" reflecting that he was confined at "OSP." APP 261. "OSP" refers to the Oregon State Penitentiary, which is "the

state's only maximum security prison."[15]  He was also serving a sentence of 15 years to life and, by his own note at the time, Purkey's only knowledge or thought about the possibility of parole was "1988 parole board tentative."  APP 259.

Counsel also stated, as part of his reason for not presenting testimony from Dr. Newton:  "All the while Mr. Purkey was working with Dr. Newton, he was also engaging in activities which were at best against the rules and at worst, arguably criminal."  APP 666.  Yet, as the government already presented in Purkey's sentencing, the only disciplinary infraction during the time Purkey was seen by Dr. Newton was the alleged sexual assault on Gary Hatfield, TR at 1927, which the government and defense counsel presented substantial evidence about.  Thus, counsel's concern now that Dr. Newton's testimony could be used as a "springboard" by the government for additional aggravation is simply *post-hoc* rationalization not based in fact.  During Purkey's capital sentencing, the government did present the available evidence of Purkey's disciplinary incidents prior to, during, and after Dr. Newton's contacts with Purkey.

---

[15]  DOC Operations Division: Prisons, Oregon State Penitentiary, www.oregon.gov/DOC/OPS/PRISON/osp.shtml#General_Information  (last visited 11/11/11).  Counsel certainly could have learned this basic information from an interview of Dr. Newton, who had been a consultant for the Oregon Department of Corrections for more than 20 years by the time of Purkey's trial.

Counsel also asserted that, in order to avoid the imagined "springboard" that might be caused by Dr. Newton's testimony, he presented "the functional equivalent of Dr. Newton, and in most cases a more updated version of that information." APP 666. Counsel then listed the witnesses believed to be a functional equivalent starting with Dr. Peterson and Dr. Cunningham, retained defense experts that never saw Purkey until he was already incarcerated on the present capital offenses. The other listed witnesses were lay witnesses with far more limited contact with Purkey than Dr. Newton and mostly referred to the time frame, again, that was after Purkey was facing a potential death penalty. Thus, the testimony of any of these witnesses would certainly be viewed through a more cynical lens by jurors than the testimony that Dr. Newton could have given considering his extended history with Purkey, his status as a mental health expert, and his status as a neutral employee of a correctional system.

Trial counsel attempted to minimize the impact of Dr. Newton's ability to testify (as the Oregon prison records reflected) that Purkey reported to him that he had been sexually abused by his mother as a child.

> Counsel for Mr. Purkey find greatest fault over my failure to produce Dr. Newton to specifically say that Wes had told him, in the late 80's, about his mother sexually abusing him ([2255] Doc. 47, p.21).[16] This evidence, it is argued, would have countered what Purkey's current Counsel claim were government accusations ". . .that Purkey had recently fabricated the allegation that he had

---

[16] APP 85.

been sexually abused by his mother in order to avoid the death penalty. . ." ([2255] Doc. 47, p.21). [17] The fatal flaw in this logic is that the government never made such claims.

APP 667.

The record reflects the contrary. Specifically, during cross-examination

of Dr. Peterson, the following exchanges occurred:

Q       Now, Doctor, you testified that you did not believe – you believe there is a mental disease and I think I heard you testify, tell me if I'm wrong, I heard you testify that you did not believe the problem here is that the defendant's primary – that he was suffering from antisocial personality disorder, that's not your diagnosis, correct?

A       I believe what I said was that this is a combination of difficulties. I would say it's too simplistic to merely put him in the characterization of antisocial personality. He certainly was identified by age 14 with having had severe psychocentral problems, problems with immaturity, problems with language delay, all sorts of things that one would expect for a child who has been sexually and physically abused and emotionally abandoned. Ultimately he has features of antisocial. He has features of borderline. He has features of dependent personality and obsessive-compulsive disorder. The latter two to a much lesser extent.

Q       Doctor, would you agree with me – you examined that large stack of records, correct?

A       Yes.

Q       And would you agree with me that about twelve or thirteen psychologists and psychiatrists before you have concluded the defendant's problem is that he suffers from an antisocial personality disorder?

---

[17] APP 85.

A    I don't know if it's twelve or thirteen, but in the present matters it's about three or four, yes.

Q    You mean the two cases we're talking about here?

A    Yes. You mean through his entire correctional record. The correctional records also suggest that he has other substantial psychosexual problems.

Q    And psychosexual problems, that could mean – you tell me if I'm wrong – that he doesn't know whether he likes men or women?

A    No, it doesn't mean that at all.

Q    What does it mean?

A    As a consequence of having been repeatedly sexually traumatized as a child, he has developed an abnormal attachment to sexual activity as a way of comfort, one of the only ways he finds comfort.

Q    *Now, you talked a long time during your direct examination about the defendant's childhood and the fact that his mom sexually abused him. Do you remember that testimony?*

A    *Yes.*

Q    *Now, did you find any records where that was detailed in his past?*

A    *No,* there really haven't [sic] been any detailed questioning of him. There were some references, and I brought up a couple of them, but there hasn't been any detailed questioning of him about his sexual development or his sexual abuse and trauma by anyone.

Q    Except you?

A    Yes.

Q    And Dr. Dietz, our expert, after you were finished

interviewing him, correct?

A    Yes.

TR 1806-1808 (emphasis added).

Q    *Doctor, going back to the defendant's childhood and the sexual abuse that he claims he suffered, again we have to rely on his word essentially, because there's not any – there is very little, if anything, in the record to support that, correct?*

A    *Well, that's correct.* There are some elements to support it, such as the reports of his brother and his aunt and the people who talked with Mr. Purkey long before he was involved in any of these cases, about his development. So certainly it would have been nice to have a video camera on Mr. Purkey's shoulder to see what he experienced, but we don't have that.  At the same time you can't really discount not knowing, or not having a camera there recording every event, because, for example, most children don't remember how they learned to walk, but most kids do walk. And so the fact that they don't remember or there's not a source of information that proves when they took their first step doesn't mean they didn't learn how to walk.

Q    We're not talking about walking. We're talking about a man who claims his mother had sex with him when he's a kid, right?

A    Yes.

Q    *You're aware from the reports that – the only report that exists of sexual contact between the defendant and his mother is her claim that in 1972 when he was 19 years old he raped her. Have you seen that report?*

A    *I have seen the report.* I've also seen the medical report that the doctor gave the opinion than [sic] she had not been sexually assaulted, and that once she had sobered up she dropped the charges.

40

Q    That wasn't in a medical report, was it, sir? It was in the detective's report. He wrote that down.

A    By the doctor to the detective.

Q    Did you also read, sir, that the mother was agonizing over the fact that her son would have to go back to prison if she pursued it; did you read that?

A    I read that. And the police could certainly have pressed charges without her.

TR 1816-1817 (emphasis added).

This section was quoted by counsel in his statement. He then asserted that "[c]urrent counsel for Purkey does not note that Dr. Peterson also more generally deflected the government advances by specifically referencing Mr. Purkey's multiple prior accounts of the sexual abuse." APP 668. The problem, however, is that Dr. Peterson was not referring to "prior accounts of the sexual abuse" by Purkey in stating that "[t]here are some elements to support it, such as the reports of his brother and his aunt and the people who talked with Mr. Purkey long before he was involved in any of these cases, about his development." Purkey's brother did not testify that Purkey had been sexually abused or reported it to him. He testified only that he had himself been sexually abused by his mother. TR 1552-53. Likewise, the records reflected only that Purkey's deceased aunt had reported that Purkey's mother was promiscuous.

41

TR 2154.[18]

The next section quoted by counsel includes the following exchange:

Q    *To your knowledge, based upon your review of the records, the only time the defendant ever told a doctor who has examined him about this sexual mistreatment or maltreatment that he's now claiming is to you, that was the first time?*

A    *To my understanding, I'm the only one he has ever told in detail to because I'm the only one who ever really asked.*

Q    To your knowledge.

A    Yes. I know that Dr. Fernando out at Larned did not ask because I asked Mr. Purkey, and I know the process out at Larned, and Mr. Purkey said Dr. Fernando did not ask him

---

[18]Dr. Cunningham made similar points during his direct examination.

> Q    *Let me stop you for just a second. Did you have any independent verification of Mr. Purkey's having been sexually abused other than the accounts that he has now given because psychosexual evaluations have been conducted?*
>
> A    *There are – there's collateral information I guess you would say.* For example, when his great aunt describes that the mother was highly promiscuous and wasn't careful about what happened in front of the boys, that's giving you some kind of inferential information about mom's lack of inhibitions or her own sexual difficulties. There is a reference in one of the early psychological evaluations that's done of Wes when he's about 15 or 16 where it talks about him having a serious problem with sexual identification and then doesn't go on and explain that, though. . . .

TR 1865-1866 (emphasis added).

anything about his sexual development before he gave the diagnosis, which is common practice out at Larned.

Q    Yet Mr. Purkey told you that?

A    Mr. Purkey told me that, plus there's no indication in any of the records especially done by the social worker of any detailed psychosexual history done by Dr. Fernando or even the social worker.

Q    Thank you. That's all I have.

TR 1824-1825 (emphasis added).

With respect to this section, counsel addressed what he believed was "the thrust of the point being made by Dr. Peterson at this point."  APP 669.  The problem, however, is not in what Dr. Peterson was saying, but in the overall theme of the government, that Purkey's extensive records did not reflect that he had ever told a doctor or anyone else about being sexually abused until he reported it to Dr. Peterson when he already had pending murder charges.  *See* TR 1824 ("based upon your review of the records, the only time the defendant ever told a doctor who has examined him about this sexual mistreatment or maltreatment that he's now claiming is to you, that was the first time?").

The government continued this theme in the following exchange.

Q    Now, I have reviewed the records too. Would it be a fair statement to say that the information that came from the aunt, the record that you're talking about, is information where she described how the mother – the mother was promiscuous, correct?

A    She described the alcoholism, promiscuity, chaotic nature of

43

the home. The records describe both his father and mother having abandoned him. Father's whereabouts being unknown.

Q     But there was nothing in those records, sir, about the defendant seeing his mother's lovers come out of the bedroom without any clothes on.

A     No, sir, that came from Mr. Purkey. The records describe that she was promiscuous and without regard to what the boys saw. The specific description of what he saw came from the discussions that he had with me. The record describes, though, provides a broader context to that same sort of action.

Q     *And there was nothing in those records, sir, was there, that talked about the defendant saying that he – or confirmation that he was having sex with his mother at age eight? There's nothing in the records from back then that would confirm that, is there?*

A     *Not specifically.* There are descriptions about sexual issues that he has. There are descriptions about being very anxious when the topic of his mother comes up. Certainly the history that he displays is consistent with somebody who has been sexually traumatized.   But otherwise *the records don't specifically recount that he made an outcry of sexual abuse to anyone else.*

Q     *Of course, the parents aren't here. They're both dead, correct?*

A     *That's correct.*

Q     *And they can't defend themselves, right?*

A     *That's correct.*

Q     And there is some indication that the defendant had a serious problem with sexual identification.

A     That was described in his adolescence, yes, sir.

Q	Could that mean that he wasn't sure whether he liked men or women?

A	Potentially. It's uncertain what that refers to or what that's a euphemism for in terms of what kind of sexual conflicts he's having.

TR 1933-35 (emphasis added).

While counsel asserted before the District Court that the government was not asserting ". . . that Purkey had recently fabricated the allegation that he had been sexually abused by his mother in order to avoid the death penalty," APP 667, *quoting* APP 85, the record clearly reflects that counsel had a different view at the time of trial. This is particularly clear in counsel's cross examination of Dr. Park Dietz, the psychiatrist retained by the government.

Q	And particularly, there was no indication of a psychosexual analysis to the extent that you and Dr. Peterson delved into it with Mr. Purkey before now; is that correct?

A	If there was, I didn't see it.

Q	Right. But both you and Dr. Peterson went into those issues; is that correct, sir?

A	Yes.

Q	Okay. And very thoroughly. You would like to think that you both did.

A	Actually, I don't know, I think Mr. Purkey cut me off on some of the questions in that area.

Q	Okay. Well, in any event, you had indicated that in terms of what Mr. Purkey was telling you, that certainly if you were to accept his account as true, he would have suffered sexual abuse at a very young age; is that a fair statement?

45

A       If what he told me was true, he underwent considerable long-term sexual abuse by his mother.

Q       *Now, in particular there are secondary indications in the record of possible sexual trauma to Mr. Purkey, is that correct, childhood sexual trauma?*

A       *That's too vague a phrase for me to respond to, but I can tell you exactly what was in the record.*

Q       *All right, sir.*

A       *There is one record from the time he was an adolescent indicating that there had been promiscuous behavior by his mother who was – had brought at least three men home and was openly engaging in sex in the home with the boys. There was another record that said that someone else had found some psychosexual problem that was never identified, and the report that supposedly said that was never received. And I think up until he's facing capital murder charges, that's all that was in the record.*

Q       All right, sir. Now, are you also familiar with the fact that Wes's brother Gary has also testified about his own abuse by his mother?

A       So I have been told, yes.

Q       Now, what you testified to the jury is, though, that this is an account that really comes from only these sources; is that correct?

A       That's right, those are the only sources I'm aware of.

Q       Okay. Is that necessarily unusual in the case of a man having been sexually abused by his mother, not coming forward about the issue until directly asked about it?

A       It's such a rare event that I don't think anyone could say what's usual or not. But looking by analogy, it's true that it's not common for males to volunteer stories of their sexual abuse unless there's something good that will come of it for

46

them.

Q     Okay. Now, in your testimony, were you indicating that you were relying upon Mr. Purkey's account of this sexual abuse or not relying on it?

A     All I can do is report it and indicate that that's where it came from. It's not for me to judge his credibility and it's not for me to find the facts. That's for the fact-finder.

Q     Sure, and I understand that, but certainly you take the facts and use them to reach the conclusions which you do. Did you use Mr. Purkey's representations that he had been sexually abused by his mother in order to reach any of the conclusions which you did, or did you not?

A     Sure, I used them to – first, I used it to reach the conclusion that he might have been sexually abused by his mother, just as he says. Second -

Q     Can I stop you there for just a second, if you don't mind. I take it by saying might as opposed to many of the things that you said more as a fact, that you are saying that in your opinion there's a possibility that that's also not true, as opposed to some of the other things that you more indicated as a fact. Am I --

A     For the reason I gave earlier. If I have corroborative evidence, I'll accept it as a fact and I don't think it's a matter in dispute. ***This I think is a matter in dispute that's not for me to be the fact-finder about.*** The jury has to do that.

Q     Okay. Now, though, isn't it the case that Mr. Purkey was also the only source for your finding that he had committed acts of delinquency prior to the age of 15?

A     No. Some of that comes from records as well, but there were some delinquent acts for which he was my only source. And I rely on that in a different way because that's an admission against interest. That is, when somebody makes a statement that hurts their interests, it has a different degree of reliability than someone who makes a self-serving statement

that promotes their interest.

Q   *For a person in prison to say you have been sexually abused by your mother is certainly not a statement in your interest, is it?*

A   *It is when you're facing capital murder charges and have people looking for bad things in your childhood to help use in mitigation.*

TR 2191-94 (emphasis added).

Clearly, this testimony indicated that the issue of whether Purkey had been sexually abused was "a matter in dispute."  In addition, the clear implication from Dr. Dietz's last statement in this exchange was that Purkey's report of sexual abuse was made only when he was "facing capital murder charges and ha[d] people looking for bad things in [his] childhood to help use in mitigation."

Another exchange between counsel and Dr. Dietz is also relevant.

Q   Let me start it fresh then. In terms of the sexual, physical, emotional abuse, that is something that a psychiatrist or a psychologist, assuming it's true, would think was important in terms of the psychological or psychiatric development of the person; would you concede me that much?

A   Yes.

Q   Would you also concede me that to the extent these factors did occur, that's at least part of the explanation for why Wes Purkey is who he is today?

