**IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

No. 10-3462

**WESLEY IRA PURKEY,**

Appellant,

v.

**UNITED STATES OF AMERICA,**

Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION
HONORABLE FERNANDO J. GAITAN, JR., CHIEF DISTRICT JUDGE

**BRIEF FOR THE UNITED STATES**

BETH PHILLIPS
  United States Attorney

KATHLEEN D. MAHONEY
  Assistant United States Attorney

DAVID KETCHMARK
  Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, Fifth Floor
Kansas City, Missouri  64106
Telephone: (816) 426-3122

*Attorneys for Appellee*

## SUMMARY OF THE CASE

The appellant, Wesley I. Purkey, was convicted by a jury of kidnaping, raping, and murdering 16-year-old Jennifer Long. The jury unanimously found nine aggravating factors, that the aggravating factors outweighed the mitigating factors, and sentenced Purkey to death. Following the denial of his appeal, Purkey filed a motion under 28 U.S.C. § 2255, raising 22 claims. The trial judge, the Honorable Fernando J. Gaitan, Jr., Chief District Judge for the Western District of Missouri, denied Purkey's motion and request for a hearing. Purkey sought a certificate of appealability. This Court granted Purkey's certificate as to six claims, all related to the penalty phase of the trial.

Purkey appeals eight issues, arguing that the district court erred in denying his claims that his trial attorney was ineffective for failing to investigate, prepare, and present mitigation witnesses, and in denying his motion without a hearing. However, the district court correctly found that the Government presented a strong aggravation case, that trial counsel presented a thorough mitigation case, and that the additional evidence proffered by Purkey would have been cumulative.

The Government requests 30 minutes for oral argument.

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

SUMMARY OF THE ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . 40

ARGUMENTS

    I.     The district court correctly found that Purkey's counsel adequately investigated mitigation evidence. . . . . . . . . . . . . 41

    II.    Trial counsel adequately prepared and presented the expert testimony of Dr. Stephen Peterson. . . . . . . . . . . . . . . . . . . . . 59

    III.   Trial counsel adequately presented the expert testimony of Dr. Mark Cunningham. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

    IV.   Trial counsel adequately prepared and presented the expert testimony of Dr. Bruce Leeson. . . . . . . . . . . . . . . . . . . . . . . . 71

    V.    Trial counsel was not ineffective for presenting mitigation witnesses Dr. William Grant and Mark Russell. . . . . . . . . . . . 76

    VI.   The district court's ruling is based upon proper legal grounds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

VII.   No hearing on Purkey's claims of ineffective assistance of counsel was necessary, as Purkey could show neither deficient performance nor prejudice.. . . . . . . . . . . . . . . . . . 84

VIII.  The district court did not abuse its discretion in denying Purkey's motion to strike Mr. Duchardt's affidavit, as this Court recognized when it denied Purkey's certificate of appealability for this claim. . . . . . . . . . . . . . . . . . . . . . . . . 101

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . 108

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

# TABLE OF AUTHORITIES

**Page**

## Cases

*Bittaker v. Woodford,* 331 F.3d 715 (9th Cir. 2003). . . . . . . . . . . . . . . .  104

*Boyd v. Estelle,* 661 F.2d 388 (5th Cir. 1981). . . . . . . . . . . . . . . . . . . . .  75

*Bucklew v. Luebbers,* 436 F.3d 1010 (8th Cir. 2006). . . . . . . . . . . . .  48, 57

*Buster v. United States,* 447 F.3d 1130 (8th Cir. 2006). . . . . . . . . . . . . .  85

*Coble v. Quarterman,* 496 F.3d 430 (5th Cir. 2007).  . . . . . . . . . . . . . . .  75

*Cullen v. Pinholster,* 563 U.S. —, 131 S.Ct.  1388 (2011).  2, 3, 4, 49, 78, 97

*Davis v. U.S. Bancorp,* 383 F.3d 761 (8th Cir. 2004). . . . . . . . . . . . . . .  101

*Day v. Quarterman,* 566 F.3d 527 (5th Cir. 2009). . . . . . . . . . . . . . . . .  74

*Delgado v. United States,* 162 F.3d 981 (8th Cir. 1998).  . . . . . . . . . . .  51, 74

*Eley v. Bagley,* 604 F.3d 958 (6th Cir. 2010).  . . . . . . . . . . . . . . . . . . . .  56

*Hall v. Luebbers,* 296 F.3d 685 (8th Cir. 2002).  . . . . . . . . . . . . . . . . .  49, 57

*Hall v. Washington,* 106 F.3d 742 (7th Cir. 1997). . . . . . . . . . . . . . . . .  43

*Henderson v. Norris,* 118 F.3d 1283 (8th Cir. 1997). . . . . . . . . . . . . . .  3, 69

*Hovey v. Ayers,* 458 F.3d 892 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . .  62

*Hubbeling v. United States,* 288 F.3d 363 (8th Cir. 2002). . . . . . . . . . . .  102

*Hunter v. Bowersox,* 172 F.3d 1016 (plain language of § 2253 limits appellate review to issues specified in COA). . . . . . . . . . . . . . . . . . .  103

*Keys v. United States,* 545 F.3d 644 (8th Cir. 2008).. . . . . .   43, 59, 67, 71, 76

*Koskela v. United States,* 235 F.3d 1148 (8th Cir. 2001). . . . . . . . . . .  84, 89

*Land Investment Club, Incorporated v. Lauer,* 371 F.3d 406
(8th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  101

*Latorre v. United States,* 193 F.3d 1035 (8th Cir. 1999). . . . . . . . . . . . .  89

*Laws v. Armontrout,* 863 F.2d 1377 (8th Cir. 1988).. . . . . . . . . . . . .  69

*Lewis v. Dretke,* 355 F.3d 364 (5th Cir. 2003). . . . . . . . . . . . . . . . . . .  63

*Lindhorst v. United States,* 585 F.2d 362 (8th Cir. 1978).. . . . . . . . . . . .  90

*Machibroda v. United States,* 368 U.S. 487 (1962). . . . . . . . . . . . . . . .  90

*Middleton v. Roper,* 455 F.3d 838 (8th Cir. 2006). . . . . . . . . . . . . . . .  3, 69

*Nave v. Delo,* 62 F.3d 1024 (8th Cir. 1995). . . . . . . . . . . . . . . . . . . .  44

*Neary v. United States,* 998 F.2d 563 (8th Cir. 1993). . . . . . . . . . . . . .  89

*Noe v. United States,* 601 F.3d 784 (8th Cir. 2010). . . . . . . . . . . . . . .  84

*Purkey v. United States,* 549 U.S. 975 (2006). . . . . . . . . . . . . . . . . . .  6, 98

*Ortiz v. United States,* 664 F.3d 1151 (8th Cir. 2011). . . . . . . . . . . . .  43, 81

*Revels v. Sanders,* 519 F.3d 734 (8th Cir. 2008). . . . . . . . . . . . . . . .  5, 102

*Rodela-Aguilar v. United States,* 596 F.3d 457 (8th Cir. 2010). . . .  3, 52, 74

*Rompilla v. Beard,* 545 U.S. 374 (2005).. . . . . . . . . . . . . . . .  54, 56, 58, 96

*Rose v. United States,* 513 F.2d 1251 (8th Cir. 1975). . . . . . . . . . . . . . .  89

*Sanders v. United States,* 341 F.3d 720 (8th Cir. 2003). . . . . . . . . . . . . .  85

*Saunders v. United States,* 236 F.3d 950 (8th Cir. 2001). . . . . . . . . . . . . . 84

*Sears v. Upton,* 561 U.S. —, 130 S.Ct. 3259 (2010). . . . . . . . . . . . . . 4, 82

*Shaw v. United States,* 24 F.3d 1040 (8th Cir. 1994). . . . . . . . . . . . . . . 88

*Smith v. United States,* 182 F.3d 1023 (8th Cir. 1999). . . . . . . . . . . . . . 89

*Strickland v. Washington,* 466 U.S. 668 (1984). . . . . . 44, 57, 69, 74, 97, 99

*Tasby v. United States,* 504 F.2d 332 (8th Cir. 1974). . . . . . . . . . . . . 5, 104

*Toledo v. United States,* 581 F.3d 678 (8th Cir. 2009). . . . 43, 59, 67, 71, 76

*Trost v. Trek Bicycle Corporation,* 162 F.3d 1004 (8th Cir. 1998). . . . . 101

*United States v. Griffith,* 301 F.3d 880 (8th Cir. 2002). . . . . . . . . . . . . . 93

*United States v. Paul,* 534 F.3d 832
(8th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 48, 50, 85, 94, 95, 96

*United States v. Purkey,* 428 F.3d 738 (8th Cir. 2005). . . . . . . . . . 3, 6, 9, 92

*United States v. Unger,* 665 F.2d 251 (8th Cir. 1981). . . . . . . . . . . . . . . 89

*Waters v. Thomas,* 46 F.3d 1506 (11th Cir. 1995). . . . . . . . . . . . . . 3, 78, 88

*Watson v. United States,* 493 F.3d 960 (8th Cir. 2007). . . . . . . . . . . . . . 90

*West v. United States,* 994 F.2d 510 (8th Cir. 1993). . . . . . . . . . . . . . . . 90

*Wiggins v. Smith,* 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . 43, 54, 55

*Williams v. Norris,* 612 F.3d 941 (8th Cir. 2010). . . . . . . . . 2, 55, 63, 69, 93

*Williams v. Taylor,* 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . 53

*Willis v. United States,* 87 F.3d 1004 (8th Cir. 1996). . . . . . . . . . . . . . . 69

*Winfield v. Roper,* 460 F.3d 1026 (8th Cir. 2006). . . . . . . . . . . . . . . . 48, 57

*Wong v. Belmontes,* 558 U.S. —, 130 S.Ct. 383 (2009). . . . . . . . . . . . . . . 78

*Worthington v. Roper,* 631 F.3d 487 (8th Cir. 2010). . . . . . . . . . . . 2, 52, 57

## Statutes and Other Authorities

18 U.S.C. §§ 1201(a), 1201(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

28 U.S.C. § 2253. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 102

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 88

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

No. 10-3462

## WESLEY IRA PURKEY,

Appellant,

v.

## UNITED STATES OF AMERICA,

Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION
HONORABLE FERNANDO J. GAITAN, JR., CHIEF DISTRICT JUDGE

## STATEMENT OF THE ISSUES

### I.

Whether the district court correctly denied Purkey's claim that trial counsel was ineffective for failing to investigate and present cumulative mitigation witnesses.

## Cases

*Worthington v. Roper*, 631 F.3d 487 (8th Cir. 2010)

*Cullen v. Pinholster*, 131 S.Ct. 1388 (2011)

*United States v. Paul*, 534 F.3d 832 (8th Cir. 2008)

## II.

Whether the district court erred in denying Purkey's claim that trial counsel ineffectively prepared and presented the expert testimony of Dr. Stephen Peterson, where counsel provided voluminous records to Dr. Peterson, and where counsel elicited from him and others copious evidence of Purkey's abuse as a child.

## Cases

*Williams v. Norris*, 612 F.3d 941 (8th Cir. 2010)

## III.

Whether the district court erred in denying Purkey's claim that trial counsel ineffectively presented the expert testimony of Dr. Mark Cunningham, where counsel chose how much detail of Purkey's abuse as a child to elicit from Dr. Cunningham.

## **Cases**

*Middleton v. Roper*, 455 F.3d 838 (8th Cir. 2006)

*Henderson v. Norris*, 118 F.3d 1283 (8th Cir. 1997)

## **IV.**

Whether trial counsel was constitutionally ineffective in his preparation and presentation of expert mitigation witness Dr. Bruce Leeson.

## **Cases**

*Rodela-Aguilar v. United States*, 596 F.3d 457 (8th Cir. 2010)

*United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005)

## **V.**

Whether trial counsel was ineffective for presenting two mitigation witnesses who provided both helpful and harmful testimony, and whose testimony Purkey now cites in an effort to portray himself favorably.

## **Cases**

*Cullen v. Pinholster*, 131 S.Ct. 1388 (2011)

*Waters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995)

**VI.**

Whether Purkey can appeal the adequacy of the district court's order, when he did not receive a certificate of appealability on that issue by this Court, and when the district court applied the proper standard in its ruling.

**<u>Cases</u>**

*Sears v. Upton*, 130 S.Ct. 3259 (2010)

**VII.**

Whether the district court erred in denying Purkey's § 2255 motion without a hearing, where Purkey alleged no area of mitigation that trial counsel did not investigate and present, so that even assuming Purkey's allegations as true, his proffered evidence was cumulative.

**<u>Cases</u>**

*United States v. Paul*, 534 F.3d 832 (8th Cir. 2009)

*Cullen v. Pinholster*, 131 S.Ct. 1388 (2011)

**VIII.**

Whether Purkey can appeal the district court's denial of his motion to strike trial counsel's affidavit, when he did not receive a certificate of appealability on that issue by this Court, and where it is clear from the record that the district court did not abuse its discretion.

-4-

## <u>Cases</u>

*Revels v. Sanders*, 519 F.3d 734 (8th Cir. 2008)

*Tasby v. United States*, 504 F.2d 332 (8th Cir. 1974)

## STATEMENT OF THE CASE

A jury convicted the appellant, Wesley Purkey, of the kidnaping, rape, and murder of 16-year-old Jennifer Long, in violation of 18 U.S.C. §§ 1201(a), 1201(g) and 3559(d). After a seven-day penalty phase of the trial, which encompassed the testimony of 13 government witnesses who testified in support of 10 aggravating factors, and 18 defense witnesses who testified in support of 27 mitigating factors, the jury found 9 aggravating factors, no mitigating factors, and recommended a death sentence for Purkey. On January 23, 2004, the Honorable Judge Fernando J. Gaitan, Jr., the Chief District Judge for the Western District of Missouri, sentenced Purkey to death.

This Court affirmed Purkey's convictions and sentence. *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005). Purkey's motion for rehearing and rehearing *en banc* was denied on January 13, 2006. The United States Supreme Court denied Purkey's petition for a writ of certiorari on October 16, 2006. *Purkey v. United States*, 549 U.S. 975 (2006).

Purkey then moved for a writ of habeas corpus under 28 U.S.C. § 2255. He asserted 22 grounds for relief in his § 2255 motion, arguing primarily that he was denied his Sixth Amendment right to effective assistance of counsel at

trial and sentencing. The district court denied relief without a hearing. (Jt. Appx. 920-31.)

Purkey sought a certificate of appealability (COA) from the district court, which was denied. (Jt. Appx. 1055-73.) Purkey then sought a COA from this Court on ten issues. On June 10, 2011, this Court granted Purkey's application for a COA in part, agreeing to consider six issues. All other requests for a certificate were denied. Notwithstanding that this Court granted a COA on just six issues, Purkey has briefed *eight* issues for appeal, all relating to his claim of ineffective assistance of trial counsel in the penalty phase.

None of Purkey's issues has merit. The Government's case in aggravation was extremely strong – after spending the majority of his adult life in prison for a long series of increasingly violent crimes, Purkey, then 46 years old, kidnaped, raped, and murdered 16-year-old Jennifer Long, dismembered her, burned her body, and disposed of her charred bones in a septic pond. Some months later, he went into the house of 80-year-old Mary Ruth Bales, and when she confronted him in her bedroom, he killed her by bludgeoning her in the head with a claw hammer; he then robbed her.

Purkey's trial counsel presented to the jury 18 witnesses in support of 27 mitigating factors, which related to Purkey's alleged mental issues, his

abuse as a child, his drug and alcohol abuse, his family's love for him, and his good works in prison. Now, even with the benefit of hindsight and years of additional investigation, Purkey does not offer one new area of mitigation evidence, but instead complains that witnesses were not interviewed in a "sensitive" manner, that even more witnesses should have been called to testify to the exact matters as the other 18 witnesses did, or conversely, that witnesses who did testify in mitigation were more harmful than helpful.

