United States Court Of Appeals For The Eighth Circuit

FILED

MAY 16 2012

MICHAEL GANS
CLERK OF COURT

WESLEY I. PUKREY,

        Appellant,

v.                              Case No. 10-3462

UNITED STATES OF AMERICA,

        Appellee.

---

### MOTION TO WITHDRAW APPELLANT COUNSEL AND FOR LEAVE OF THE COURT TO PROCEED PRO SE IN THESE APPELLATE PROCEEDINGS AND FOR ORAL ARGUMENTS TO BE CANCELLED AND FOR SUCH APPEAL TO BE DETERMINED ON THE RECORD

The Appellant Wesley I. Purkey (hereafter "Purkey"), acting pro se in this matter does respectfully request the court to grant him an Order withdrawing appellant counsel(s), Teresa Norris and Gary Brotherton from representing him and to grant him leave to proceed in this matter and thereafter pro se because of existing and protracted irrevocable difference, whereas both Brotherton and Norris have no objections to such action. Further' Purkey request that the court cancel designated oral arguments in this case and that the court render its determination of issues involved soley on the record before it. In support of these matters Purkey offers the following:

Purkey Has A 6th Amendment Right To Represent Himself In These Capital Proceedings

Under applicable authority Purkey has a constitutional right to represent himself in these appellate proceedings. See Vega v. Johnson, 149 F.3d 354 (5th Cir. 1998); U.S. v. Treff, 924 F.2d 977 (10th Cir. 1991); see also Moore v. Calderon, 108 F.3d 261 (9th Cir. 1997). This right could not be more so here

1.

RECEIVED

MAY 1 6 2012

U.S. COURT OF APPEALS
EIGHTH CIRCUIT

in light of the seriousness of the issues before the court determining whether Purkey is to live or die. Both Brotherton and Norris have clearly advised Purkey that they have no objections to being taken-relieved of representing him, whereas both counsel's have stated, inter alia, that, based on Purkey's significant violent crimes he shouldn't expect any positive results from these appellate review of issues pending before the court. Here there has been, as previously noted before the court through other pro se filings by Purkey that a irrevocable differences exist between Purkey and appellant counsel, which although counsel guaranteed Purkey that such differences would be alleviated nothing could be farther from the truth - whereas such difference have only been aggravated and enhanced with time. The resurgence of such animus by counsel against Purkey has not been more so than in preparation of both the appellant brief and finally through counsel totally alienation of Purkey in preparing and filing the Reply to the government's appellee brief. Some of the most egregious obstinacy to preparing and filing the Reply are:

1. As previously stressed in prior pro se filings regarding request to have habeas counsel withdrawn was reiterated both to counsel deep rooted obstinacy to replying to Purkey's correspondence and addressing material issues presented in such correspondence to counsel Norris and Brotherton. Since the incession of habeas counsel(s) appointment they have repelled Purkey to execise his right to assist in these proceedings - other than through making lip service to such. A case in point is seen through the past several weeks prior to the filing of the Reply. In the weeks prior to such Purkey afforded both Brotherton and Norris with detailed and articulated correspondence delineating issues germane to the Reply presenting authority bearing of those issues and yet neither Norris, nor Brotherton affording Purkey with any imput or consideration with such matters. In fact as both Norris and Brotherton both clarified to Purkey on May 2nd, 2012

2.

through a telephone conversation that, "the court has ordered us to file a reply by May 3rd and that is what we are going to do and we do not care what Purkey might think about what we file." Teresa Norris was driving on the Interstate during this coversation and Mr. Brotherton advised Purkey that he had been out of town for several weeks and had not yet had a chance to actually read the government's response but he would do the best he could to add a little something to the reply before it was filed the next day. In fact Ms. Norris advised Purkey that she did not have any of the materials before her during her interstate drive to actually discuss the matters Purkey was presented (which will be clarified through subsequent paragraphs) but Brotherton (who at the start of the phone call advised Purkey that he was sorry but he did not have long to talk as he was due in another court hearing shortly) was in his office and could take notes. Both attorneys rebuffed Purkey for his anxiety shown to these circumstances surrounding discussions to matters dealing with his life but both attorneys advised Purkey that, "if he did not appreciate it then they would simply hang up." Brotherton who recently went through a divorce and lost of multiple secrtaries and was swamped by state habeas proceedings clearly did not spend any sufficient time in addressing the issues presented through the government's brief - and refused to discuss relevant legal issues and facts with Purkey for presenting in such reply.. Purkey advised both attorneys that he did not want the reply brief filed as was and if they were unwilling to make appropriate revisions then do not file such. Norris advised Purkey that, "that we do not care what you want we are filing the reply whether you like it or not." And so the did adamantly against Purkey's request.

