**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

**NO. 10-3462**

**WESLEY IRA PURKEY,**
**Appellant,**

**v.**

**UNITED STATES,**
**Appellee.**

*On Appeal from the United States District Court*
*for the Western District of Missouri*
*The Honorable Fernando J. Gaitan, Jr., Chief Judge*

_____

**PETITION FOR PANEL REHEARING**
_____

Pursuant to F.R.A.P. 35(b), appellant, Wesley Ira Purkey, petitions for panel rehearing on the basis that the panel overlooked or misapprehended significant relevant facts in determining that Purkey suffered no prejudice from trial counsel's deficient performance in sentencing with respect to the issue of Purkey's childhood sexual abuse.

**<u>ARGUMENT</u>**

Amongst other issues, Purkey asserted that trial counsel, Fred Duchardt, was ineffective in failing to adequately investigate and present the evidence establishing that Purkey was sexually abused as a child and teenager. In order to

1

establish prejudice, Purkey need only establish a reasonable probability that, but for counsel's deficient conduct, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). This is not an outcome determinative test. *Id.* at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"). Instead, prejudice is established if "there is a reasonable probability that at least one juror would have struck a different balance" but for counsel's errors. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

While trial counsel did present some testimony from mental health experts about the sexual abuse, counsel did not present the available corroborating evidence establishing that Purkey had reported the sexual abuse long before he was facing capital murder charges.

In its review, the panel found that "two of Purkey's expert witnesses, Dr. Stephen Peterson and Dr. Mark Cunningham, . . . both testified in detail about the sexual abuse that Purkey suffered as a child." Slip Op. at 5-6. While Purkey does not dispute this finding, the panel overlooked the fact that the government mocked the testimony that Purkey was sexually abused as being based solely on Purkey's self-serving reports made *only after* he was facing capital murder charges and the death penalty.

Specifically, in cross-examining Dr. Peterson, the defense psychiatrist, the government elicited testimony that the sexual abuse had never before been reported to anyone.  Transcript (hereinafter "Tr.") 1817, 1824.

Q    *Now, you talked a long time during your direct examination about the defendant's childhood and the fact that his mom sexually abused him.  Do you remember that testimony?*

A    *Yes.*

Q    *Now, did you find any records where that was detailed in his past?*

A    *No,* there really haven't [sic] been any detailed questioning of him. There were some references, and I brought up a couple of them, but there hasn't been any detailed questioning of him about his sexual development or his sexual abuse and trauma by anyone.

Q    Except you?

A    Yes.

Q    And Dr. Dietz, our expert, after you were finished interviewing him, correct?

A    Yes.

Tr. 1806-1808 (emphasis added).

Q    *Doctor, going back to the defendant's childhood and the sexual abuse that he claims he suffered, again we have to rely on his word essentially, because there's not any – there is very little, if anything, in the record to support that, correct?*

A    *Well, that's correct.* There are some elements to support it, such as the reports of his brother and his aunt and the people who talked with Mr. Purkey long before he was involved in any of these cases, about his development. So certainly it would have been nice to have a video camera on Mr. Purkey's

3

shoulder to see what he experienced, but we don't have that. At the same time you can't really discount not knowing, or not having a camera there recording every event, because, for example, most children don't remember how they learned to walk, but most kids do walk. And so the fact that they don't remember or there's not a source of information that proves when they took their first step doesn't mean they didn't learn how to walk.

Q  We're not talking about walking. We're talking about a man who claims his mother had sex with him when he's a kid, right?

A  Yes.

Q  *You're aware from the reports that – the only report that exists of sexual contact between the defendant and his mother is her claim that in 1972 when he was 19 years old he raped her. Have you seen that report?*

A  *I have seen the report.* I've also seen the medical report that the doctor gave the opinion than [sic] she had not been sexually assaulted, and that once she had sobered up she dropped the charges.

Q  That wasn't in a medical report, was it, sir? It was in the detective's report. He wrote that down.

A  By the doctor to the detective.

Q  Did you also read, sir, that the mother was agonizing over the fact that her son would have to go back to prison if she pursued it; did you read that?

A  I read that. And the police could certainly have pressed charges without her.

Tr. 1816-1817 (emphasis added).

Q  *To your knowledge, based upon your review of the records, the only time the defendant ever told a doctor who has examined him about this sexual mistreatment or maltreatment that he's now claiming is to you, that was the first time?*

4

A       *To my understanding, I'm the only one he has ever told in detail to because I'm the only one who ever really asked.*

Q       To your knowledge.

A       Yes. I know that Dr. Fernando out at Larned did not ask because I asked Mr. Purkey, and I know the process out at Larned, and Mr. Purkey said Dr. Fernando did not ask him anything about his sexual development before he gave the diagnosis, which is common practice out at Larned.

Q       Yet Mr. Purkey told you that?