A   That the abuse that occurred of him is part of why he is who he is and makes the decisions he makes, has the personality he has, all of that I would agree.

Q   All right, sir. Now, this is not some usual level of abuse that you would see in people. This is a fairly significant level of abuse, if you assume that it's all true.

A   The sexual part is beyond the ordinary. The rest of it is a pretty average story for the kinds of people I see.

Q   Not for the normal kid. I mean, I don't recall that, and I assume you didn't have it.

A   I'm talking about for the kinds of people I see. I hear the rest of that very often. But not the sexual abuse by the mother. That's a very unusual story. I have never heard it before, actually.

Q   And basically it is an explanation for why people get damaged and end up in the places many times – it's not an excuse, but it's certainly an explanation for why they end up where they do?

A   What is?

Q   Abuse.

A   Abuse does help explain some of why people end up getting in trouble.

Q   And particularly what you're talking about is many of the people who you deal with in these evaluations that you do tell a similar story of abuse and neglect?

A   Correct.

Q   A story just like Wes Purkey's that can be independently verified?

A   No. Usually it can't.

Q   *Actually we have kind of – did our homework and got together a lot of records that verify what he's saying; is that correct, sir?*

A   *That's right. For everything but the sexual abuse I think*

*there's plenty of verification.*

TR 2214-15 (emphasis added).

Like the previous quoted testimony, this exchange clearly indicated that the government and its experts were not conceding that Purkey had been sexually abused. Counsel asserted before the District Court that "government Counsel took their questioning of the sexual abuse no further" than Dr. Peterson's cross examination. APP 670. Counsel even stated, against any reasonable view of the evidence, that the government was "instead essentially conceding that Purkey had been abused." APP 670. Counsel cited a portion of argument where, according to counsel, "government Counsel actually conceded the abuse took place." APP 671, quoting TR 2268. The problem, however, is that government counsel conceded only that Mr. Purkey had "a bad childhood."

> Now, the next group of mitigating factors have to do with the defendant's ***bad childhood***. Now, that's ***the old abuse excuse***. He had a ***bad childhood***. No doubt he did not have a good childhood. I'm not disputing that. But many people in this country grow up with alcoholic parents or are abused and they turn out fine. His own brother corrected his behavior way back in 1977, decided he wasn't going to do any more crimes, and he changed. And this is about personal choices. He chose not to make any changes in his life. He just kept doing the same things, being violent, committing crimes. He made those choices.

TR 2268 (emphasis added).

In addition, counsel deleted from his quotation the next paragraph that makes it clear that the government was not conceding that Purkey had been

sexually abused.

> What about personal responsibility? Aren't you tired of people having an excuse for everything? This guy goes out and he beats – he stabs this girl to death, beats an 80-year-old grandmother, and it's somebody else's fault. It's his mom's fault, who is not here to defend herself. Did you notice the picture they brought of mom, did you notice that? You know, the one they bring of her, she's sitting on a couch in her nightgown with a cigarette. Now, come on.

TR 2268-69. The reference to Purkey's mother not being "here to defend herself" had, of course, been used in cross-examination of Dr. Cunningham in challenging the evidence of sexual abuse. Counsel clearly understood it that way at trial when he argued in his own closing:

> Where was there a glimmer of hope in anything that Wes Purkey dealt with for the first 14 years of his life? The glimmer of hope was maybe he and his brother could hold off his dad from beating their mother, or maybe they could hold him off from beating them, but only then have dad take in a prostitute or have mother sexually molest you.

> The government wants to talk about they're not here to defend themselves, and what a crock. You know what, folks. They were not there to defend themselves back in the '60s and 70's either when these allegations were first coming up. You know why. They abandoned them.

TR 2275.

Counsel's additional trial argument also made clear that he was not thinking that the government or its experts had conceded the sexual abuse.

> And you know what else they never did? They never did the psychosexual history of Mr. Purkey to find out about this depraved

childhood that he was dealing with. So it isn't a fairy tale that Dr. Peterson talked to you about. It's the reality. It's the reality I tried to get Dr. Dietz to come along with me on and assume for at least the sake of argument that there was brain injury, what's that mean. He didn't want to go there. He said, well, you have to forget everything else that went before.

Of course you don't have to forget everything. And particularly you don't have to forget what's clear. The injuries of this man's background and what those things did to him, the horrific childhood that he had to deal with. And when you put all of those things together, you come up with a conclusion by Dr. Peterson that this man could not, could not intend to kill Jennifer or cause her serious physical injury at the time that killing happened, that he does suffer from a mental disease or illness, that he does have a severe mental or emotional disturbance.

It's all there, folks. It is all there despite the hatchet job that was tried to be done on it. And even Dr. Dietz, much as he was reluctant to do so, has to admit the information is all there about the terrible childhood, and there's no reason to think otherwise about the sexual abuse. Remember what Gary told you about his same experience with the mother.

TR 2280-81.  Counsel was, of course, referring back to Dr. Dietz's concession that the defense did the "homework and got together a lot of records" verifying Purkey's "story of abuse and neglect" but pointing out that the concession of verification did not include sexual abuse.  Specifically, he said, "For everything but the sexual abuse I think there's plenty of verification."  TR 2215.

The government's rebuttal argument made the final point that the government was not conceding that Purkey was sexually abused.

An expert is only as good as the information they have to evaluate. They fed them the information. They gave them the three and a

> half feet, or, you know, it got taller and shorter, boxes of information to evaluate. They fed it to those experts. Garbage in, garbage out.
>
> They want you to believe him, a man that can take a tattoo off his arm because he wears shirts to here and his boss is Jewish, they want you to believe that man when he said his mother sexually molested him. You're going to have to make that decision, whether you believe that. He was 46 years old when he made these decisions.

TR 2291-92. Clearly, in context, the implication was that Purkey's statements concerning sexual molestation were simply more "[g]arbage in, garbage out," rather than having "given up challenging the abuse," as counsel asserted when leaving out the first four quoted lines from his own quotation of this final argument. APP 672.

Counsel may be correct that, even with Dr. Newton's records and testimony, the government would have been "asking the jury to doubt Purkey's accounts of the abuse, whenever those accounts occurred." APP 672. This argument would have been greatly deflated, however, when put in the context of a documented initial report made in seeking mental health treatment from a prison mental health counselor more than 15 years prior to having pending capital charges. This was the information that Dr. Newton could have provided to dispel the picture painted of a self-serving statement made only when Purkey was "facing capital murder charges" and the defense was "looking for bad things in [his] childhood to help use in mitigation." TR 2191-94.

At bottom, counsel did not have a "strategy" pretrial not to interview Dr. Newton and did not have a strategy during sentencing not to present his testimony. Counsel's conduct was deficient because counsel never interviewed Dr. Newton. *See Link v. Luebbers*, 469 F.3d 1197, 1204 (8th Cir. 2006) ("Ordinarily, we consider strategic decisions to be virtually unchallengeable unless they are based on deficient investigation").

**Floyd Bose and Dion Leiker**

Counsel failed to interview Floyd Bose and his daughter, Dion Leiker, who were made known to trial counsel as potential mitigation witnesses well prior to trial. *See, e.g.*, APP 296-297. Bose, a law enforcement officer for 24 years and the former Sheriff in Smith Center, Kansas, would have testified that he met Purkey while Purkey was in prison in the early 1980's. Bose's son had been murdered and Purkey, who did not know them beforehand, contacted the family to provide them with information he had learned that gave the family closure in helping them to understand what had happened. Bose also found Purkey to be very remorseful for his own crimes. APP 298.

As a result of Purkey's assistance to the family, Bose's daughter, Dion Leiker, who also served twelve years in law enforcement, contacted Purkey and developed a friendship with him. She described Purkey as a very compassionate person, who even helped her understand her own grandson's problems after her

54

grandson was sexually molested. She credited Purkey with saving her life in 1983 when he convinced her to escape an extremely violent marriage in which she was being abused weekly. APP 299-300.

Despite having no notes and no time records supporting his current account of events,[19] counsel declared before the District Court that he had "various opportunities to talk to Dion" about Purkey's assistance to her and her father "in their attempt to sort out the death in prison of Floyd's son, Dion's brother."[20] APP 673. Counsel purported a strategy for not presenting their testimony, which included counsel's desire to prohibit revelation that Purkey "had asked for" financial assistance in exchange for his information, which was "possibly false." APP 675.

Counsel's professed "strategy" is contradicted by the other available evidence. First and foremost, Ms. Leiker, a former law enforcement officer, is adamant that counsel never talked to her. APP 830. Second, as is clear from Ms. Leiker's initial declaration, and her second declaration in response to

---

[19]It should be noted that Purkey's counsel turned over no notes whatsoever to the undersigned counsel, which is again consistent with his practices in *Sinisterra*, where he also turned over no trial notes to 2255 counsel. *See generally Sinisterra v. United States*, 600 F.3d 900 (8th Cir. 2010) (remanding for evidentiary hearing on the question of ineffective assistance of counsel in failing to adequately prepare and present mitigation evidence).

[20]Counsel also asserted that he "obtained what records [he] could about the matter," APP 673, but there are none in counsel's file and no indication of any attempt to obtain such records in notes or time records.

counsel's allegations, her brother was *not* killed in prison. APP 299, 830. He was killed outside of prison, and Purkey only heard about it later. In addition, as Ms. Leiker stated, "His murder had nothing to do with a 'conspiracy which involved inmates, prison officials or government officials.'" Finally, as is clear from both Ms. Leiker's declaration and Mr. Bose's second declaration in response to counsel's allegations, APP 830-831,[21] Duane Bose was Purkey's friend, and Purkey never asked for any financial assistance from them in exchange for the information provided or otherwise. Thus, all of counsel's purported reasons again fold in the face of other evidence and information and stand starkly as after-the-fact declarations rationalizing counsel's failures in the pretrial investigation.

**Peggy and Evette Noe**

Counsel failed to interview Margaret Ann Noe ("Peggy") and her daughter, Evette Noe ("Evette"). Peggy was listed as Purkey's common law wife in Wichita Police Records from April 4, 1974. Counsel possessed these records but did not interview Peggy.

If counsel had interviewed her, he would have learned that Peggy has known Purkey since the second grade. They attended the same small school together and were friends outside of school. She knew he went to special

---

[21]Mr. Bose's initial declaration was attached as Exhibit 20 to 2255 Doc. 47 – APP 298.

classes every day after school for his stuttering problem. She was also aware at the time it was happening that he was physically abused by his parents and that they were alcoholics. When Purkey was only 16 or 17 years old, he confided in Peggy the information that his mother was sexually abusing him and had been doing so for a long time. While it was difficult for him to talk about it and stuttered badly when he did, he told Peggy that his mother forced him to have sex with her and made him do other things to her sexually to stimulate her. Peggy was also aware that after Purkey's grandmother died, his mother lived with her step-father "like husband and wife" and clearly had a sexual relationship with him. Peggy even observed Purkey's step-grandfather threaten Purkey with a shotgun when he confronted them asserting that their actions were wrong. APP 513.

Peggy also had many very positive things to say about Purkey, as she remained in contact with him over the years. Her daughter, Evette Noe, who was born in 1973, also had very good things to say about Purkey, including that he has been like a father to her. She has known him since she was a child. She started writing to him in prison when she was nine years old, and she still writes to him. She tried to contact trial counsel a number of times prior to Purkey's capital trial. He never returned her calls. APP 515. This is simply unforgivable, deficient conduct. *See, e.g.*, *Williams v. Taylor,* 529 U.S. at 396

("Counsel failed even to return the phone call of a certified public accountant who had offered to testify" in mitigation).

Again with no notes or time records reflecting any contact with these witnesses, counsel asserted before the District Court that he "did speak, prior to trial, certainly with Peggy, and possibly with Evette." APP 676. Both of these women adamantly denied that counsel ever talked to them. Indeed, Peggy characterized counsel's statement that he talked to her as "an out and out lie." Evette declared that she attempted to call counsel but her calls were never returned. APP 832-833.

Counsel went further in his assertion that Dr. Peterson considered the information from Peggy, even though there is absolutely no reference to it in Dr. Peterson's reports, his testimony, or anywhere else that counsel can point to.

Finally, as with Dr. Newton, counsel asserted that the Government never asserted "that Purkey had recently made up the story about the sexual abuse in order to avoid the death penalty." APP 677. This "reason" has already been addressed and the argument will not be repeated here.

**Other Family Members and Associates**

With respect to Angie Genail, Purkey's daughter, counsel stated that he met with her in person three times to prepare her testimony, which in the end

58

was "powerful" from his perspective.[22]  APP 661-662.  Notably, counsel did not dispute the allegation that his first in-person contact with Ms. Genail was to show up at her wedding to attempt to interview her and her mother.  APP 819. Ms. Genail clearly disputed counsel's recollection about his contacts with her. APP 819.[23]

> As Mr. O'Brien observed:
>
> A competent interviewer will also be sensitive to other distractions that may erect barriers to disclosure of sensitive information. Showing up at a wedding, for example, and expecting to conduct meaningful interviews of family, friends and members of the wedding party is not likely to produce meaningful information.

APP 817-818.

Counsel's lack of attentiveness to the interviewing and preparation of Purkey's family members is also reflected in the declarations of Purkey's cousin, Debbie Prothero – APP 822-824, and his aunt, Marguerite Hotchkiss. APP 826-828.  Counsel cited as reasons not to call Ms. Prothero as a witness "that she had little or no recollection of or prior relationship with Wes and that

---

[22] According to Genail, counsel failed to advise her of the scope of possible mitigation.  Thus, Genail did not include in her testimony reference to the many "inspirational and encouraging poems, stories and letters" that Purkey has provided to her and her children continuously.  APP 819.

[23] Notably, counsel's vouchers submitted to the District Court for payment reflect only one in-person meeting with Ms. Genail long before the trial and one brief consultation with her when the sentencing proceeding was already on-going.  This is far more consistent with Ms. Genail's recollection than counsel's.

she was personally very much in favor of the death penalty," APP 662, "and was in no way opposed to Wes receiving the death penalty in this case." APP 663, n.6. Ms. Prothero, on the other hand, cited as "absolutely wrong," counsel's recollection that she was not opposed to Purkey receiving the death penalty. APP 822. She also cited her willingness to testify on his behalf and provided the substance of the testimony that she could have given. APP 823-824.[24]

While Purkey's aunt, Marguerite Hotchkiss did testify by teleconference,[25] she stated that she only spoke to counsel by telephone and was never prepared to testify. The substance of her testimony was also hampered by the circumstances of her testimony, where she was alone in a room looking at a screen where she could only see counsel from the neck down. By her own description, the circumstances were "uncomfortable and frustrating" and she was "appalled." APP 827. Ms. Hotchkiss also provided the additional substantive information that she could have included in her testimony. *Id.*

Counsel also failed to call Sam Hoffmeier, a volunteer prison minister, as

---

[24]Her husband, Russ Prothero, also provided the substance of the testimony that he could have given. APP 825.

[25]Counsel stated that Ms. Hotchkiss was "adamant" that she not testify in person because of "emotional problems over the case itself and her perceived difficulties related to travel." APP 663. Ms. Hotchkiss, however, disputed these statements and explained that she was unable to testify in person because "her health had deteriorated by the time of Wes' trial." APP 826.

a mitigation witness.  Counsel stated that he did not call Hoffmeier to testify as a character witness because "Hoffmeier did not deal with Purkey in the segregation pod."  APP 642.  This simply was not true because Mr. Hoffmeier's "only dealings" with Purkey "was in the segregation unit" or "segregation pod."  APP 829.  Mr. Hoffmeier would have testified consistent with his initial declaration.  APP 426.  Thus, he would have provided good character evidence at least as significant as some of the evidence discussed in *Williams v. Taylor*, *supra*, such as a "certified public accountant" who could have testified based on his visits with the defendant "as part of a prison ministry program."