## STATEMENT OF THE FACTS

### A. *Procedural Background*

A jury convicted Wesley Purkey of the kidnaping, rape, and the murder of Jennifer Long, in violation of 18 U.S.C. §§ 1201(a), 1201(g) and 3559(d), and sentenced him to death. On January 23, 2004, following a denial of Purkey's motion for a new trial, the Honorable Judge Fernando J. Gaitan, Jr., the Chief District Judge for the Western District of Missouri, sentenced Purkey to death. This Court affirmed Purkey's convictions and sentence. *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005). Purkey's motion for rehearing and rehearing *en banc* was denied on January 13, 2006. The United States Supreme Court denied Purkey's petition for a writ of certiorari on October 16, 2006. *Purkey v. United States*, 549 U.S. 975 (2006).

Purkey then moved for a writ of habeas corpus under 28 U.S.C. § 2255. He asserted 22 grounds for relief in his § 2255 motion, arguing primarily that he was denied his Sixth Amendment right to effective assistance of counsel at trial and sentencing. The district court denied relief without a hearing. (Jt. Appx. 920-31.) Purkey sought a COA from the district court. (Jt. Appx. 972-92.) Judge Gaitan denied the COA on all grounds. (Jt. Appx. 1055-72.)

Purkey then applied for a COA from this Court, which was configured in pertinent part:

III(A)(1)(a) Whether counsel was ineffective for failing to hire a mitigation specialist;

III(A)(1)(b) Whether counsel was ineffective for failure to investigate mitigation witnesses;

III(A)(1)(c) Whether counsel was ineffective for failing to properly prepare and present the testimony of Dr. Stephen Peterson;

III(A)(1)(d) Whether counsel was ineffective for failing to properly prepare and present the testimony of Dr. Mark Cunningham;

III(A)(1)(e) Whether counsel was ineffective for failing to properly prepare and present the testimony of Dr. Bruce Leeson;

III(A)(1)(f) Whether counsel was ineffective for failing to investigate and prepare the testimony of Dr. Grant and Mark Russell, which led to them being prejudicial;

III(A)(1)(g) Whether the district court erred in entering an order that was conclusory and insufficient for appellate review;

III(A)(2) Whether the district court erred in denying the § 2255 motion without a hearing;

III(B) Whether counsel's affidavit should have been stricken, with four sub-parts; and

III(C) Whether counsel rendered ineffective assistance in not calling Dr. Peterson in the guilt phase of the trial to rebut a claim of recent fabrication. (Purkey App. COA, i-ii.)

On June 10, 2011, this Court granted the application for a COA in part, on the issues designated by Purkey as Part III(A)(1)(b)-(f) and III(A)(2). All other requests for a certificate were denied. Even though this Court granted a COA on just six issues, Purkey has briefed eight issues on appeal. The Government moved to strike the two issues Purkey appealed without a COA, and this Court ordered that the motion be taken with this brief.

## B.    *Guilt Phase Evidence*

Purkey was tried and convicted of kidnaping, raping, and murdering 16-year-old Jennifer Long. On December 15, 1998, while in the Wyandotte County jail awaiting trial for the robbery and first-degree murder of 80-year-old Mary Ruth Bales, Purkey contacted law enforcement and offered to speak about a murder and kidnaping that had occurred earlier that year. Purkey said he wanted to spend his time in a federal prison, rather than a state prison. After giving an account of the kidnaping, rape, and murder of the victim, later

identified as Jennifer Long, Purkey refused to cooperate further unless he was assured he would be federally prosecuted.

Frederick Duchardt was appointed to represent Purkey at trial. Mr. Duchardt was a state public defender for 15 years, and has acted as lead counsel in three other federal capital cases and in four state (Missouri) capital cases. Laura O'Sullivan, also a former state public defender, served as second-chair. (Jt. Appx. 605-06.)

At trial, the Government established that on January 22, 1998, Purkey applied for a position as a plumber with the Roto-Rooter plumbing company, located in Kansas City, Missouri. Following the interview, Purkey stopped his truck in a parking lot and smoked a rock of crack cocaine and then proceeded east on Truman Road. (Tr. 925.)[1] Purkey planned to go buy something to drink before heading back to his home in Lansing, Kansas. (Tr. 485.) At that point, Purkey saw a young woman whom he believed to be approximately 17 to 19 years of age. During a conversation with the girl he learned that her name was Jennifer. Purkey asked the girl if she wanted to get something to drink with him. Jennifer entered the pickup without any threats or force, according to Purkey. (Tr. 485.) The two then drove to a liquor store a few

---

[1]"Tr." refers to the trial transcript by page number.

miles away and purchased gin and orange juice. Purkey soon learned that Jennifer was in high school and that she had left school during the morning after arguing with some female classmates. (Tr. 485.)

Purkey then informed Jennifer that he wanted to go to his home, which was in Kansas, for a few minutes. Jennifer told Purkey that she did not want to go to Kansas and that she wanted to be dropped off. At that point, Purkey reached over into the glove box, pulled out what he described as a boning knife and placed it under his right thigh in the presence of Jennifer. Purkey claimed that it was at that point that he decided not to let Jennifer out of his truck. (Tr. 487.)

Purkey then drove west on Interstate 70 from Missouri into Kansas, to his home in Lansing. (Tr. 487, 493-94.) Upon arrival, Purkey took Jennifer into his basement; she asked him to please take her back home. (Tr. 510.) Holding a knife in his hand, Purkey ordered Jennifer to take her clothes off and lie down on the floor, where he then raped her. (Tr. 997.)

Following the rape, Purkey told her that he had just finished a long sentence in the penitentiary and did not want to return. Jennifer told Purkey that she had been a virgin. Purkey became fearful. (Tr. 942.) Jennifer begged Purkey to let her leave. (Tr. 1017.) A brief struggle ensued and Purkey

became enraged and began stabbing Jennifer in the chest, neck, and face, eventually breaking off the blade of the knife inside of her body. (Tr. 942-43, 1017-18, 1024.)

Following the murder, Purkey put Jennifer into a large tool box designed to fit into the back of a pickup truck. (Tr. 1024-25.) Purkey changed his clothes and got rid of Jennifer's backpack. Purkey then drove to Snoopy's Bar in Lansing and had several drinks. (Tr. 1025-26.) Purkey next drove to the Sears store in Lansing and purchased an electric chainsaw for $59.[2]

Over the next several days, while his wife was at work and his stepchildren were at school, Purkey dismembered Jennifer Long with the chainsaw while she was lying inside the tool box. (Tr. 1028-29.)[3] Purkey put her body parts in plastic bags and mixed in leaves and debris from his back yard. (Tr. 1029-30.) Purkey burned her body parts in his fireplace; he purchased two cords of wood and used diesel gasoline to accelerate the burning process. (Tr. 492, 646-47, 1030.)

---

[2]Investigators later recovered a copy of the receipt from Sears confirming Purkey purchased the electric chainsaw on January 22, 1998. (Tr. 501, 1022.)

[3]The tool box was later recovered by investigators at the home of Purkey's friend, Patrick Howe. Purkey gave the tool box to Mr. Howe following the murder. (Tr. 730-32.) The box has several chainsaw cut marks in the bottom and on the sides. (Tr. 730, 810-18, 1029.)

Purkey next cleaned up the chainsaw using gasoline to remove the blood and human debris. (Tr. 1032.)[4] Purkey made his three stepsons help him wash down the basement although they had no idea that a murder had taken place there. (Tr. 648-49, 1030-31.) Purkey also swept the ashes out of the fireplace after burning Jennifer's body parts. Purkey used a hammer to crush the bones that did not burn up. (Tr. 1033.) The bags with the bones and ashes were taken by Purkey south to Clearwater, Kansas, after his family moved from Lansing in March 1998. (Tr. 517, 1034.)

Purkey threw the bags with Jennifer's ashes and bones into a septic pond located on the property in Clearwater. Crushed human bones of an individual under the age of 25 were recovered from the pond in the area where Purkey indicated he had thrown Jennifer's remains. (Tr. 789.) Human bones were also found in the sweepings from the ash pit of the fireplace at Purkey's former home. (Tr. 781-83.) All of the bones recovered by the FBI appeared to have been burned. (Tr. 781-94.) Purkey admitted the bones recovered from the septic pond were those of Jennifer Long. (Tr. 1034.)

Purkey's defense at trial was that he did not kidnap the 16-year-old victim and that she had gone with him to Kansas voluntarily. (Tr. 934, 1014.)

---

[4]The chainsaw was recovered by investigators from the home of Purkey's stepfather, Edward Wiley. (Tr. 639-40.)

Purkey's testimony at trial was inconsistent with all four of his previous statements to investigators in which he steadfastly insisted that he had kidnaped Jennifer Long. Significantly, Purkey's testimony also contradicted his own prior sworn testimony in the same case, while represented by the same attorneys as at trial, in a suppression hearing held October 25, 2002, before United States Magistrate Judge Sarah W. Hays. (Tr. 1002-08, 1041-43.) The jury rejected Purkey's testimony and defense, returning verdicts of guilty on November 5, 2003.

## C.     *Penalty Phase Evidence*

The Government called nine witnesses in its case-in-chief during the penalty phase in support of its submission of six statutory and four non-statutory aggravating factors. (Tr. 1210-1403.) Purkey called 18 witnesses, including four doctors to testify concerning his alleged mental disorders, in support of his submission of 27 mitigating factors. (Tr. 1406-1955.) In rebuttal, the Government called four expert witnesses, including three doctors, in response to Purkey's diminished mental capacity and brain damage claims. (Tr. 1962-2225.)

*1.      Aggravation Evidence*

The Government submitted six statutory aggravating factors to the jury, and the jury found all six, that: (1) the death of Jennifer Long occurred during the commission and attempted commission of her kidnaping; (2) Purkey killed Jennifer Long in an especially heinous, cruel, and depraved manner in that the killing involved torture and serious physical abuse; (3) the victim was particularly vulnerable due to her youthful age of 16 years; (4) Purkey had previously been convicted of an offense punishable by a term of imprisonment of more than one year, involving the use, attempted use, and threatened use of a firearm against another person; (5) Purkey had previously been convicted of an offense resulting in the death of a person for which a sentence of life imprisonment was authorized by statute; and (6) Purkey had previously been convicted of two or more offenses punishable by a term of imprisonment of more than one year, committed on different occasions and involving the infliction and attempted infliction of serious bodily injury and death upon another person.  (Govt. Appx. A3-A6.)

The Government submitted four non-statutory aggravating factors to the jury, of which the jury found three, that: (1) the Government established loss and harm because of the victim's personal characteristics as an individual

-17-

human being and the impact of the death upon the victim's family; (2) Purkey had previously killed Mary Ruth Bales in a vicious manner in that he repeatedly struck her in the head with a hammer until she died; and (3) Purkey had a substantial criminal history. The Government also submitted a non-statutory aggravating factor that the jury did not find – the future dangerousness of Purkey. (Govt. Appx. A6-A8.)

Before Purkey murdered Jennifer Long and Mary Ruth Bales, he spent most of his adult life incarcerated in various prisons in the states of Kansas, Arizona, and Oregon. Purkey had 13 prior felony convictions before receiving the sentence of death in this case, including: a 1971 conviction for first-degree burglary; 1976 convictions for robbery and theft; a 1978 conviction for aggravated escape from custody; a series of convictions for aggravated robbery, kidnaping, aggravated battery, and firearms violations stemming from a 1980 crime spree which included two home invasion robberies plus the kidnaping and aggravated battery of Gregg Carlberg described below; and Purkey's May 2000 convictions for the first-degree murder and aggravated robbery of Ms. Bales. (Tr. 975-86, 1211-14, 2166.) Purkey received a life sentence as part of his 1980 crime spree but was paroled in March 1997 after serving approximately 16½ years on the life sentence. (Tr. 985.)

Evidence in the Government's aggravation case established that on October 27, 1998, approximately nine months after kidnaping, raping, murdering, and dismembering Jennifer Long, Purkey went to the Kansas City, Kansas, home of Mary Ruth Bales, an 80-year-old widow who walked using a cane. Ms. Bales had called Reddi-Root'r about a leaking pipe. Purkey, who had been working at Reddi-Root'r for about ten weeks, agreed to make the necessary repairs for Ms. Bales.

The next day, October 28, 1998, Purkey smoked crack cocaine with a prostitute and then drove to the home of Ms. Bales with the prostitute in his work van. While the prostitute waited outside, Purkey went into Ms. Bales' bedroom, and when Ms. Bales asked him what he was doing there, he viciously bludgeoned the 80-year-old grandmother to death with a claw hammer. Using the claw side of the hammer, Purkey caved in Ms. Bales' cranium and face. She had defensive wounds on both of her hands, apparently having tried to ward off the hammer blows from Purkey. (Tr. 1236.) While Ms. Bales lay dead in her bedroom, Purkey stole $200 from her purse, after which he and the prostitute smoked some more crack cocaine and ate food from Ms. Bales' kitchen. Purkey planned to burn down Ms. Bales' house to eliminate evidence, but before he could, he was arrested for these crimes and confessed.

He was charged with first-degree murder and aggravated robbery in Wyandotte County, Kansas, District Court and pled guilty as charged on April 28, 2000. Purkey was sentenced to a term of life imprisonment with eligibility for parole after 15 years. (Tr. 1215-43.)

As additional aggravation evidence, Gregg Carlberg testified that he was the victim of a kidnaping, aggravated battery, and aggravated assault by Purkey in 1980. Carlberg was kidnaped from a convenience store in the summer of 1980 in Wichita, Kansas. (Tr. 1245.) He then was put into the trunk of a car and driven to a wooded area by Purkey and an accomplice, robbed of $40, and later shot in the head and shoulder while being forced to lie down in an abandoned bathtub in the woods, even though he did not resist the robbery at all. (Tr. 1250-54.) Purkey later admitted to shooting Carlberg in the back of the head. (Tr. 1256.) Carlberg suffered serious injuries including paralyzation for several months, a stroke, and permanent neurological damage. Part of the bullet Purkey fired into Carlberg's head remained lodged in the back of his skull. (Tr. 1253-54.)

Ken Lucas, a gang expert with the Arizona Department of Corrections, testified that Purkey was an active member of the Arizona Aryan Brotherhood, a violent white supremacist prison gang, while confined in a Florence,

Arizona, prison in the early 1980's. (Tr. 1340-48, 1352-54, 1360.) Mr. Lucas also explained the meaning of many of the tattoos that appeared on Purkey's body and their association with the Aryan Brotherhood. Purkey had a large "Aryan Brotherhood" tattoo on his back, a Nazi swastika surrounded by "Aryan Pride" on his arm, another swastika tattoo on his right forearm, and a tattoo of a Ku Klux Klansman with a shotgun and a noose. (Tr. 1361-66.)

Gary Lee Hatfield, a former inmate of slight stature who briefly served time with Purkey in the Oregon Department of Corrections in 1987, testified that Purkey forcibly sodomized him at knife-point and then beat him in the kitchen of the prison camp where they were serving prison sentences. (Tr. 1270, 1273-77.)

William Porter, District Attorney for Tillamook County, Oregon, was the prosecuting attorney assigned to prosecute the Hatfield sodomy case. (Tr. 1315-17.) He testified he eventually dismissed the forcible sodomy charge against Purkey because Purkey cooperated in an internal prison investigation that resulted in criminal charges against prison employees. Mr. Porter testified that Hatfield never recanted his allegations that Purkey had beaten and forcibly sodomized him in the kitchen of the prison camp. In addition, Porter described

-21-

the incriminating evidence contained in his files, including photographs of injuries to Hatfield as a result of the assault. (Tr. 1318-29.)