Issues Norris and Brotherton Were Obstinate To In Filing Both Appellant Brief and Reply

The government was correct that the court had denied Purkey a COA anent

review of the legal sufficient of Fred Duchardt's affidavit. Government's Appellee Brief (herafter "Appellee Br.") p.103. Although a COA is not necessary for the court to reveiw the sufficient of evidentiary matters, which Mr. Duchardt's affidavit attached to the government's answer to Purkey's §2255 Petition constitutes. See Thomson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005)("[t]he Habeas Rules thus view the exhibits contained in a habeas corpus answer to be part of the answer itself, without which a habeas corpuse must be deemed incomplete".) Both the Habeas Rules and the Federal Rules of Civil Procedure specify that exhibits constitute contents of such an answer. Id. 267. The Civil Rules also make clear that the written instruments made exhibits to any pleading are part of the pleading (such as a habeas corpus answer). Id. 268. When Purkey advised both attorneys that they needed to step up and advise the court that they were wrong when they misunderstood that a COA was not necessary for the court to review the sufficiency of Mr. Duchardt's affidavit which constitutes evidentiary material, rather than their erroneous belief that it constituted a procedural matter that a COA might or might not be required on depending on the definition of the same. Ms. Norris vehemently claimed and continues to assert that the rules of civil procedures are not applicable to habeas proceedings and/or the same as summary judgment proceedings, whereas such affidavit attached to the government's answer does not contitute evidentiary material, but is of a procedural nature. She spent four (4) pages in the initial draft of the reply arguing this point which was absolutely clearly erroneous. In fact as stressed in previous pro se filings to this court Purkey clarified that Ms. Norris and Brotherton both reburked Purkey's advise and abundancy of authority that he provided to them stating that the Rules of Civil Procedure 56(e) did not apply to habeas proceedings. In fact it was not until Purkey demonstrated acute anxiety regarding such obstinacy that Norris and

4.

Brotherton actually obtained the Local Rules of the Court demonstrating the applicability of Rule 56e to all affidavits presented whether through civil litigation and/or habeas proceedings which in reality habeas proceedings are. Thereby in the reply brief Norris cut out her previous four (4) pages of arguments that a COA was not needed regarding this procedural matter, which is vividly a evidentiary matter that a COA is never required on to obtain the court's review of its legality and sufficiency. But rather than readily admit that counsel was wrong for seeking a COA on this matter Norris and Brotherton remain obstinate to advising the court of such and to why such a COA was not necessary.

During this same call, as Purkey had advise both Brotherton and Norris of three weeks previously that he was not able to research the record and evidence presented in this case for assisting in preparation of the reply because Purkey had been forced under threat of disciplinary action by the Special Housing Unit - Unit Team, Mr. Stephens to either mail out or destroy significant amounts of his legal materials. Further' after Purkey advised Mr. Stephens that he did not have funds to mail such materials he was forced to destroy such or be subject to disciplinary action. Thereafter' Purkey provided one (1) large bag of destroyed legal materials to OIC Strains and later three (3) more large trash bags of legal materials to C.O. Johnson for placing in the unit's trash. Both Norris and Brotherton told Purkey that, "we don't care about that. We are tired of hearing you cry about the b.s. on the unit and that you need to start sucking this stuff up." Some of the other issues that Brotherton and Norris has advised Purkey that he needed to such up has been presented to the court through less than coherent and articulated pleadings, although not relevant to the immediate consideration. Warden Lockett has condoned the destruction of inmates legal materials under the mandate of Mr. Stephens and has in the past readily identified his general animus

against death row prisoners advising them through counsel that, "the victim's families need to be consulted about the complaints being waged by death row prisoners regarding the conditions of their confinement on death row. See Appendix (hereafter "Appx")(A)(Correspondence from the ACLU to the Regional Director/BOP).