A       Mr. Purkey told me that, plus there's no indication in any of the records especially done by the social worker of any detailed psychosexual history done by Dr. Fernando or even the social worker.

Q       Thank you. That's all I have.

Tr. 1824-1825 (emphasis added).

The government similarly cross-examined Dr. Cunningham:

Q       Now, I have reviewed the records too. Would it be a fair statement to say that the information that came from the aunt, the record that you're talking about, is information where she described how the mother – the mother was promiscuous, correct?

A       She described the alcoholism, promiscuity, chaotic nature of the home. The records describe both his father and mother having abandoned him. Father's whereabouts being unknown.

Q       But there was nothing in those records, sir, about the defendant seeing his mother's lovers come out of the bedroom without any clothes on.

A       No, sir, that came from Mr. Purkey. The records describe that she was promiscuous and without regard to what the boys saw. The specific description of what he saw came from the discussions that he had with me. The record describes, though,

provides a broader context to that same sort of action.

Q  *And there was nothing in those records, sir, was there, that talked about the defendant saying that he – or confirmation that he was having sex with his mother at age eight? There's nothing in the records from back then that would confirm that, is there?*

A  *Not specifically.* There are descriptions about sexual issues that he has. There are descriptions about being very anxious when the topic of his mother comes up. Certainly the history that he displays is consistent with somebody who has been sexually traumatized.  But otherwise *the records don't specifically recount that he made an outcry of sexual abuse to anyone else.*

Q  *Of course, the parents aren't here. They're both dead, correct?*

A  *That's correct.*

Q  *And they can't defend themselves, right?*

A  *That's correct.*

Q  And there is some indication that the defendant had a serious problem with sexual identification.

A  That was described in his adolescence, yes, sir.

Q  Could that mean that he wasn't sure whether he liked men or women?

A  Potentially. It's uncertain what that refers to or what that's a euphemism for in terms of what kind of sexual conflicts he's having.

Tr. 1933-1935 (emphasis added).

The government's theme that the sexual abuse was never reported until after

Purkey was facing the death penalty continued in the testimony of Dr. Park Dietz,

6

the psychiatrist retained by the government, in response to cross-examination by

Purkey's counsel.

Q	And particularly, there was no indication of a psychosexual analysis to the extent that you and Dr. Peterson delved into it with Mr. Purkey before now; is that correct?

A	If there was, I didn't see it.

Q	Right. But both you and Dr. Peterson went into those issues; is that correct, sir?

A	Yes.

Q	Okay. And very thoroughly. You would like to think that you both did.

A	Actually, I don't know, I think Mr. Purkey cut me off on some of the questions in that area.

Q	Okay. Well, in any event, you had indicated that in terms of what Mr. Purkey was telling you, that certainly if you were to accept his account as true, he would have suffered sexual abuse at a very young age; is that a fair statement?

A	If what he told me was true, he underwent considerable long-term sexual abuse by his mother.

Q	*Now, in particular there are secondary indications in the record of possible sexual trauma to Mr. Purkey, is that correct, childhood sexual trauma?*

A	*That's too vague a phrase for me to respond to, but I can tell you exactly what was in the record.*

Q	*All right, sir.*

A	*There is one record from the time he was an adolescent indicating that there had been promiscuous behavior by his mother who was – had brought at least three men home and was openly engaging in sex in the home with the boys. There was another record that said that someone else had found*

7

*some psychosexual problem that was never identified, and the report that supposedly said that was never received. And I think up until he's facing capital murder charges, that's all that was in the record.*

Q   All right, sir. Now, are you also familiar with the fact that Wes's brother Gary has also testified about his own abuse by his mother?

A   So I have been told, yes.

Q   Now, what you testified to the jury is, though, that this is an account that really comes from only these sources; is that correct?

A   That's right, those are the only sources I'm aware of.

Q   Okay. Is that necessarily unusual in the case of a man having been sexually abused by his mother, not coming forward about the issue until directly asked about it?

A   It's such a rare event that I don't think anyone could say what's usual or not. But looking by analogy, it's true that it's not common for males to volunteer stories of their sexual abuse unless there's something good that will come of it for them.

Q   Okay. Now, in your testimony, were you indicating that you were relying upon Mr. Purkey's account of this sexual abuse or not relying on it?

A   All I can do is report it and indicate that that's where it came from. It's not for me to judge his credibility and it's not for me to find the facts. That's for the fact-finder.

Q   Sure, and I understand that, but certainly you take the facts and use them to reach the conclusions which you do. Did you use Mr. Purkey's representations that he had been sexually abused by his mother in order to reach any of the conclusions which you did, or did you not?