**Prejudice**

"The jury was called upon to determine whether a man whom they did not know would live or die."  *Collier v. Turpin*, 177 F.3d 1184, 1204 (11th Cir. 1999).  Although counsel did present mitigation evidence through retained mental health experts, Purkey was prejudiced by not having disinterested, lay witnesses, such as Dr. Newton, Mr. Bose, and Ms. Leiker, in particular, testify on his behalf.  The jury should have "heard first-hand accounts" and "personal testimony" from these witnesses in support of the expert testimony.  *Powell v. Collins*, 332 F.3d 376, 400 (6th Cir. 2003).  These witnesses could have provided the testimony that "would have humanized" Purkey for the jury.  *Williams v. Anderson*, 460 F.3d 789, 805 (6th Cir. 2006).

The testimony of these witnesses also would have provided substantial support for Dr. Cunningham's testimony rebutting the government's assertion of future dangerousness. In addition, the testimony of Peggy Noe and Dr. Newton was also relevant corroborating information that would have supported Dr. Peterson's testimony and established that Purkey did not just "make up" the report of sexual abuse in order to escape the death penalty. In short, their testimony would have "corroborated [Dr. Peterson's] testimony and bolstered the credibility of his response to the prosecution," *Hovey v. Ayers*, 458 F.3d 892, 926 (9th Cir. 2006), who attacked him and Purkey by essentially asserting that Purkey had recently fabricated an allegation that his mother had sexually abused him. With respect to Dr. Newton, in particular, his testimony "coming as it did from [a] doctor[] who had no connection to the defense or incentive to invent a diagnosis and thus who [was] invulnerable to charges of fabrication, could very well have made the difference in a life as opposed to death verdict." *Id.* at 927.

The overall prejudice is clear because the available, but unpresented mitigation evidence was not simply "'new' evidence [that] largely duplicated the mitigation at trial." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1409 (2011). Even without this evidence, the jury spent approximately eleven hours in sentencing deliberations before reaching a verdict. If all of the available mitigating

evidence had been presented, "there is a reasonable probability that at least one juror would have struck a difference balance."  *Wiggins*, 539 U.S. at 537.

### (b)  Failure to Adequately Prepare and Present the Testimony of Stephen Peterson, M.D.

Dr. Stephen Peterson, a forensic psychiatrist retained by counsel, testified in sentencing.  He detailed Purkey's report of sexual abuse by his mother in his report prepared in April 2000 in connection with Purkey's prior murder conviction in Kansas.  APP 301-353.  He also noted in his August 2003 report prepared in connection with this case that Purkey's prior report of the sexual abuse to Dr. Newton was documented in the Oregon Department of Corrections records.  APP 354-418.

During sentencing, Dr. Peterson testified only generally that Purkey was "severely sexually and physically and emotionally abused in childhood" and he "developed abnormal psychosexual ideas."  TR 1748.  The only detail he included in his testimony was that Purkey had reported pervasive sexual abuse by his mother from age six to 14 and he witnessed her sexual involvement with her boyfriends after his father left.  TR 1750.  He also mentioned Purkey's father paying for prostitutes for him at a young age and how each of these things resulted in Purkey having substantial difficulties with "emotional detachment" to women.  TR 1750.  He also mentioned Purkey's prior diagnosis of "psychosexual problems of identification."  TR 1752.

During cross-examination, however, Dr. Peterson "admitted" that the only prior report of sexual contact with his mother was her 1972 report that Purkey allegedly raped her.[26] TR 1817. He also testified on cross that he was the only one Purkey told about sexual abuse in detail because he was the only one to ask. TR 1824. At the time, he was not aware, of course, that Purkey had provided some of this information to Peggy Noe 20 years before or that Purkey had also provided detailed information on this topic to Dr. Cunningham.

Dr. Peterson was aware, however, but had simply forgotten that the Oregon Department of Corrections Records reflected Purkey's prior report of being sexually abused as a child. Nonetheless, counsel failed to even point out those records in redirect or to even direct him to his own report, which referenced in detail the prior Oregon reports. APP 354-418.

In short, counsel failed to prepare Dr. Peterson to testify about the details of the sexual abuse he was aware of; to provide him with the information concerning the details of the sexual abuse Dr. Cunningham was aware of; to develop the additional information that Dr. Newton and Peggy Noe could have provided; or even to correct the false perception created during cross-

---

[26] Purkey was never charged with this alleged offense because law enforcement officers reported that Mrs. Purkey was intoxicated and appeared to have mental problems, the examining doctor found no evidence of sexual assault, and Mrs. Purkey's aunt, who lived in the home, reported that Purkey was not even present in the home at the time of the alleged rape.

examination.

As addressed, the prior records and information from Dr. Newton and Noe "would have strengthened" and "confirmed" Dr. Peterson's opinion that Purkey had, in fact, been sexually abused by his mother and that he was not simply fabricating an allegation in order to avoid the death penalty. *See, e.g., Hovey*, 458 F.3d at 926.

Dr. Peterson also should have been prepared and questioned on the stand by counsel concerning the details of the horrid abuse Purkey endured from his mother rather than just the "conclusional testimony" that Purkey was sexually abused. *Lewis v. Drake*, 355 F.3d 364, 368 (5th Cir. 2003). This was "wholly inadequate to present to the jury a true picture of the tortured childhood" Purkey experienced. *Id.* at 369.

The prejudice is especially clear "[w]here, as here, the very matter as to which defense counsel has been ineffective becomes one of the linchpins of the prosecutor's closing." *Commonwealth v. Alvarez*, 740 N.E.2d 610, 618 (Mass. 2000). Here, because counsel did not adequately prepare Dr. Peterson beforehand or redirect him after the very damaging cross, government counsel was free to argue (without objection or contradiction by defense counsel) that Dr. Peterson's "findings were a fairy tale" and that the evidence of Purkey's horrible childhood was simply "the old abuse excuse." TR 2267-68. If counsel

had performed adequately, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

### (c) Failure to adequately prepare and present the expert testimony of Mark Cunningham, Ph.D.

Dr. Cunningham, a forensic psychologist, was retained by counsel to rebut the government's allegations of future dangerousness and to address other matters. In his interviews of Purkey, Dr. Cunningham was provided with details about the sexual abuse of Purkey by his mother. Specifically, Dr. Cunningham had learned and was prepared to testify, based on information provided to him by Purkey, that Purkey had been exposed to such things as his parents having sexual intercourse with the door open, seeing his father walk around naked with a partial erection, and seeing his mother frequently in only a negligee. After his parents separated, he had also observed his mother having sexual intercourse with another man.

Dr. Cunningham was also prepared to testify about the details of the sexual abuse by Purkey's mother because he believed it was very important in providing mitigating information to a jury to provide the actual details of events rather than simply putting a label on it such as "sexual abuse." APP 227. He could have testified that, when Purkey was only eight, his mother was

66

inappropriately touching his genitalia. APP 227-228. After she separated from her husband, she would have him sleep with her and manually stimulate her sexually or penetrate her with the handle of a hairbrush. APP 227. She would also have him rub lotion on her breasts and genitalia. APP 227-228. As he grew older, she had him to perform cunnilingus on her, and she would manually stimulate him to orgasm. APP 228. Ultimately, she sporadically engaged him in sexual intercourse. APP 228.

Dr. Cunningham had prepared slides, which were discussed with counsel in preparation for his testimony. APP 225-235. When he took the witness stand, Dr. Cunningham understood that he would be testifying about the details of "the sexual abuse of Mr. Purkey and his exposure to other sexual traumas as a child." APP 225-235. But counsel did not question him about these details, and Dr. Cunningham believed "this was a significant omission because this was important mitigating information in its own right but was also important in understanding Mr. Purkey's mental makeup." APP 228.

Like Dr. Peterson, Dr. Cunningham testified only generically about Purkey's mother's promiscuous behavior. TR 1858. He also testified generically that she sexually abused him for years and that he had also been abused by an older male several times. TR 1865.

Counsel's conduct was deficient in failing to adequately prepare Dr.

Cunningham to testify concerning the details of the sexual abuse he was aware of, failing to develop the additional information that Dr. Newton and Peggy Noe could have provided, and failing even to ask the questions of Dr. Cunningham to elicit the information about which he was prepared to testify to in accordance with the slides he had prepared. APP 225-235.

Counsel did not base his conduct on any reasonable strategic or tactical decision. Dr. Cunningham's intent to testify to these details is clear from his slides. APP 229-235. Thus, counsel failed to ask the appropriate questions, perhaps, because of his failure to prepare or refer to notes while he examines witnesses in court. APP 124. Just as with Dr. Peterson, counsel's failure to adequately present the available evidence was prejudicial.

### (d) Failure to adequately prepare and present the expert testimony of Bruce Leeson, Ph.D.

During sentencing, one of the expert witnesses presented by counsel was Bruce Leeson, Ph.D., who testified on the basis of neuropsychological testing that Purkey suffers from frontal and temporal lobe dysfunction. During cross-examination, however, it became apparent that he had not been provided with sufficient information and/or had not been adequately prepared by defense counsel for the government's cross examination. Specifically, Dr. Leeson was not aware that Purkey had completed some college courses or that he was "a jailhouse lawyer." TR 1616. He also was not aware of neurological

68

examinations of Purkey following head injuries in car accidents, even though Dr. Leeson had referred to these head injuries as a possible source of neurological dysfunction. He was also unaware of other prior expert reports that formed the basis for government cross-examination. TR 1626-31.

Counsel's conduct was deficient in failing to provide Dr. Leeson with sufficient records and failing to adequately prepare him for cross-examination. "[W]hen experts are placed on the stand with virtually no preparation or foundation, a capital defendant has not received effective penalty phase assistance of counsel." *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998).

> A defense attorney in the sentencing phase of a capital trial has "a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client[ ] facts that the experts do not request." Regardless of whether a defense expert requests specific information relevant to a defendant's background, it is defense counsel's "duty to seek out such evidence and bring it to the attention of the experts."

*Hovey*, 458 F.3d at 925.

Counsel's conduct was prejudicial because Dr. Leeson's credibility was severely challenged before the jury simply because he had not been adequately prepared to address the prior reports and other information.

> The clear implication of the prosecution's argument was that [Dr. Leeson] was uninformed about the subject of his diagnosis and that his conclusions stemmed from a general misunderstanding of the facts. Even if the background information did not change [his] diagnosis, he at least would have been able to testify more knowledgeably about the case and better weather the prosecution's

attempts to discredit him. He would have been able to anticipate the prosecution's questions during cross-examination and explain [his opinions] . . . . Instead, [he] was caught by surprise, in an embarrassed and vulnerable situation. He was entirely discredited by his lack of critical information, information that lay in the hands of [Purkey's] counsel.

*Hovey*, 458 F.3d at 929. If Dr. Leeson had been adequately prepared and able to explain that his findings of neurological dysfunction, which were an integral part of the defense theme in mitigation, were not rebutted by the information the government used in cross-examination, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different. Brain damage, especially when combined with the influence of drugs, has significant impact on functioning. *Caro v. Woodford*, 280 F.3d 1247, 1258 (9th Cir. 2002) ( Counsel ineffective in capital sentencing for failing to prepare and present evidence of the defendant's brain damage, i.e., "*physiological defects* . . . on his behavior, such as causing him to have impulse discontrol and irrational aggressiveness").

> **(e)** **Failure to adequately investigate and prepare witnesses, which resulted in counsel calling alleged "mitigation" witnesses that were prejudicial.**

Counsel's inattention and lack of preparation for sentencing also manifested itself in counsel's presentation of "mitigation" witnesses that provided information that was more harmful than helpful to Purkey.

Specifically, the very first defense witness was Dr. William Grant, a Bureau of Prisons employee, who testified about the medications he had prescribed for Purkey, but also made it clear that he prescribed these medications based on the recommendation of Dr. Peterson and because Purkey was "on trial for his life" and the medications were not otherwise inappropriate. TR 1410, 1415, 1417. He then testified on cross-examination that while Dr. Peterson reported that Purkey suffered "anxiety" others, presumably himself included, would call it "attitude, belligerent, irritable." He also testified that it "seems to be more acceptable to be anxious than to be irritable, angry and aggressive" and that Purkey has "real anger control problems." TR 1416.

Counsel also called Mark Russell, a counselor at USP-Leavenworth, presumably to testify that it was no "club Fed." On cross-examination, however, Russell acknowledged that Purkey was housed in a unit for inmates that had behavioral problems and were administratively segregated. He also testified that Purkey was the only pretrial detainee there and he was sent because he "was a management problem" and was "demanding." TR 1656. He also testified that he had heard that Purkey has a long history of assaultive behavior in prison. TR 1658.

Counsel's conduct was deficient in failing to adequately interview these witnesses beyond the basic contact before putting them on the witness stand.

71

"[C]ounsel could not have evaluated or weighed the risks and benefits of calling [these witnesses] . . . without so much as asking [them] what [they] would say if called." *Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005). If counsel had done so, it would have been clear that their testimony was not "mitigating" and, in fact, was more harmful than helpful to Purkey. Their testimony was, in fact, prejudicial to Purkey.

### (f) The District Court's ruling.

In ruling on these issues, the district court simply made conclusory findings that Purkey "failed to overcome the presumption that Mr. Duchardt's actions were not sound trial strategy." The court also made conclusory findings that counsel's "actions did not fall below an objective standard of reasonableness," and Purkey could not establish prejudice from counsel's actions or inactions. APP 923.

In analyzing prejudice, this Court must "evaluate the totality of the evidence–'both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding[s].'" *Wiggins*, 539 U.S. at 536 (quoting *Williams*, 529 U.S. at 397-98). The test is not whether the sentencer could have heard all available mitigating evidence and still decided on a death sentence. In other words, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a

preponderance of the evidence to have determined the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Thus, "a defendant need *not* show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693 (emphasis added).

The Court must determine whether the undiscovered "mitigating evidence, taken as a whole, might well have influenced the jury's appraisal" of the defendant's culpability. *Rompilla*, 545 U.S. at 376 (quoting *Wiggins*, 539 U.S. at 538. "Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams*, 529 U.S. at 398. Prejudice is established if "there is a reasonable probability that *at least one juror* would have struck a different balance" but for counsel's errors. *Wiggins*, 539 U.S. at 537 (emphasis added).

The district court relied on the assertion that "no jurors voted for a single mitigating factor," (2255 Doc 89 at 11), based on the evidence counsel presented, to support the logically faulty extension of that assertion – i.e., jurors would, therefore, have necessarily rejected any and all evidence that counsel could have *but did not* prepare and present. This prejudice analysis is faulty in the same fashion as that employed by the state court in *Sears v. Upton*, 130 S. Ct. 3259, 3264 (2010) (the state postconviction court failed to apply the proper

prejudice inquiry in determining that counsel's facially inadequate mitigation investigation did not prejudice the petitioner simply because "*some* mitigation evidence" had been presented).

The District Court simply ignored the significance of the fact that Purkey's jury found that he *did not* pose a future danger (underlying criminal Doc. 487, p. 7).[27] The District Court just adopted the government's argument and assumed, without any support for the assumption that "no jurors voted for a single mitigating factor." This is only an *assumption*, without any factual or legal support offered, because the *fact* is that the Verdict form is simply blank as to any mitigating factor. Given the void in the record – due to the

---

[27] As the Court stated in *United States v. Johnson*, 2010 U.S. Dist. LEXIS 133727, 9-10 (N.D. Ill. Dec. 13, 2010):

> A number of studies suggest that future dangerousness is one of the most [significant] issues, if not the most significant, for juries deciding whether or not to sentence a defendant to death. See, e.g., John H. Blume, et al., *Future Dangerousness in Capital Cases: Always "At Issue"*, 86 Cornell L. Rev. 397, 404 (2001); Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*, 98 Colum. L. Rev. 1538, 1559-60 (1998); Sally Costanzo & Mark Costanzo, *Life or Death Decisions: An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework*, 18 Law & Hum. Behav. 151, 160 (1994) ("[n]early all jurors [surveyed]...offered the observation that the penalty decision hinged on the issue of whether the defendant would pose a continuing threat to society").

(emphasis added).