The parents of Jennifer Long as well as one of her close personal friends testified, explaining what her loss meant to their lives and how it affected their families. (Tr. 1396-1406.)

### 2. *Mitigation Evidence*

Purkey called 18 witnesses to support the 27 mitigating factors he submitted to the jury. His mitigation case lasted approximately three days and took more than 500 pages of trial transcript. (Tr. 1406-1955.) The 27 mitigating factors Purkey submitted to the jury were: (1) Purkey's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired; (2) Purkey committed the offense under severe mental or emotional disturbance; (3) With proper medications, such as the medications that Purkey is currently taking, Purkey's mental illness and behaviors can be managed; (4) Purkey suffered brain injuries as a result of car accidents, drug abuse, or both; (5) Purkey suffered significant psychological and emotional damage as a result of the serious physical and emotional abuse of him by his parents; (6) Purkey suffered significant psychological and emotional damage as a result of sexual abuse of

him by his mother; (7) Purkey suffered significant psychological and emotional damage as a result of his growing up in a dysfunctional home environment in which alcohol abuse, sexual promiscuity, and incestuous sex were modeled as proper behavior by his parents; (8) Purkey has never received treatment for the psychological and emotional damage that he suffered as a result of his parents' abuse of him; (9) Purkey's past criminal behavior is attributable, at least in part, to the brain injuries and psychological and emotional damage that he suffered earlier in his life; (10) Purkey became dependent upon alcohol and illegal drugs at an early age because of a genetic predisposition inherited from his parents and because such dependence was modeled for him by his parents and his older brother Gary; (11) Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence; (12) As a child, Purkey suffered from slow speech development, and for his entire life, Purkey has suffered from the disability of stuttering; (13) While incarcerated, Purkey was the victim of serious physical abuse, that is stabbings; (14) While incarcerated, when given the opportunity to do so, Purkey completed a significant number of hours of college course work; (15) While incarcerated, when given the opportunity to do so, Purkey received training and became qualified as a plumber; (16) Purkey has offered to donate a portion of his liver to his sister-

in-law who is dying of liver failure; (17) Purkey should be sentenced to life imprisonment without release because Purkey was led to believe that he would receive that sentence if he provided information regarding the killing of Jennifer Long, and Purkey provided all of the information which was required; (18) The disappearance of Jennifer Long was solved only because Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing; (19) By coming forward and admitting that he had killed Jennifer Long, and directing authorities to evidence about the killing, Mr. Purkey has shown remorse for what he did; (20) Purkey has repeatedly expressed his remorse for what he has done; (21) Purkey is the father of Angie Purkey Genail, and the two have carried on a loving, father-daughter relationship, with Purkey providing Angie Purkey Genail advice, nurturance, and emotional support, even while he has been incarcerated; (22) Angie Purkey Genail loves her father Mr. Purkey very much; (23) If Purkey is sentenced to life imprisonment without possibility of release, he and Angie Purkey Genail would continue to carry on a loving, nurturing father-daughter relationship; (24) Purkey is the grandfather of Angie Purkey Genail's children Mikey, age 4, and Haley, age 1, and has carried on a loving, grandfatherly relationship, particularly with Mikey, speaking with Mikey on

the telephone on numerous occasions; (25) If Purkey is sentenced to life imprisonment without possibility of release, he and his grandchildren, Mikey and Haley, would continue to carry on a loving, nurturing grandfather/grandchild relationship; (26) Purkey has loving and caring relationships with friends and family, and those relationships would continue if he was sentenced to life imprisonment without possibility of release; and (27) For the last three years, Mr. Purkey has volunteered to offer good advice to many young men in trouble about how to avoid a life of crime, and would continue to do so if sentenced to life imprisonment without possibility of release. (Govt. Appx. A9-A16.)

Despite the presentation of the exhaustive mitigation case consisting of 18 witnesses over three days, covering more than 500 pages of transcript in support of 27 mitigating factors, no juror found a single mitigating factor. Purkey's witnesses included: a prison psychiatrist; a criminal defense attorney who had previously represented Purkey; several former inmates who had been incarcerated with Purkey; a friend and pastor; a friend who was a tattoo artist; an administrator from the Hutchinson Correctional Center who had supervised Purkey while he was a custodian; a former parole officer from the State of Kansas; Purkey's aunt; a friend who was incarcerated with Purkey at the

Hutchinson Correctional Center; Purkey's daughter; Purkey's brother; a prison minister; a clinical psychologist with the Missouri Department of Corrections; a correctional counselor from the United States Penitentiary at Leavenworth; a radiologist from Kansas University Medical Center; a forensic psychiatrist; and a clinical and forensic psychologist who testified as a mitigation specialist.

Dr. William Grant, a Bureau of Prisons psychiatrist, testified that he had prescribed three medications for Purkey, which were designed to address Purkey's depression, anxiety, anger, and aggression. Dr. Grant testified that he used the best medications that were available. (Tr. 1406-16.)

Dennis Messoline, an Oregon attorney who represented Purkey in the Gary Hatfield sodomy case, testified that he had planned to assert a consent defense, and had filed a motion with the court seeking permission to elicit Mr. Hatfield's prior sexual history at trial before the case was eventually dismissed. (Tr. 1664-1736.)

Nealy Vinson, a former inmate who was incarcerated with Purkey and Hatfield in Oregon, was called to discredit Hatfield's account of the sexual assault by Purkey. Vinson testified that Purkey got along well with other inmates and that he was not a racist. Vinson also testified that Purkey was not violent during his incarceration in Oregon. (Tr. 1449-64.)

Randy Masterson, another inmate who was incarcerated with Purkey in Oregon, testified Purkey was not a racist, got along well with the other inmates, and was not involved with the Aryan Brotherhood prison gang in Oregon. Purkey also offered Masterson's testimony to discredit Hatfield. Masterson testified that he had sexual relations with Hatfield in a broom closet at the prison. Masterson also testified that he was the homosexual lover of Purkey for two and a half years. (Tr. 1468-76.)

Linda Skeen, a pastor at the Faith and Evangelistic Center in Leavenworth, Kansas, testified that she became a friend of Purkey's while he was on parole in 1997 and 1998. Skeen testified that Purkey was always nice when in her home and that she and her husband referred to Purkey as "Uncle Wes." (Tr. 1478-84.)

Patrick Howe, a friend of Purkey's and a tattoo artist, testified that Purkey asked him to cover up his Nazi swastikas and Aryan Brotherhood tattoos. Howe testified that he tried to cover up the tattoos with skin toned ink, but the process was unsuccessful. Howe also testified that Purkey was friendly to people of other races in prison. (Tr. 1485-91.)

Dominic Genuik, a Public Service Administrator at the Hutchinson Correctional Facility in Kansas, testified that Purkey was an auditorium

custodian while incarcerated at his institution. Genuik testified that Purkey participated in a program called JAIL (Juvenile Assistance Information Liaison), a program similar to the Scared Straight program. The purpose of the program was to counsel juvenile offenders not to violate the law and to share prison experiences. Inmates participating in the program would share with the juveniles the consequences of negative behavior in an effort to discourage participation in criminal activity. Genuik testified that Purkey was not a racist, counseled both African-American and Hispanic juveniles, and he did not consider Purkey to be a security threat at the institution. (Tr. 1491-1501.)

Michael Gibbons, a correctional counselor from the Lansing Correctional Facility, testified that he was Purkey's former parole officer in Kansas. Gibbons testified that Purkey participated in a drug and alcohol counseling program, a family counseling program, and that he was employed while on parole. Gibbons testified that Purkey had no employment problems while under his supervision. Gibbons further testified that while Purkey was on parole he tested positive for alcohol, and although he denied using cocaine, he sought to gain admission into a drug counseling program at the Kansas University Medical Center. (Tr. 1502-17.)

Marguerite Hotchkiss, Purkey's 78-year-old aunt, testified she was the sister of Purkey's father. She testified in detail about Purkey's neglectful and disadvantaged childhood. She further testified that when Purkey was five years old, he could not speak words and would only grunt. She said that Purkey was a stutterer as he got older and that stuttering was a common trait in Purkey's family. Hotchkiss testified that Purkey's father, Jack, had suffered a head injury requiring a metal plate to be inserted in his head, that he had terrible headaches, and that he was an alcoholic who was always drunk. She also testified that Jack Purkey lost a good job at Boeing Aircraft in Wichita, Kansas, because of his alcohol problem. She further testified that Jack Purkey committed suicide in 1984. She testified that Purkey was involved in a terrible automobile accident and was hospitalized. Hotchkiss also testified about her love for Purkey and that she would continue her relationship with him if he was granted a sentence of life without parole. (Tr. 1520-29.)

Robert Lopez, a fellow inmate who was incarcerated with Purkey at the Hutchinson Correctional Facility in Kansas, worked as a custodian with Purkey. Lopez testified that Purkey was not associated with the Aryan Brotherhood prison gang at the Hutchinson facility. He testified that Purkey read the Bible frequently and he considered Purkey to be a friend who had

counseled him about staying out of gangs while in prison. Lopez also testified Purkey was not a racist and would help African-American inmates with legal work. He testified Purkey represented other inmates, never fought with other inmates, counseled juvenile offenders, and did not use drugs in prison. Finally, Lopez also testified that in his opinion, Purkey loved his daughter very much. (Tr. 1530-40.)

Angie Genail, Purkey's daughter, testified about her relationship with her father. She displayed a large number of photographs of Purkey's family and described for the jury the individuals in each photo. She testified Purkey's parents were alcoholics. She testified that Purkey had shared with her that his mother had thrown alcoholic drinks in his face when he was a child. She testified that she had a good and loving relationship with Purkey and he had always kept in contact with her even though most of his adult life was spent in prison. She testified that Purkey was a good grandfather to her son, was supportive to her, that she loved him, and that she would maintain a relationship with Purkey if he was given a life sentence. (Tr. 1541-48.)

Gary Hamilton, Purkey's brother, testified that Jack Purkey was his stepfather and Purkey's father. Hamilton testified that Jack Purkey was an alcoholic who had lost his job at Boeing Aircraft, after which he lived on skid

row in Wichita.  He testified that Jack Purkey beat Purkey, himself (Gary), and their mother frequently.  He testified that Purkey's mother, Velma Purkey, was also an alcoholic and would bring men home to have sex in front of both him and Purkey when they were children and in their teen years.  He testified those men beat both him and Purkey.  Hamilton further testified his mother sexually abused him, but Hamilton did not know if she had also sexually abused Purkey.  He also testified that both he and Purkey had been diagnosed as bipolar.  He testified that he had prior felony convictions for property theft crimes, but he had decided to change his life in the 1970's and had not been in trouble with the law since that time.  He further testified that Purkey had volunteered to donate part of his liver to help Hamilton's sick wife who had liver disease.  On cross-examination, Hamilton admitted that Purkey had been an aggressive, self-centered, and manipulating con man.  (Tr. 1548-64.)

Reverend John Otto, a prison minister at the Hutchinson Correctional Facility, testified that he counseled Purkey in prison.  He further testified that in his belief, Purkey was a Christian and he was remorseful for his criminal conduct.  (Tr. 1564-69.)

Dr. Bruce Leeson, a clinical psychologist with the Missouri Department of Corrections, testified that he was retained as an expert witness for Purkey

and had administered neuropsychological tests to Purkey. Dr. Leeson testified that in his opinion Purkey was depressed and anxious and had a significant amount of frontal and temporal lobe brain impairment, which detrimentally affected his ability to plan ahead and focus. He further testified that the brain damage could explain Purkey's impulsive behavior. On cross-examination, Dr. Leeson said that Purkey had scored well on intelligence tests, and that Purkey's test results correlated with classification profiles for drug abuse, assault, rape, and antisocial personality disorder. (Tr. 1577-1650.)

Mark Russell, a correctional counselor at the United States Penitentiary in Leavenworth, Kansas, testified that while Purkey was incarcerated in the special housing unit at Leavenworth he had no disciplinary violations. He further testified that Purkey had submitted a request to have his tattoos surgically removed or covered. (Tr. 1651-63.)

Dr. David Preston, a physician, testified that according to tests he performed on Purkey, Purkey had frontal and temporal lobe brain damage. He said it could have been caused by car accidents Purkey had been in, or by Purkey's drug and alcohol abuse. (Tr. 1664-1736.)

Dr. Stephen Peterson, a forensic psychiatrist, was another expert witness who testified on Purkey's behalf. Dr. Peterson said that he testifies as an

expert witness about 10 to 20 times per year, usually for the defense, and has previously testified in capital cases. Dr. Peterson testified he had received and reviewed a stack of Purkey's records from trial counsel that was about three feet, three inches high. Dr. Peterson opined that Purkey had a longstanding chronic mental illness that had been untreated at the time of the murders of Jennifer Long and Mary Ruth Bales. He testified that Purkey suffered severe sexual, physical, and emotional abuse during childhood. He testified that Purkey was extremely impulsive and angry, and concluded that Purkey had substantial problems with substance abuse beginning in his teens. He testified that Purkey suffered from depression and was dysthymic, and had a severe personality disorder with anti-social features, obsessive-compulsive, and dependency features. (Tr. 1738-58.)

Dr. Peterson further described in detail three closed-head injuries that Purkey allegedly suffered in 1968, 1972, and 1974. He testified in great detail about Purkey's abusive, chaotic, and neglectful home life as a child and teenager. He described Purkey's parents as alcoholics and told the jury that Purkey's father had committed suicide. In conclusion, Dr. Peterson testified that Purkey did not have the capacity to form the intent to kill Jennifer Long because of severe psychiatric illness. (Tr. 1749-85.)

On cross-examination, Dr. Peterson admitted that Purkey had most if not all of the characteristics of antisocial personality disorder, and that 12 or 13 psychologists/psychiatrists had concluded that Purkey was a sociopath and/or had antisocial personality disorder. (Tr. 1785-1832.)

Dr. Mark Cunningham, a clinical and forensic psychologist, testified as a mitigation specialist on behalf of Purkey. Dr. Cunningham testified that he had reviewed a total of ten binders of information from Purkey's incarcerations in both state and federal prisons, that he reviewed medical and psychiatric records of Purkey's parents, Jack and Velma Purkey, and that he reviewed all Purkey's medical records, psychiatric records, and school records. Dr. Cunningham also reviewed the reports of all the medical experts for both the defense and prosecution, as well as interview summaries of Purkey's friends and family. Finally, Dr. Cunningham interviewed Purkey himself a number of times. He testified that Purkey was a profoundly damaged person in both his neurological and neuro-developmental history. He described in great detail Purkey's abusive, neglectful, and alcoholic parents. He informed the jury of their poor parenting skills and how these had impacted Purkey's development. He also testified that Purkey had been in car accidents resulting

in probable brain damage, consistent with frontal and temporal lobe brain damage. (Tr. 1840-72.)

Dr. Cunningham testified that Purkey's mother had been sexually promiscuous with several boyfriends in front of Purkey and his brother. He also testified that Purkey's mother sexually abused him as a child and as a teenager, and described the abuse. He said Purkey was made to penetrate his mother with a hairbrush and have intercourse with his mother. Dr. Cunningham described reports from Purkey's aunt and brother as corroboration of the sexual abuse. He also described Purkey's significant alcohol and drug addictions, including addiction to methamphetamine, cocaine, and Ritalin. (Tr. 1864-79.)

Dr. Cunningham testified that homicide rates in federal prison were lower than those in American cities, and that there was an extremely high level of security at the Federal Bureau of Prisons facility at ADX Florence, Colorado. He described it as a super-max facility in which the likelihood of violence had been substantially reduced from rates in federal penitentiaries generally, because of the high level of security. Dr. Cunningham also testified that in his opinion, because Purkey was taking appropriate medications to control his behavior, because of his age (then 51 years old), and because of the

high security precautions within the Bureau of Prisons, he believed that Purkey would not be a significant threat to others in the future. (Tr. 1879-1908.)