It is well established law that prisoners have no right to counsel in postconviction proceedings, see Pensylvania v. Finley, 481 U.S. 551, 555 (1987) and that the prisoner bears all errors commented by counsel in such habeas proceedings. Coleman v. Thompson, 501 U.S. 722, 754 (1991). Here the gravity of the mistakes and obstinacy shown by counsel to allow Purkey to assist in these proceedings could not be more so, whereas Purkey is of sound mind and knowingly requesting that this court grant his request to withdraw counsel from representing him and allow him to proceed pro se in this action.

> Both Habeas Counsel Content That The Government Can Deliberately Misconstrue
> Facts and That The Government Is Not Required To Provide Reference To
> The Record When Making Such Errneous Claims

Both Norris and Brotherton when confronted by Purkey about the numerous misconstruing of facts asserted by the Government through their Appellee Brief contend that the government is not required to provide relevant reference to the record in making such claims that the government can interpret claims and facts however they want. Of course such contentions by Norris and Brotherton are not supported by law. See Federal Rule Of Appellate Procedure 28(which states in relevant part: "... contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant/appelle relies must be provided".) Further, references to the parts of the record contained in the appendix filed with the appellant/appellee's brief must be to the pages of the appendix. Id. (e)Reference to the Record. After making this erroneous claim

6.

both of Purkey's habeas counsel went on to show unfathomable indifference to some of the more skewing of facts by the government which implied was heard by the jury, but as well used to support Purkey's trial attorney's facts asserted through his 117 page affidavit to debunk claims of ineffectiveness against him by Purkey. Habeas counsel for Purkey illegimately claimed that these issues were not important and that this court would perform a thorough review of the record before it to discern any misrepresentations of facts by the government. Contrary to that disingenuous claim the misrepresentations and blatant deceptions by the government were significant and this is why:

The government claims that the jury was told that after Purkey killed Ms. Bales that he stole $200 from her purse, after which he and a prostitute smoked some more crack cocain and ate food from Ms. Bales kitchen. Appellee Br. 19. The government goes on to claim that the jury heard that Purkey had planned to burn down Ms. Bales home, but was arrested before he could. Id. The government does not off any reference to the trial transcript to support these erroneous claims probably because none exist. First of all Purkey was not partying after he admittedly killed Ms. Bales. In fact he tried to kill himself consuming four or five bottles of Ms. Bales nitroglycerin tablets. See Jt.Appx. 322. He even told the prostitute that he wanted to die as he did later the police. id. Contrary to the government's claim that Purkey robbed Ms. Bales he did not take anything from her, whereas the prostitute took the money and left in Purkey's work van. id. Thereafter, Purkey's wife came after him in a cab. Id at 313. As well contrary to the government Purkey did not plan on burning Ms. Bales home, and did not do so because he was arrested, whereas Purkey was actually arrested three days after killing Ms. Bales and was on his way to the Leavenworth Police Department to turn himself in. Id. at 320. Again the government attempts

7.

to claim that the jury found it appalling that Purkey and the prostitute smoked crack cocaine in Ms. Bales kitchen. Id. at 91. This was mere fabrication because it never happen and the jury never heard such deceptive facts surrounding Ms. Bales murder.

Next the government erroneously skews the fact that the jury heard Mr. Carlberg testify that Purkey had shot him in the back of the head during the 1980 kidnapping and in support of this claim references Mr. Carlberg's testimony. Appellee Br. 20. Although the cited testimony by Mr. Carlberg does not state what the government claims but states that, "I (Carlberg) read that somewhere." Tr. 1253-54. In fact Purkey did not initiate Mr. Carlberg's kidnapping which Carlberg clairifed himself, see Appx. (B), as well as Purkey's wife stated at that time. Discovery document #00416 (Criminal Case Report - Wichita Police Department August 1980. In fact Mr. Carlbery clearly states that Foster shot him with a 25 automatic, whereas Purkey had a 38 ca. Appx. (B)p 1 - 2.