A   Sure, I used them to – first, I used it to reach the conclusion that he might have been sexually abused by his mother, just as he

8

says. Second -

Q    Can I stop you there for just a second, if you don't mind. I take it by saying might as opposed to many of the things that you said more as a fact, that you are saying that in your opinion there's a possibility that that's also not true, as opposed to some of the other things that you more indicated as a fact. Am I --

A    For the reason I gave earlier. If I have corroborative evidence, I'll accept it as a fact and I don't think it's a matter in dispute. ***This I think is a matter in dispute that's not for me to be the fact-finder about.*** The jury has to do that.

Q    Okay. Now, though, isn't it the case that Mr. Purkey was also the only source for your finding that he had committed acts of delinquency prior to the age of 15?

A    No. Some of that comes from records as well, but there were some delinquent acts for which he was my only source. And I rely on that in a different way because that's an admission against interest. That is, when somebody makes a statement that hurts their interests, it has a different degree of reliability than someone who makes a self-serving statement that promotes their interest.

Q    ***For a person in prison to say you have been sexually abused by your mother is certainly not a statement in your interest, is it?***

A    ***It is when you're facing capital murder charges and have people looking for bad things in your childhood to help use in mitigation.***

Tr. 2191-2194 (emphasis added).

Clearly, this testimony indicated that the issue of whether Purkey had been sexually abused was "a matter in dispute." In addition, the clear implication from Dr. Dietz's last statement in this exchange was that Purkey's report of sexual abuse

9

was made only when he was "facing capital murder charges and ha[d] people looking for bad things in [his] childhood to help use in mitigation."

Another exchange between counsel and Dr. Dietz is also relevant.

Q    Let me start it fresh then. In terms of the sexual, physical, emotional abuse, that is something that a psychiatrist or a psychologist, assuming it's true, would think was important in terms of the psychological or psychiatric development of the person; would you concede me that much?

A    Yes.

Q    Would you also concede me that to the extent these factors did occur, that's at least part of the explanation for why Wes Purkey is who he is today?

A    That the abuse that occurred of him is part of why he is who he is and makes the decisions he makes, has the personality he has, all of that I would agree.

Q    All right, sir. Now, this is not some usual level of abuse that you would see in people. This is a fairly significant level of abuse, if you assume that it's all true.

A    The sexual part is beyond the ordinary. The rest of it is a pretty average story for the kinds of people I see.

Q    Not for the normal kid. I mean, I don't recall that, and I assume you didn't have it.

A    I'm talking about for the kinds of people I see. I hear the rest of that very often. But not the sexual abuse by the mother. That's a very unusual story. I have never heard it before, actually.

Q    And basically it is an explanation for why people get damaged and end up in the places many times – it's not an excuse, but it's certainly an explanation for why they end up where they do?

A    What is?

10

Q    Abuse.

A    Abuse does help explain some of why people end up getting in trouble.

Q    And particularly what you're talking about is many of the people who you deal with in these evaluations that you do tell a similar story of abuse and neglect?

A    Correct.

Q    A story just like Wes Purkey's that can be independently verified?

A    No. Usually it can't.

Q    *Actually we have kind of – did our homework and got together a lot of records that verify what he's saying; is that correct, sir?*

A    *That's right. For everything but the sexual abuse I think there's plenty of verification.*

Tr. 2214-2215 (emphasis added).

Like the previous quoted testimony, this exchange clearly indicated that the government and its experts were contesting the expert testimony that Purkey had been sexually abused, relying primarily on the allegation that he had never reported the abuse until after he was facing capital murder charges.

The government's rebuttal argument made the final point that the government was contesting the testimony that Purkey was sexually abused.

An expert is only as good as the information they have to evaluate. They fed them the information. They gave them the three and a half feet, or, you know, it got taller and shorter, boxes of information to evaluate. They fed it to those experts. Garbage in, garbage out.

11

> They want you to believe him, a man that can take a tattoo off his arm because he wears shirts to here and his boss is Jewish, they want you to believe that man when he said his mother sexually molested him. You're going to have to make that decision, whether you believe that. He was 46 years old when he made these decisions.

Tr. 2291-2292.

If counsel had adequately investigated and presented the evidence, counsel could easily have countered the allegation of recent fabrication with: (1) Purkey's Oregon Department of Corrections records that were in counsel's possession; (2) the testimony of Rex Newton, Ph.D., the mental health expert who counseled Purkey in the Oregon State Penitentiary; and (3) the testimony of Margaret Ann "Peggy" Noe, a childhood friend to whom Purkey reported the sexual abuse while it was happening.

The Oregon Department of Corrections records reflect that on November 25, 1986, Purkey completed a life history questionnaire in applying for counseling by Dr. Newton. On the questionnaire, he reported "anxiety or guilt feelings arising out of sex or masturbation" from "years ago." In response to a request that he list "[a]ny relevant details regarding your first or subsequent sexual experiences," he wrote "being abused as a child." He also listed his "most significant memories and experiences" for ages "6-10" as "being sexually abused." Appendix (hereinafter App. 259-293) (Portion of Oregon Department of Corrections Records). Thus, it was clear from these records, which had even been specifically noted by Dr.