Government's prior objection,[28] it is just as likely that the form – as to mitigation – was not filled out due to oversight as it is that no juror voted for a single mitigating factor. This presents a one of a kind circumstance, making Purkey's case the only federal capital case in which a death verdict was imposed but the jury simply left the form *blank* as to all mitigating factors. Indeed, after exhaustive research and comprehensive review of federal capital trial verdict forms, counsel have been unable to identify even one other federal death penalty case in which the jury simply recorded no vote at all on any mitigating factor.[29]

Here, Purkey's jury failed to indicate any acknowledgment, let alone *consideration*, of even obvious undisputed evidence in mitigation. For example:

> 18.   The disappearance of Jennifer Long was solved only because Mr. Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing.

---

[28] At trial, the District Court was initially willing to ask the jurors to complete the form, but the Government retorted, "Absolutely no[t]." (TR 2313). As a result, no inquiry was made.

[29] Counsel have, however, identified four federal death-sentenced inmates whose jurors found future dangerousness and recorded a zero vote on all mitigating factors: Brandon Bernard, Len Davis, Jurijus Kadamovas, and Iouri Mikhel. In contrast, the jury did not find future dangerousness in Purkey's case and the Court only assumes, without evidentiary or logical support, that the jury found no mitigating factors.

(underlying-Doc. 484, pp. 33-36; underlying-Doc. 487, pp. 9-16). It is undisputed fact that this crime would not have been solved if Mr. Purkey had not come forward. It is also beyond dispute that this is a mitigating factor. The fact that the jury made no markings whatsoever on this finding or any other mitigating factor, thus, clearly indicates that the jury simply failed to consider and record their votes on these factors. Plainly put, the lack of any acknowledgment of Purkey's mitigating factors makes it impossible to ascertain whether "no juror voted for a single mitigating factor." Thus, there can be no assurance that the jury actually considered the mitigation, let alone that the jury considered it and rejected it. A blank form simply does not permit such a conclusion. *See United States v. Hammer*, 404 F.Supp.2d 676, 801 (M.D. Pa. 2005) ("the jury's defective answers with respect to mitigating factors renders the penalty phase of the trial defective").

In this context, it cannot be said that had the jury heard the full body of mitigating evidence available to trial counsel that there is no reasonable probability that even one juror would have held out for a life verdict.

**II. An evidentiary hearing should have been conducted regarding Purkey's claims of ineffective assistance of counsel**.

On October 16, 2007, Purkey filed his motion to vacate his conviction and death sentence, supporting it with a number of affidavits:

| | |
|---|---|
| Ex. 1 | Declaration of Laura O'Sullivan |
| Ex. 11 | Declaration of Mark Cunningham, Ph.D. |
| Ex. 15 | Declaration of Stephen Peterson, M.D. |
| Ex. 16 | Declaration of Gary Hamilton |
| Ex. 18 | Declaration of Rex Newton, M.D. |
| Ex. 20 | Declaration of Floyd Bose |
| Ex. 21 | Declaration of Dion Leiker |
| Ex. 25 | Declaration of Sam Hoffmeier |

APP 65-426. Mr. Purkey, then, requested an evidentiary hearing. APP 117-118. Six weeks later, Purkey filed his Memorandum of Law in Support of his 2255 motion, attaching additional affidavits:

| | |
|---|---|
| Ex. 26 | Declaration of Cornelius Peoples |
| Ex. 27 | Declaration of Melvin Lister |
| Ex. 28 | Declaration of Margaret Noe |
| Ex. 29 | Declaration of Evette Noe |

APP 427-515. Before responding, the Government obtained an Order from the district court directing Duchardt to prepare an affidavit. APP 531-537, 540-541. After obtaining lengthy extensions to give Duchardt additional time to craft his affidavit, the Government filed its suggestions in opposition on May 20, 2008. APP 544-720. The Government, by and large, simply incorporated the arguments from Duchardt's affidavit. *See*, *e.g.*, APP 587, *citing* APP 646-

683 ("Mr. Duchardt's explanation is very thorough and no further *argument* is necessary") (emphasis added); APP 588, *citing* APP 682-685 ("Mr. Duchardt provides a well-reasoned response to Purkey's allegations that he inadequately prepared defense expert Dr. Leeson to testify at trial…No further *argument* is necessary") (emphasis added); APP 589, *citing* APP 692-695 ("As Mr. Duchardt correctly states in his affidavit, post-conviction counsel for Purkey have not fully and accurately described the trial testimony of Dr. Cunningham").

On September 15, 2008, Purkey filed his (sealed)[30] motion to strike Duchardt's affidavit, attaching several affidavits:

| | |
|---|---|
| Ex. 1 | Emails between 2255 counsel and Duchardt |
| Ex. 2 | Email from Duchardt to AUSA |
| Ex. 3 | Email from 2255 counsel to Duchardt |
| Ex. 4 | Letter from Duchardt to Purkey |
| Ex. 5 | Report of Lawrence Fox |
| Ex. 6 | Declaration of Dion Leiker |
| Ex. 7 | Declaration of Floyd Bose |
| Ex. 8 | Declaration of Debbie Prothero |
| Ex. 9 | Declaration of Margaret Ann Noe |
| Ex. 10 | Declaration of Evette C. Noe |

APP 834-890. Purkey contemporaneously filed his (sealed)[31] reply suggestions in support of his 2255 motion, again, attaching a number of additional affidavits:

---

[30] This motion was filed under seal since Duchardt's affidavit exceeded the scope of waiver and contained privileged information.

| Ex. 1 | Declaration of Jennifer Herndon (12/2/04) (filed in *Sinisterra v. United States*, Case No. 04-cv-8003-GAF (W.D. Mo.) |
| Ex. 2 | Declaration of Jennifer Herndon (10/31/07) (filed in *Sinisterra v. United States*, Case No. 04-cv-8003-GAF (W.D. Mo.) |
| Ex. 4 | Declaration of Sean D. O'Brien, Esq. |
| Ex. 5 | Declaration of Angie Genail |
| Ex. 6 | Declaration of Debbie Prothero (7/23/08) |
| Ex. 7 | Declaration of Debbie Prothero (3/2/08) |
| Ex. 8 | Declaration of Russ Prothero |
| Ex. 9 | Declaration of Marguerite Hotchkiss (7/23/08) |
| Ex. 10 | Declaration of Marguerite Hotchkiss (1/25/08) |
| Ex. 11 | Declaration of Sam Hoffmeier |
| Ex. 12 | Declaration of Dion Leiker |
| Ex. 13 | Declaration of Floyd Bose |
| Ex. 14 | Declaration of Margaret "Peggy" Noe |
| Ex. 15 | Declaration of Evette Noe |

APP 727-833. Purkey renewed his request for an evidentiary hearing, noting that he would be filing a separate request for a hearing by October 15, 2008. APP 783. Purkey filed his separate request for an evidentiary hearing on October 7, 2008. APP 891-902.

### (a) The District Court applied the wrong standard

To dismiss Purkey's motion without an evidentiary hearing, the District Court had to accept the factual allegations in Purkey's 2255 motion as true. After all, § 2255 requires a hearing as follows:

> Unless the motion and *the files and records of the case* conclusively show that the prisoner is entitled to no relief, the

---

[31] This reply was filed under seal for the same reason.

court shall cause notice thereof to be served upon the United States Attorney, grant a prompt hearing thereon....

28 U.S.C. § 2255 (emphasis added); *see also In Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627 (1944) (judgment on the pleadings is only permitted where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is so that no genuine issue remains for trial). The District Court's judgment, however, ignored Purkey's factual allegations and the thirty-one supporting affidavits he had filed. The District Court relied, instead, exclusively on Duchardt's 117-page affidavit. *See* APP 922 ("In response to these allegations, Mr. Duchardt filed a 117-page affidavit, in which he goes into extensive detail to refute movant's claims"); APP 923 ("The Court has reviewed Mr. Duchardt's affidavit, as well as the briefs and arguments presented by counsel and finds that movant has failed to overcome the presumption that Mr. Duchardt's actions were not sound trial strategy").

### (b) Duchardt Attached no Documentation to his 117-page Affidavit

Throughout his 117-page affidavit, Duchardt makes bold – and often self-aggrandizing – assertions of fact that in turn refer vaguely to corroborating documentation. Saying it, however, does not make it so. Without corroborating documentation, such conclusory statements violate FRCP 56(e) and must be ignored by the court. *Dennis v. Osram Sylvania, Inc.*, 549 F.3d

851, 856 (1st Cir. 2008); *Heisler v. Metropolitan Council*, 339 F.3d 622 (8th Cir. 2003).

In *North Dakota State University (NDSU) v. United States*, 255 F.3d 599, 607 (8th Cir. 2001), an IRS audit assessed the university with a deficit in its FICA taxes for "early retirement payments" it had been making to its tenured professors. *Id*. at 602. NDSU paid the deficit and began withholding FICA from its "early retirement payments;" however, it then sought a refund and, ultimately, filed suit to get that refund. *Id*. In reviewing whether NDSU had created an issue of fact on the question of whether some of its administrators should be treated as having tenure so it could avoid summary judgment, this Court observed,

> The only evidence offered to support this factual allegation are bald assertions made in depositions. Although affidavit or deposition testimony is sufficient to create a fact issue for summary judgment purposes, NDSU has *never offered any documentary evidence of the administrators' tenure rights*. "When written documents are relied on, they must be exhibited in full. The statement of the substance of written instruments or of affiant's interpretation of them . . . are not sufficient." *Sprague v. Vogt*, 150 F.2d 795, 800 (8th Cir. 1945).

255 F.3d at 607 (emphasis added); *accord Washington Post Co. v. Keogh*, 365 F.2d 965, 971 (D.C. Cir. 1966) (sworn or certified copies of all documents referenced in affidavit must be attached to enable summary disposition), *citing Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157 (7th Cir. 1963)

(public records); *Allstate Finance Corp. v. Zimmerman*, 296 F.2d 797 (5th Cir. 1961) (other papers).

In *Sprague*, 150 F.2d at 796, the district court granted summary judgment against Sprague relying on answers and affidavits by Vogt, et al. Sprague appealed, arguing that his complaint showed "on its face that it state[d] a claim against defendants upon which relief can be granted." *Id.* This Court agreed, "The statement of the substance of written instruments or of *affiant's interpretation of them* or of mere conclusions of law or restatements of allegations of the pleadings are not sufficient. *Id*. at 800 (emphasis added), *citing* FRCP 56(e) (additional citations omitted).

### (c) Summary judgment was improper

Here, the District Court clearly erred in relying on Duchardt's conclusory affidavit as establishing that no issue of fact existed. *Dennis*, *supra*; *Heisler*, *supra*. Duchardt referenced several pieces of documentary support for his statements: For example, Duchardt stated,

- "I chose Mr. Armstrong for this dual role because of *his extensive experience and training*." APP 612 (emphasis added);

- "Mr. Armstrong had also, during this time, availed himself of *training opportunities* which subsequently served him well in discharging both of these dual roles." APP 612 (emphasis added);

- "On the poisoning issue, I developed and presented to Dr. Peterson the *confirmatory information* about the matter." APP 617 (emphasis added);

- "I believe that *the thorough reports* prepared by those experts served us well as means of discovery for the government and as roadmaps for the bulk of our mitigation presentation." APP 650 (emphasis added);[32]

- "That context was also contained in *others of the records* which we obtained in our investigation, provided to the government in discovery, and ultimately provided to Purkey's current Counsel." APP 666 (emphasis added);

- "that was why it was so important that Dr. Peterson referred in his testimony to the *reports in the records* from two persons directly familiar with the abuse, Wes' deceased Aunt and Wes' brother Gary." APP 673 (emphasis added);

- "I knew that the government would easily be able to counter Wes' account with the contrary results of *the official investigation*." APP 675 (emphasis added);

- "While I was not sure the government was aware of this, I knew that it would not be difficult for the government to obtain *institutional financial records*, or to simply ask the questions directly of Dion and Floyd." APP 676 (emphasis added);

- "I decided, independently from [Purkey], not to pursue using Peggy and Evette as witnesses, and that my reasoning was based on things contained *in the materials* we obtained." APP 677 (emphasis added);[33]

- "I still have *that videotape* should the Court wish to review it." APP 715 (emphasis added);

---

[32] Duchardt's notation that he had released his file to 2255 counsel lacks any claim that he requested copies of these, or any other documents, to be provided back to him. APP 650, n. 2. Indeed, his subsequent disclosure that he had withheld other portions of his file from 2255 counsel makes this gratuitous implication ring hollow.

[33] Again, Duchardt made no claim that 2255 counsel rebuffed a request from him for copies of these or any other records from the file he transferred to them.

- I did not ask for Dr. Peterson to complete *another affidavit* in these regards, but I can if the Court wishes." APP 688 (emphasis added);

- "If the Court would like, I can provide a copy of *the allocution point which was contained in the original brief* tendered to the Court of Appeals." APP 704 (emphasis added).

Notably, neither Duchardt nor the Government provided any documentary support for any of these bald assertions. *See* District Court Local Rule 56.1(a) ("Where facts referred to are contained in another document, such as a deposition, interrogatory answer or admission, a copy of the relevant excerpt from the document shall be attached."). A fair inference to be drawn from this failure is that no such documentation exists. Duchardt's 117-page affidavit cannot establish a basis for summary judgment against Purkey. It could only establish the need for an evidentiary hearing. *See Machibroda v. United States*, 368 U.S. 487, 494-95 (1962).

### (d) An evidentiary hearing must be held

Although Purkey bore the burden to establish his right to a hearing, that burden is "relatively light...and is *significantly lower* than his burden to show he is entitled to § 2255 relief." *Valentine v. United States*, 488 F.3d 325, 333-34 (6th Cir. 2007) (emphasis added); *accord Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999). The Rules Governing § 2255 Proceedings illustrate that the rules are intended to incorporate the standards governing evidentiary hearings

in *habeas corpus* cases that was articulated by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 312 (1963). *See* Advisory Committee Notes to Rule 8, Rules Governing § 2255 Proceedings (incorporating Advisory Committee Notes to Rule 8, Rules Governing § 2254 Cases).[34] There, the Supreme Court held that an evidentiary hearing must be granted:

> *Where the facts are in dispute*, the federal court in *habeas corpus* must hold an evidentiary hearing if the *habeas* applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding.

372 U.S. at 312 (emphasis added). As the *Townsend* court further explained, the movant must also demonstrate that the facts alleged, if true, would entitle him to relief. 372 U.S. at 312. The *Townsend* court then identified six circumstances under which a federal court *must* grant an evidentiary hearing:

> If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the factfinding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

372 U.S. at 313.

---

[34] "The standards for § 2255 hearings are essentially the same as for evidentiary hearings under a *habeas* petition, except that the previous federal fact-finding proceeding is in issue [in determining whether a hearing is necessary] rather than the state's." Advisory Committee Notes to Rule 8 of the Rules Governing § 2255 Proceedings.

In 2255 cases like this, of course, there is no prior *habeas* proceeding in which an evidentiary hearing could have been conducted on the movant's claims. Thus, the 2255 proceeding is the only vehicle through which a factual record may be made. Thus, an evidentiary hearing must be held when (1) the facts are in dispute and cannot be conclusively resolved on the basis of the extant record alone and (2) those facts, if true, would entitle the movant to relief. "[A] petitioner need only *allege* – not prove – reasonably specific, non-conclusory facts . . . ." *Aron v. United States*, 291 F.3d 708, 715 n.6 (11th Cir. 2002). Thus, "[i]f the allegations are not affirmatively contradicted by the record and the claims are not patently frivolous, the district court is required to hold an evidentiary hearing." *Id.*

Here, Purkey made copious allegations of ineffectiveness which are specific, not conclusory and not conclusively refuted by the record and which, if true, entitle him to relief from his conviction and death sentence. *See* APP 65-515 727-833. Such claims necessarily involve events well outside the files and records before the court; thus, the files and records almost never establish – conclusively or otherwise – that relief would not be warranted. *See Shaw v. United States,* 24 F.3d 1040 (8th Cir. 1994); *accord, Nelson v. United States*, 297 Fed. Appx. 563, 2008 U.S. App. LEXIS 22338 (8th Cir. Oct. 27, 2008) (remanded because evidentiary hearing was required on several claims of

ineffective assistance) (Attached per FRAP 32.1); *Koskela v. United States*, 235 F.3d 1148, 1149 (8th Cir. 2001) (remanded because evidentiary hearing was required on claim of ineffective assistance in failing to call certain witnesses).[35] Many of Purkey's allegations involve activity outside the courtroom, and, thus, the record sheds absolutely no light on them. The Supreme Court has concluded that, where movant's allegations relate to events "outside the courtroom and upon which the record could, therefore, cast no real light," a hearing must be granted. *Machibroda v. United States*, 368 U.S. 487, 494-95 (1962).