Dr. Cunningham admitted on cross-examination that there was a very high probability that Purkey would assault someone again, "80, 90 percent or more." (Tr. 1914.) He also admitted that for a good part of Purkey's childhood, Purkey's father worked at Boeing and Purkey attended private Catholic schools. (Tr. 1935.)

3. *Evidence Mr. Duchardt Sought to Introduce in Mitigation*

Trial counsel sought to introduce even more mitigation evidence, but was prohibited by the court. Mr. Duchardt proffered evidence that Purkey's wife, Jeannette Purkey, had poisoned him, under the theory that Purkey was operating under the influence of poison when he murdered Jennifer Long and Mary Ruth Bales. (Tr. 2237-49; *Purkey*, 428 F.3d at 757.) The district court's ruling that this evidence was irrelevant was affirmed by this Court, which held that while there is a low bar for admissibility of evidence in capital sentencing hearings, "this does not mean that the defense has carte blanche to introduce any and all evidence that it wishes." *Id.* at 756. To Purkey's claim on appeal that the evidence should have been admitted to demonstrate his difficult home life, this Court held, "the record is replete with evidence of the difficult and

dysfunctional environments in which Mr. Purkey has lived, and so we cannot conclude that the omission of this additional evidence affected his substantial rights." *Id.* at 757.

Mr. Duchardt also sought to have Dr. Cunningham testify that Purkey suffered from fetal alcohol exposure. (Tr. 1855-56.) The district court prohibited the evidence, ruling that there was no specific evidence that Purkey's mother drank while she was pregnant with Purkey. *Id.* On appeal, this Court concluded that the district court erred in excluding the evidence, given the relaxed standard set forth for capital sentencing hearings, but found that it was harmless beyond a reasonable doubt, as the jury was presented with other significant expert testimony about Purkey's mental condition. *Id.*

Finally, Mr. Duchardt requested that the trial court allow Dr. Peterson to testify in surrebuttal in response to Dr. Mayberg's testimony that Purkey had not suffered significant brain injuries, and that Purkey's actions as a "jailhouse lawyer" were inconsistent with the sort of brain damage claimed by defense experts. *Id.* at 759. On appeal, this Court found that the trial court did not err in excluding the surrebuttal testimony, as it did not relate to a new matter raised in rebuttal. *Id.* This Court further held that even if the rebuttal testimony did relate to a new matter, the putative error did not provide grounds

for reversal as Purkey had presented significant testimony regarding his claimed brain damage and the additional testimony would have offered marginal support, at best. *Id.*

4.    *Rebuttal Evidence*

The Government called four witnesses in rebuttal. Helen Mayberg, M.D., a neurologist, testified that Purkey's brain scans were normal, as were neurological exams conducted on him after his car accidents. She further testified that Purkey's actions before, during, and after the murders of Jennifer Long and Mary Ruth Bales, particularly his efforts at concealment, were inconsistent with the kind of brain damage described by defense experts. (Tr. 1962-2045.)

FBI Supervisory Special Agent James McNamara testified as to Purkey's future dangerousness, and described Purkey as manipulative. In support, McNamara noted for the jury that in 1981, Dr. Targownik in the Kansas prison system filed a report stating that Purkey was quite manipulative and would appease an interviewer for secondary gains. In 2000, 19 years later, another doctor at the Kansas Department of Corrections stated that Purkey would try to manipulate the system to get what he wanted. (Tr. 2052-2110.)

David Martell, Ph.D., an expert in mental disorders, testified that Purkey's test data was entirely within normal limits, and that Dr. Leeson had found minor errors in testing which he blew out of proportion to come to a different conclusion. Dr. Martell also testified that Purkey's personality test results corresponded with those of drug abusers, rapists, those with assault histories, and those with antisocial personality disorder. (Tr. 2112-35.)

Park Dietz, M.D., Ph.D., testified that he examined Purkey's police, prison, and medical records, as well as those of defense experts. Dr. Dietz diagnosed Purkey with antisocial personality disorder and polysubstance abuse. Dr. Dietz testified that to be diagnosed with antisocial personality disorder, a person must exhibit three of seven specified kinds of bad behavior; Purkey showed "abundant evidence of all of them." (Tr. 2170.) Dr. Dietz further testified that Purkey had no mental disease either at the time of trial or at the time he murdered Jennifer Long, as evidenced by Purkey's extensive efforts to cover up the crime. (Tr. 2137-2225.)

The jurors unanimously found nine aggravating factors. Not one juror found even one mitigating factor out of the 27 submitted. (Govt. Appx. A9-A16.)

## SUMMARY OF THE ARGUMENTS

Purkey claims his trial counsel was ineffective in the penalty phase of trial for failing to properly investigate, prepare, and present mitigating witnesses, and conversely, that trial counsel was ineffective for presenting two mitigation witnesses whose testimony was more harmful than helpful. Purkey also argues that the district court erred in denying his motion without an evidentiary hearing. Finally, Purkey appeals two issues for which this Court did not grant a certificate of appealability – the sufficiency of the district court's order, and whether the district court abused its discretion by not striking trial counsel's affidavit that it had ordered trial counsel to submit.

However, the Government's case in aggravation was extremely strong – Purkey committed two brutal and senseless murders against two defenseless women after spending the majority of his adult life in prison for a long series of violent crimes. Purkey's trial counsel investigated, prepared, and presented an exhaustive mitigation case – so exhaustive that even after years of additional investigation and the benefit of hindsight, Purkey has been unable to find a single area of mitigation that was not presented. Purkey therefore is left to argue that trial counsel did not interview witnesses in a "sensitive" manner, that he should have presented even more witnesses to testify to the

exact matters to which the 18 mitigation witnesses testified, that counsel should have asked more or different questions of the mitigation expert witnesses, and, in an about-face, that trial counsel should not have presented mitigation witnesses whom he now claims were more harmful than helpful.

Purkey can show neither deficient performance nor prejudice. Accordingly, the district court's denial of Purkey's motion was proper and should be affirmed.

**ARGUMENTS**

**I.**

**The district court properly denied Purkey's claim that his trial attorney was ineffective for failing to investigate mitigation evidence, because Purkey's trial attorney conducted an exhaustive, thorough investigation, and made sound, strategic decisions after extensive investigation as to what evidence would be helpful but not redundant or cumulative.**

Under Argument I of his brief, Purkey contends that his trial attorney failed to conduct a proper mitigation investigation, claiming that some of the investigative interviews were not conducted in a "sensitive" manner, or not in person, and that trial counsel did not interview every person Purkey had ever known in his life. But even with the benefit of hindsight and years of additional investigation, Purkey fails to allege even one new category of mitigation evidence that was not presented at sentencing, and therefore fails to show either deficient representation or prejudice.

**A.** *Standard of Review*

"We review claims of ineffective assistance of counsel as mixed questions of law and fact." *Toledo v. United States*, 581 F.3d 678, 680 (8th Cir. 2009) (citing *Keys v. United States*, 545 F.3d 644, 646 (8th Cir. 2008)). "We review the district court's factual findings for clear error and the legal

question whether those findings amount to ineffective assistance de novo." *Toledo*, 581 F.3d at 678 (quoting *Keys*, 545 F.3d at 646).  In order to prevail on an ineffective assistance of counsel claim, Purkey must show that (1) "counsel's performance was deficient," meaning "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [Purkey] by the Sixth Amendment; and (2) "the deficient performance prejudiced the defense.  Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffective assistance claim."  *Ortiz v. United States*, 664 F.3d 1151, 1169 (8th Cir. 2011) (citation omitted).

## B.    *Discussion*

"*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing."  *Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).  *See also Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997) (counsel need not have "a scorch-the-earth strategy").

### 1.    *Gary Hamilton*

Purkey alleges ineffective assistance for failure to investigate.  His first claimed subcategory is the failure to interview Gary Hamilton in a "sensitive"

manner. (Purkey Brf. 25.) He speculates that a better investigation/interview would have uncovered an additional act of abuse by Purkey's father, Jack Purkey, against Purkey's mother, Velma Purkey. That is, Hamilton could have testified that Jack Purkey broke Velma Purkey's arm by slamming it in a door. The other additional information that Purkey thinks trial counsel should have uncovered was that Hamilton had been sexually abused by his grandmother (Hamilton had already disclosed and testified that he had been sexually abused by his mother). (Purkey Brf. 25.)

As detailed above in the factual summary, Hamilton testified that he, his mother, and Purkey were physically abused by Jack Purkey, that Velma Purkey had sex with other men in front of Hamilton and Purkey, that their mother's boyfriends beat both Hamilton and Purkey, that Velma Purkey sexually abused Hamilton, and that both he and Purkey were diagnosed as bipolar. (Tr. 1548-64.) Just because different counsel, several years later, uncovered additional details from a witness does not establish that trial counsel was ineffective. *Nave v. Delo*, 62 F.3d 1024, 1037 (8th Cir. 1995). Further evidence regarding the abuse of Purkey's *mother* and *brother* would add nothing to mitigate Purkey's crimes – Purkey's "new" evidence is therefore redundant and cumulative.

-44-

## 2. *Rex Newton*

Purkey next claims trial counsel was ineffective for failing to fully investigate Rex Newton, a prison psychologist from Oregon. However, trial counsel did secure all of Purkey's prison records from Purkey's incarceration in Oregon; indeed, those very records now are being used by Purkey to make the claim that trial counsel should have investigated Purkey's Oregon incarceration more thoroughly. He argues that Dr. Rex Newton would have testified that while Purkey was incarcerated in Oregon, Purkey disclosed sexual abuse in a questionnaire, and that Purkey was not racist or involved in prison gangs in Oregon.

First, the questionnaire was obtained, available, and used by the defense in mitigation. The Oregon records were used and cited by Dr. Peterson and Dr. Cunningham in their reports. In his affidavit, Dr. Newton adds no information to the sexual abuse statements in the questionnaire, in which Purkey wrote only that he was "abused as a child." (Jt. Appx. 269.) Purkey's comment on the questionnaire says nothing about who abused him, or how, or when, and Dr. Newton's affidavit adds nothing to that answer on the questionnaire. (Jt. Appx. 269, 271, 294-95.)

Second, while Purkey spends 25 pages of his brief arguing that Dr. Newton would have significantly bolstered Purkey's claim to having been sexually abused as a child, the *source* of Dr. Newton's record of Purkey's sexual abuse remained the same – Purkey himself. (Purkey Brf. 30-54.) Thus, the Government would have still been able to argue that those claims lacked verification, and that they were "garbage in, garbage out." (Purkey Brf. 53.)

In an attempt to show prejudice, Purkey argues that the Government did not concede that Purkey had been sexually abused, citing the Government's closing argument, "Aren't you tired of people having an excuse for everything?" (Purkey Brf. 51.) Purkey also argues that his disclosure of sexual abuse before he was facing the death penalty is more believable than his statements to Dr. Peterson and Dr. Cunningham.

But this one more iota of evidence that Purkey had been sexually abused as a child would not have added to the mitigation case. Contrary to what Purkey argues, the Government did concede Purkey had a bad childhood, and instead argued that the "abuse excuse" did not mitigate Purkey's vicious and senseless murders of two innocent and defenseless women - murders Purkey committed at the age of 46.

Third, had Dr. Newton testified, the Government would have cross-examined him, resulting in evidence that would have been harmful to Purkey. Dr. Newton would have been questioned about his report stating that Purkey "was transferred out to Oregon to break-up a racial clique he was involved with (Aryan Brotherhood)." (Jt. Appx. 284.) Dr. Newton would have been questioned about his report stating that Purkey only participated in three or four sessions in the program before discontinuing and that Purkey "does not wish to participate in anything [the program] has to offer." (Jt. Appx. 289, 293.) Dr. Newton would have been questioned about his report stating that Purkey's number one problem was "criminal personality." (Jt. Appx. 288.) Given Purkey's record and history, Dr. Newton undoubtedly would have been cross-examined about even more matters damaging to Purkey.

Fourth and finally, even with the benefit of hindsight, Purkey cannot point to *any* new area of mitigation evidence that Dr. Newton would have testified to. He argues that Dr. Newton would have testified that he knew Purkey before he was facing the death penalty, that Purkey was ashamed of his racist tattoos, that Purkey wanted treatment, and that he was abused as a child. (Purkey Brf. 31-32.) So if Dr. Newton had testified, he would have been at least the twelfth mitigation witness who knew Purkey before he was facing the

death penalty,[5] the fourth mitigation witness who knew Purkey from his incarceration in Oregon,[6] the seventh mitigation witness to testify that Purkey was neither racist nor involved in prison gangs,[7] the third mitigation witness to testify that Purkey sought treatment in and/or out of prison,[8] and the sixth mitigation witness to testify that Purkey was abused as a child.[9] Purkey's proffered testimony of Dr. Newton would have been redundant and cumulative of evidence already presented. *United States v. Paul*, 534 F.3d 832, 838 (8th Cir. 2008) (counsel not ineffective for failing to present redundant and cumulative evidence); *Winfield v. Roper*, 460 F.3d 1026, 1033 (8th Cir. 2006) (same); *Bucklew v. Luebbers*, 436 F.3d 1010 (8th Cir. 2006) (counsel not

---

[5]Angie Genail, Gary Hamilton, Nealy Vinson, Randy Masterson, Linda Skeen, Dominic Genuik, Michael Gibbons, Marguerite Hotchkiss, Robert Lopez, the Reverend John Otto, and Dennis Messoline all knew Purkey before he faced the death penalty.

[6]Dennis Messoline, Nealy Vinson, and Randy Masterson all knew Purkey from his Oregon incarceration.

[7]Mark Russell, Nealy Vinson, Randy Masterson, Patrick Howe, Dominic Genuik, and Robert Lopez all testified that Purkey was not racist or involved in prison gangs.

[8]Michael Gibbons and Dr. Peterson both testified that Purkey sought treatment.

[9]Angie Genail, Gary Hamilton, Marguerite Hotchkiss, Dr. Stephen Peterson, and Dr. Mark Cunningham all testified to abuse Purkey suffered as a child.

ineffective for not calling witnesses who would damage his case or whose testimony would be cumulative); *Hall v. Luebbers*, 296 F.3d 685, 694 (8th Cir. 2002) (counsel not ineffective for failing to adduce cumulative evidence).

In short, Dr. Newton would have provided no information regarding Purkey's sexual abuse beyond what the Oregon prison records trial counsel had already secured, he would have provided only cumulative evidence on other matters, and he would have been cross-examined on records which would have been harmful to Purkey. To the extent Purkey argues that Dr. Newton would have provided additional corroboration for evidence that was presented in the mitigation case, the Supreme Court recently held that largely duplicative and substantiating "new" mitigation evidence will not support a finding that trial counsel was ineffective. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1409-10 (2011).

### 3. *Floyd Bose and Dion Leiker*

Purkey argues that his trial counsel was ineffective for failing to interview Floyd Bose and his daughter Dion Leiker, both former law enforcement officers, to present favorable character evidence about Purkey. (Purkey Brf. 54-56.) No fewer than seven mitigation witnesses testified that

Purkey had positive character traits.[10]   And two other law enforcement witnesses testified on Purkey's behalf.[11]

4.    *Peggy and Evette Noe*

Purkey claims that Mr. Duchardt should have called Peggy Noe as a witness to testify that Purkey was abused as a child and had good character traits.  Again, no fewer than five mitigation witnesses testified that Purkey was abused as a child,[12] and no fewer than seven mitigation witnesses testified that Purkey had positive character traits.[13]   As with Purkey's other proffered testimony, the Noes would have been redundant and cumulative of evidence already presented.  *Paul*, 534 F.3d at 838.