In no less than six (6) times the government reiterates that the jurors failure to designate mitigators found or not found is equivalent to none being found by the jury. Appellee Br. 39, 6, 25, 65, 85-86 & 100. Perhaps the government believes that if it states this claim enough that is will begin to spout substance. Here the court should not allow neither the district court, nor the government to flaunt this claim when both the government and the district court had an opportunity to send the verdict form back to the jury for further clarification to mitigators found or not found. Neither the district court, nor the government held at that time that the juror's failure to show mitigators voted on was the equivalent to none being found they should not be allowed nine years later to make such claim.

Norris and Brotherton claimed that it is not important that the government

misrepresents facts that were never heard by the jury and ~~purported~~ *purportedly* was utilized

by Purkey's trial attorney not to contact or call Dr. Newton as a mitigating

witness. First of all the government claims that the jury heard that Purkey

was transferred to Oregon State Penitentiary to break-up a racial clique. <u>Appellee</u>

<u>Br. 47.</u> Further they contend that Dr. Newton would of been questioned about

Purkey only participating in three or four sessions in the program and then

quite altogether. That Dr. Newton would of admitted that Purkey's number one

problem was his "criminal personality." Finally that, "given Purkey's record

and history, Dr. Newton . . . would of been questioned about even more matters

damaging to Purkey." <u>Id.</u> First of all these issues were never presented to the

district court for consideration, let alone presented by Duchardt himself as

reasons not to contact Dr. Newton. In fact the government claims that Purkey

never identified sexual abuse on the intake form submitted to Dr. Newton when

he sought mental health treatment. Nothing could be farther from the truth on

any of these issues. Duchardt readily admits that Purkey told Dr. Newton

about suffering sexual abuse when he was a child by his mon in his affidavit.

<u>Jt. App. 667.</u> In fact the sexual abuse was clearly delineated on the intake

application submitted to Dr. Newton. <u>See Jt. App. 271.</u> And contrary to the

government's contentions Purkey did not refuse to participate in the mental

health treatment Dr. Newton had arrange for him - the sessions of individual

treatment and group therapy were discontinued because Purkey was being trans-

ferred to the Forest Camp. <u>Jt. App. 289.</u> And' as far as a "criminal personality"

being listed as Purkey's number one problem - such criminal personality was listed

as a "Problem Area". <u>Jt. App. 288.</u> Again' none of these claims were presented

by the government to support Duchardt's reasoning for not contacting Dr. Newton

in the district court, and Duchardt himself never came within shouting distance

9.

of making such claims to support his failure to contact Dr. Newton. But Norris and Brotherton did not find these matters worthy of clarifying the reality of there boggishness.

In effort to down-grade Duchardt failing to call Floyd Bose and Dion Leiker to testify on Purkey's behalf in mitigation, both of whom were former law enforcement officers the government illegitimately contends that their testimony would not of had any impact upon the jury because Duchardt had other law enforcement officers to testify. Appellee Br. 50. Contrary to Norris and Brotherton's agreement with the government in-so-much-as other law enforcement officers testifying, i.e. Dominic Genuik and Michael Gibbons this simply is not true. Id. fn. 11. Mr. Duchardt's affidavit puts such claims to rest that other law enforcement officers testified on Purkey's behalf in mitigation. See Jt. App. 666. Mr. Duchardt clarifies that both Genuik and Gibbons was "lay witnesses," not law enforcement as the government and Purkey habeas/appellant counsel would have the court believe. Id. The signifiance of these former law enforcement officers, especially describing Purkey's relationship to Flody's son and Dion's brother Duane whom Purkey was friend's with and aided in bringing closure/peace to how and why Duane was murder cannot be overstated despite the government's efforts to again misconstrue the facts before the court.