Peterson is his own report, that Purkey had previously reported the sexual abuse. And, significantly, Purkey had reported it years before trial in a correctional setting where there was no possible motivation for doing so except in attempting to get mental health counseling.

Contrary to the panel's findings, these 1986 records from the Oregon Department of Corrections are *not* the same as the 1982 "Kansas State Reception Diagnostic Center report that Dr. Peterson discussed" in his testimony. Slip Op. at 9. That report, as discussed by Dr. Peterson and quoted earlier in the panel opinion, described Purkey as "having a serious personality disorder centered on psychosexual problems of identification," Slip Op. at 6, but contained no information that Purkey had reported the sexual abuse by his mother.

Counsel could also have presented the testimony of Dr. Newton, who counseled Purkey for a period that spans, at minimum, from November 1986 to August 1988 to establish that Purkey had reported the sexual abuse to him. App. 294. Dr. Newton could have provided powerful mitigation from a clearly disinterested witness that Purkey was "a throw away kid," who was abused and never got adequate parenting, but he very much wanted to face his demons with therapy and treatment. App. 294.

Likewise, Margaret Ann "Peggy" Noe, who has known Purkey since about age 7, would have testified, *inter alia*, that Purkey told her of his mother's sexual

13

abuse when he was only 16 or 17 years old. He reported that his mother was sexually abusing him and that the abuse had been ongoing for a long time. While it was difficult for him to talk about it and he stuttered badly when he did, he told Peggy that his mother forced him to have sex with her and made him do other things to her sexually to stimulate her. App. 513.

In short, the records and the testimony of these witnesses would have corroborated the expert testimony concerning sexual abuse and rebutted the government's allegation that Purkey had only made up and reported the sexual abuse after he was facing capital murder charges. The available but unpresented evidence would have "corroborated [Dr. Peterson's] testimony and bolstered the credibility of his response to the prosecution," *Hovey v. Ayers*, 458 F.3d 892, 926 (9th Cir. 2006), who attacked him and Purkey by essentially asserting that Purkey had recently fabricated an allegation that his mother had sexually abused him. With respect to Dr. Newton, in particular, his testimony "coming as it did from [a] doctor[] who had no connection to the defense or incentive to invent a diagnosis and thus who [was] invulnerable to charges of fabrication, could very well have made the difference in a life as opposed to death verdict." *Id.* at 927.

As this evidence was the only evidence available to rebut the government's allegations of recent fabrication, this evidence was not, contrary to the panel's findings, "entirely cumulative." Slip Op. at 9. *See, e.g., Arizona v. Fulminante*,

14

499 U.S. 279, 298-299 (1991) (evidence is not "merely cumulative" if it corroborates other evidence that is in dispute or "unbelievable"); *Mosley v. Atchison,* 689 F.3d 838, 848 (7th Cir. 2012) ("Evidence that provides corroborating support . . . on a central and hotly contested factual issue cannot reasonably be described as cumulative"); *Washington v. Smith*, 48 F. Supp. 2d 1149 (E.D. Wis. 1999), *aff'd*, 219 F.3d 620 (7th Cir. 2000) ("cumulative evidence" is "offered to prove something already established beyond reasonable dispute"). Likewise, this evidence was not simply "'new' evidence [that] largely duplicated the mitigation at trial." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1409 (2011).

Moreover, even without this evidence, the jury spent approximately eleven hours over a period of two days in sentencing deliberations before reaching a verdict. If this available corroborating evidence to rebut the government's recent fabrication arguments had been presented, "there is a reasonable probability that at least one juror would have struck a difference balance." *Wiggins*, 539 U.S. at 537.

## **CONCLUSION**

For the foregoing reasons, Purkey requests that the panel grant rehearing, vacate the death sentence, and order a new sentencing trial.

15

Respectfully submitted,

By:  /s/ Teresa L. Norris

Teresa L. Norris, Esq.  Gary E. Brotherton, Esq.
900 Elmwood Ave., Ste. 101  910 E. Broadway, Ste. 202
Columbia, SC 29201  Columbia, MO 65201
(803) 765-1044  (Phone)  (573) 875-1571  Phone
(803) 765-1143  (Fax)  (573) 875-1572  Fax
teresa@blumelaw.com  GEBrotherton@LegalWritesLLC.com
Co-counsel for Appellant  Co-counsel for Appellant

## CERTIFICATE OF SERVICE

This will certify that, on today's date, this motion was served upon the United States by filing via CM/ECF.

/s/ Teresa L. Norris
Co-counsel for Appellant

Dated: Columbia, SC
November 20, 2013