*Machibroda* is cited in Rule 5 of the Rules Governing § 2255 Proceedings:

> Numerous cases have held that the government's answer and affidavits are not conclusive against the movant, and *if they raise disputed issues of fact a hearing must be held. Machibroda v.*

---

[35] *See also Smith v. United States*, 182 F.3d 1023 (8th Cir. 1999) (remanded because evidentiary hearing was required regarding prisoner's ineffective assistance of counsel claim); *Latorre v. United States*, 193 F.3d 1035 (8th Cir. 1999) (remanded because evidentiary hearing was required because the record was inconclusive on movant's claim); *Shaw v. United States*, 24 F.3d 1040 (8th Cir. 1994) (remanded because evidentiary hearing was required because the claim of ineffective assistance was not "inadequate on its face"); *Neary v. United States*, 998 F.2d 563 (8th Cir. 1993) (remanded because evidentiary hearing was required on claim of ineffective assistance); *United States v. Unger*, 665 F.2d 251 (8th Cir. 1981) (remanded because evidentiary hearing was required on claim of ineffective assistance not refuted by the record); *Rose v. United States*, 513 F.2d 1251 (8th Cir. 1975) (remanded because evidentiary hearing was required on movant's claim that he was incompetent at the time of his guilty plea).

*United States*, 368 U.S. 487, 494, 495 (1962); *United States v. Salerno*, 290 F.2d 105, 106 (2nd Cir.1961); *Romero v. United States*, 327 F.2d 711, 712 (5th Cir.1964); *Scott v. United States*, 349 F.2d 641, 642, 643 (6th Cir.1965); *Schiebelhut v. United States*, 357 F.2d 743, 745 (6th Cir.1966); and *Del Piano v. United States*, 362 F.2d 931, 932, 933 (3rd Cir.1966).

Advisory Committee Notes to Rule 5, Rules Governing Section 2255 Cases (emphasis added). Indeed,

> "[a]n opposing affidavit by the Government is not part of 'the files and records of the case' which can be taken to 'conclusively show that the prisoner is entitled to no relief,' within 28 U.S.C. § 2255. The principle was established by the Supreme Court as long ago as *Walker v. Johnston*, 312 U.S. 275 (1941)..."It is true that they (appellant's allegations) are denied in the (government) affidavits filed with the return to the rule, but the denials only serve to make the issues which must be resolved by evidence taken in the usual way. They can have no other office. The witnesses who made them must be subjected to examination Ore tenus or by deposition as are all other witnesses."

*Lindhorst v. United States*, 585 F.2d 361, 365 (8th Cir. 1981), *quoting Walker*, 312 U.S. at 286-87. Here, the record and files from the underlying criminal case do not conclusively refute Purkey's 2255 claims; indeed, as with most ineffective assistance claims, the record does not even speak to Purkey's claims let alone refute them. While it is true that the Government and Duchardt have both strenuously denied Purkey's allegations, APP 544-720, those denials serve only to demand a hearing where the claims may be resolved by evidence taken in the usual manner.

The numerous facts stated in the copious affidavits filed by Purkey and the one contrary affidavit provided by Duchardt for the Government cannot be resolved without taking testimony. *See*, *e.g.*, *Watson v. United States*, 493 F.3d 960 (8th Cir. 2007) (remanded because evidentiary hearing was required before court could decide credibility questions). The District Court's judgment, however, purports, without factual or legal basis, to do just that, holding,

> The Court finds that no hearing is necessary in this case, because even if movant's allegations are true, and Mr. Duchardt was ineffective for failing to call certain witnesses or to present a more complete mitigation case, movant would not be entitled to relief. As noted above, of the twenty-seven mitigating factors which were presented to the jury, no jurors voted for a single mitigating factor.[36] So, even if movant's counsel had called different or additional witnesses or introduced more or additional mental health or evidence relating to his abuse as a child and young adult, it is unlikely that the jury would have considered this mitigating evidence or that they would have sentenced movant to life in prison.

APP 930. Certainly, a hearing can be denied when it can be conclusively shown that taking the allegations of ineffectiveness as true no prejudice resulted from the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 697 (1984). Such a conclusive showing cannot be made here; indeed, the District Court did not find as much. It simply found that "it is unlikely that the jury *would have considered* this mitigating evidence . . .." APP 930 (emphasis

---

[36] Actually, the reasonable inference is that no juror voted on any mitigating factor at all, as they recorded no voting of any kind – not simply that "0" jurors voted for any factor.

added).  First, it is a juror's obligation to *consider* mitigating evidence.  *See Eddings* v. *Oklahoma*, 455 U.S. 104, 112 (1982) (the Eighth Amendment require jurors to give full effect to mitigating evidence).  Further, the Government's case in aggravation may have been strong, but it was far from being "so overwhelming as to preclude the possibility of a life sentence." *Hovey v. Ayers*, 458 F.3d 892, 930 (9th Cir. 2006).  "Heinous crimes do not make mitigating evidence irrelevant." *Id.*  Here, Purkey's jury found that he *did not pose a future danger*.  (underlying-Doc. 487, p. 7).

The competing affidavits filed in this case clearly establish a "question of fact."  *West v. United States,* 994 F.2d 510 (8th Cir. 1993) (remanded for evidentiary hearing because movant's allegations were sufficient to make a "question of fact").

In *Machibroda, supra*, the movant submitted an affidavit claiming that

- on three separate occasions, the Assistant U.S. Attorney (AUSA) had promised him that, if he pleaded guilty, he would receive a sentence of not more than twenty years;

- the AUSA cautioned him not to tell his defense lawyer about the offer or the AUSA would raise two other previously uncharged robberies; and

- the movant had sent letters to both the AUSA and the sentencing court regarding the misrepresentations of the AUSA, to which the movant had received no reply.

*Machibroda, supra* at 489-490. The AUSA responded with a competing affidavit denying any promises or coercion with respect to the movant's plea, but admitting having spoken with the movant in the county jail the day before the co-defendant's trial, and having told the movant that this was his last opportunity to tell the truth, and that the sentencing court might well take into consideration the movant's refusal to talk. *Id.* at 491-492.

The district judge decided, *without a hearing*, that the movant's allegations were false, observing that the court had received no letters from the movant mentioning any alleged agreement with the AUSA and that the movant had not complained in a timely manner when no request was forthcoming by the AUSA for a reduction of sentence. *Id.* at 492-493. The Supreme Court *reversed*, holding:

> This was not a case where the issues raised by the motion were conclusively determined either by the motion itself or by the "files and records" in the trial court. The factual allegations contained in the Appellant's motion and affidavit, and put in issue by the affidavit filed with the Government's response, related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light. Nor were the circumstances alleged of a kind that the District Judge could completely resolve by drawing upon his own personal knowledge or recollection.

368 U.S. at 494-495. The Court rejected the Government's argument that a hearing in the case would be futile because of the apparent lack of any other

witnesses to the alleged occurrences, other than the movant himself and the

AUSA:

> The petitioner's motion and affidavit contain charges which are detailed and specific. It is not unreasonable to suppose that many of the material allegations can either be corroborated or disproved by the visitors' records of the county jail where the petitioner was confined, the mail records of the penitentiary to which he was sent, and other such sources. *Not by the pleadings and the affidavits, but by the whole of the testimony, must it be determined whether the petitioner has carried his burden of proof and shown his right to a discharge.* The Government's contention that his allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence. On this record it is his right to be heard.

368 U.S. at 495 (emphasis added) (citation and quotation marks omitted).  The

*Machibroda* court further held that the specific and detailed factual assertions

by the movant in that case, "while improbable, cannot at this juncture be said to

incredible. If the allegations are true, the [movant] is clearly entitled to relief.

Accordingly, we think the function of [§ 2255] can be served in this case only

by affording the hearing which its provisions require."  368 U.S. at 496.

Here, Purkey raised copious claims that the trial record and Duchardt's

affidavit do not refute, and which, if true, demand relief.  Through numerous

affidavits, Purkey's witnesses uniformly contradict the facts asserted by

Duchardt's affidavit.  These contradictions cannot be rectified without a

hearing.  Where evidence outside the trial record contradicts the

constitutionality of the judgment and sentence, "the function of 28 U. S. C. §

2255 can be served...only by affording the hearing which its provisions require." *Machibroda*, 368 U.S. at 496. The District Court could not determine whether to believe Purkey's witnesses or Duchardt's denials without hearing from the witnesses themselves.

In *Watson*, 493 F.3d at 962, the movant alleged that he was denied effective assistance of counsel when his counsel failed to file a notice of appeal as Watson had directed. The district court denied his claim *without an evidentiary hearing*, but this Court reversed, noting

> There is no evidence in the record to contradict Watson's assertion that he requested an appeal. Although the district court was not required to credit Watson's assertion, (citation omitted), *it was required to hold a hearing before making factual determinations about Watson's credibility*.

*Id.* at 964; (emphasis added); *accord Koskela v. United States*, 235 F.3d 1148, 1149 (8th Cir. 2001); *Machibroda*, *supra*. Likewise, there is no evidence in the record to contradict Purkey's post-conviction claims that trial counsel rendered ineffective assistance. There are allegations and there are denials, but the District Court could not determine which to credit without hearing the witnesses testify, observing their demeanor, and making credibility determinations. Indeed, Purkey's evidence must be believed, and all justifiable inferences are to be drawn in his favor before an evidentiary hearing can be denied. *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456 (1992), *citing*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In *Koskela,* 235 F.3d at 1149, the district court denied the 2255 motion *without an evidentiary hearing*, finding that "the [movant's supporting] affidavits lacked credibility in the face of the government's pleadings and affidavits, and in any event did not undermine the Court's confidence in the trial outcome." This Court reversed, holding, "Because the record before the District Court contained sharply conflicting evidence, the Court abused its discretion in finding a hearing unnecessary." *Id.* The District Court, here, was likewise confronted with "sharply conflicting" assertions and denials, and an evidentiary hearing was the only means of resolving those conflicts.

It is "uncontroversial...that the privilege of *habeas corpus* entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Boumediene v. Bush*, 553 U.S. 723, 779 (2008), *quoting I.N.S. v. St. Cyr*, 533 U.S. 289, 302 (2001). "Congress has recognized that federal *habeas corpus* has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty." *McFarland v. Scott*, 512 U.S. 849, 859 (1994). In order for the Writ to serve this vital function, a petitioner such as Purkey "is entitled to careful consideration and plenary processing of [his

claim, including full opportunity for presentation of the relevant facts." *Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977). Indeed, Purkey's claims are not "so 'palpably incredible,' so 'patently frivolous or false,' as to warrant summary dismissal." *Id*. at 76 (quoting *Pennsylvania ex rel. Herman v. Claudy*, 350 U.S. 116, 119 (1965)).

In refusing even to hear evidence, the District Court misapplied three critical principles. First, the "reasonable probability of a different result," has a unique importance in the capital context. The sentencing phase is "the most critical phase of a death penalty case." *Smith v. Mullin*, 379 F.3d 919, 939 (10th Cir. 2004) (quoting *Romano v. Gibson*, 239 F.3d 1156, 1180 (10th Cir. 2002)). It is then that "the jury is called upon to make a 'highly subjective, unique, *individualized* judgment regarding the punishment that a particular person deserves,'" *Turner v. Murray*, 476 U.S. 28, 33 (1986) (emphasis added) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 340 n.7 (1985)). In the federal death penalty scheme, a non-unanimous jury in sentencing spares the defendant's life. *See* 18 U.S.C.S. § 3591 et seq. In *Wiggins v. Smith*, 539 U.S. 510, 536 (2003), the Court noted that in this type of death penalty scheme, confidence in the outcome is undermined where there is "a reasonable probability that *at least one juror* would have struck a different balance." (emphasis added).

A § 2255 movant "faces a relatively low burden" in establishing the right to a hearing since "it only takes one juror to nix a death sentence." *United States v. Johnson*, 2010 U.S. Dist. LEXIS 133727,[37] 9-10 (N.D. IL December 13, 2010) (*Johnson II*) (quoting *United States v. Johnson*, 223 F.3d 665, 670 (7th Cir. 2000) (*Johnson I*). In *Johnson II*, the movant argued that trial counsel had been ineffective in not presenting evidence that the

> Federal Bureau of Prisons is empowered to classify a prisoner serving a life sentence without possibility of release to the highest security level federal prison, under conditions of confinement that eliminate any reasonable probability that the prisoner will be a continuing and serious threat to society.

2010 U.S. Dist. LEXIS 133727, 10-11. In vacating Johnson's death sentence, the district court observed that

> [a] number of studies suggest that *future dangerousness is one of the most [significant] issues, if not the most significant, for juries deciding whether or not to sentence a defendant to death. See, e.g.*, John H. Blume, et al., *Future Dangerousness in Capital Cases: Always "At Issue"*, 86 Cornell L. Rev. 397, 404 (2001); Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*, 98 Colum. L. Rev. 1538, 1559-60 (1998); Sally Costanzo & Mark Costanzo, *Life or Death Decisions: An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework*, 18 Law & Hum. Behav. 151, 160 (1994) ("[n]early all jurors [surveyed]...offered the observation that the penalty decision hinged on the issue of whether the defendant would pose a continuing threat to society").

2010 U.S. Dist. LEXIS 133727, 9-10 (emphasis added).

---

[37] There remains no Federal Supplement citation.

Here, it cannot be overstated that Purkey's jury found that he *did not* pose a future danger (underlying-Doc. 487, p. 7). Capital juries give almost over-riding significance to its finding with regard to the defendant's future dangerousness.[38] Thus, it cannot be that there is no reasonable probability that the mitigating evidence that Purkey's jury did not hear could not have caused even one juror to opt for life, rather than death.

Second, to prove that his attorneys' deficient performance at trial prejudiced him, Purkey does not even have to prove that but for that deficient performance one such juror *would have* voted to spare his life; only that there is a "reasonable probability" of such a result. In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Court made clear:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Id.* at 434; *see also Strickland v. Washington*, 466 U.S. 668, 693 (1984) ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"); *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("a defendant need not establish that the attorney's deficient performance more

---

[38] Duchardt acknowledged this as well: "It is my experience that a capital case jury is much more inclined to give a death penalty to the extent that its members believe that the client will pose a danger to others in prison." APP 701.

97

likely than not altered the outcome in order to establish prejudice"). "[T]he adjective ["reasonable"] is important." *Kyles*, 514 U.S. at 434. Indeed, *Strickland* explained,

> [R]easonable probability of a different result" is thus *less than a preponderance of the evidence*. It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome."

466 U.S. at 693 (emphasis added).

Finally, in a capital case, a "reasonable probability" of a different sentence can only be determined by weighing the full "body of mitigation evidence" that was presented along with the evidence that could have been presented that "might well have influenced the jury's appraisal of [the defendant's] moral culpability." *Williams v. Taylor*, 529 U.S. 362, 398 (2000); *accord Sears v. Upton*, 130 S. Ct. 3259, 3267 (2010) ("A proper analysis of prejudice under *Strickland* would have taken into account the newly uncovered evidence of Sears' 'significant' mental and psychological impairments, along with the mitigation evidence introduced during Sears' penalty phase trial, to assess whether there is a reasonable probability that Sears would have received a different sentence after a constitutionally sufficient mitigation investigation"). Without hearing the mitigation evidence that *could have been* presented, the District Court had nothing with which to judge whether, when added to the mitigation actually presented, the full body of mitigation produced a

"reasonable probability" that at least one juror would have voted to spare Purkey's life.