---

[10]Angie Genail, Gary Hamilton, Marguerite Hotchkiss, Linda Skeen, Patrick Howe, Robert Lopez, and the Reverend John Otto all testified that Purkey had good character traits.

[11]Dominic Genuik and Michael Gibbons were law enforcement witnesses.

[12]Angie Genail, Gary Hamilton, Marguerite Hotchkiss, Dr. Stephen Peterson, and Dr. Mark Cunningham all testified to abuse Purkey suffered as a child.

[13]Angie Genail, Gary Hamilton, Marguerite Hotchkiss, Linda Skeen, Patrick Howe, Robert Lopez, and the Reverend John Otto all testified that Purkey had good character traits.

5.    *Other Family Members and Associates*

Purkey claims that trial counsel's investigation and interviews of Angie Genail and Marguerite Hotchkiss were inadequate, but does not bother to delineate what was lacking from their testimony.  Purkey's failure to provide specific testimony that would have otherwise been elicited is fatal to his claim. *Delgado v. United States*, 162 F.3d 981, 983 (8th Cir. 1998) (failure to aver what testimony should have been adduced and why it would have affected the result fatal to ineffective assistance claim).  Purkey merely cites the same law professor who provides extensive armchair quarterbacking by attacking the timing and sensitivity of trial counsel's witness interviews.  (Purkey Brf. 59.)

Purkey also complains that trial counsel should have called Purkey's cousin, Debbie Prothero, as character witnesses, along with yet another of Purkey's fellow inmates, Sam Hoffmeier.  (Purkey Brf. 59-60.)  It is unclear why these two witnesses are lumped into Purkey's allegations of an inadequate investigation, since it is undisputed that Mr. Duchardt interviewed these two witnesses.  He can only be challenging Mr. Duchardt's decision not to call these two additional character witnesses to supplement the other seven character witnesses who testified on Purkey's behalf.  To the extent Purkey attacks Mr. Duchardt's trial strategy, his claim must fail.  "Under *Strickland,*

-51-

strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Rodela-Aguilar v. United States*, 596 F.3d 457, 464 (8th Cir. 2010).

In *Worthington v. Roper*, 631 F.3d 487 (8th Cir. 2010), this Court examined Supreme Court law regarding claims of counsel's failure to investigate mitigation evidence. Worthington was sentenced to death by the Circuit Court of St. Charles County, Missouri, after he pled guilty to one count of first-degree murder, one count of first-degree burglary, and one count of forcible rape. *Id.* at 491. Following unsuccessful state appeals and post-conviction motions, Worthington filed a petition for writ of habeas corpus with the federal district court, alleging seven grounds for relief. *Id.*

In his mitigation investigation, Worthington's trial counsel contacted only two of the defendant's relatives, and despite having the names of other family members and acquaintances, he did not contact them or travel to Peoria, Illinois, Worthington's home town, to investigate or interview witnesses. *Id.* at 500. Trial counsel consulted with two mental health experts, after which he elected to not present an area of mitigation evidence, that is, psychological mitigation evidence. *Id.* at 501.

The federal district court found that trial counsel had failed to adequately investigate Worthington's social and medical history, including his family's background, and failed to pursue psychological mitigation evidence, and ordered that Worthington either be sentenced to life in prison without the possibility of parole or be given a new penalty phase hearing. *Id.* at 494. The district court rejected Worthington's argument that his trial counsel was ineffective for failing to investigate and present further mitigation evidence, in particular, that counsel did not present the testimony of Worthington's parents as to his troubled upbringing. Worthington cross-appealed this decision. *Id.* at 503.

This Court reversed the district court's finding of ineffective assistance, holding that counsel had obtained the services of a qualified expert on the issue of the defendant's sanity and had conducted a reasonable investigation into psychological mitigating evidence. *Id.* at 502-03. On the cross-appeal, this Court affirmed the district court's finding that counsel made a reasonable decision to not call Worthington's parents to testify. *Id.* at 505-06.

The opinion examined three Supreme Court cases cited by Worthington in which trial counsel was found ineffective for failing to investigate. The first was *Williams v. Taylor*, 529 U.S. 362 (2000), in which trial counsel did not

begin to prepare for the penalty phase until a week before the trial, failed to introduce evidence of Williams's exemplary prison behavior or his borderline mental retardation, and neglected to uncover records describing his "nightmarish" childhood. *Id.* at 395.

In the second case examined by this Court, *Wiggins*, 539 U.S. at 510, trial counsel was found to have unreasonably limited his investigation when he abandoned any form of mitigation based on personal history after having acquired only the presentence investigation report and city social service records documenting Wiggins's placements in the state foster care system. *Id.* at 523.

The third case examined was *Rompilla v. Beard*, 545 U.S. 374 (2005), in which the petitioner argued trial counsel was ineffective for failing to obtain his school records, juvenile records, evidence of alcohol dependence, and the court file of his prior conviction. *Id.* at 382-83. The Court acknowledged that with regard to the school, juvenile, and alcohol records, there was "room for debate about trial counsel's obligation to follow at least some of these lines in enquiry." *Id.* at 383. However, the Court held trial counsel was deficient for failing to examine the easily obtained court file of Rompilla's prior conviction, which the prosecution had provided notice of its intent to introduce at

sentencing. *Id.* at 389-90. This failure was found to be prejudicial, as entries in the file "would have destroyed the benign conception of Rompilla's upbringing and mental capacity" that trial counsel had supposed. *Id.* at 391.

Worthington argued his trial counsel was ineffective for failing to interview more than two of Worthington's relatives, to procure his records from the Illinois Department of Corrections, and to obtain psychiatric and medical records of Worthington's mother, father, uncle, grandmother, and grandfather. *Id.* at 500. However, trial counsel had sought the opinion of two mental-health professionals upon which he based his decision not to pursue psychological mitigation. *Id.* at 502. This Court found Worthington's trial counsel's investigation was reasonable in contrast with the three above-mentioned Supreme Court cases:

> Cases in which the Supreme Court has held counsel's failure to investigate to be constitutionally ineffective involved a level of deficiency absent from the present case. Counsel in *Williams* neglected to prepare for the penalty phase until one week before the hearing and erroneously believed that state law barred access to their client's records. Counsel in *Wiggins* based their decision not to present any mitigating evidence solely on one page in a presentence investigation report and a collection of social service records that documented their client's placement history in the foster care system. And counsel in *Rompilla* failed to examine a readily available court file that they knew the prosecution planned to introduce as evidence of aggravating factors.

*Id.* at 502.

Having found that Worthington's counsel's investigation was not deficient, this Court held that counsel reasonably decided not to further investigate or present expert psychological evidence at the penalty phase: "[q]uestioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there." *Id.* at 502-03; (quoting *Rompilla*, 545 U.S. at 390); *see also Strickland*, 466 U.S. at 689. This Court found that Worthington's counsel presented a meaningful mitigation case that focused on Worthington's abusive background and persuaded the sentencing court to find as mitigating factors his dysfunctional family life, his abuse and neglect as a child, and his history of drug abuse, and therefore reversed the district court's grant of habeas relief. *Id.* at 503.

With regard to Worthington's cross-appeal of the denial of his claim that counsel should have presented the testimony of Worthington's parents, this Court affirmed the district court's finding that the testimony was cumulative: "[t]he additional testimony 'did not cover any new subject matter and was not substantially more persuasive' than that actually presented, and 'would barely have altered the sentencing profile presented' during the penalty phase. *Id.* at 506 (internal citations omitted) (quoting *Eley v. Bagley*, 604 F.3d 958, 969 (6th

Cir. 2010), and *Strickland*, 466 U.S. at 700). *See also Winfield*, 460 F.3d at 1033 (counsel not ineffective for failing to call witnesses whose testimony would be cumulative); *Bucklew*, 436 F.3d at 1010 (same); *Hall*, 296 F.3d at 694 (same).

Purkey's claim that his trial counsel's investigation was deficient is far weaker than Worthington's was. Purkey does not claim that his trial counsel failed to interview numerous relatives, or that he failed to secure important records, or that he failed to obtain his social and medical history, or that he failed to investigate his family's background, or that he failed to introduce a category of mitigation evidence, all of which Worthington's counsel failed to do. Instead, Purkey claims trial counsel failed to interview witnesses such as Gary Hamilton and Marguerite Hotchkiss in a "sensitive" manner, or to interview and present witnesses such as Dr. Rex Newton, Floyd Bose, and Peggy Noe, none of whom would have provided testimony on "any new subject matter" nor whom would be "substantially more persuasive" than testimony actually presented. *Worthington*, 631 F.3d at 506. Instead, Purkey's claims exactly fit the scenario in which his proposed new evidence "would barely have altered the sentencing profile presented during the penalty phase." *Id.* (quoting *Strickland*, 466 U.S. at 700).

Purkey asks this Court to find his trial counsel ineffective because he did not "scour the globe on the off-chance something will turn up." *Rompilla*, 545 U.S. at 383. Yet even with the benefit of hindsight and years of additional investigation, Purkey proposes no new area of mitigation that Mr. Duchardt should have pursued. The district court properly denied this claim and should be affirmed.

## II.

**The district court properly found that trial counsel adequately prepared and presented the expert testimony of Stephen Peterson, M.D., since Purkey's trial attorney provided Dr. Peterson with all relevant records and exercised reasonable trial strategy in presenting Dr. Peterson's testimony.**

Purkey asserts, under Argument II of his brief, that trial counsel should have elicited more details of Purkey's abuse as a child and that trial counsel failed to remind Dr. Peterson of information in records that had been provided to Dr. Peterson and which Dr. Peterson included in his report, but forgot about while testifying. The district court properly denied this claim and should be affirmed.

### A. *Standard of Review*

"We review claims of ineffective assistance of counsel as mixed questions of law and fact." *Toledo v. United States*, 581 F.3d 678, 680 (8th Cir. 2009) (citing *Keys v. United States*, 545 F.3d 644, 646 (8th Cir. 2008)). "We review the district court's factual findings for clear error and the legal question whether those findings amount to ineffective assistance de novo." *Toledo*, 581 F.3d at 678 (quoting *Keys*, 545 F.3d at 646).

**B.** *Discussion*

Purkey alleges Mr. Duchardt was constitutionally deficient in preparing Dr. Peterson to testify. He claims that Dr. Peterson was not familiar with his own report, but he fails to explain how or why this was Mr. Duchardt's fault. (Purkey Brf. 64.) Dr. Peterson acknowledged at trial that he testified as an expert witness approximately 10 to 20 times per year, for the past 11 years, and had previously testified in capital cases; he therefore should not have needed Mr. Duchardt's help in reading his own report before he testified. (Tr. 1788.)

Purkey's other claim is that Dr. Peterson testified only "generally" about Purkey's abuse as a child, and that Dr. Peterson was "the only one Purkey told about sexual abuse in detail." (Purkey Brf. 63-64.) However, Purkey has not correctly characterized Dr. Peterson's testimony. Dr. Peterson did testify that Purkey had reported his sexual abuse to multiple persons on multiple previous occasions. (Tr. 1752-53, 1816.)

Further, contrary to Purkey's allegations, Dr. Peterson testified in some detail about Purkey's sexual abuse. Dr. Peterson testified that Purkey described that his mother was "teaching him how to sexually stimulate her anally and orally and also washing him in ways that were sexualized, at least in his recollection, all the way back to about age six to ten." (Tr. 1750.)

To the extent he did not provide even greater detail, Mr. Duchardt exercised reasonable trial strategy – as he noted in his affidavit, "I wanted Dr. Peterson to strike a balance so that enough was said about the varieties of sex used by the mother upon Wes and the young age at which she exposed Wes to those kinds of sex, in order to give Dr. Peterson the opportunity to convey the psychological and emotional damage wrought by overwhelming one too young with such sex games." (Jt. Appx. 687.)

Contrary to Purkey's allegations that the Government used his supposed recent fabrication of sexual abuse as a "linchpin" in its closing argument and that Dr. Peterson's findings were a "fairy tale," Government counsel essentially conceded that Purkey had been abused as a child. (Purkey Brf. 65.) What Government counsel instead argued was that Purkey's abuse as a child did not mitigate horrific crimes he committed when he was 46 years old. The prosecutor used as an example Purkey's brother, who had also been physically and sexually abused but nevertheless lived a law-abiding life:

> Now, the next group of mitigating factors have to do with the defendant's bad childhood. Now, that's the old abuse excuse. He had a bad childhood. No doubt he did not have a good childhood. I'm not disputing that. But many people in this country grow up with alcoholic parents or are abused and they turn out fine. His own brother corrected his behavior way back in 1977, decided he wasn't going to do any more crimes, and he changed. And this is about personal choices. He chose not to make any changes in his

life.   He just kept doing the same things, being violent, committing crimes.  He made those choices.

What about personal responsibility?  Aren't you tired of people having an excuse for everything?  This guy goes out and he beats – he stabs this girl to death, beats an 80-year-old grandmother, and it's somebody else's fault.

(Tr. 2268.)

Purkey has mischaracterized the Government's argument that Dr. Peterson's "findings were a fairy tale." (Purkey Brf. 65.)  The Government was not referring to Purkey's claim of sexual abuse, but rather Dr. Peterson's opinion that Purkey suffered from a mental disease:

Dr. Peterson, who Dr. Dietz so aptly stated, his findings were a fairy tale.  He couldn't even show me in the DSM-IV manual where he had come up with this diagnosis.  And that's the Bible of forensic psychiatry.  He said that medication could control and has controlled this defendant's behavior.  Ten minutes after he says that, the defendant interrupts the proceedings in an angry outburst.

(Tr. 2267.)

Purkey cites two cases in support of his argument that Mr. Duchardt was ineffective for failing to prepare and present the testimony of Dr. Peterson. Both are easily distinguishable from the facts of this case.  In the first, *Hovey v. Ayers*, 458 F.3d 892 (9th Cir. 2006), the Ninth Circuit found that trial counsel was ineffective for failing to provide to the primary mental health

expert in mitigation: (1) medical records of an incident in which the defendant was hospitalized following what may have been a schizophrenic episode; and (2) details of the crime for which the defendant was on trial. *Id.* at 925-26. The second case Purkey cites is *Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003), in which trial counsel was found ineffective for failing to *investigate* the defendant's abuse as a child. *Id.* at 367-68.

By way of contrast, in this case Purkey faults trial counsel for not helping the expert witness read his own report, and for failing to ask a question about the report on re-direct examination. Purkey does not claim that Mr. Duchardt failed to provide significant records to the expert, or that he failed to investigate an entire category of mitigation, such as Purkey's abuse as a child.

More on point than the cases cited by Purkey is a recent opinion from this Court, in which the defendant claimed that trial counsel was ineffective for failing to provide documentation supporting his mitigation claims. *Williams v. Norris*, 612 F.3d 941 (8th Cir. 2010). Williams was sentenced to life in prison for capital murder, attempted capital murder, kidnaping, aggravated robbery, theft, and arson in 1999 in Arkansas. While serving that sentence, he escaped from prison, went to a nearby residence where he shot and killed the homeowner, after which he stole the victim's firearms and truck and eluded

capture for one day. *Id.* at 945. He was captured after a high-speed car chase that ended when Williams crashed into a water truck, killing the driver. *Id.* In the penalty phase of the trial, the jury found four aggravating circumstances: (1) the murder was committed while Williams was unlawfully at liberty after a felony conviction; (2) Williams previously committed a violent felony; (3) Williams caused the death of more than one person during the criminal episode; and (4) Williams killed the victim for the purpose of evading capture. The jury found one mitigating factor – that Williams had experienced inter-generational family dysfunction. *Id.*

In his post-conviction motion, Williams argued his trial counsel was ineffective for failing to introduce supporting documentation to his testifying expert, Dr. Mark Cunningham (who coincidentally also testified in Purkey's case and is the subject of Purkey's third argument) about Williams's difficult childhood and mental challenges. Williams argued that introduction of those documents could have made the claims more plausible to the jury and increased the chance that the jury would find mitigating circumstances. *Id.* at 956.