Although Purkey's appellant counsel through half measures clarified the erroneousness of the government's palable efforts to down-play Duchardt's failure to call Sam Hoffmeier to testify in mitigation, whereas the government mischaracterized him as being another "jail inmate." Appellee Br. 51. Through Appellant's Reply it was stated that, "Hoffmeier is not a jail inmate. He is a volunteer prison minister who conducted Bible study grounps for inmates." P.7. Although this is so, this was also the reason Duchardt stated that he did not call Mr. Hoffmeier

to testify for Purkey in mitigation because Purkey was in segregation and Hoffmeier never visited him there. Jt. App. 642. But of course this claim by Duchardt was wrong, but here actually reinforced by appellant counsel's ineptness and absolutely lack of knowledge of the applicable facts in this case. Mr. Hoffmeier visited Purkey on a weekly basis in segregation after performing Bible study groups in population. Jt. App. 426. Here appellant counsel utterly failed to bring to bear the glaring significance of Mr. Hoffmeier's testimony. The character evidence that would of been provided through Mr. Hoffmeier's testimony is far more compelling of that found by the Supreme Court in William v. Taylor, constituting ineffective assistance of counsel and reversing Williams death sentence. Mr. Hoffmeier would not only of testified to his relationship with Purkey during the protracted time he was in segregation, but as well would of provided significant testimony about visits he shared with Purkey's daughter, Angie and Purkey's grandkids. Id. This would of been extremely moving testimony.

The government contends that since the district court did not rely on Duchardt's affidavit to resolve disputed facts, that there was no need for Duchardt to provide documentation to support claims presented. Appellee Br. 86. This claim is without doubt contrary to well established law that, "[A] supporting or opposing affidavit must be made not only one personal knowledge, but must set out facts and supporting evidence that would be admissible at trial." El Deep v. University of Minnesota, 60 F.3d 423, 429 (8th Cir. 1995). Contrary to the governments contentions that the district court did not rely on Duchardt's affidavit to resolve disputed facts that is absolutely untenable because that is the only document relied on by the court to resolve disputed facts through conclusory form. In reality the record is repleted with material disputed facts that the district court did not resolve on the record or otherwise.

In final analysis the government claims two-fold that the court should not review the legal sufficiency of Duchardt's affidavit, but if it does then it will find that is comports with requirements in accord with Rule 56(e);Fed.R.C.P. Appellee Br. 103-04. First of all the government has utterly failed to hint at some authority that mandates granting of a COA on an evidentiary matter before this court has authority to review it. It is not the job of this court to research the law to support appellee's claims. Molosky v. Principal Mut. Life Ins. Co., 149 F.3d 881, 885 (8th Cir. 1998). Further' Mr. Duchardt's affidavit is no more than a narrative making post hoc claims and arguing authorities of law to support untenable trial strategy falling to satisfy requirements set out under Rule 56(e). Contrary to what appellant counsels recognized until Purkey through acute anxiety stressed was applicable to habeas proceedings.

WHEREFORE Purkey request that this court grant him leave to proceed pro se in this matter, relieving him of present appellant counsel, and to cancel oral arguments scheduling and to decide the merit of such appeal on the record.

May 10th, 2012

RESPECTFULLY SUBMITTED,

*Wesley J. Purkey*

Wesley I. Purkey #14679-045
United States Penitentiary
P.O. Box 33
Terre Haute, IN 47808
Appellant/Pro Se

12.

*Appx CAS p 16 e*



LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT

## VIA U.S. FIRST CLASS MAIL

April 19, 2011

Mr. Michael K. Nalley
Regional Director, North Central Region
Bureau of Prisons
400 State Avenue, Suite 800
Kansas City, KS 66101

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500

OFFICERS AND DIRECTORS
SUSAN N. HERMAN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

ROBERT B. REMAR
TREASURER

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

Dear Mr. Nalley:

I read with deep concern the attached letter from Warden Charles Lockett to capital defense attorney Paul Enzinna. In that letter, dated March 1, 2011, Mr. Lockett responded to multiple communications from Attorney Enzinna seeking a meeting to discuss conditions of confinement in the Special Confinement Unit at USP-Terre Haute. Specifically, Attorney Enzinna expressed concern about the ability of death-sentenced prisoners to communicate with their counsel, seemingly arbitrary and possibly retaliatory discipline by staff, and the failure to provide prisoners with constitutionally adequate medical care. As you know, attorneys for the men on death row have consistently raised similar complaints for many years.

Mr. Lockett responded, in part, with the following:

> In the event that you feel these issues still require further attention, I will contact the U.S. Attorney's office and the victim's [sic] families and arrange for them to meet with us as they are also interested parties in the treatment of inmates and their conditions of confinement.