Instead of looking at the full body of mitigation that the jury should have heard, the District Court's judgment contorted the law to conclude that, since the jury was not swayed by the mitigation that it heard at trial, it also would have rejected the full body of mitigation that *could have been* presented. This unsupported reasoning would make it impossible for any capital defendant to prove prejudice. Specifically, under the District Court's reasoning, even if trial counsel had presented no mitigation evidence prior to the jury's rejection of mitigating factors, the Movant could not establish prejudice in § 2255 proceedings. That is not, and cannot become, the state of the law.

Equally problematic is the District Court's inconsistent opinion as to what the jury did or did not do with respect to finding mitigating factors. On the one hand, in rejecting Purkey's claim that his jury did not even acknowledge the mitigating factors, the District Court's judgment finds that the jury "simply chose not to give any weight to [the mitigating] evidence, which under the law they are entitled to do." APP 928. But, then, to find that Purkey could not establish any prejudice from his claims of ineffective assistance of counsel, the District Court's judgment opines that "no jurors voted for a single mitigating factor." APP 930. The record does not support either statement.

The fact is that the verdict returned by the jury is simply blank ("____") as to any mitigating factor. At trial, the District Court was initially willing to ask the jurors to complete the form, but the Government retorted, "Absolutely no[t]." (TR 2313). As a result, no inquiry was made. This presents a one of a kind circumstance, making Purkey's case the only case out of the Western District of Missouri in which the verdict is simply blank ("____") as to all mitigating factors.[39] Indeed, after exhaustive research and comprehensive review of federal capital trial verdict forms, counsel have been unable to identify even one other federal death penalty case in which the jury simply left the form blank ("____") as to the mitigating factors.

A similar situation arose in *Anderson (Randy) v. State*, 108 S.W.3d 592, 609 (Ark. 2003) (*Anderson I*), where the jury did not check any box to indicate it had found a mitigating factor to exist. The parties, however, had stipulated to the existence of the mitigating factor of no previous criminal history. *Id.* The Arkansas Supreme Court held,

[39] *Compare United States v. Moore*, No. 94-00194 (W.D. MO) (votes indicated – deadlocked); *United States v. Ortiz*, No. 98-00149 (W.D. MO) (votes indicated – death verdict); *United States v. Sinisterra*, No. 98-00311 (W.D. MO) (votes indicated – death verdict); *United States v. Tello*, No. 98-00311 (W.D. MO) (votes indicated – non-unanimous verdict); *United States v. Nelson*, No. 99-00303 (W.D. MO) (votes indicated – death verdict); *United States v. Haskell*, No. 00-00395 (W.D. MO) (votes indicated – life verdict); *United States v. Smith*, No. 02-05025 (W.D. MO) (votes indicated – non-unanimous verdict); *United States v. Montgomery*, No. 05-06002 (W.D. MO) (votes indicated – death verdict).

> There is *no written proof that the jury considered any mitigating circumstances*. Section 5-4-603 requires "written findings" that "aggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances found to exist." Without a signed and filed Form 2, this court is unable to say that the jury considered any possible mitigating circumstances, much less that it concluded beyond a reasonable doubt that the only aggravating circumstance outweighed any mitigating circumstances found to exist. Accordingly, *we reverse and remand for resentencing*.

*Id*. at 609 (emphasis added).

A slightly different scenario arose in *Anderson (Justin) v. State*, 163 S.W.3d 333, 358 (Ark. 2004) (*Anderson II*). There, the jury heard "unrebutted evidence…that [Justin Anderson] grew up in an abusive family, that his mother was mentally retarded, and that he was separated from his family and sent to a foster home at an early age." *Id*. at 358. Nonetheless, the jury's verdict indicated that no such evidence had been presented. *Id*. With no objection and no polling, the Arkansas Supreme Court could "only conclude that the jury eliminated from its consideration all evidence presented of mitigating circumstances and sentenced [Justin] Anderson to death solely based on the aggravating circumstance." *Id*. at 360. The *Anderson II* court reversed for a new sentencing trial. *Id*.

Here, while the Government did not stipulate that any mitigating factor existed (as in *Anders I*), many such factors were nevertheless undisputed (as in *Anderson II*). Like the jury in *Anderson II*, Purkey's jury failed to indicate any

acknowledgment, let alone *consideration*, of the obvious undisputed evidence in mitigation:

* * *

11. Mr. Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence.

12. As a child, Mr. Purkey suffered from slow speech development, and for his entire life, Wesley Purkey has suffered from the disability of stuttering.

13. While incarcerated, Mr. Purkey was the victim of serious physical abuse, that is stabbings.

14. While incarcerated, when given the opportunity to do so, Mr. Purkey completed a significant number of hours of college coursework.

15. While incarcerated, when given the opportunity to do so, Mr. Purkey received training and became qualified as a plumber.

16. Mr. Purkey has offered to donate a portion of his liver to his sister-in-law who is dying of liver failure.

* * *

18. The disappearance of Jennifer Long was solved only because Mr. Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing.

* * *

21. Mr. Purkey is the father of Angie Purkey Genail, and the two have carried on a loving, father-daughter relationship, with Mr. Purkey providing Angie Purkey Genail advice, nurturance and emotional support, even while he has been incarcerated.

22. Angie Purkey Genail loves her father Mr. Purkey very much.

* * *

24. Mr. Purkey is the grandfather of Angie Purkey Genail's children Mikey, age 4, and Haley, age 1, and has carried on a loving, grandfatherly relationship, particularly with Mikey, speaking with Mikey on the telephone on numerous occasions.

* * *

27. In the past three years, Mr. Purkey has volunteered to offer good advice to many young men in trouble about how to avoid a life of crime, and would continue to do so if sentenced to life imprisonment without possibility of release.

(underlying-Doc. 484, pp. 33-36; Doc. 487, pp. 9-16). The evidence made these mitigating factors obvious, but the jury did not merely fail give these any weight, the jury failed to acknowledge them altogether.

"[T]he failure appropriately to consider mitigating circumstances can have an adverse affect on the weighing process and result in an inappropriate sentencing outcome." *United States v. Hammer*, 404 F. Supp. 2d 676, 801 (M.D. Pa. 2005).[40] Errors regarding either aggravating factors or mitigating factors can distort the weighing process, and thereby raise doubts about the

---

[40] The Government's appeal of this judgment was dismissed in *United States v. Hammer*, 564 F.3d 628, 634 (3rd Cir. 2009) because "a § 2255 proceeding is not final until the prisoner is resentenced." *Citing Andrews v. United States*, 373 U.S. 334, 339 (1963).

propriety of a death sentence. Lisa R. Duffet, *Habeas Corpus and Actual Innocence of the Death Sentence After Sawyer v. Whitley: Another Nail into the Coffin of State Capital Defendants*, 44 Case W. Res. L. Rev. 121, 148 (1993). Hammer argued that his jury failed to find, consider and weigh undisputed or conceded mitigating factors. *Hammer*, *supra* at 690. The district court agreed, holding, "The jury's defective answers with respect to mitigating factors renders the penalty phase of the trial defective." *Id*. at 801.

In Purkey's direct appeal, this Court noted that a "jury's identification of proven mitigating factors facilitates appellate review, especially when we have to evaluate the effect of any error on the sentence that the jury recommended." *United States v. Purkey*, 428 F.3d 738, 763 (8th Cir. 2005); *see also United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009) (noting that the recorded votes on the mitigating factors facilitated appellate review). This Court, did not, however, suggest that the jury's failure to document any voting on the mitigating factors was equivalent to a finding that none existed. The lack of documentation makes the District Court's finding here particularly problematic. As was true in *Anderson I* and *Anderson II*, the lack of any acknowledgment of Purkey's mitigating factors makes it impossible to ascertain what mitigation evidence the jury considered, or how it weighed that evidence against the

aggravating factors – let alone how the full body of mitigating evidence that could have been presented would have been viewed by each *individual* juror.

In *Rodriguez*, the Government had argued that "the issue of punishment for the Defendant is not an issue of how it affects his family." 581 F.3d at 800. The majority agreed that this argument crossed the line. *Id*. at 800-801. Pointing to the jury's penalty-phase verdict form, however, the majority noted that the jury had "unanimously found that six members of Rodriguez's family 'will suffer emotional pain if [Rodriguez] is executed.'" *Id*. at 801. Thus, the recorded votes established that the *Rodriguez* jury had not "ignore[d] the family-impact" but simply imposed death in spite of that factor. *Id*. The same review cannot be had here because Purkey's jury did not record *anything*. Thus, there can be no assurance that the jury actually considered the mitigation, let alone that the jury considered it and rejected it. A blank form simply does not support either contradictory inference that the Government now claims in collateral proceedings and that District Court adopts in denying relief.

The District Court's judgment hinges on an assessment that it is "unlikely" that the jury "would have sentenced movant to life in prison" even if it heard his full body of mitigating evidence because it was not moved by what it actually heard. Aside from the unsupported reasoning, this ignores the trouble the jury quite obviously had in returning its death verdict. The jury

struggled for nearly eleven hours over the course of two days: It began deliberating at 11:30 a.m. on November 18, 2003, and recessed for the night at 4:15 p.m. TR 10, 2297, 2309. The jury resumed deliberations at 8:37 a.m. on November 19, 2003 (underlying-Doc. 482), and it returned its verdict just over six hours later at 2:45 p.m. *Id.* This totals 10 hours, 53 minutes. This was not a "slam dunk" for the Government even with the incomplete mitigation case presented by trial counsel. It cannot be said that had the jury heard the full body of mitigating evidence available to trial counsel that there is no reasonable probability that even one juror would have held out for a life verdict. *Wiggins*, *supra*. Further, if proved, the facts Purkey has alleged through a plethora of affidavits would warrant relief. Thus, this Court must reverse the District Court's judgment and remand for an evidentiary hearing.

**III**. **Duchardt's Affidavit Exceeded the Scope of the Attorney-Client Waiver Resulting from Purkey's Claims of Ineffectiveness**

On January 3, 2008, the Government moved the District Court to order Purkey's former attorney, Frederick A. Duchardt, Jr., to prepare an affidavit in response to Purkey's allegations that Duchardt rendered ineffective assistance. APP 531-537. The Government specifically stated that it sought "a *narrow waiver* of the attorney-client privilege which would permit Mr. Duchardt to respond to the *specific allegations* of ineffective assistance by Purkey." APP 536-537 (emphasis added), *citing Bittaker v. Woodford,* 331 F.3d 715 (9th Cir. 2003) and *Tasby v. United States,* 504 F.2d 332, 336 (8th Cir. 1974). Indeed, "[t]he scope of required disclosure should not be so broad as to effectively eliminate any incentive to vindicate the constitutional right. . .." *Greater Newburyport Clamshell Alliance v. Public Service Co. of New Hampshire*, 838 F.2d 13, 22 (1st Cir. 1988). Given this "narrow waiver" sought by the Government, Purkey did not then object, and, on February 1, 2008, the District Court granted the Government's motion. APP 538-542.

The Government sought numerous extensions to give Duchardt time to prepare his affidavit. APP 8-10). Ultimately, this gave Duchardt about four months, during which time he crafted a 117-page affidavit. APP 604-720. Duchardt, however, provided not an affidavit, but a *de facto* brief in opposition.

*Id*. The Government's "Suggestions in Opposition to Motion Under 28 USC § 2255" quoted extensively from Duchardt's affidavit; indeed, it often simply incorporated the "arguments" in Duchardt's affidavit. *See*, *e.g.*, APP 587, *citing* APP 646-683 ("Mr. Duchardt's explanation is very thorough and no further *argument* is necessary") (emphasis added); APP 588, *citing* APP 682-685 ("Mr. Duchardt provides a well-reasoned response to Purkey's allegations that he inadequately prepared defense expert Dr. Leeson to testify at trial…No further *argument* is necessary") (emphasis added); APP 589, *citing* APP 692-695 ("As Mr. Duchardt correctly states in his affidavit, post-conviction counsel for Purkey have not fully and accurately described the trial testimony of Dr. Cunningham").

Purkey moved to strike Duchardt's affidavit, pointing out that it is in the form of a formal adversary's brief rather than a factual affidavit. APP 834-890. The District Court's judgment relied solely on the black letter law that justified its initial Order for Duchardt to execute *an* affidavit. APP 923-924, *citing Tasby,* 504 F.2d at 336 and *Stobaugh v. United States*, [2007 U.S. Dist. LEXIS 13331], 2007 WL 628420, *1, n.1 (W.D.Mo. Feb. 27, 2007)). Reliance on this general law missed the point. Purkey never contended that Duchardt could not execute *an* affidavit; indeed, he did not oppose the Government's motion for an Order compelling Duchardt to do so. Purkey's objection to *this* affidavit is that

Duchardt (1) exceeded the scope of the narrow waiver by disclosing privileged information; (2) made purely legal arguments rather than factual statements; and (3) asserted facts based on investigation in preparation of this affidavit.

### (a) Exceeded the scope of the narrow waiver by disclosing privileged information

Throughout his affidavit, Duchardt referred to confidential information that he learned in the course of representing Purkey, information that is not in the record below and information that was otherwise not generally known prior to Duchardt's disclosure. For example, with respect to the claim that trial counsel should have presented the testimony of Floyd Bose and Dion Leiker as mitigation witnesses, Mr. Duchardt asserted:

> It was my understanding that, in the years since Wes' (sic) revelations[41] to Dion and Floyd, Wes has asked for and had received from them financial assistance.[42] *While I was not sure the government was aware of this*, I knew that it would not be difficult for the government to obtain institutional financial records."

---

[41] Clarification is required: Purkey contacted Ms. Leiker and Mr. Bose because he had learned information about how Duane Bose had died. APP 830. Ms. Leiker described Purkey as Duane's only real friend, *id*.; Purkey's relating what he had heard about Duane's death was far from a "revelation." It was a caring extension of his hand to Duane's family.

[42] Again, this must be clarified: Ms. Leiker has sent Purkey a little money, but she did not begin doing so until *after* Purkey arrived on Death Row. APP 886. Likewise, Mr. Bose posted "a few bucks" on Purkey's account in the 1980s, but Purkey did not ask him to do so and it had nothing to do with Purkey having given Mr. Bose information about Duane's death. APP 887.

APP 676 (emphasis added). Even assuming that Duchardt's spurious claim was true, he owed Purkey a duty to keep it confidential. *See* Missouri Rule 4-1.6(b)[43] (requiring counsel to keep information confidential *unless* reasonably necessary to establish a "claim or defense"); *accord* Restatement (Third) of The Law Governing Lawyers § 33 (2)(a) & (d) (requiring that an attorney "take no unfair advantage of a former client by abusing knowledge or trust acquired by means of the representation"). Making the false assertions of fact was not *reasonably necessary.* By doing so, Duchardt simply sought an *unfair advantage* over his former client.

Likewise, to rebut a claim that he should have developed Debbie Prothero and her husband as mitigation witnesses, Duchardt stated:

> In her conversations with me, Debbie made clear that neither she nor her husband knew much of anything about Wes or his side of the family. Moreover, in every conversation I had with Debbie, she made sure it was abundantly clear that she was very much in favor of the death penalty, and was in no way opposed to Wes receiving the death penalty in this case.

APP 663.[44] Even if this was true, Duchardt owed Purkey a duty to keep it

---

[43] The Western District of Missouri's Local Rule 83.5(c)(2) reads, "The Code of Professional Responsibility adopted by this Court is the Code of Professional Responsibility adopted by the highest court of the state in which this Court sits..." Thus, Duchardt's affidavit must be reviewed within the confines of Missouri Supreme Court Rule 4.