This Court affirmed the district court's determination that there was neither deficient performance nor prejudice, because counsel had conducted a

thorough investigation of Williams's childhood, introduced extensive testimony by Dr. Cunningham, and made a strategic decision to not ask the jury to sift through all the supporting documentation. *Id.* at 956-57. This Court held, in looking at other claimed errors by Williams, that any error was harmless in light of the four aggravating factors found by the jury, contrasted with just one mitigating circumstance. *Id.* at 956.

Like Williams, Purkey argues that if his trial counsel had introduced into evidence, either though Dr. Rex Newton, or Dr. Peterson, the fact that Purkey wrote on a questionnaire in the late 1980's that he was sexually abused as a child, that Purkey's claim to have been sexually abused "'would have strengthened' and 'confirmed' Dr. Peterson's opinion." (Purkey Brf. 65.) Purkey's claim fails just as Williams's claim failed. Just as Williams's trial counsel made a thorough mitigation investigation and presentation, Purkey's trial counsel made a thorough mitigation investigation and presentation. And Purkey's case in aggravation was even stronger than Williams's – Purkey's jury found nine aggravating factors and no mitigating factors, compared with Williams's four aggravating factors and one mitigating factor.

The district court correctly found that Purkey can show neither deficient performance nor prejudice in trial counsel's preparation and presentation of Dr. Peterson's testimony, and should be affirmed.

**III.**

**The district court correctly found that Purkey's trial attorney adequately prepared and presented the expert testimony of Mark Cunningham, Ph.D., because trial counsel provided Dr. Cunningham with all relevant information and exercised reasonable trial strategy in presenting Dr. Cunningham's testimony.**

Purkey's third argument is that trial counsel failed to elicit enough detail of Purkey's abuse as a child, claiming that Dr. Cunningham testified only "generically" about details such as Purkey's parents not wearing enough clothes in their home. The district court properly denied this claim and should be affirmed.

*A.* *Standard of Review*

"We review claims of ineffective assistance of counsel as mixed questions of law and fact." *Toledo v. United States*, 581 F.3d 678, 680 (8th Cir. 2009) (citing *Keys v. United States*, 545 F.3d 644, 646 (8th Cir. 2008)). "We review the district court's factual findings for clear error and the legal question whether those findings amount to ineffective assistance de novo." *Toledo*, 581 F.3d at 678 (quoting *Keys*, 545 F.3d at 646).

-67-

**B.** _Discussion_

Purkey argues Mr. Duchardt was ineffective in the preparation and presentation of Dr. Cunningham's testimony. However, Purkey does not actually allege a failure to _prepare_ Dr. Cunningham to testify – his argument focuses only on the _presentation_ of Dr. Cunningham testimony. Purkey claims that Dr. Cunningham should have given more detail about Purkey's parents not wearing enough clothes in their home (Purkey saw "his mother frequently in only a negligee"), about Purkey's sexual abuse as a child, and argues Dr. Cunningham should have used slides in his trial presentation. (Purkey Brf. 66-67.)

All of these claims are clearly trial strategy. Mr. Duchardt set forth in his affidavit his trial strategy in having Dr. Cunningham describe some, but not all of the details concerning Purkey's abuse. (Jt. Appx. 692-93.) Likewise, Mr. Duchardt describes his reasonable trial strategy for not having Dr. Cunningham use a PowerPoint demonstration during his testimony, since that would have opened the door for Dr. Park Dietz to use a PowerPoint presentation during his testimony, which Mr. Duchardt hoped to prevent. (Jt. Appx. 693-95.)

As this Court has stated, "We give great deference to counsel's informed strategic decisions, noting we must resist the temptation to second-guess a lawyer's trial strategy. Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Middleton v. Roper*, 455 F.3d 838, 848-49 (8th Cir. 2006) (quoting *Laws v. Armontrout*, 863 F.2d 1377, 1393 (8th Cir. 1988) and *Strickland*, 466 U.S. at 690)) (internal citations omitted).

Purkey argues that trial counsel's presentation of Dr. Cunningham's direct testimony was constitutionally deficient. In analyzing a similar claim, whether trial counsel's cross-examination was deficient, this Court noted, "there are a few, if any, cross-examinations that could not be improved upon. If that were the standard of constitutional effectiveness, few would be the counsel whose performance would past muster." *Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997) (quoting *Willis v. United States*, 87 F.3d 1004, 1006 (8th Cir. 1996)); *see also Williams*, 612 F.3d at 956-57 (concluding counsel's choice to forego presenting documentary evidence in mitigation supported neither deficient performance nor prejudice). Purkey has offered complaints about form, rather than substance, and his claims do not come close

to establishing a "substantial showing of the denial of a constitutional right."

28 U.S.C. § 2253(c)(2).

**IV.**

**The district court properly denied Purkey's claim that his trial attorney failed to adequately prepare and present the expert testimony of Bruce Leeson, Ph.D., because trial counsel provided Dr. Leeson with Purkey's records, and Purkey does not establish how Dr. Leeson's testimony could have been made more credible.**

Under Argument IV of his brief, Purkey argues that Dr. Leeson's credibility was "severely challenged" on cross-examination and that trial counsel was at fault for failing to properly prepare Dr. Leeson for that cross-examination. As Purkey does not explain how more or better preparation would have made Dr. Leeson more credible, the district court properly denied his claim without a hearing and should be affirmed.

*A.* *Standard of Review*

"We review claims of ineffective assistance of counsel as mixed questions of law and fact." *Toledo v. United States*, 581 F.3d 678, 680 (8th Cir. 2009) (citing *Keys v. United States*, 545 F.3d 644, 646 (8th Cir. 2008)). "We review the district court's factual findings for clear error and the legal question whether those findings amount to ineffective assistance de novo." *Toledo*, 581 F.3d at 678 (quoting *Keys*, 545 F.3d at 646).

-71-

## B. *Discussion*

Purkey also argues Mr. Duchardt was constitutionally deficient in failing to prepare Dr. Bruce Leeson to testify: "Counsel's conduct was deficient in failing to provide Dr. Leeson with sufficient records and failing to adequately prepare him for cross-examination." (Purkey Brf. 69.) A review of Dr. Leeson's testimony on cross-examination contradicts Purkey's claim that Dr. Leeson was not provided with records:

> Q: Did you see that Dr. O'Donnell concluded in a neurological examination that it was negative, that there were no indications of brain injury?
>
> A: I don't recall that. It may well be, but I know there are many instances where people are released with no – from the hospital with no significant neurological findings by a neurologist who upon psyche testing show that they have lost or had specific functions compromised very significantly.
>
> Q: Were you aware that a second doctor, Dr. Vinzant, also examined Mr. Purkey and he also concluded that the neurological examination was negative; were you aware of that?
>
> A: I must have read it. I did review the records. . . .

(Tr. 1629.)

> Q: Did you also read in the records from the 1972 accident, the records from St. Joe Hospital, that the defendant apparently suffered a laceration on his forehead; do you remember seeing those records?

A:     I saw those records, yes.  My report reflects that part of the records did diagnose a cerebral concussion.

(Tr. 1630.)

Purkey argues that Mr. Duchardt should have informed Dr. Leeson that Purkey was "a jailhouse lawyer" and claims his defense was prejudiced, "because Dr. Leeson's credibility was severely challenged before the jury simply because he had not been adequately prepared to address the prior reports and other information." (Purkey Brf. 68-69.)  Purkey does not back up this claim with an affidavit or declaration of Dr. Leeson explaining how he could have better explained evidence which contradicted his conclusion – the conclusion that Purkey had some sort of brain damage from a car accident, brain damage never seen or diagnosed until Purkey was charged with a capital crime, and which conclusion was at odds with Purkey's purposeful, manipulative, and self-centered adult life of crime.

It is highly probable that claiming lack of memory of certain records was the best answer that Dr. Leeson could have provided.  Purkey offers no details on how Dr. Leeson could have explained his diagnosis that, contrary to Purkey's claim, was strongly refuted by Dr. Mayberg in rebuttal, not to mention fundamentally at odds with science and Purkey's extensive criminal activity, including concealment of that activity.  Purkey's failure to specify the

evidence that would have been elicited had Dr. Leeson been "better prepared" is fatal to this claim.

"A claim of ineffective assistance based on the failure to consult and call an expert requires "evidence of what a scientific expert would have stated" at trial in order to establish *Strickland* prejudice." *Rodela-Aguilar v. United States*, 596 F.3d 457, 462 (8th Cir. 2010) (quoting *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *accord Delgado v. United States*, 162 F.3d 981, 983 (8th Cir. 1998).

Even years later and with the benefit of hindsight, Purkey does not establish how better preparation would have made Dr. Leeson a more effective witness. He makes the vague argument that if "Dr. Leeson had been adequately prepared and able to explain that his findings of neurological dysfunction, which were an integral part of the defense theme in mitigation, were not rebutted by the information the government used in cross-examination, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different." (Purkey Brf. 70.) But even assuming trial counsel failed to fully prepare this witness, argument that he would have been more effective if he had been better prepared does not come close to suggesting that "but for

counsel's errors, the result of the proceeding would have been different."

*Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007) (quoting *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981)).

This Court found, in the appeal of this very case, that there was no prejudice and thus, no error in the denial of Purkey's ability to call a surrebuttal witness on the issue of whether Purkey's work as a "jailhouse lawyer" demonstrated lack of brain damage.

> As mentioned previously, Mr. Purkey presented a significant amount of testimony regarding his assertion that he suffered from brain damage. This additional testimony would have, at best, offered only marginal additional support for this defense. When we consider this fact combined with the significant number and serious nature of the aggravating factors advanced by the government and found by the jury, we can't conclude that this error affected Mr. Purkey's substantial rights. To that there was plenty of evidence presented on the brain damage issue.

*Purkey*, 428 F.3d at 760. The district court properly denied this claim and should be affirmed.

# V.

**The district court did not err in denying Purkey's claim that trial counsel was ineffective for presenting mitigation witnesses that Purkey now claims were prejudicial, because the witnesses offered helpful testimony, and counsel exercised reasonable trial strategy in presenting them.**

In contrast to Purkey's claim earlier in his brief that trial counsel did not present enough evidence in mitigation, Purkey complains under Argument V of his brief that trial counsel was ineffective for calling mitigation witnesses to testify who were, he insists, more harmful than helpful. However, given Purkey's history and record, most, if not all, mitigation witnesses provided harmful as well as helpful testimony, so the district court properly denied this claim and should be affirmed.

## A.   *Standard of Review*

"We review claims of ineffective assistance of counsel as mixed questions of law and fact." *Toledo v. United States*, 581 F.3d 678, 680 (8th Cir. 2009) (citing *Keys v. United States*, 545 F.3d 644, 646 (8th Cir. 2008)). "We review the district court's factual findings for clear error and the legal question whether those findings amount to ineffective assistance de novo." *Toledo*, 581 F.3d at 678 (quoting *Keys*, 545 F.3d at 646).

**B.**    ***Discussion***

In this claim, Purkey argues that Mr. Duchardt was ineffective for calling *too many* witnesses in mitigation, and that the testimony of Dr. Grant and Mark Russell was prejudicial to Purkey. However, both men testified in support of mitigation themes for which, earlier in his brief, Purkey argues that Mr. Duchardt did not present *enough* evidence. (Purkey Brf. 16-63.) Leaving aside the contradictory positions taken by Purkey in attempts to argue Mr. Duchardt's performance was deficient, he fails to show prejudice.

Purkey complains that Dr. Grant testified that Purkey had "real anger control problems" and that Mark Russell testified that Purkey had a long history of assaultive behavior in prison. (Purkey Brf. 71.) However, these witnesses only acknowledged what was already abundantly in evidence through almost every witness, both for the Government and the defense, and indeed, through Purkey's own outbursts during the trial: that Purkey was angry and assaultive. (Tr. 1798-1800, 1931, 1955-62, 2298-2301.)

This claim illustrates the downside to calling an endless stream of mitigation witnesses to testify, and why presentation of mitigating evidence is a double-edged sword. The Supreme Court recently held that trial counsel was not ineffective for failing to call a defendant's siblings to testify to the

defendant's abuse by his father, nor for failing to call a psychiatrist. *Cullen v. Pinholster*, 563 U.S. —, 131 S.Ct. 1388, 1409-10 (2011). The Court found that if trial counsel had called the psychiatrist to testify, that would have opened the door to testimony by a state expert, and had trial counsel presented additional evidence of the defendant's family problems, the jury could have concluded he was beyond rehabilitation. *Id.* at 1410; *see also Wong v. Belmontes*, 558 U.S. —, 130 S.Ct. 383, 389-90 (2009) (per curiam) (no prejudice found, given that more mitigating evidence would have exposed the petitioner to further aggravating evidence).

Capital counsel must make strategic decisions about whether to present witnesses who provide both harmful and helpful testimony. In *Waters v. Thomas*, 46 F.3d 1506, (11th Cir. 1995), trial counsel was claimed to be ineffective for presenting: (1) a mental health expert witness who testified that the defendant suffered from anxiety neurosis, but was in good contact with reality; (2) the testimony of the defendant himself; and (3) a mental health expert who testified that the defendant was a paranoid schizophrenic who raped his victims to fulfill his sexual desire, all of which testimony the defendant argued was harmful. *Id.* at 1518-19. The court held "Such are the

strategic decisions that trial counsel are called upon to make. We cannot, and will not second guess such decisions." *Id.*

As noted by Mr. Duchardt in his affidavit, both Dr. Grant and Mr. Russell were called in order to provide favorable testimony on the issue of future dangerousness as part of his trial strategy. (Jt. Appx. 696-701.) These witnesses did provide favorable testimony – Mr. Duchardt was able to convince the jury that Purkey did not warrant a finding of future dangerousness, the only aggravating factor *not found* by the jury, so the testimony of these two men describing Purkey's current and future prison conditions must have been persuasive, or at the very least, non-harmful.

Indeed, Purkey, who names only two witnesses from the entire trial in the statement of facts portion of his brief, prominently cites Dr. Grant's testimony in an attempt to portray himself favorably to this Court:

> During trial, testimony was offered in sentencing concerning the importance of medications to relieve [ ] Purkey's prominent mental health symptoms – symptoms, which interfere with this ability to communicate calmly and rationally with counsel. (Footnote omitted). William Grant, M.D., of the federal Medical Center in Springfield, Missouri, testified at trial that he prescribed Tegretol, which stabilizes "unstable people," Zoloft, which is an anti-depressant that helps with obsession, and Klonepin, which is an anti-anxiety medication. [Tr] at 1409.

(Purkey Brf. 4.)

Later in his brief, Purkey tries to establish prejudice by arguing to this Court, "it cannot be overstated that Purkey's jury found that he did not pose a future danger." (Purkey Brf. 97.) Thus, Purkey uses to his advantage the testimony of Dr. Grant and Mark Russell, which was developed and presented by Mr. Duchardt, the same testimony Purkey argues Mr. Duchardt was ineffective for eliciting. Nothing could better illustrate how this claim, like the others, is without merit and was properly denied by the district court.

# VI.

**The district court's ruling denying Purkey's § 2255 motion is neither conclusory nor based on faulty assumptions. Also, this Court did not grant a certificate of appealability on this issue, so it should not even consider this claim.**

For his sixth claim, Purkey argues that the district court "simply made conclusory findings" in its order denying his § 2255 motion. However, despite what Purkey insists on this appeal, the district court applied the proper legal standards and analysis, as this Court previously recognized when it did not issue a certificate of appealability (COA) on this issue.