I am aware of no BOP policy or legal precedent that permits the Bureau to consult with victims' families when determining what kind of medical care a prisoner may receive, whether disciplinary actions against that prisoner should be just or unjust, or under what conditions he may communicate with his defense counsel. But if I am mistaken, please identify with specificity the statute, regulation, Bureau of Prisons policy, or legal authority that permits the Bureau to do so.

Regardless of whether such authority exists, Mr. Lockett's proposal to discuss, *inter alia*, prisoners' medical care with victims' families and United States Attorneys raises serious confidentiality concerns and may violate BOP policy and applicable law. *See* Program Statement 1351.05 ("Release of Information"); Program Statement 6090.02 ("Health Information Management").

I look forward to your reply and thank you for your attention to this matter.

Very truly yours,

Gabriel B. Eber
Staff Counsel

cc:

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Mr. Paul Enzinna, Esq.
Ms. Ruth Friedman, Esq., Director, Federal Capital Habeas Project
Ms. Miriam Gohara, Esq., Resource Counsel, Federal Capital Habeas Project
Ms. Cynthia A. Schnedar, Acting Inspector General, U.S. Dep't of Justice
Mr. Harley Lappin, Director, Bureau of Prisons

Enclosure

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription     05/27/2003

GREGG CARLBERG, was contacted by Special Agent Dirk D. Tarpley of the Federal Bureau of Investigation relative to the ongoing investigation into the kidnaping and murder of Jennifer Long. CARLBERG was specifically contacted regarding an incident on August 03, 1980, where he was robbed and shot by MARTIN FOSTER and WESLEY PURKEY. Present during the interview was Assistant United States Attorney (AUSA), Western District of Missouri, Matt Whitworth. After having been advised of the identity of the agent and the purpose of the interview, CARLBERG provided the following information:

According to CARLBERG, on the evening of August 03, 1980, he went to a local convenient store, the TOWN & COUNTRY, in Wichita, Kansas, for a flashlight. Upon exiting the store he was accosted by a man later identified as MARTIN FOSTER. FOSTER produced a gun and ordered CARLBERG into his 1973 Volvo. After driving a short distance from the convenient store, FOSTER ordered CARLBERG into the trunk. CARLBERG believe's FOSTER drove to a local bar where he picked up another person, later identified as WESLEY PURKEY. While parked at the bar, FOSTER pounded on the trunk and asked if CARLBERG was still inside. CARLBERG could hear some conversation between FOSTER and PURKEY but not its content.

After an extended period of driving the vehicle was stopped and FOSTER opened the trunk. FOSTER was standing over CARLBERG pointing a gun at him and saying, "Time to knock you out." As he was climbing out of the trunk, CARLBERG could hear someone else say, "Yeah, it's time to knock you out now."

Once out of the trunk, CARLBERG was ordered to lie down in an old discarded bathtub and place his hands behind his head. He was shot twice, once in the upper right arm and once near the right ear. The bullet lodged in the base of his skull.

CARLBERG survived his injuries and was able to identify FOSTER and PURKEY as the individuals responsible for his abduction, robbery and assault. CARLBERG later learned that FOSTER was found in possession of a .25 caliber weapon which was used to shoot him and PURKEY was in possession of a .38 caliber. CARLBERG indicated

Investigation on   05/21/2003   at   Wichita, Kansas

File #   7A-KC-80744                                           Date dictated   05/27/2003

by   SA DIRK D. TARPLEY:ddt

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

4260

FD-302a (Rev. 10-6-95)

7A-KC-80744

Continuation of FD-302 of ___GREGG W. CARLBERG___ , On 05/21/2003 , Page ___2___

FOSTER admitted to authorities he was the shooter. CARLBERG was unable to identify who shot him that night.

As a result of the shooting, CARLBERG was temporarily paralyzed. He continues to suffer in that he has not regained the full strength of his right arm. He has partial paralysis of the face and difficulty with balance and walking.

CARLBERG agreed testify to the events as previously mention and was provided a subpoena for his testimony.

Shot w/ 22 Ck
Act 38 Ck