[44] Again, however, Duchardt's assertion is strenuously contradicted by Ms. Prothero's affidavit. APP 888. Ms. Prothero actively assisted Duchardt in compiling a history of Purkey's dysfunctional childhood. *Id.* She never even

confidential. *See* Missouri Rule 4-1.6(b) (requiring counsel to keep information confidential *unless* reasonably necessary to establish a "claim or defense"); *accord* Restatement § 33 (2)(a) & (d) (requiring that an attorney "take no unfair advantage of a former client by abusing knowledge or trust acquired by means of the representation"). Creating such a false image of Ms. Prothero was not *reasonably necessary*; it simply sought an *unfair advantage* over Duchardt's former client.

Yet again, with respect to a claim that Duchardt should have developed Peggy and Evette Noe as mitigation witnesses, Duchardt stated that his decision not to pursue them as witnesses was based on "either . . . problems in the relationship between Wes and Peggy, or problems in Peggy's and Evette's backgrounds, or both." APP 677. Duchardt's assertion is nothing but a pot shot that the facts simply do not support. These women both insist that Duchardt never even talked to them. APP 889-890. Still, even assuming Duchardt's assertion was true, he owed Purkey a duty to keep it confidential. *See* Missouri Rule 4-1.6(b) (requiring counsel to keep information confidential *unless* reasonably necessary to establish a "claim or defense"); *accord* Restatement § 33 (2)(a) & (d) (requiring that an attorney "take no unfair advantage of a former client by abusing knowledge or trust acquired by means of the representation.").

suggested that she favored him being executed; she loves Purkey, and she has maintained contact with him. *Id.*

111

Creating the false image that these two women have "problems" was not *reasonably necessary*; it simply sought an *unfair advantage* over Duchardt's former client.

In each of these instances, Duchardt made unsupported factual assertions that, even if true, disclosed information that was otherwise generally unknown and that he could only have received through his representation of Purkey. Of course, Purkey presented contradicting affidavits showing that many of Duchardt's assertions could only be based on hypothetical discussions because he did not even talk to Ms. Leiker, Mr. Bose, Peggy Noe or Evette Noe before trial. APP 886-890; and Ms. Prothero never told Duchardt what he asserted in his affidavit. APP 888. Rather than leaving the veracity of his assertions to assumption, Durchardt was obliged to attach documentation to his affidavit. *See* MOW Local Rule 56.1(a) ("Affidavits or declarations shall be made on personal knowledge and by a person competent to testify to the facts stated. Where facts referred to are contained in another document, such as a deposition, interrogatory answer or admission, a copy of the relevant excerpt from the document shall be attached").

An attorney must take steps to safeguard any information which might be damaging to his client and provide a "proportionate and restrained response" to the allegations of ineffective assistance. *See* Restatement (Third) of The Law

Governing Lawyers, § 64 Comment (e) (2008). Ignoring this, Duchardt responded in a disproportionate and unrestrained manner that simply sought to erect unwarranted obstacles to Purkey's ability to use these witnesses as part of his *habeas* proceedings. Such conduct violates Missouri Rules 4-1.6 and 4-1.9, which prohibit the disclosure of confidential information. *See also* Comment to Missouri Rule 4-1.6 at ¶ 3 ("The confidentiality rule ... not only applies to matters communicated in confidence by the client, but also to all information relating to the representation, whatever its source") and at ¶ 4 ("This prohibition also applies to disclosures by a lawyer that do not in themselves reveal protected information but could reasonably lead to the discovery of such information by a third person").

Duchardt's conduct also violates Restatement § 33, which requires that counsel take no unfair advantage of a client after termination of representation by abusing knowledge acquired by means of representation; Restatement § 60, which requires that counsel not disclose confidential information "if there is a reasonable prospect that doing so will adversely affect a material interest of the client"; Restatement §§ 63 and 86, which provide that trial counsel should work with successor counsel to invoke a privilege against the disclosure of confidential information; and Restatement § 64, which provides that any such disclosure must constitute a "proportionate and restrained response." This latter

113

provision of the Restatement is echoed in the ABA Guidelines and the Missouri PD Guidelines.[45]   *See* ABA Guideline 10.13, requiring that trial counsel cooperate with the strategies of successor counsel and to safeguard the interests of the client; Missouri PD Guideline 11.3.5, requiring that trial counsel not volunteer information that may be detrimental to the client's post-conviction case.

Still, in answering a claim that trial counsel failed to adequately prepare Purkey to testify at trial, Duchardt offered to provide the District Court with a copy of a videotape that he claimed to have used in his preparation sessions with Purkey.  APP 715.  Incredibly, Duchardt had apparently removed this alleged video when transferring Purkey's file to current post-conviction counsel.  APP 851.  Any such videotape would constitute confidential work product that is otherwise privileged from disclosure.  *See* Restatement § 92, Reporter's Note on Comment c.  But Duchardt volunteered to transfer his work product to the District Court rather than post-conviction counsel.  Such blatant advocacy against his client cannot be countenanced.  *See, e.g.,* Missouri PD Guideline 11.3.6, requiring that trial counsel not act, or appear to act, as an advocate against a former client.

---

[45] Just as the ABA Guidelines have been held to reflect the prevailing norms, so, too, should the Missouri Public Defender Guidelines.  Certainly, the latter reflects what the largest group of criminal defense attorneys in Missouri must abide by.

Duchardt's 117-page[46] statement volunteered copious amounts of unwarranted and privileged information. His conduct violated the ABA Guideline 10.13 requirement that trial counsel safeguard the interests of his former client as well as the Missouri PD Guideline 11.3.5 requirement that trial counsel not volunteer information against his former client, as well as. Ignoring these commands, Duchardt acted in his self-interest, while baldly seeking to undermine Purkey's *habeas* claims.

On a claim regarding Duchardt's failure to call CCA inmate Cornelius Peoples as a witness, Duchardt responded by referring to extra-record conversations he allegedly had with Mr. Peoples's lawyer, Bill Odle. APP 635-636. Additionally, Duchardt referred to purported "bad acts" evidence against Mr. Peoples that he claimed to have learned in the course of representing one of Mr. Peoples's co-defendants (Carl Haskell) in a different case. APP 636-637. Finally, Duchardt volunteered information about Mr. Peoples's decision to become a cooperating witness against other defendants as a justification for why he did not call him as a witness for Purkey. APP 637-638. Here, Duchardt telegraphed his motive to assert facts <u>not</u> as they existed when he prepared for Purkey's trial but as they only could have existed after trial. He used hindsight

---

[46] The sheer volume of Duchardt's affidavit is stunning. The 24-page affidavit he filed in *Sinisterra v. United States*, MOW No. 98-311-02-CR-W-GAF (Doc. 50) pales by comparison.

to rationalize his trial preparation and to impede Purkey's post-conviction rights. In the process, Duchardt ignored that Mr. Peoples's cooperation in the referenced cases did not occur or even come to light until *after* Purkey's trial.[47]

Duchardt continued, saying, "Peoples then went on to inform in another case, *United States v. Hargrove*, District of Kansas case number 03-20192-CM, and received an additional reduction of sentence for that cooperation." APP 637 (citation to criminal record omitted). Again, the chronology betrays the falsity of Duchardt's reasoning; Mr. Peoples did not testify in *Hargrove* until October 2005. *See United States v. Peoples*, WDMO #00-395, DOC. #812, p. 1. Duchardt cannot explain how Mr. Peoples's actions in October 2005 impacted Duchardt's "decision" not to use him in October 2003.

Again, the District Court's judgment began from the correct premise, i.e., "that movant had waived his attorney-client privilege *as to his ineffective assistance of counsel claims*…" APP 925 (emphasis added). The District Court's conclusion "that Mr. Duchardt did not act improperly in filing the

---

[47] Duchardt stated that Mr. Peoples "*was in negotiations* to become an informer against his codefendant, Xavier Lightfoot, and received a substantial reduction in sentence as a result." APP 637, *citing United States v. Peoples*, WDMO Case # 00-395, Doc. 658, 660, 800) (emphasis added). This is a curious assertion because Purkey went to trial in October 2003, and Mr. Peoples was not even interviewed by law enforcement concerning Xavier Lightfoot until December 18, 2003. *See United States v. Peoples*, WDMO Case # 00-395, Doc. 781, p. 1. Thus, Mr. Peoples's status as an informer against Mr. Lightfoot simply could not have played any part in Mr. Duchardt's preparation for Mr. Purkey's October 2003 trial.

Affidavit nor did he violate his duty of loyalty or his duty of confidentiality, *as the attorney-client privilege had been waived*," *id*. (emphasis added), however, does not follow.  The Government acknowledged in its motion to compel that the waiver of the attorney-client privilege was a "narrow" one.  It certainly was not waived to the extent of Duchardt's disclosures.  The waiver authorized by *Tasby* and the rules of professional conduct is much narrower than the District Court's conclusion implies.  Under ABA Model Rule 1.6(b)(5) a "lawyer may reveal information relating to the representation of a client to the extent the lawyer *reasonably* believes *necessary*...to respond to allegations in any proceeding concerning the lawyer's representation of the client..." (emphasis added); *accord* Missouri Supreme Court Rule 4-1.6(b)(3) and Comment to Rule 4-1.6, ¶ 17.

> [T]he rule allows disclosure of only that information which is *reasonably necessary to respond to the specific allegations* of malpractice, ineffective assistance of counsel or ethical misconduct.  In certain instances, attorneys have exceeded this restriction, apparently in an effort to exact a toll upon the client alleging misconduct or malpractice against their attorney.  The rule prohibits such, and an attorney's engaging in this type of conduct subjects him to disciplinary action, and possible civil liability.

J. McLain, *"OPINIONS OF THE GENERAL COUNSEL: CONFIDENTIALITY – CAN YOU KEEP A SECRET?"* 62 Ala. Law. 296, 297-298 (Sept. 2001) (emphasis added).

The District Court's judgment eliminated this limitation and transformed the narrow waiver into a blanket one that gives attorneys an unfettered license to disclose any and all privileged communications whether relevant to a claim of ineffectiveness or not. Such an exception swallows the rule. "An ethical code is not a garment that lawyers may don and doff at pleasure." *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1264 (5th Cir. Tex. 1983). The Professional Rules and *Tasby* required the District Court to analyze each of Purkey's specific allegations of ineffectiveness and determine whether each response in Duchardt's 117-page affidavit was reasonably necessary to answer Purkey's specific allegations.

Duchardt's privileged, false and *post hoc* justifications far exceeded the "narrow waiver" the Government was entitled to pierce.

### (b) Duchardt made purely legal arguments rather than factual statements

An "affidavit" is "a *written statement of fact*, signed and sworn to before a person having authority to administer an oath." The Law Dictionary, Anderson Publishing Co. (2002) (emphasis added). With no objection from Purkey, the District Court Ordered Duchardt to provide such an affidavit. APP 538. In response, Duchardt prepared a 117-page affidavit that includes a plethora of hearsay, legal argument and opinion. Duchardt did not limit his affidavit to the factual allegations in Purkey's 2255 motion; he painstakingly

reviewed the cases cited in Purkey's memorandum in support of his § 2255 motion and provided his own legal analysis of those cases (*See*, *e.g.*, APP 622-623, 629-633, 643-647, 678-683, 685-686, 692-693, 710, 711-713, 718). In all, Duchardt devoted approximately 25 pages (roughly 21%) of his affidavit to legal argument about the applicability of the cases cited in Purkey's *memorandum of law*. More often than not, Duchardt annotated his discussion of case law with legal argument such as:

> What Counsel for Purkey have done is *tease certain language* from these cases, *ignoring the extreme facts* in those cases which justified the language in those cases, and ignoring that the very different circumstances in this case would not allow application of that language to this case. The upshot of all of this is, *despite the invective tone of the arguments advanced by Counsel for Purkey*, there is no factual or legal support for the arguments themselves.

APP 632-633 (emphasis added). Such a comprehensive brief opposing his former client's 2255 motion far exceeds the bounds of an "affidavit."

Duchardt's affidavit does not simply state the facts as they existed when Duchardt made his decisions; it zealously advocates for the Government and against Purkey. Duchardt assumed the role, not of a factual witness, but of an advocate against his former client. "Mr. Duchardt, in effect, has undertaken the role as co-counsel for the United States of America in this proceeding." APP

880.[48]

> Time and again, Mr. Duchardt's affidavit not only discloses privileged and confidential information, but also spends, page after page, paragraph after paragraph, distinguishing for the court the case law that Mr. Purkey's lawyers rely upon in seeking relief from the court. One cannot imagine a more significant demonstration that a lawyer has switched sides and gone way beyond defending himself to attacking his former client than the exercise in which Mr. Duchardt engages by disdainfully characterizing and disparaging the legal arguments of Mr. Purkey's present counsel.

*Id*.

Duchardt continued unabated, not to defend himself, but simply to undermine Purkey's 2255 claims. In arguing that Purkey could not show any prejudice, Duchardt gratuitously disparaged Purkey's proffered witnesses: falsely describing Debbie Prothero as a family member anxious to see Purkey executed, APP 663-664; falsely describing Marguerite Hotchkiss as someone aloof and uninterested in helping Purkey. APP 663-665; falsely describing Dion Leiker and Floyd Bose, both former law enforcement officers, as gullible and easily misled, APP 674-676; and falsely describing Peggy Noe and Evette Noe as having "problems" in their backgrounds. APP 676-678. None of those assertions were even remotely accurate, but, rather, pot-shots that illustrate the

---

[48] Lawrence J. Fox is the I. Grant Irey, Jr. Adjunct Professor of Law at the University of Pennsylvania Law School and a lecturer on law at Harvard Law School. He teaches legal ethics and professional responsibility (Exhibit 5, p. 2). Professor Fox has written extensively regarding lawyers' responsibilities to their clients.

wholesale abandonment of Duchardt's duty of loyalty to Purkey. Again, Restatement § 33 instructs counsel not to take any unfair advantage of a client after termination of representation by abusing knowledge acquired by means of representation. *See also* Restatement § 60 (requiring that counsel not disclose confidential information "if there is a reasonable prospect that doing so will adversely affect a material interest of the client"); Restatement §§ 63 and 86 (providing that trial counsel should work with successor counsel to invoke a privilege against the disclosure of confidential information); and Restatement § 64 (providing that any such disclosure must constitute a "proportionate and restrained response").

Duchardt also took it upon himself to describe what he considered to be deficiencies or omissions in Purkey's § 2255 motion. For example, on two of the claims, Duchardt needlessly commented on the absence of affidavits. (*See* APP 634 (noting that *habeas* counsel have not provided affidavits from inmate Xavier Lightfoot and prison personnel Perdue and Williams); APP 663 ("In a footnote, Wes' current Counsel allege that Debbie and her husband would have willingly testified on Wes' behalf . . . However, Counsel do not provide affidavits from Debbie or her husband, nor do they mention what Debbie or her husband could have or would have said had they been called to witness").

121

Elsewhere, on a claim regarding Duchardt's failure adequately to develop and present mitigation evidence, Duchardt argued that the claim was deficient:

> Though current Counsel for Mr. Purkey have indicted my approach in this regard, they do not identify in their pleadings a single mitigation theme which was missed as a result of this approach.
>
> It is also implied in the argument made by current Counsel for Mr. Purkey that our efforts to develop certain avenues of mitigation evidence, for instance the poisoning came at the expense of work on other avenues of mitigation evidence ([APP 452]). However, current Counsel for Mr. Purkey do not support that inference, since they fail to advance even one new mitigation theme which they found and we supposedly missed.

APP 654.