## A.    *Standard of Review*

This Court should not consider this issue at all, since the COA did not include this issue. A district court's denial of a § 2255 motion is reviewed *de novo* as to the district court's legal conclusions, and as to mixed questions of law and fact. Factual findings are reviewed for clear error. *Ortiz v. United States*, 664 F.3d 1151, 1164 (8th Cir. 2011)

## B.    *Discussion*

Purkey claims that the district court's order is insufficient to provide for appellate review. Specifically, Purkey argues that the district court made conclusory findings, and relied on a faulty assertion – that "no jurors voted for a single mitigating factor (2255 Doc. 89 at 11), based on the evidence counsel

presented, to support the logically faulty extension of that assertion – *i.e.*, jurors would, therefore, have necessarily rejected any and all evidence that counsel could have but did not prepare and present." (Purkey Brf. 73.)

Purkey argues that the district court did not follow the proper *Strickland* inquiry when determining whether Purkey showed prejudice. (Purkey Brf. 73-74.) The Supreme Court recently articulated that standard in *Sears v. Upton*, 561 U.S. —, 130 S.Ct. 3259 (2010); "To assess the probability [of a different outcome under *Strickland*], we consider the totality of the available mitigation evidence – both that adduced at trial and the evidence adduced in the habeas proceeding – and reweig[h] it against the evidence in aggravation." *Id.* at 3266.

Purkey is exactly wrong. In its order denying Purkey's COA, the district court engaged in precisely the proscribed analysis articulated by the Supreme Court. Regarding Purkey's claims that Mr. Duchardt failed to interview and properly prepare witnesses, the district court considered and weighed Purkey's proffered mitigation evidence, and despite Purkey's mistaken claim (Purkey Brf. 73) that the district court failed to consider what was *not* presented in mitigation, Judge Gaitan found that the proffered evidence would not have changed the jury's verdict:

the Government also presented a very strong aggravation case. The jury heard testimony describing how Purkey first raped Jennifer Long, then stabbed her several times. Following the murder, he described how he put her body into a tool box and then used a chainsaw to dismember her body, put her body parts in plastic bags and then burned them in a fireplace. Purkey also described how he swept the ashes out of the fireplace and put any remaining bones into the bags and then threw the bags into a septic pond in Clearwater, Kansas. The jury also heard that Purkey confessed to murdering an eighty year old woman with a claw hammer. Additionally, the jury also heard that Purkey had kidnapped and robbed a man in 1980 and then shot him in the back of the head. The jury certainly weighed this strong aggravating evidence against all the mitigation evidence that Mr. Duchardt presented. The Court is capable without a hearing, of weighing the mitigation case which was presented against the mitigation case which could have been presented. The Court has determined that the additional evidence which Purkey argues should have been presented would have been as in the *Paul* case, largely cumulative to the evidence that was presented. The Court finds that it is not reasonably possible that the testimony of these additional witnesses would have swayed at least one juror to have voted for a life sentence.

(Jt. Appx. 1067-68.)

The district court properly analyzed Purkey's claims – he considered the totality of the available mitigation evidence, both that adduced at trial and the evidence adduced in the habeas motion – and he reweighed it against the evidence in aggravation. The district court's order should be affirmed.

**VII.**

**The district court properly denied Purkey's motion without a hearing, because the court correctly concluded that Purkey could show neither deficient performance of trial counsel nor prejudice.**

Argument VII of Purkey's brief raises the claim that his § 2255 motion should not have been denied without an evidentiary hearing. However, even accepting Purkey's allegations as true, he showed neither deficient performance nor prejudice. The district court properly denied the request for hearing and should be affirmed.

### A.      *Standard of Review*

"We review the district court's decision to deny an evidentiary hearing for abuse of discretion." *Noe v. United States*, 601 F.3d 784, 792 (8th Cir. 2010) (citing *Koskela v. United States*, 235 F.3d 1148, 1149 (8th Cir. 2001)). "[R]eview of the determination that no hearing was required obligates us to look behind that discretionary decision to the court's rejection of the claim on its merits, which is a legal conclusion that we review de novo." *Noe*, 601 F.3d at 792 (citing *Saunders v. United States*, 236 F.3d 950, 952 (8th Cir. 2001)).

### B.      *Discussion*

Purkey argues the district court erred in denying his § 2255 motion without an evidentiary hearing. "A district court does not err in dismissing a

movant's § 2255 Motion without a hearing if (1) the movant's allegations, accepted as true, would not entitle the movant to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Buster v. United States*, 447 F.3d 1130, 1132 (8th Cir. 2006) (citing *Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003)).

Purkey argues the district court erred in three ways in making this determination. First, Purkey argues that the district court did not apply the proper standard set forth in § 2255(b): "[u]nless the motion and *the files and records of the case* conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States Attorney, grant a prompt hearing thereon" (Purkey Brf. 79-80.) But in response to this same argument, the district court made that exact finding:

> The Court disagrees and finds that the issues are resolvable based solely on the record and the pleadings. . . .
>
> [T]his additional information would only have added to the *quantity* of mitigation evidence and would not have changed the type or the nature of evidence which was offered. As previously discussed, in the penalty phase of the case Mr. Duchardt submitted 27 mitigating factors and called 18 witnesses to testify. Purkey argues that the Court's analysis was flawed because by concluding that the jury was not swayed by the evidence that was presented, they would have also rejected the evidence which *could* have been presented. However, the Court finds that there

is not a "reasonable probability" that this additional evidence would have swayed at least one juror, because despite carefully filling out all the other areas of the Special Verdict Form, and signing their names below the Certification, not one juror indicated that they found the existence of a single mitigating factor.

(Jt. Appx. 1064-66.)  (Emphasis in original.)

Purkey argues the district court made its second error because Mr. Duchardt attached no documentation to support his statements in his affidavit. (Purkey Brf. 80.)  Since the district court did not rely on Duchardt's affidavit to resolve disputed facts, there was no need for any documentation.  That is, the district court accepted any disputed facts as true:

> The Court has determined that the additional evidence which Purkey argues should have been presented would have been as in the *Paul* case, largely cumulative to the evidence that was presented.  The Court finds that it is not reasonably possible that the testimony of these additional witnesses would have swayed at least one juror to have voted for a life sentence.

(Jt. Appx. 1067-68.)

Purkey's third claimed error by the district court is that summary judgment was improper.  To make this claim, Purkey again argues mistakenly that the district court relied on Mr. Duchardt's affidavit to establish that there were no issues of fact.  (Purkey Brf. 82.)  But the district court relied on Mr. Duchardt's affidavit only for findings of trial strategy.  And even though

Purkey created factual disputes by submitting his own affidavits, the district

court could and did resolve the issues on the record and the pleadings. Purkey

repeatedly made this same argument to the district court, that Purkey had

created issues of fact which required a hearing to resolve. The district court

responded:

> Purkey argues that the affidavits which he submitted create
> questions of fact which must be resolved by hearing the testimony
> of these witnesses. The Court has reviewed the affidavits of these
> witnesses as well as the affidavit of Mr. Duchardt's co-counsel,
> Laura O'Sullivan, and find the majority of the affidavits do not
> create issues of fact. Although some of the affidavits dispute
> Mr. Duchardt's recollection of events, the Court does not find that
> these differences are significant. Most of the affidavits are from
> individuals who state they would have testified in the mitigation.

(Jt. Appx. 1063-64.)

The Eleventh Circuit aptly characterized the importance of affidavits in

claims of ineffective assistance in the presentation of mitigation evidence:

> It is common practice for petitioners attacking their death
> sentences to submit affidavits from witnesses who say they could
> have supplied additional mitigating circumstance evidence, had
> they been called, or, if they were called, had they been asked the
> right questions. This case is no exception. But the existence of
> such affidavits, artfully drafted though they may be, usually
> proves little of significance. This case is no exception in that
> respect, either. That other witnesses could have been called or
> other testimony elicited usually proves at most the wholly
> unremarkable fact that with the luxury of time and the opportunity
> to focus resources on specific parts of a made record, post-
> conviction counsel will inevitably identify shortcomings in the

performance of prior counsel.  As we have noted before, "[i]n retrospect, one may always identify shortcomings," but perfection is not the standard of effective assistance.

*Waters v. Thomas*, 46 F.3d 1506, 1513-14 (11th Cir. 1995) (Internal citation omitted.)

Purkey relies on several cases to support his argument that the district court should have granted a hearing.  None of the cited cases could be resolved on the existing record, where the district court found any disputed facts to be redundant and thus irrelevant, or because the court found that counsel exercised reasonable trial strategy.  Purkey cites *Shaw v. United States*, 24 F.3d 1040, 1042 (8th Cir. 1994), which did not even have an existing record – it was remanded for hearing because the court did not permit a prisoner to find and interview witnesses in support of his § 2255 motion before denying the motion.

Purkey also cites *Nelson v. United States*, 297 Fed.Appx. 563 (8th Cir. 2008), to support his claim that this Court should have held an evidentiary hearing.  But the Government in *Nelson* actually *joined* in Nelson's request for an evidentiary hearing, since neither of Nelson's attorneys at trial had provided affidavits: "The United States respectfully requests that the Court enter an order denying Nelson's motion filed pursuant to 28 U.S.C. § 2255 following an evidentiary hearing . . . it will be necessary to obtain testimony  from both

Patrick Berrigan and Susan Hunt in order to adequately create a record to address all of the issues raised by Nelson in his motion." (Govt. Appx. A69.)

Likewise, all the remaining cases cited by Purkey in support of his right to an evidentiary hearing present far different factual situations. Purkey cites *Koskela*, 235 F.3d at 1149, but in *Koskela*, the record contained sharply conflicting evidence as to whether the attorney failed to investigate an entire *category* of evidence – alibi evidence. *Id.*

The other cases cited by Purkey are equally distinguishable. *See Smith v. United States*, 182 F.3d 1023, 1026 (8th Cir. 1999) (remanded for hearing for court to decide whether attorney's failure to object to prisoner wearing jail clothes at jury trial was ineffective); *Latorre v. United States*, 193 F.3d 1035, 1041 (8th Cir. 1999) (prisoner claimed actual innocence and the original plea colloquy was inadequate); *Neary v. United States*, 998 F.2d 563, 566 (8th Cir. 1993) (remanded because prisoner was sentenced in excess of maximum sentence authorized by law); *United States v. Unger*, 665 F.2d 251, 256 (8th Cir. 1981) (remanded for hearing where prisoner claimed attorney materially misrepresented sentence she would receive after pleading guilty, and where prisoner had not waived attorney's actual conflict of interest on the record); *Rose v. United States*, 513 F.2d 1251, 1257 (8th Cir. 1975) (remanded for

hearing on whether prisoner was incompetent at time of guilty plea, where there was no record he was competent, and where he was found incompetent eight months after plea).

Purkey also cites a string of cases in which the movant's allegations, if true, would constitute relief. In *Machibroda v. United States*, 368 U.S. 487 (1962), the movant alleged his plea was induced by the prosecutor's promises. *Id.* at 493. In *Lindhorst v. United States*, 585 F.2d 362 (8th Cir. 1978), the movant alleged that the prosecution suborned perjury at trial with witnesses the prosecution admitted were essential. *Id.* at 363-64; *see also Watson v. United States*, 493 F.3d 960, 964 (8th Cir. 2007) (movant alleged he requested his attorney to file an appeal, and nothing in the record refuted his assertions); *West v. United States*, 994 F.2d 510, 513 (8th Cir. 1993) (movant made undisputed claim that his attorney failed to develop and present rebuttal evidence to the presentence investigation report).

Precisely because the district court properly analyzed Purkey's proffered mitigation and weighed it against the very strong aggravating factors, Purkey argues his mitigation case was stronger than it appeared or than the jury found. He complains that the jury did not consider 11 mitigating factors that were

supported by "obvious undisputed evidence." (Purkey Brf. 102-03.) To address just a few of the 11 supposedly undisputed factors:

> 11. Mr. Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence.

While Purkey may have been addicted to alcohol and illegal drugs, his voluntary intoxication and use of controlled substances is hardly mitigating. The fact that after he bludgeoned Mary Ruth Bales to death, Purkey sat in Ms. Bales' kitchen and smoked crack cocaine with a prostitute is appalling behavior and certainly not worth any sympathy or credit to Purkey.

> 15. While incarcerated, when given the opportunity to do so, Mr. Purkey received training and became qualified as a plumber.

Again, the facts of this claim may be true, but in no way *mitigating* of Purkey's crimes. It was this very plumbing training that presumably led Purkey to apply for a job at Roto-Rooter, right after which he kidnaped, raped, and murdered Jennifer Long, and that same training which brought him into employment with Reddi-Root'r and into the home of 80-year-old Mary Ruth Bales, so that Purkey could bludgeon her to death and rob her. It is no wonder the jury did not consider Purkey's plumbing training to be mitigating – it would have been astonishing if they had.

18. The disappearance of Jennifer Long was solved only because Mr. Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing.

Purkey contacted law enforcement about Jennifer Long's murder because he hoped to better his prison conditions by spending his time in federal, rather than state prison. After giving an account of the kidnaping, rape, and murder of the victim, later identified as Jennifer Long, Purkey refused to cooperate further unless he was assured he would be federally prosecuted. *United States v. Purkey*, 428 F.3d 738, 745 (8th Cir. 2005). So Purkey acted out of self-interest, not out of any concern for Jennifer Long or her family.

And what her family learned about Jennifer's death was perhaps any parent's worst nightmare. Her parents now know that their daughter spent her last hours and minutes with a sociopath who kidnaped her, raped her, and stabbed her repeatedly when she told him she had been a virgin, after which he dismembered her, burned her body, and threw away her bones and ashes. Again, the fact that Jennifer Long's disappearance was solved when Purkey came forward may be true, but it is no credit to him as he acted purely out of self-interest, and it was of no comfort to her family – the fact could not be considered mitigating. Purkey's other mitigators are equally unavailing.

Continuing his attempt to discount the unhelpful fact that no juror found a single mitigating factor, Purkey argues that the jury's "failure to document" voting on the mitigating factors is problematic, because the jury did not write "0" under each mitigating factor on the verdict forms, but merely left the forms blank. (Purkey Brf. 104.)

This Court recently addressed a similar claim in which a jury did not make findings on mitigating circumstances. *Williams v. Norris*, 612 F.3d 941, 955. (8th Cir. 2010.) Williams made the same claim that Purkey does here – that the jury did not weigh the mitigating circumstances against the aggravating factors. (Purkey Brf. 104-05.) This Court rejected Williams's argument, holding, "There is no evidence that the jury was precluded from considering mitigating circumstances, or that it was mistaken about its ability to do so." *Id.* at 956. Further, as jurors are presumed to follow the court's instructions, Purkey's complaints that they did not fill out the mitigation forms are without merit. *United States v. Griffith*, 301 F.3d 880, 884 n.3 (8th Cir. 2002).

In yet another attempt to bolster his claim that this was a close case, Purkey cites the length of jury deliberations in the penalty phase. (Purkey Brf. 106.) The jury deliberated approximately 10 hours and 53 minutes over two

days, before returning a unanimous death verdict, having unanimously found nine aggravating factors. (Gov. Appx. A1-A19.) This time period included two lunches, and almost certainly other breaks as well. (Tr. 2297.) The jury was instructed to deliberate on 37 separate factors (10 aggravating factors and 27 mitigating factors), after listening to 31 witnesses testify over several days. The jury never sent a note or question to the judge indicating that they were having trouble reaching a verdict. (Tr. 2297, 2308-10.)

Just because the jurors took their job seriously does not mean that they struggled to reach a verdict or that this was a close case. Purkey kidnaped, raped, and brutally killed a 16-year-old girl, after which he coldly and methodically dismembered her, burned her body, and disposed of her remains in a septic pond. A few months later, he viciously murdered and robbed an 80-year-old woman who walked using a cane, beating her in the head with a claw-hammer, in the bedroom of her own home.