The Government relied exclusively on Duchardt's briefing of the issues in filing its suggestions in opposition to Purkey's 2255 motion. APP 544-603. While not labeling it as such, the Government's suggestions in opposition constituted a motion for summary judgment. *See Siguenza v. United States*, 2010 U.S. Dist. LEXIS 75660 (W.D.N.C. July 27, 2010)[49] (holding that the Government's response to Siguenza's 2255 motion was a "*de facto* motion for summary judgment"). As in *Siguenza*, the Government, here, moved for a summary disposition of Purkey's motion merely on the pleadings. APP 662. In making such a prayer, the Government could supply affidavits and declarations disputing Purkey's factual allegations; however, it could not rely on legal briefs

---

[49] There remains no Federal Supplement citation.

posing as such.  F.R.C.P. 56(e).[50]

"The Federal Rules of Civil Procedure govern habeas proceedings unless superseded by the rules governing section 2254 or 2255 cases.  FRCP 81(a)(4)." *Barnett v. Roper*, 541 F.3d 804, 807 (8th Cir. 2008).  There is no corresponding rule governing 2255 cases regarding affidavits like Duchardt's, thus, FRCP 56(e) applies to the summary disposition of this case.  *See Lemay v. United States*, 2010 U.S. Dist. LEXIS 133369, 1, n.1 (W.D.N.C. Dec. 15, 2010); *Baker v. United States*, 2009 U.S. Dist. LEXIS 75143 (D.S.C. July 7, 2009) (applying FRCP 56(e) to motions to dispose of 2255 proceedings on their pleadings).  Under FRCP 56(e)(2) (2007-2008),

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits [] - set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

The *Lemay* court emphasized that affidavits and declarations must be in a form that would be admissible at trial. *Lemay*, *supra*.  Thus, Rule 56(e)

---

[50] Rule 56 has been amended during these proceedings:  On December 1, 2007 and December 1, 2008, Rule 56(e)(1) provided, *inter alia*, "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence…."  The December 1, 2009, amendment to Rule 56, however, maintains "the concept expressed in former subsection (e)(2)" *Lemay v. United States*, 2010 U.S. Dist. LEXIS 133369, 1, n.1 (W.D.N.C. Dec. 15, 2010), *citing* FRCP 56 (c)(1)(B) and (e)(2) (2010).

forecloses the inclusion of legal conclusions or arguments in an affidavit. *See Toro Co. v. Krouse, Kern & Co, Inc*., 644 F. Supp. 986, 989 (N.D. Ind. 1986). "[T]he standard set forth therein for the adequacy of supporting affidavits is a high one, and the rule places an *affirmative duty on the affiant to present statements which would be admissible at trial*." *Id*. at 990 (emphasis added).

Duchardt ignored this duty while crafting his 117-page affidavit. Statements of particular legal research that he had done in preparation of trial would not have been objectionable. In that instance, the legal research he did would have been a factual statement. But Duchardt did not do that; he went so far as to research Purkey's legal memorandum in support of his 2255 motion, researched the cases and arguments made in it, and wrote 25 pages of post hoc legal analysis. None of those 25 pages would be admissible at a hearing on Purkey's allegations that Duchardt's pretrial, trial and appellate assistance was ineffective. The <u>current legal arguments</u> in Duchardt's affidavit played <u>no</u> role in his decision-making during his representation of Purkey; they simply opine as to the merit and strength of Purkey's 2255 claims. He repeatedly argued that a given claim of error was either harmless or that no prejudice can be proven. A sample of some of Duchardt's legal arguments and opinions follows:

| **2255 GROUNDS FOR RELIEF** | **DUCHARDT'S RESPONSE** |
|---|---|
| **Issue II**: Counsel failed to object to the government's repeated improper references to Purkey's desire to serve a life sentence in a federal penitentiary as a desire to go to "Club Fed"<br><br>APP 70-71 | APP 620: there was no prejudice resulting from the use of "Club Fed" because Mr. Purkey's desire for a federal sentence would have still been a part of the record, so the jury "would have still been potentially led to the very same sorts of dangerous misconceptions about the favorable conditions of confinement in a Federal penitentiary."<br><br>APP 621: there was no prejudice from the failure to object because jurors already have misconceptions about supposedly "soft" conditions of a life sentence. |
| **Issue III**: Counsel made an unfulfilled and prejudicial promise to the jury during opening statements that the victim's friends and family would testify that there was no kidnaping.<br><br>APP 71-72 | APP 626: the testimony of Brooke Doolittle (the victim's friend) that the victim would never get into a car with a stranger was not prejudicial because the judge sustained an objection and instructed the jury to disregard that testimony. |
| **Issue V**: Counsel failed to adequately develop and present mitigation evidence.<br><br>APP 74-88 | APP 678: proposed testimony from Peggy Noe – a witness that § 2255 counsel allege could have been called as a mitigation witness – regarding Purkey's childhood sexual abuse would only have been cumulative of evidence presented at trial and would not have been as effective as the trial testimony of Purkey's brother, Gary Hamilton |

| | |
|---|---|
| **Issue VII**: Counsel failed to adequately prepare and present the expert testimony of Dr. Stephen Peterson, M.D., a psychiatrist who evaluated Purkey for the defense and testified in the penalty phase.<br><br>APP 90-93 | APP 690: the "real problem faced by Dr. Peterson in advancing the conclusions that he did" was not rooted in counsel's failure to adequately prepare him, but rather that Dr. Peterson was "swimming upstream against a torrent of evaluation results from numerous mental health professionals made over the preceding thirty-some-odd years" and that the government expert's diagnosis of anti-social personality disorder "simply mirrored the conclusions reached consistently and persistently by the various mental health professionals who had evaluated Wes over the years." |
| **Issue X**: Counsel rendered ineffective assistance in calling certain mitigation witnesses who provided prejudicial information.<br><br>APP 96-97 | APP 700: prison official Mark Russell's concession that he had heard rumors of Mr. Purkey's assaultive behavior was not prejudicial: "In a different case, under different circumstances, such a revelation would have been problematic. In this case, Mr. Russell's information was but a thimble of water from the ocean." |

The legal arguments and opinions that fill Duchardt's affidavit are profuse.

Legal argument is an expression of legal opinion and not a recitation of a "fact"

to which an affiant is competent to testify. *Pfeil v. Rogers*, 757 F.2d 850, 862

(7th Cir. 1985). In *Pfeil*, the Seventh Circuit rejected portions of Pfeil's

affidavit that asserted that Rogers' advice was incorrect and Pfeil's conclusion

that Rogers conspired to illegally destroy the dogs. *Id.* The Seventh Circuit held that these were mere legal arguments that could not be considered as a recitation of fact to which Pfeil would be competent to testify. *Id.*

This Court has similarly held,

> In evaluating evidence related to possible summary judgment, *a court may not consider* affidavits that do not satisfy the requirements of [FRCP] 56(e). *See, e.g., Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987); *see also Kern v. Tri-State Insurance Co.*, 386 F.2d 754, 756 (8th Cir. 1967).

*El Deeb v. University of Minnesota*, 60 F.3d 423, 429 (8th Cir. 1995) (emphasis added). Here, Duchardt's affidavit falls far outside the requirements of Rule 56(e). His affidavit has legal argument and opinion interwoven throughout its entire 117 pages. He left no legal analysis for the Government to do in preparing its suggestions in opposition to Purkey's 2255 motion; indeed, at 117 pages, Duchardt's "affidavit" nearly doubled the length of the Government's own brief. *Cf.* APP 663 AND 720. The examples set out in the above table clearly demonstrate that Duchardt did not merely recite the facts explaining his work on Purkey's trial and appeal, but also provided lengthy legal argument and lofty opinion that Purkey's 2255 claims of ineffectiveness were legally baseless.

### (c) Duchardt asserted facts based on investigation done in preparing his affidavit

Even with his legal arguments, Duchardt was not finished trying to disprove his former client's 2255 claims. He next assumed the role of the Government's investigator, conducting his own witness interviews in an effort to debunk Purkey's 2255 claims. Duchardt accused undersigned counsel of obtaining an affidavit from Dr. Peterson by deceiving him and further offered to obtain another affidavit from Dr. Peterson to corroborate his own fallacious premise:

> It should be noted that, even though their claims are incorrect, current Counsel for Purkey persuaded Dr. Peterson to embrace and admit them as if they were true ([APP 349-350]). I have spoken to Dr. Peterson, and have learned that current Counsel for Purkey were able to obtain these inaccurate admissions from him by misleading him, showing him only the limited parts of the record, as cited in their pleadings, and not providing Dr. Peterson with the whole transcript of the case, and in particular not providing Dr. Peterson the portions of the transcript wherein he does refer to Mr. Purkey's other revelations about the sexual abuse and wherein the actual government arguments are revealed. I did not ask for Dr. Peterson to complete another affidavit in these regards, but I can if the Court wishes.

APP 687. This investigation by proxy fell way outside the bounds of the narrow waiver affected by Purkey's allegation of ineffective assistance of counsel. Duchardt's affidavit could legitimately address only the facts relating to his pretrial, trial and appellate work as he recalled them.

128

When Duchardt conducted his own post hoc "interview" of Dr. Peterson about Purkey's 2255 allegations, Dr. Peterson was away from his office and had not reviewed Purkey's file for quite some time. APP 867-869. Duchardt's hasty accusation was thereby baseless. Moreover, at bottom, his actions demonstrated that he forgot or deliberately abandoned his continuing duty of loyalty to Purkey.

The Supreme Court has recognized that "the duty of loyalty to a client is 'perhaps the most basic' responsibility of counsel." *Burger v. Kemp*, 483 U.S. 776, 800 (1987). Interviewing witnesses as the Government's proxy violated that duty of loyalty. It certainly was not reasonably necessary in order for Duchardt to provide his factual response to the limited allegations of ineffectiveness. *See* Missouri Rule 4-1.6; *accord* ABA Guideline 10.13 (requiring that trial counsel cooperate with successor counsel); Missouri PD Guideline 11.3.5 (requiring that counsel not volunteer information that may be detrimental to his client's post-conviction case); and Missouri PD Guideline 11.3.6 (requiring that counsel not advocate, or give the appearance of advocating, against his former client).

### (d)  Duchardt's 117-page affidavit must be struck

In these 2255 proceedings, Duchardt meticulously investigated, researched and argued claims in his 117-page statement in which he recklessly

disclosed privileged and confidential information, strenuously advocated against his former client and haphazardly ignored his duty of loyalty. Duchardt went far beyond questions of fact. He essentially wrote a legal brief attacking the merits of Purkey's post-conviction claims. Worse, in publishing his quasi-brief to the Government, Duchardt did much more than what was reasonably necessary to answer Purkey's 2255 claims. He far exceeded the restriction imposed by Missouri Rule 4-1.6 not to jeopardize his former client's rights. "An ethical code is not a garment that lawyers may don and doff at pleasure." *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1264 (5th Cir. 1983). Duchardt, however, completely disregarded his ethical obligation to Purkey. Therefore, this Court should reverse the District Court's judgment and remand for further proceedings at which Duchardt's 117-page affidavit will be struck.

## CONCLUSION

Purkey pleaded substantial facts that are not refuted by the record and that, if proved, establish that he suffered ineffective assistance of counsel during the investigation, preparation and presentation of his defense. In denying Purkey's motion without an evidentiary hearing, the district court relied entirely on trial counsel's 117-page affidavit. This Court must reverse the District Court's judgment and remand for an evidentiary hearing where the 117-page affidavit will be struck.

Respectfully submitted,

Teresa L. Norris, Esq.
P.O. Box 11744
Columbia, SC 29211
(803) 765-1044 (Phone)
(803) 765-1143 (Fax)
teresa@blumelaw.com
Co-counsel to Appellant

Gary E. Brotherton, Esq.
601 W. Nifong Blvd., Ste. 1C
Columbia, Missouri 65203
(573) 875-1571 Phone
(573) 875-1572 Fax
GEBrotherton@LegalWritesLLC.com
Co-counsel to Appellant

 /s/ Gary E. Brotherton 
GARY E. BROTHERTON

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type volume limitations by including only 32,003 words, which does not exceed the 35,000 words granted by this Court, excluding parts of the brief exempted by FRAP 32(a)(7)(B)(iii).  This brief was typed in size 14 font, Times New Roman and typed using Microsoft Word 2003.

Respectfully submitted,

Teresa L. Norris, Esq.　　　　　Gary E. Brotherton, Esq.
P.O. Box 11744　　　　　　　　601 W. Nifong Blvd., Ste. 1C
Columbia, SC 29211　　　　　　Columbia, Missouri  65203
(803) 765-1044  (Phone)　　　　(573) 875-1571  Phone
(803) 765-1143  (Fax)　　　　　(573) 875-1572  Fax
teresa@blumelaw.com　　　　　GEBrotherton@LegalWritesLLC.com
Co-counsel to Appellant　　　　　Co-counsel to Appellant


 _/s/ Gary E. Brotherton___
GARY E. BROTHERTON

# CERTIFICATE OF VIRUS SCAN

I, the undersigned, hereby certify that on the $\underline{14^{h}}$ day of November, 2011, the two CDs labeled *Wesley I. Purkey v. United States*, Nos. 10-3462 were scanned for viruses by using AVG 9.0 antivirus program, which is updated daily and reported that no viruses were found on the diskettes. One of these diskettes is being sent to the United States Court of Appeals for the Eighth Circuit and the other is being mailed to the opposing counsel for this case – i.e., Kathleen D. Mahoney and David M. Ketchmark, U.S. Attorney's Office, 400 E. Ninth Street, 5th Floor, Kansas, City, MO 64106.

Respectfully submitted,

Teresa L. Norris, Esq.
P.O. Box 11744
Columbia, SC 29211
(803) 765-1044 (Phone)
(803) 765-1143 (Fax)
teresa@blumelaw.com
Co-counsel to Appellant

Gary E. Brotherton, Esq.
601 W. Nifong Blvd., Ste. 1C
Columbia, Missouri 65203
(573) 875-1571 Phone
(573) 875-1572 Fax
GEBrotherton@LegalWritesLLC.com
Co-counsel to Appellant

  /s/ Gary E. Brotherton___
GARY E. BROTHERTON

# CERTIFICATE OF FILING

The undersigned does hereby certify he will file *Appellant's Brief & Addendum* by delivering ten (10) copies thereof to the Eighth Circuit Court of Appeals, Clerk of Court, Thomas F. Eagleton Courthouse, 111 S. 10th Street, Rm. 24.329, St. Louis, MO 63102 on the __14th__ day of November, 2011, by delivering them via United States Priority Mail.

Respectfully submitted,

Teresa L. Norris, Esq.        Gary E. Brotherton, Esq.
P.O. Box 11744        601 W. Nifong Blvd., Ste. 1C
Columbia, SC 29211        Columbia, Missouri  65203
(803) 765-1044  (Phone)        (573) 875-1571  Phone
(803) 765-1143  (Fax)        (573) 875-1572  Fax
teresa@blumelaw.com        GEBrotherton@LegalWritesLLC.com
Co-counsel to Appellant        Co-counsel to Appellant

                        _/s/ Gary E. Brotherton___
                        GARY E. BROTHERTON

# CERTIFICATE OF SERVICE

On the  _14th_  day of November, 2011, the undersigned party served the *Appellant's Brief & Addendum* on the United States by delivering two copies via United States Priority Mail to:  Kathleen D. Mahoney and David M. Ketchmark, U.S. Attorney's Office, 400 E. Ninth Street, 5th Floor, Kansas, City,  MO  64106.  Further, on the 16th day of November, 2011, the undersigned party served the *Appellant's Brief & Addendum* on the United States by filing same via CM/ECF.

Respectfully submitted,

| | |
|---|---|
| Teresa L. Norris, Esq. | Gary E. Brotherton, Esq. |
| P.O. Box 11744 | 601 W. Nifong Blvd., Ste. 1C |
| Columbia, SC 29211 | Columbia, Missouri  65203 |
| (803) 765-1044  (Phone) | (573) 875-1571  Phone |
| (803) 765-1143  (Fax) | (573) 875-1572  Fax |
| teresa@blumelaw.com | GEBrotherton@LegalWritesLLC.com |
| Co-counsel to Appellant | Co-counsel to Appellant |

  /s/ Gary E. Brotherton___
GARY E. BROTHERTON