Purkey committed these two horrific and senseless murders after spending most of his adult life in prison for a series of increasingly violent crimes such as aggravated escape from custody, kidnaping, assault, and robbery. This Court's holding in *United States v. Paul*, 534 F.3d 832, 838 (8th Cir. 2008), in affirming the denial of a § 2255 motion without a hearing,

applies to Purkey: "Nothing that Paul offers detracts from the government's strong case in aggravation, and the weight of this evidence is a proper and significant factor in considering whether Paul has established prejudice." *Paul*, 534 F.3d at 843.

The defendant in *Paul* made the same exact claims Purkey does here – that his trial counsel failed to investigate and present evidence in mitigation. *Id.* The record in *Paul* was not as extensive as the record in this case, because the attorney in *Paul* did not provide a rationale for his actions, so there was no evidence that any particular decision was strategic. *Id.* at 837. Nonetheless, this Court found that the record conclusively showed Paul did not suffer prejudice, as the proffered evidence "would have been largely cumulative of evidence already presented, and likely less powerful than testimony already elicited." *Id.* at 838.

The jury in *Paul* had unanimously agreed on four mitigating factors. But Paul contended that his attorney was ineffective in not investigating and presenting additional witnesses to testify that Paul was abused as a child and had a compassionate personality. *Id.* at 841-42. This Court held that much of the new evidence cited was largely cumulative, as Paul's mother had testified about his childhood abuse and Paul's love for animals and his great-

grandmother.  *Id.* at 842.  This Court's discussion of the issue of prejudice in the sentencing phase of a capital case is instructive:

> We recognize that the jury's findings do not preclude the possibility that more detail about Paul's difficult and abusive childhood or his compassionate character may have caused the jury to give more weight to mitigating factors that some or all of the jurors already found, but we must consider the incremental benefit of the proffered evidence in the context of the entire record.  Nothing that Paul offers detracts from the government's strong case in aggravation, and the weight of this evidence is a proper and significant factor in considering whether Paul has established prejudice.  The mitigation case at trial covered much of the same ground as the newly proffered evidence.  The record at trial gave the jury an opportunity to consider the same mitigating factors to which the new evidence pertains for similar or identical reasons.  We acknowledge that the evidence of physical abuse by Paul's father presented at trial was not as extensive as that proffered in this habeas proceeding, but the jury certainly was not given reason to develop a "benign conception" of Paul's childhood, as in *Rompilla v. Beard*, 545 U.S. 374, 391 (2005).

*Paul*, 534 F.3d at 843.  (Some internal citations omitted.)

This Court held, "Taking the record as a whole, therefore, we conclude that Paul's proffered evidence concerning his medical, mental, or physical history is insufficient to undermine confidence in the jury's verdict in the penalty phase.  Accordingly, even assuming that Paul could show that the performance of trial counsel was constitutionally deficient, he has not established resulting prejudice."  *Id.*

Likewise, the recently decided Supreme Court case in *Cullen v. Pinholster*, 563 U.S. —, 131 S.Ct. 1388 (2011), supports the district court's ruling in this case. In *Pinholster*, counsel representing a capital defendant called only one witness, the defendant's mother, in the penalty phase, although the defendant's brother testified in the guilt phase; counsel had also consulted a psychiatrist but decided not to call him as a witness. *Pinholster*, 131 S.Ct. at 1396. The California Supreme Court affirmed the denial of Pinholster's claim that his trial counsel was ineffective, but a federal district judge reversed, finding that trial counsel was ineffective for failing to investigate and present mitigation evidence, including a new category of evidence, claimed mental illness; the Ninth Circuit affirmed the district judge. *Id.* at 1396-97.

The Supreme Court reversed the Ninth Circuit, finding that trial counsel had provided effective assistance of counsel. *Id.* at 1407-08. Pinholster argued that his trial counsel "should have pursued and presented additional evidence about: his family members and their criminal, mental, and substance abuse problems; his schooling; and his medical and mental health history, including his epileptic disorder." *Id.* at 1404. The Court noted that Pinholster's counsel confronted a challenging penalty phase with an unsympathetic client, and held that the Ninth Circuit wrongly overlooked "the constitutionally protected

independence of counsel and . . . the wide latitude counsel must have in making tactical decisions." *Id.* at 1406 (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)).

The Supreme Court also found that Pinholster had not established prejudice, after weighing the aggravation evidence against the totality of available mitigating evidence. *Id.* at 1408-10. The aggravating evidence consisted first of Pinholster's underlying crime – a home burglary in which Pinholster and two accomplices beat and stabbed to death two men who happened to interrupt the burglary. *Id.* at 1394. The State also presented evidence that Pinholster had threatened to kill the State's lead witness, assaulted a man with a straight razor, kidnaped another person with a knife, and had a history of violent outbursts and involvement in gangs. *Id.* at 1408.

In mitigation, Pinholster's mother testified that he had a troubled childhood and adolescence, that he had suffered two head injuries, that he struggled in school, that he spent time in a state institution for emotionally handicapped children, that he was beaten in jail, and that his siblings had been in trouble. Pinholster's brother testified in the guilt phase that Pinholster had been in institutions all his life, suffered from epilepsy, and was "more or less" drunk on the night of the murders. *Id.* at 1408-09.

After weighing the evidence in aggravation and mitigation, the Supreme Court held that the additional evidence Pinholster would have presented would have "largely duplicated the mitigation evidence at trial." *Id*. at 1409. The Court found that additional details of substance abuse, mental illness, and criminal problems in Pinholster's family was by no means clearly mitigating, as the jury "might simply have concluded that Pinholster was simply beyond rehabilitation." *Id*. at 1410. Further, the Court held that additional details that Pinholster was abused and neglected as a child, that he may not have had enough to eat as a child, that he may have suffered "some degree" of brain damage, and that he had a drug problem were not so significant that, even assuming Pinholster's trial counsel performed deficiently, it was unreasonable for the California Supreme Court to conclude that Pinholster had failed to show a "substantial" likelihood of a different sentence. *Id*. (citing *Harrington v. Richter*, 562 U.S. —, 131 S.Ct. at 792 (2011); *Strickland*, 466 U.S. at 693).

Purkey's claims of ineffective assistance are far weaker than Paul's or Pinholster's were. Mr. Duchardt presented 18 witnesses in support of 27 mitigating factors, so that Purkey alleges, at best, cumulative benefit. This was recognized in the direct appeal of this case, when this Court found there was no prejudice in excluding some mental health evidence: "We nevertheless

harbor no doubt that considering the minimal probative value of the evidence and the overwhelming evidence and jury findings of serious aggravating factors, its exclusion was harmless." *Purkey*, 428 F.3d at 758.

This case presents this Court with the strongest possible grounds for affirming the district court's denial of a hearing. The Government presented very strong aggravation evidence, and Purkey presented an extensive and thorough mitigation case. The jury found nine aggravating factors and no mitigating factors. That the jury found no mitigation was not the fault of defense counsel; it was an impartial assessment of Purkey's horrific murders, his long history of increasingly violent crimes, and his unsympathetic personality. The district court did not err in denying him a hearing.

<strong>VIII.</strong>

**The district court did not abuse its discretion by denying Purkey's motion to strike Mr. Duchardt's affidavit, as this Court recognized when it did not grant a certificate of appealability on this issue.**

Purkey maintains under Argument VIII of his brief that the district court erred in denying its motion to strike Mr. Duchardt's affidavit. The district court properly relied on "black letter law" (Purkey Brf. 108) as Purkey complains about in his brief, which this Court previously recognized when it did not issue a certificate of appealability on this issue.

*A.*   *Standard of Review*

This Court should not consider this issue at all, since the COA did not include this issue. However, district court discovery rulings are reviewed for an abuse of discretion. *Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004). "We will reverse a decision to exclude or admit only if the court based its decision on 'an erroneous view of the law or a clearly erroneous assessment of the evidence,' such that to affirm would result in 'fundamental unfairness.'" *Id.* (internal citations omitted) (quoting *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir. 1998); *Land Inv. Club, Inc. v. Lauer*, 371 F.3d 406, 415 (8th Cir. 2004)).

**B.** **_Discussion_**

    1.    _This Court did not issue a COA for this claim and should not consider it._

Purkey sought a COA from this Court on ten issues. On June 10, 2011, this Court issued the following order on Purkey's application for COA, granting a certificate on six issues:

> The application for a certificate of appealability is granted in part. The issues upon which a certificate is granted are those appellant designated as Part III(A)(1)(b)-(f) and III(A)(2) as set forth in the application. All other requests for a certificate are denied. Appellant's brief is due July 11, 2011.

Notwithstanding the very clear order of this Court, Purkey has briefed eight issues for appeal. The Government moved to strike the two issues for which Purkey was not granted a COA, and the motion was ordered to be taken with the briefs.

A COA may issue only if the applicant has made a substantial showing of the denial of a constitutional right. _See_ 28 U.S.C. § 2253(c)(2). The certificate must specify which of the applicant's claims satisfy the foregoing test. _See_ U.S.C. § 2253(c)(3). Accordingly, appellate review may consider only "the specific issue or issues" listed in the COA. _Revels v. Sanders_, 519 F.3d 734, 739 (8th Cir. 2008); _see also Hubbeling v. United States_, 288 F.3d 363, 364 (8th Cir. 2002) (despite unambiguous limitation in his certificate,

Hubbeling argued additional theories on appeal; court considered only the issue specified in the certificate); *Hunter v. Bowersox*, 172 F.3d 1016, 1020 (plain language of § 2253 limits appellate review to issues specified in COA).

This Court was fully briefed on the issues Purkey sought to appeal (Purkey's application for COA was 134 pages) and issued an order granting a COA on six issues. In violation of the unambiguous language in this Court's order and without seeking an expansion of the COA, Purkey briefed an additional two issues. Accordingly, the Government requests that this Court enforce its own order and strike those portions of Purkey's brief.

>    2.    *The district court did not abuse its discretion in denying Purkey's motion to strike Mr. Duchardt's affidavit.*

Although Purkey criticizes the district court for relying on "black letter law" in denying Purkey's motion to strike Mr. Duchardt's affidavit, he nowhere cites any case, statute, or rule that compels this Court to strike a validly executed affidavit that Mr. Duchardt was ordered to produce. (Purkey Brf. 108.) Instead, Purkey cites the Restatement of The Law Governing Lawyers, which is irrelevant, the Missouri State Public Defender Guidelines, also irrelevant, and opinions of law professors, which are likewise irrelevant.

Purkey complains that Mr. Duchardt exceeded the scope of the attorney-client privilege waiver, but in each example cited, Mr. Duchardt directly

responded to a claim by Purkey that he was ineffective. For example, Purkey claimed that Mr. Duchardt should have developed Debbie Prothero as a mitigation witness. Mr. Duchardt responded to the claim that he was ineffective by citing a conversation he had with Ms. Prothero, in which she said she did not know much about Purkey's family and that she was in favor of the death penalty. (Jt. Appx. 662.) Purkey claims that Mr. Duchardt had a duty to keep this conversation confidential. (Purkey Brf. 110-11.) Purkey argues that divulging the information "was not reasonably necessary" to counter Purkey's claim of ineffective assistance. (Purkey Brf. 111.)

But when Purkey claimed that Mr. Duchardt was ineffective for failing to develop this mitigation witness, he waived any attorney-client privilege as it related to Mr. Duchardt's decision not to use the witness. *See Tasby v. United States*, 504 F.2d 332, 336 (8th Cir. 1974); *Bittaker v. Woodford*, 331 F.3d 715, 716 (9th Cir. 2003) ("It has long been the rule in the federal courts that, where a habeas petitioner raises a claim of ineffective assistance of counsel, he waives the attorney-client privilege as to all communications with his allegedly ineffective lawyer.")

The district court did not, as Purkey claims, turn the waiver into "unfettered license to disclose any and all privileged communications whether

relevant to a claim of ineffectiveness or not." (Purkey Brf. 118.) The district court analyzed each of Purkey's many claims of violation of privilege, along with Mr. Duchardt's responses, and made specific findings in denying Purkey's application for a COA on this issue: "Purkey may not like the way that Mr. Duchardt drafted his affidavit or how he framed the issues, but the Court finds that the disclosures in Mr. Duchardt's affidavit were necessary in order to rebut the numerous charges of ineffectiveness raised by Mr. Purkey." (Jt. Appx. 1069.)

Purkey also argues that Mr. Duchardt's affidavit included legal arguments in addition to facts. (Purkey Brf. 118.) However, a lawyer, forced to defend himself against 22 allegations that he was constitutionally ineffective, will respond with legal arguments to explain his trial strategy. Had Mr. Duchardt submitted an affidavit in which he merely claimed that every decision he made was part of his trial strategy, without explaining his strategy, Purkey would have complained that the affidavit was conclusory.

Purkey argues that Mr. Duchardt made "*current legal arguments*" rather than describe the legal research supporting his decisions. (Purkey Brf. 124.) (Emphasis in original.) As an example of this supposedly egregious conduct, Purkey quotes Mr. Duchardt's response to Purkey's claim that he failed to

investigate mitigation evidence: "[P]roposed testimony from Peggy Noe – a witness that § 2255 counsel allege could have been called as a mitigation witness – regarding Mr. Purkey's childhood sexual abuse would only have been cumulative of evidence presented at trial and would not have been as effective as the trial testimony of Mr. Purkey's brother, Gary Hamilton." (Purkey Brf. 125.)  Mr. Duchardt's response explains his reasonable trial strategy, which is exactly what Judge Gaitan ordered him to do in producing the affidavit.  Purkey's claim that the district court abused its discretion in not striking Mr. Duchardt's affidavit is without foundation in law or fact and should be denied.

## CONCLUSION

Purkey insists that trial counsel's mitigation investigation and presentation were constitutionally deficient, claiming that some of the investigative interviews were conducted not in a "sensitive" manner, or not in person, and that counsel did not ask enough questions, and conversely, that counsel presented mitigation witnesses who were more harmful than helpful. But even with the benefit of hindsight and additional investigation, Purkey cannot show either deficient representation or prejudice. The district court's denial of his § 2255 motion without an evidentiary hearing should be affirmed.

Respectfully submitted,

BETH PHILLIPS
  United States Attorney

By    */s/ Kathleen D. Mahoney*

KATHLEEN D. MAHONEY
  Assistant United States Attorney

*/s/ David Ketchmark*

DAVID KETCHMARK
  Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, 5th Floor
Kansas City, Missouri  64106
Telephone: (816) 426-4288

*Attorneys for Appellee*

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Fed. R. App. P. 32(a)(7)(C), that this brief complies with the type-volume limitations in Fed. R. App. P. 32(a)(7)(B) and contains 21,058 words. The brief was prepared using WordPerfect for Windows Version X4 software. In making this certification I have relied upon the word-count feature of WordPerfect for Windows, Version X4. Furthermore, the brief and addendum have has been determined to be virus-free in compliance with Eighth Circuit Rule 28A(h).

*/s/ Kathleen D. Mahoney*
Kathleen D. Mahoney
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2012, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. A paper copy will be served on participants in the case by U.S. Mail, postage prepaid, within five days of the Court's notice that the brief has been reviewed and filed.

I hereby certify that a copy of the Government's brief was mailed on March ____, 2012, to:

> Gary E. Brotherton
> 601 W. Nifong Blvd., Suite 1C
> Columbia, Missouri 65203
>
> Teresa Norris
> 900 Elmwood Avenue, Suite 101
> Columbia, SC 29201
>
>
> */s/ Kathleen D. Mahoney*
> Kathleen D. Mahoney
> Assistant United States Attorney